1

```
 1            UNITED STATES DISTRICT COURT.
                EASTERN DISTRICT OF TEXAS
 2                 SHERMAN DIVISION

 3   UNITED STATES OF AMERICA, )
                               )
 4          Plaintiff,         )  Case Nos.
                               )  4:20-cr-00382-103
 5   vs.                       )  4:20-cr-00382-104
                               )
 6   MAAZ AZIZ                 )
     SAAD AZIZ,                )
 7                             )
            Defendants.        )
 8   -----------------------------------------------------

 9          TRANSCRIPT OF DETENTION HEARING
            ELECTRONICALLY RECORDED PROCEEDINGS
10   BEFORE THE HONORABLE CHRISTINA A. NOWAK
             UNITED STATES MAGISTRATE JUDGE
11
                  September 27, 2021
12                 Sherman, Texas

13   -----------------------------------------------------

     APPEARANCES OF COUNSEL:
14
     FOR THE UNITED STATES:
15
             MR. ERNEST GONZALEZ
16           Office of the United States Attorney
             101 East Park Boulevard, Suite 500
17           Plano, Texas 75074
             ernest.gonzalez@usdoj.gov
18

19   FOR THE DEFENDANT
     MAAZ AZIZ:
20
             MR. LUCAS C. WOHLFORD
21           MR. ROBERT M. CASTLE, III
             Duane Morris, LLP - Dallas
22           100 Crescent Court, Suite 1200
             Dallas, Texas 75201
23           lwohlford@duanemorris.com
             rmcastle@duanemorris.com
24

25
```

2

```
1   FOR THE DEFENDANT
    SAAD AZIZ:
2
            MR. BRANDON N. MCCARTHY
3           MR. RYAN J. MEYER
            Katten Muchin Rosenman LLP - Dallas
4           2121 North Pearl Street, Suite 1100
            Dallas, Texas 75201
5           brandon.mccarthy@katten.com
            ryan.meyer@katten.com
6

7
        *********************************************
8                  APRIL HARGETT, RPR, RVR
             Federal Official Court Reporter
9                    300 Willow Street
                Beaumont, Texas  77701
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1              I N D E X

2  CHRISTOPHER B.  DOERING                              Page

3   DIRECT EXAMINATION BY MR. GONZALEZ              8
    CROSS-EXAMINATION BY MR. CASTLE                72
4   CROSS-EXAMINATION BY MR. MCCARTHY             130
    REDIRECT-EXAMINATION BY MR. GONZALEZ         160
5   RECROSS-EXAMINATION BY MR. CASTLE            169
    RECROSS- EXAMINATION BY MR. MCCARTHY         171
6   FURTHER REDIRECT EXAMINATION BY MR. GONZALEZ 179
    FURTHER RECROSS-EXAMINATION BY MR. CASTLE    184
7
    HAITHAM ISSA
8
    DIRECT EXAMINATION BY MR. CASTLE             188
9   CROSS-EXAMINATION BY MR. GONZALEZ            193

10
    DUA AZIZ
11
    DIRECT EXAMINATION BY MR. MEYER              202
12  CROSS-EXAMINATION BY MR. GONZALEZ            205

13

14              E X H I B I T S

15

16                                                   Page

17  Defendant Saad Aziz No. A                    151
    Defendant Saad Aziz No. B                    152
18  Defendant Saad Aziz No. C                    152
    Defendant Saad Aziz No. D                    152
19  Defendant Saad Aziz No. E                    152

20

21

22

23

24

25

4

1  September 27, 2021                      12:10 p.m.

2                    ---o0o---

3                 ELECTRONICALLY RECORDED

4                   PROCEEDINGS

5                    ---o0o---

6          THE COURT:  All right.  The Court's going to

7  call its remaining individuals on Cause No. 4:20-cr-382

8  at this time, the *United States of America v. Maaz Aziz*,

9  as well as *Saad Aziz*.

10         And, Gentlemen, I apologize if I incorrectly

11 pronounced your names again.

12         I am going to go ahead and ask for an

13 appearance on behalf of the government.

14         MR. GONZALEZ:  Your Honor, Ernest Gonzalez

15 for the government.  The government's ready to proceed.

16         THE COURT:  Thank you.  And I will need at

17 least one counsel on behalf of these individuals to come

18 around to those microphones and to make their appearance

19 at this time.

20         MR. WOHLFORD:  Good morning, your Honor.

21 Luke Wohlford and with my co-counsel Rob Castle on

22 behalf of Maaz Aziz.

23         THE COURT:  Thank you.

24         And then an appearance on behalf of

25 Saad Aziz.

5

1          MR. MCCARTHY:  Your Honor, Brandon McCarthy

2   and Ryan Meyer for Saad Aziz.

3          THE COURT:  Okay.  And, Mr. Meyer, I

4   apologize.  I have Ms. Riley on the docket for this.

5          Have you entered an appearance?

6          MR. MEYER:  Yes, your Honor.

7          MR. MCCARTHY:  Yes, your Honor.

8          THE COURT:  Okay.  Thank you.  I just have to

9   confirm.

10          MR. MCCARTHY:  She's -- yeah.  She's at --

11   same firm, yeah.

12          THE COURT:  Whether same firms or not --

13          MR. MCCARTHY:  Yeah.

14          THE COURT:  -- we require every lawyer who is

15   participating to enter an appearance, and so I just have

16   to make sure that you've -- everyone has formally

17   entered their appearance.

18          Okay.  So then let me go ahead and turn back

19   to the government.

20          Does the government persist in its request to

21   detain each of these individuals?

22          MR. GONZALEZ:  We do, your Honor.

23          THE COURT:  And if I could go ahead and

24   ask -- I'm going to need counsel -- if y'all will stay

25   at those microphones for me.

6

1                Mr. Wohlford, do you and your client continue

2   to request a full hearing?

3                MR. WOHLFORD:  Yes, your Honor, we do.

4                THE COURT:  And Mr. McCarthy?

5                MR. MCCARTHY:  Yes, your Honor, we do.

6                THE COURT:  Okay.  Now, as it relates

7   to each of these individuals, has both the government

8   and defense counsel had an opportunity to review the

9   pretrial services reports and its recommendations?

10               MR. GONZALEZ:  I have, your Honor.

11               THE COURT:  And Mr. Wohlford?

12               MR. WOHLFORD:  Yes, your Honor, we

13   have.

14               THE COURT:  And Mr. McCarthy?

15               MR. MCCARTHY:  Yes, your Honor.

16               THE COURT:  And other than any information

17   that y'all will bring out during the course of the

18   hearing, are there any errors or omissions in that

19   report that any of you care to bring to the Court's

20   attention at this time?

21               Mr. Gonzalez?

22               MR. GONZALEZ:  Not from the government.

23               THE COURT:  Mr. Wohlford?

24               MR. WOHLFORD:  No, your Honor.

25               THE COURT:  And Mr. McCarthy?

7

 1          MR. WOHLFORD:  The only addition is
 2    Mr. Aziz has been given an offer of employment.  We
 3    brought that offer letter here.  He also has another
 4    application pending that's been accepted.  That's the
 5    only thing that would have changed in the presentence
 6    report.
 7          THE COURT:  Thank you.
 8          MR. WOHLFORD:  And -- I'm sorry.  One more
 9    thing.  We do have his passports here in our possession,
10    which we're certainly willing to turn over.
11          THE COURT:  Let me ask the government at this
12    time:  Is this a presumption case?
13          MR. GONZALEZ:  It is not a presumption case,
14    your Honor.
15          THE COURT:  All right.  Then the government
16    may call its first witness.
17          MR. GONZALEZ:  The government calls
18    Special Agent Chris Doering.
19          (The witness was duly sworn.)
20          THE COURT:  Sir, once you're seated, if I
21    might ask -- if you can please state your full name for
22    the record as well as spell it.
23          THE WITNESS:  Christopher B. Doering,
24    C-h-r-i-s-t-o-p-h-e-r, middle initial B., Doering,
25    D-o-e-r-i-n-g.

8

1    THE COURT:  Thank you.

2    Counsel, you may proceed.

3                CHRISTOPHER B. DOERING,

4   called as a witness herein, having been first duly

5   sworn, was examined and testified as follows:

6                DIRECT EXAMINATION

7   BY MR. GONZALEZ:

8   Q.    Sir, how are you employed?

9   A.    I'm a special agent with the FBI out of the Dallas

10  Division on the Dallas Violent Crimes Task Force.

11  Q.    How long have you been so employed?

12  A.    I've been with the FBI since 2005.

13  Q.    Have you received any specialized training with the

14  FBI in regards to your duties?

15  A.    Yes, I have.

16  Q.    What training have you received?

17  A.    I've received training regarding cell phones, the

18  use of cell phones, Title IIIs -- experience in

19  Title IIIs in both analyzing cell phones, the data that

20  comes from cell phones, tactical training, training in

21  investigations, and so on.

22  Q.    Have you testified in both federal and state court?

23  A.    Yes.

24  Q.    If you had to estimate the total times you've

25  testified, how many times have you testified?

9

1  A.    Over ten.

2  Q.    Now, you are the lead case agent involving two

3  individuals, Maaz Aziz and Saad Aziz.

4         Do you see those individuals in the courtroom

5  today?

6  A.    I do.

7  Q.    Could you point to where they're seated and

8  indicate an article of clothing -- to simplify things,

9  let me do this:  They're located at this table.  Let's

10  say this is Person No. 1, Person No. 2, No. 3, No. 4,

11  No. 5, and No. 6.  And if you could identify Mr. Saad

12  Aziz first.

13  A.    Mr. Saad Aziz would be Person No. 4, and he also

14  has longer hair.

15         MR. GONZALEZ:  And may the record reflect

16  that the witness has identified the defendant Saad Aziz?

17         THE COURT:  The record shall so reflect.

18  BY MR. GONZALEZ:

19  Q.    Now, can you identify Mr. Maaz Aziz?

20  A.    Person No. 2 with a buzzed cut hair.

21         MR. GONZALEZ:  And may the record reflect

22  that the witness has identified defendant Maaz Aziz?

23         THE COURT:  The record shall so reflect.

24  BY MR. GONZALEZ:

25  Q.    Now, sir, are you familiar with the facts that led

1  to the indictment and subsequent arrest of these

2  individuals?

3  A.    I am.

4  Q.    And have you prepared a PowerPoint in order to

5  assist you in summarizing those facts for the Court here

6  today?

7  A.    I have.

8  Q.    Okay.  If you would proceed and -- and if you could

9  give this Court and the defense counsel a summary of the

10  evidence that was obtained for the presentment of

11  indictment.

12  A.    Yes, sir.  This PowerPoint is in draft form.  The

13  content is subject to change due to further review and

14  analysis, collection of additional evidence.  The cell

15  site evidence presented, if there is any, is from a

16  warranted preliminary draft review.  The review has not

17  been peer reviewed and is subject to change.  All dates,

18  amounts, times, and call links are approximate.  This

19  presentation does not include each and every fact of the

20  investigation.  Only those facts establish -- necessary

21  to establish detention.

22         Maaz Aziz is with SCS Supply Chain and

23  Gizmobile.  He's approximately 28 years of age.  He's

24  the principal for Gizmobile.  He's the president of SCS

25  Supply Chain.  Both him and his brother Maaz are

1  involved in the operations of SCS Supply Chain.  No

2  criminal history.  The Texas Workforce Commission has

3  shown since January of 2019, 30- to $35,000 per quarter

4  from SCS Supply Chain.

5          Saad Aziz, 34 years of age, principal for SCS

6  Supply Chain.  Both Maaz and Saad, again, brothers are

7  involved in the operations of the company.  No criminal

8  history, and the same TWC reportings for SCS Supply

9  Chain.

10          George Israel, 32 years of age.  No Texas

11  Workforce history.  And he has worked for -- a work Visa

12  and refugee status until June of 2020.

13          This investigation is focused on the new

14  devices that are obtained through the gray market, which

15  is essentially from robbery, theft, fraud, and warehouse

16  transit.  In this conspiracy, RJ Telecom, their goal was

17  to obtain these new devices -- these stolen new devices

18  for export to the U.A.E. and Hong Kong.  RJ Telecom

19  relied on these device traffickers, the individuals that

20  were obtaining them through fraud, theft, and robbery,

21  to obtain these new Apple and Samsung devices.  Devices

22  being phones, laptops, MacBooks, iPads, headphones,

23  personal cellular, or non-cellular devices.

24  Q.    And would they be new and used as well?

25  A.    It could be used.  Typically, it was new.  That's

1  what RJ Telecom, SCS Supply -- these wholesaler

2  suppliers -- were seeking new devices in order to export

3  these to foreign markets.

4  Q.    And these new devices were being obtained by the

5  manner in which you've indicated through fraud, robbery,

6  and theft?

7  A.    Correct.

8  Q.    Okay.

9  A.    RJ Telecom, SCS Supply, other wholesalers, they

10  would export these new devices, these shipments through

11  interstate carrier to foreign import companies in the

12  U.A.E. and Hong Kong.  Oftentimes, they would receive

13  payment for these shipments by wires.

14        Over the course of this investigation, RJ

15  Telecom has exported over $100 million in devices to the

16  U.A.E. and Hong Kong import companies and has sent over

17  5,000 packages via FedEx to both the U.A.E. and Hong

18  Kong.  What you see here is an organizational chart

19  where you see Arsalan Bhangda and Abdul Bhangda up at

20  the top.  You see their various companies in the second

21  line.  In the third level is where you see the suppliers

22  for RJ Telecom.  You'll see SCS Supply Chain on the far

23  left where you'll see Saad Aziz and Maaz Aziz associated

24  with that company.  You'll also see their manager, vice

25  president of operations Mohsin Zia, and then Feras

1    Obeidat who is the manager of Gizmobile.  All four

2    individuals are indicted in this conspiracy.

3              You'll also see connections to Dawn Wireless,

4    Dawn Trading, Am-Pak Cellular.  All wholesale suppliers

5    that are connected to SCS Supply Chain as well as RJ

6    Telecom.  The fourth level are the device traffickers.

7    These are the individuals that are obtaining iPads,

8    iPhones, Samsung new cellular phones, tablets, MacBooks,

9    laptops via fraud, theft, and robbery.

10   Q.    And in your previous slide, you talked about

11   shipments to foreign companies.

12             And are you telling this Court that the only

13   ones that are having contact through shipments to

14   foreign companies are the top two -- that being Abdul

15   Bhangda and Arsalan Bhangda -- or some of these other

16   companies -- some of these other wholesalers also having

17   direct shipments to foreign companies?

18   A.    No.  The other wholesalers, while they might sell

19   these devices to RJ Telecom for export, they might also

20   export as well to their contacts or businesses in Dubai

21   or other -- Hong Kong or other foreign companies.  So it

22   could be one or the other when you obtain these devices.

23   It can be sold to a company, an exporter, an aggregator

24   like RJ Telecom, or it could be sell to your own

25   business contacts.

14

1    Q.    And would that be the case with SCS?

2    A.    Yes.

3    Q.    That they would be able to ship directly to these

4    foreign entities?

5    A.    Yes.

6    Q.    So by natural business activity, they would have

7    extensive contact with individuals in foreign countries?

8    A.    Correct.

9    Q.    Okay.

10   A.    In the typical manner, how these devices are

11   obtained when you're talking about new devices -- again,

12   iPads, phones, MacBooks, tablets -- these devices in an

13   authorized channel are purchased through big carriers

14   like AT&T, T-Mobile, and Verizon or big box re-sellers

15   such as Wal-Mart, Target, Best Buy who will sell these

16   phones for the carrier or -- at a full retail cost.

17   And, typically, the way that these devices are purchased

18   is financed.

19           So in a typical scenario, individuals will go

20   to an AT&T store, a T-Mobile store, or a Wal-Mart that

21   sells financed phones for these companies.  On their

22   credit, they will enter into a two-year service

23   agreement with that company to obtain a new phone with

24   taxes or a small down payment based on their credit.

25   They walk out with the phone.  Sometimes it can be

1  two -- up to numerous different devices based on the

2  credit with the promise of a two-year service agreement.

3          So they get the phone on financing and

4  then -- with the promise to pay that off over two years.

5  In this case how these device traffickers are doing it

6  is with stolen identities or what's called credit muling

7  where you find someone who will use their own credit to

8  go into a store to obtain these devices with no promise

9  to repay.  On the identity theft side, which is rampant

10 throughout this investigation, you'll have individuals

11 who will obtain identities.  They'll create identities,

12 manufacture identities, and then these device

13 traffickers or device trafficking organizations will go

14 into these stores and obtain as many devices from the

15 different carriers that they can on a set of identities.

16          The other way that these devices can be

17 purchased is at full retail cost using some unique or

18 seasonal discount or a seasonal trade-in.  Such as if

19 the iPhone 13 is being launched, at times Apple might

20 ask for old phones.  And they'll take -- take those old

21 phones in and give a rebate.  Absent that, this is the

22 authorized line that we've seen these companies sell

23 these new devices.  We haven't found a secondary

24 wholesaler market that offers bulk discount purchasing

25 of new Apple or Samsung products.

1  Q.    Now, just drilling down a little further on the

2  identity theft and the documents or -- that they're

3  using for this identity theft.

4        What types of documents did you undercover in

5  your investigation that were being used in order to

6  establish some sort of credit?

7  A.    You would see a Texas driver's license.  And that

8  would typically have a social security card and then an

9  associated debit or credit card all with the same name

10  on them.  So essentially a set of identity documents

11  that that individual -- that device trafficker would go

12  in to an AT&T, T-Mobile, or Verizon store and present

13  that.  They would also get a background report from

14  certain identity manufacturers.  That background report

15  would be used to answer any challenge questions from the

16  representative of AT&T or Verizon and allow them to

17  essential, quote-unquote, prove that that is who they

18  said they were.

19  Q.    And were there individuals that were specializing

20  in that particular activity and producing those types of

21  documents?

22  A.    There were.

23  Q.    And were some of those individuals dealing directly

24  with SCS?

25  A.    I don't know if they were dealing directly with

1   SCS.

2   Q.    Okay.  Were individuals that were dealing with SCS

3   obtaining some of the items through that method?

4   A.    Correct.

5   Q.    And --

6   A.    Yes.

7   Q.    And were knowledgeable or know that individual that

8   specializes in producing those documents?

9   A.    Correct.

10  Q.    Okay.

11  A.    So as we talked about the gray market supply -- in

12  large part, where these devices can't be purchased

13  through the authorized distribution channel, they come

14  in through the gray market.  Gray market being robbery,

15  fraud, theft.  These types of ways that these new

16  devices are obtained illegally and then resold to a

17  supplier, wholesaler with those devices then being

18  shipped overseas either by that supplier or wholesaler

19  or pushed on up to someone like SCS or RJ Telecom.

20  Q.    Okay.

21  A.    So the types of fraud.  You have new line

22  activation fraud.  This is what we just talked about.

23  This is where the use of identity theft is used to

24  activate new accounts, new lines at AT&T, T-Mobile,

25  Best Buy, Wal-Mart, the big box retailers.  The use of

1  good credit of stolen identities to purchase or finance

2  these phones and devices.  Like I said, at the time --

3  at the time when these individuals are at the store or

4  an online purchase, only the payment of tax or possibly

5  a small down payment depending on the credit is

6  required.

7           Essentially, the individual is able to make a

8  small payment and walk out with a brand new device.  The

9  carriers don't know that this is fraud for at least

10 30 days or longer because it takes one missed payment

11 cycle for the carriers to realize that that device was

12 likely obtained by fraud or in some cases is obtained by

13 fraud if the person whose identity is stolen reports

14 that to the carrier.  This does a couple of things.  It

15 allows for suppliers to check IMEIs at the time they buy

16 it, and it will show a clean IMEI.  Because at that

17 time, the carriers have no reason to believe that that

18 wasn't a legitimately purchased phone.  And it allows

19 time to ship to another country and get out of the

20 country.

21          Account takeover.  Again, this is using

22 existing customer's stolen information to purchase --

23 Q.    Let me stop you there.  Let's go back to -- can you

24 tell the Court the quantity you have based on your

25 investigation -- the quantity of IDs or identities

1 stolen by individuals?

2 A.    I mean, this is a preliminary check because we're

3 still obtaining IMEIs through the course of the

4 investigation through records.  I'm going to say at one

5 time we looked at it and -- because some -- because you

6 can't equate it to devices because one identity could

7 get two to seven or however many, but I think it was

8 around 10,000 identities, if I recall correctly.

9 Q.    Okay.

10 A.    Account takeover.  Again, this is using identity

11 theft where you take an existing customer's stolen

12 information to purchase or add more devices on an

13 account.

14        Breakout fraud, which is where groups will

15 set up numerous shell businesses and build credit

16 through the businesses by making small payments on a

17 small number of phones.  The credit increases, which

18 allows that group to then make a much bigger purchase of

19 new devices on credit.  Once they get that big purchase

20 of phones, they take those phones and sell them to a

21 business such as Global One Wireless or RJ Telecom that

22 makes no further payments on the devices.  And then in

23 an attempt to recoup the earlier payments made to

24 establish the credit, the group will then sometimes

25 contact the carrier and provide false statements that

1  their business identity was stolen and they made none of

2  the purchases.  Thus, even the money they paid down to

3  establish the credit to steal the phones, they can at

4  times recoup.

5          Warehouse theft is also another big type of

6  theft.  It's been identified through this investigation.

7  Either new or refurbished electronic devices are found

8  to be stolen from warehouses, from FedEx, UPS, other

9  interstate carriers, and that can include Samsung S20s,

10  iPads, iPhones, Fitbits.

11          In regards to the Global Standards

12  Mobilization Association, the GSMA, they maintain a

13  device regulatory list, which is commonly known as the

14  blacklist or blacklisted phones.  This is an

15  organization that maintains this registry where

16  approximately 120 mobile network companies in 43

17  countries participate, including T-Mobile, AT&T, and

18  Verizon.  Essentially, when AT&T, T-Mobile, and Verizon

19  find that a phone has been stolen, it's broken, for

20  whatever reason this phone should not be on a network,

21  they will submit the IMEI of that phone.  And, again,

22  the IMEI is like a -- it's like a VIN number for a car.

23  It's a unique identifier.  That IMEI will be added to

24  the registry list thus preventing a -- for example, a

25  T-Mobile blacklisted or locked phone from operating on

1  an AT&T network.

2         So if you have phones that are going to be

3  blacklisted, you have to ship them outside of the United

4  States in order for them to be able to work or operate

5  on one of the three networks; AT&T, T-Mobile, or

6  Verizon.  And there are numerous countries that do not

7  participate in the GSMA, meaning that if a phone -- AT&T

8  blacklisted or blocked phone makes its way over to

9  Pakistan, that phone will still operate on a Pakistan

10  network.  It will operate on a China network even if

11  it's blacklisted over here in the United States.

12  Q.   And were those some of the countries that

13  RJ Telecom as well as SCS was sending their phones or

14  their shipments to?

15  A.   Typically, the phones would be sent to Dubai and

16  Hong Kong.  And then from there, those phones, we've

17  seen through other records, could work their way to

18  those countries -- to China or Pakistan, but typically

19  the import companies that we saw were located in

20  Hong Kong or Dubai.

21  Q.   Okay.  If we can just go back briefly to your

22  transit theft.

23         And can you -- can you explain that a little

24  better to the Court?  How does this transit theft occur?

25  Is it just shipments of product that are stolen off the

22

1  truck?  Shipments of product that are stolen off a UPS

2  truck?  Explain that further, please.

3  A.    Both.  So you can see oftentimes in this

4  investigation we've seen FedEx drivers or we've received

5  information that FedEx drivers will somehow remove

6  portions of a shipment of new iPhones or some sort of

7  device.  So that could be one way.

8          Another way could actually be taking from the

9  warehouse where those devices or master cartons of

10  devices are removed from the warehouse without

11  authorization.  And then you actually see -- not so

12  much -- you'll see it later on -- not so much with the

13  devices, but you'll see cargo theft where entire

14  tractor-trailers are stolen or trailers are stolen that

15  contain pallet fulls of consumer electronics or consumer

16  goods.

17  Q.    Okay.

18  A.    So to get to the background of this investigation,

19  in December of 2020, the FBI and other law enforcement

20  agencies began investigating a series of aggravated

21  robberies targeting cell phone stores in the Dallas

22  metroplex.  They began on or around July 2020 and

23  continued on or through December 2020.  The

24  investigation led to arrests on December 9th and

25  December 22 and to date 15 individuals have been

23

1  indicted in the Eastern District under -- it's a typo

2  right there -- 4:20-cr-382.

3         THE COURT:  Mr. Gonzalez, before we proceed,

4  can I ask for you and counsel for the defendants to

5  please approach?

6         (Off-the-record discussion.)

7  BY MR. GONZALEZ:

8  Q.    All right.  Now, trying not to just read your

9  PowerPoint presentation, maybe summarize the individual

10 slides.  Maybe that will assist in moving things along a

11 little faster.

12 A.    Sure.  Yes, sir.  What you see here are just that

13 Arsalan and Abdul Bhangda operate numerous companies.

14 Essentially, all of these countries -- all of these

15 companies, with the exception of RJ Builder and

16 Developers, were there to obtain new devices for export.

17 And so for the remainder of the presentation, all

18 transactions will be referred to by RJ Telecom in the

19 sense that it was acting as the parent company.

20         Arsalan Bhangda for RJ Telecom controlled the

21 finances, accounts payable.  He met primarily with the

22 wholesalers, the suppliers.  Abdul Bhangda was more of

23 an operations -- in more of operations.  He coordinated

24 purchases from device traffickers, such as Taurean

25 Armstrong, Kaylen Taylor, Ryeshawn Green a/k/a Peso.

1   They maintained a corporate office that had a loading

2   dock.  There were deliveries that went to the rear

3   loading dock by these employees.  It also maintained two

4   other retail cell phone stores; 2513 Fitzhugh in Dallas,

5   Texas, and another in Arlington.

6              A search warrant was actually -- was

7   conducted on December 9th of 2020.  They maintained

8   numerous employees that obtained devices.  They logged

9   them into spreadsheets for RJ Telecom.  From the HP

10  computer that was seized from the business, it was

11  forensically examined.  Numerous spreadsheets.  Some

12  deleted were extracted.  What we were able to glean from

13  these spreadsheets is that numerous spreadsheets were

14  named "daily buyings" and something to the effect of

15  date, IMEI, product description, carrier, condition,

16  amount, customer.  Essentially, a ledger of devices that

17  were purchased.  These purchases were primarily in 2019

18  and '20.  This is not a complete set of records.  It's

19  what we were able to piece together from the computer.

20  Q.   And it would -- SCS would be a supplier to

21  RJ Telecom.  And that is captured in some of those daily

22  buyings; is that correct?

23  A.   Correct.  What you're looking at here is just an

24  example of raw data that we've recovered.  You can see

25  the different categories.  You can see the date, the

1  IMEI, which is the unique identifier.  You can see the

2  carrier.  In this case, they're unlocked.  You can see

3  that they're sealed, meaning that they're brand new

4  sealed devices, the price, and "Saad" right there would

5  be Saad Aziz.

6  Q.    And what's the significant of that -- on that slide

7  of unlocked and sealed?

8  A.    When you have carrier locked phones, that's a phone

9  that will only work on an AT&T network.  In order to get

10 that unlocked, you have to pay off the device or nearly

11 pay off the device and AT&T will unlock that device for

12 you.  If you send that locked device overseas, then that

13 device has to be unlocked over there in order to be used

14 on a country's network where a blacklisted phone could

15 be used.

16         So if it's carrier locked, then at some point

17 it has to be unlocked to be used off of that network.

18 So if you're obtaining financed phones illegally or

19 robbery phones or warehouse phones, once those become

20 blacklisted, you can't use them on AT&T or the other two

21 providers' networks.

22 Q.    Okay.

23 A.    Meaning those are shipped overseas unlocked used on

24 a non-participating member's network.  And the condition

25 is just sealed, meaning that's a brand new phone.

1  Q.    Okay.

2  A.    And, again, this is just talking about the export

3  of these new products to Dubai.  So RJ Telecom had

4  several companies they exported these products to, such

5  as Xpress Logistics, Ziyantech.  One way we tracked this

6  was that in the records for RJ Telecom, they had IMEIs

7  associated with shipments.  So we can tell what IMEIs

8  were shipped overseas.  Here's an example of that as

9  well where you can see an IMEI on the left and what

10  Dubai-based company it was shipped to and the date.

11        For SCS Supply, as part of the RJ Telecom

12  records, their records were found under a SCS folder.

13  There were numerous spreadsheets documenting

14  transactions with SCS.  So it would show both the money

15  ledger of where a product was going, what wire was

16  remitted for what shipment to what country, IMEIs

17  associated with the purchase from RJ Telecom, and it

18  also showed some charges for unlocking carrier-locked

19  cell phones.

20        So as we just discussed with locked and

21  unlocked, in order to get those unlocked outside of the

22  proper method, a company is used.  And the only way that

23  can happen is when these companies develop a source

24  inside of AT&T, inside T-Mobile that can illegally

25  unlock these phones.  So these companies charge.  And in

1  this spreadsheet, you can see charges for the unlocking

2  service.

3           Just other -- this slide just shows the other

4  types of records that showed these devices were going

5  overseas.  Whether Apple records showing activation or

6  registration records for IMEIs, the FedEx shipments.

7  SCS Supply Chain had shipments to the U.A.E., Hong Kong,

8  Canada, and other countries.  Over a thousand shipments

9  to Dubai.  The last one being in April of '21.  And this

10 is from records for a subpoena that was served on April

11 28th of '21.

12          Again, we've talked about this.  The

13 RJ Telecom's sources of supply; device traffickers, such

14 as Ryeshawn Green and others, and then suppliers, such

15 as SCS Supply Chain, Dawn Wireless, and others.  This is

16 just a list.  As you can see, new line activation fraud

17 through identity theft was a primary driver for the

18 procurement of these devices.  Again, just listing

19 different suppliers that were also on that chart.

20 Here's foreign importers.  Xpress Logistics in Dubai.

21 Action Logistics is a company used by SCS in Dubai, and

22 Hanggroup Telecom, Ltd., which is in Hong Kong.

23          This is generally who SCS or RJ Telecom will

24 send their shipments to.  These import companies --

25 those import companies will then coordinate the sell of

1  the product with the actual company and then remit wire

2  payment back through the import company.  Almost a

3  clearinghouse.  Interstellar General Trading is a

4  Dubai-based company.  SCS Supply Chain and SCS Supply

5  Chain's location in Canada -- SCS Supply Chain in

6  Canada -- sold products to Interstellar General Trading.

7  Q.    So based on your investigation, SCS has some sort

8  of subsidiary or some sort of business in Canada?

9  A.    Correct.

10 Q.    What type of business does it have in Canada?

11 A.    It appears to be the same type of business where

12 they're involved in devices and devices going overseas.

13 There also is FedEx shipments to and from, but I don't

14 know what those shipments mean at this point.

15 Q.    Were there any other wholesalers or individuals

16 dealing with the company in Canada?

17 A.    Not that I know of.

18 Q.    Okay.  Do you know who was associated with that

19 company in Canada that's associated with the two

20 defendants here?

21 A.    Jawaad Farooq, if I'm saying that correctly, who I

22 believe is a cousin to both Maaz and Saad Aziz.

23         So moving through the background of the case

24 of how this conspiracy worked, how SCS fits in to the

25 RJ Telecom picture as far as the devices being -- and

1   the devices sold to RJ Telecom being shipped overseas.

2   SCS Supply Chain here has an office, slash, warehouse

3   space at 14292 Gillis Road in Farmers Branch, Texas.  As

4   shown earlier, Saad Aziz is a principal for SCS Supply

5   Chain.  Both Maaz and Saad are involved in the

6   operations.  Both received wages from SCS Supply Chain.

7   Gizmobile is a retail phone store.  Much and like

8   RJ Telecom, it had a corporate office and a retail cell

9   phone store meant for cell phone repair business.

10  Gizmobile is that for SCS Supply Chain located in

11  Dallas, Texas, off Alpha Road.

12           In this investigation, three controlled sales

13  were conducted at the business from May of '21 to August

14  of '21.  Maaz Aziz is the principal for Gizmobile, and

15  Feras Obeidat is the manager of Gizmobile, a

16  co-defendant.

17  Q.    Have you been able to come up with an amount or a

18  figure as to the amount of business that SCS is

19  conducting during a time period -- whatever time period

20  it was that you examined?

21  A.    Through financial statements -- a financial

22  statement review -- it's, again, preliminary.  It's not

23  complete.  We don't have all of the records.  It's a

24  slide later down.  But just off the top of my head, I

25  want to say for business being exported to Dubai, China,

1  and other countries, it's around 37 million from '16 to

2  the current time frame.

3  Q.    Okay.  From 2016 to 2021?

4  A.    To, like, April '21 or somewhere in there.

5  Q.    Okay.  And in regards to looking into their

6  financial -- financials, have you been able to determine

7  any bank accounts?

8  A.    There are bank accounts.  Talking with the forensic

9  accountant, there are approximately 65 bank accounts.

10 We haven't obtained all of the bank accounts.  We still

11 don't have a good financial picture of the Aziz brothers

12 or the companies just based on the sheer number of the

13 accounts and the time it takes to get those records and

14 process them.  We believe there is still other accounts

15 out there we don't have.

16 Q.    And you talked about a subsidiary or another

17 business in Canada.  Have you received any financial

18 information as to that business?

19 A.    No, sir.

20 Q.    How about financial information as to foreign

21 countries that they do business in?

22 A.    Through the bank accounts that we have here for SCS

23 Supply or a related entity.

24 Q.    But any bank accounts that they personally own in

25 foreign countries?

31

1  A.    No.

2  Q.    Are you investigating that?

3  A.    Yes.

4  Q.    But as of right now, that's a continuing

5  investigation?

6  A.    That's a continuing investigation.

7  Q.    Okay.

8  A.    We're working through the financial accounts.

9  Q.    Okay.

10  A.    Again, as we talked about, both SCS Supply Chain

11  and RJ Telecom worked together.  They supplied each

12  other with devices.  SCS Supply Chain developed somewhat

13  of an expertise in Samsung devices where RJ Telecom was

14  more of an expert in the Apple devices.  And they would

15  trade devices back and forth to each other.  SCS Supply

16  Chain also sold devices to RJ Telecom that went to

17  Interstellar in Dubai.

18          And in this investigation, we have

19  cooperating defendants.  Cooperating Defendant No. 1 and

20  2 have both advised that Saad and Maaz began purchasing

21  new devices from the street in 2016 or '17.  Cooperating

22  Defendant No. 1 advised they were smaller quantities at

23  first at three and four and then quickly moved up to 200

24  to 300 a week.  They both worked together and that Maaz

25  Aziz was -- specialized more in getting devices from

1  FedEx drivers.  They both sold devices to RJ Telecom.

2  They eventually began dealing in bigger quantities and

3  specialized in Samsung.

4        Because RJ Telecom and SCS Supply were

5  trading phones back and forth, they wouldn't make

6  payments every time.  You could equate it to a tally

7  system where essentially they would just keep track of

8  who gave what phones and then at some point a payment

9  would be made.  Since the Apple phones were generally

10  more expensive, RJ Telecom would generally make the

11  payment.  This would also keep transactions from going

12  through the bank.

13  Q.    What was the magnitude or the size of the payments?

14  A.    In the same bank records that I talked about,

15  there's about $4 million approximately that went from

16  RJ Telecom to SCS.  Again, this just talks about Saad

17  gaining an expertise in dealing with wholesalers from

18  CD 2.  And CD 2 also saying that Maaz gained an

19  expertise in cargo and transit theft and developed a

20  network of drivers dealing and on -- dealing in the

21  street level.

22        CD 3 advised that Awais Chodhury worked for

23  Maaz and Saad in the 2017 time frame.  Awais Chodhury

24  worked security with Maaz Aziz to pick up devices from a

25  FedEx guy.  They went to the FedEx guy's house.  Maaz

33

1  provided a gun to Awais, a former Pakistani Army

2  soldier, who would wait outside while Maaz went inside

3  to conduct the transaction as security.  And Awais had

4  told CD 3 that he believed the FedEx guy was in a

5  high-end position and took the phones.

6           CD 3 also sold other consumer goods and

7  electronic devices to SCS.  Awais Chodhury would pick up

8  the stolen devices and consumer electronics, which

9  included drills, vacuums, generators, and other similar

10 items.  Awais Chodhury provided that Maaz Aziz obtained

11 devices from the street and black people and that Saad

12 Aziz sold the devices overseas.  And, again, CD 3 also

13 talked about an individual named Irfan Ahmed, which

14 provided the number for a black male involved in

15 obtaining stolen goods with the understanding he would

16 take a middleman cut.

17 Q.    Obviously, you talked about the strong-armed

18 robberies that were occurring where individuals were

19 going into the stores and using firearms and holding

20 people captive and stealing phones, but here in this

21 particular slide you're indicating that one of the

22 defendants here in the courtroom was providing or using

23 a phone [sic] while doing one of these transactions?

24 A.    Correct.  As security, yes.

25 Q.    And is that -- have you seen that in your

34

1   investigation that some of the individuals that are

2   conducting these transactions are actually bringing

3   firearms or using firearms in order to accomplish the

4   transaction that they're involved in?

5   A.    Yes.

6   Q.    Okay.

7   A.    As we've talked about earlier, RJ Telecom had the

8   daily buyings, which are the documents that we put

9   together through a series of Excel spreadsheets to get

10  somewhat of a financial picture from RJ Telecom.  From

11  approximately January of '19 to May of '19, the

12  RJ Telecom daily buyings listed approximately 2,327

13  devices from Saad Aziz totaling $1,643,887 in payment

14  from RJ Telecom.  That's not the retail loss amount.

15  That's just the moneys paid from RJ Telecom.

16          AT&T has confirmed some of these devices were

17  stolen through transit theft, fraud, equipment gaming.

18  They were under review or through nonpayment.  The

19  retail loss amount was 305,000, but that's only 305

20  devices out of the over 2,000 devices.  As part of this

21  investigation -- this request is still pending to

22  Verizon and T-Mobile, so it's incomplete.  And AT&T is

23  still reviewing the IMEIs for other theft as transit

24  theft can be difficult to identify.

25          Also through RJ Telecom records through

1  e-mails and RJ Telecom buyings, approximately 729 IMEIs

2  were associated with Maaz Aziz.  The time frame being

3  2016 to 2018.  Through preliminary carrier checks --

4  again, these requests were sent to AT&T, T-Mobile,

5  Verizon, and Sprint.  We have yet to finalize this

6  request.  AT&T found transit theft for approximately 86

7  devices.  Another 29 were found to be stolen through

8  fraud transit or likely fraud.  Sprint found 110 devices

9  likely to be stolen through theft, fraud, or likely to

10 be stolen -- excuse me -- stolen through fraud, theft,

11 or likely to be stolen.  T-Mobile found 12 devices were

12 through fraud or theft approximately.  And Verizon found

13 approximately three devices obtained by fraud and three

14 likely fraud.

15         Interstellar, which was the Dubai-based

16 company that we spoke about earlier -- RJ Telecom --

17 that I spoke about earlier -- I apologize -- purchased

18 laptops and other devices besides phones from SCS Supply

19 and SCS Supply Canada.  Interstellar was designed or set

20 up for the purchase of MacBooks, laptops other than

21 phones.  SCS generally went through their importer

22 Action Logistics versus Xpress Logistics, the preferred

23 company for RJ Telecom.

24         Here, you have SCS Supply Chain in Canada.

25 What you see there is a FedEx label taken from the

1    search warrant at the warehouse at the top left.  You

2    see Jawaad Farooq, the cousin to Maaz and Saad Aziz.

3    You can see the address in Canada.  And that was as

4    of -- I believe the ship date was April 21 of 2021.

5    Cooperating Defendant 2 provided that SCS had a Canadian

6    location that also shipped the MacBooks and iPads to

7    Interstellar.  Same cooperator said the phones collected

8    in Canada were sent to Dubai through Action Logistics

9    directly.  And CD 2 also stated that Jawaad had come to

10   SCS Supply in Dallas for six months to learn the

11   business while CD 4 stated that Jawaad was a cousin and

12   ran the SCS Supply Chain location in Canada.

13          Also, CD 4 mentioned that SCS also had three

14   certified sellers on Amazon that were located in Canada.

15   Here you see the SCS Supply Chain warehouse on the left.

16   You see the Gizmobile cell phone and repair store on the

17   right.

18          A review of seven bank accounts from April of

19   '16 to February of '21, which is not an exhaustive

20   review of the SCS Supply Chain related entity financial

21   picture, shows that payments that were received from

22   RJ Telecom were just over $4 million.  Dubai-based

23   income was $21 million.  China-based income was

24   3.28 million.  And other foreign-based income was over

25   $11 million to include Canada of 167,000 and Pakistan of

1  46,000.

2          Also, from the same bank record review, you

3  can see that Dawn Trading, who is a supplier to

4  RJ Telecom and SCS, received 5 -- over 500,000.  Jibran

5  Khalil, who is with Am-Pak Cellular, again, supplying

6  RJ Telecom and SCS, was 23,000.  M7 Group, another

7  company whose -- whose owner and employee have been

8  indicted in this conspiracy, was 27,000.  Blowfish

9  Unlocks that -- payments of 86,000 were made.  Again,

10  this is a company that would provide an unlocking

11  service for locked cell phones.  This is locking -- a

12  carrier locked cell phone over here in the United States

13  to be able to send it overseas so it could work on that

14  network.

15          Approximately 65 savings and deposit accounts

16  have been identified so far.  As we've talked about, the

17  investigation continues, and we're still trying to

18  develop the complete overall financial picture for SCS

19  Supply related entities and Saad and Maaz Aziz.  At the

20  Gizmobile store location -- this store location was

21  initially used to finance phones, buy used phones,

22  financing.  During COVID, this store was used to

23  purchase street stock.  CD 4 began purchasing street

24  stock based on pressuring from Saad Aziz.  And street

25  stock is new devices that -- what we've talked about;

1   the iPads and phones obtained through financing, theft,

2   warehouse by device traffickers.  And that street stock

3   would then be taken to SCS Supply Chain.  It was logged

4   at SCS Supply Chain.  The cash used to buy that street

5   stock came from SCS Supply Chain.  And that's -- that's

6   how Gizmobile fits into the street stock.

7           CD 4 also advised that "good for local

8   phones" meant that it could be sold in the U.S. and

9   "carrier locked phones" or "blacklisted phones" had to

10  be sent overseas.  Anything purchased by CD 4 was for

11  SCS Supply Chain, and the last conversation CD 4 had

12  with Saad Aziz was to continue street stock purchasing.

13  At this time, CD 4 was purchasing 30,000 to 40,000 worth

14  of street stock a week.  Ryeshawn Green is one of those

15  device traffickers that sold street stock to Gizmobile.

16  He sold approximately 60 new phones to CD 4.  CD 4 did

17  not believe these devices were purchased legitimately.

18  Peso or Ryeshawn Green also sold to RJ Telecom and Malik

19  Salameh.

20          The initiation of this investigation in

21  regards to SCS Supply Chain began with Smart Cellular

22  Solutions being listed on the opening account paperwork

23  for Southwestern National Bank as a major supplier.

24  This is all kind of happening at the same time in the

25  late March or early April time frame of Abdul Bhangda's

1   iCloud account.  A warranted review of that also found

2   very limited chats with Maaz Aziz, payments in the Rozi

3   Wireless bank account statements, and then a controlled

4   sale on April 21st, 2021, with Ali Anwar and the

5   following surveillance that led investigators to SCS

6   Supply Chain in Farmers Branch is really what started

7   the investigation.

8          And in that controlled sale, a FBI CHS sold

9   one Apple 16-inch MacBook for $1,700 and five 13-inch

10  MacBooks for 900.  A total of 6,200 to Ali Anwar.  Anwar

11  mentioned he could sell only the older 13-inch device

12  for 1,040 in Dubai.  These prices are below the retail

13  price that you would get at an Apple store.

14         Following the sale, law enforcement continued

15  surveillance.  Ali Anwar went to his store in Mesquite

16  at Dawn Wireless and then was followed to SCS Supply

17  Chain where he was observed retrieving five boxes from

18  the trunk of his vehicle and handing them to an

19  unknown -- handing them or setting them on the dock to

20  an unknown individual.  The boxes were consistent with

21  the boxes sold during the controlled sale.

22         A review of the pen registered data of Ali

23  Anwar's phone found that he made two outgoing calls to

24  Maaz Aziz's cell phone at the approximate times of

25  11:38, which is approximately the time that Anwar

1  departed his store in Mesquite, and 12:00 p.m., which is

2  approximately 10 minutes prior to Anwar arriving at SCS

3  Supply Chain.

4          There is also another FBI -- an investigation

5  related to theft of Fitbits from approximately October

6  '17 to April of '18.  Approximately $1.2 million in

7  Fitbit devices were stolen.  These thefts took place at

8  a Kohl's distribution center here in the Dallas area.

9  And FedEx and UPS drivers would take those devices

10  stolen by the Kohl's employee and deliver them back to

11  another Kohl's employee.  Some of these Fitbits were

12  purchased by Arsalan Bhangda from an individual known as

13  Dave and then sold to Smart Cellular or Saad Aziz.

14          The FBI interviewed Saad Aziz during the

15  course of this investigation who advised he made two to

16  four Fitbit purchases from Arsalan Bhangda in the

17  November '17 to '18 time frame, and then '18, July, he

18  directly purchased approximately 42,000 in Fitbit

19  product from Dave.  CD 2 advised these Fitbits were

20  stolen.

21          Briefly, a second controlled sale was done on

22  May 14th of 2021 with the FBI CHS.  The CHS represented

23  these devices were stolen from a warehouse.  He sold ten

24  new sealed Apple iPhones SEs for $300.  During that time

25  frame, Obeidat told the CHS they purchased devices from

1 Dawn. All ten phones were new in the box, and of those

2 devices, two were activated in the U.A.E., two were

3 activated in India, and one was activated in Jordan.

4 Shortly after the surveillance, Obeidat was

5 seen leaving Giz and unloading the product, entering the

6 product -- and entering SCS with the product and leaving

7 SCS without the product. Again, on May 24th, another

8 controlled sale was done. This time for sealed -- one

9 new sealed Apple MacBook for 1,100 and two new sealed

10 Apple iPhones for 660 each. The Apple MacBook was

11 purchased for approximately $523 less than a retail sale

12 purchase.

13 The last controlled sale was done on

14 August 5th, 2021. Obeidat was not at the sale, but he

15 coordinated the sale with the CHS. The CHS met with an

16 employee and sold seven iPhone XRs, four iPhone 12s, and

17 four Apple MacBook Pros totaling 8,850 to an employee

18 there. That employee took those devices to SCS and

19 delivered those devices.

20 Dawn Wireless is a supplier both for

21 RJ Telecom and to SCS Supply. They obtain their devices

22 through several different ways -- several different

23 device traffickers. From the RJ Telecom daily buyings

24 from January of '19 to December of '20, 1,341 devices

25 for Ali Anwar totaling $856,000 approximately and

1  approximately 3,500 devices for Abdullah Anwar totaling

2  $1.8 million were sold to RJ Telecom with preliminary

3  confirmed losses from AT&T of over a million dollars.

4          We also -- there are also bank accounts for

5  SCS that we talked about where Dawn Trading was paid

6  $500,000.  No records for Dawn Wireless have been

7  identified at this point.  One of the device traffickers

8  for Dawn Wireless was an individual stealing product

9  from a warehouse of approximately $100,000 who later

10  became an FBI CHS.  They also purchased devices from two

11  individuals conducting strong-armed robberies and thefts

12  of demoed devices and other devices from the floor of

13  cell phone stores.  Another individual is George Israel

14  who would purchase products from a source down in the

15  Waco area.  And he would sell devices and pallets of

16  stolen goods to CD 1 who would then sell these devices

17  and goods to SCS Supply Chain.

18          Last Wednesday Mr. Israel was taken into

19  custody.  A consent review of his phone found

20  approximately -- found numerous IMEIs.  A sample of

21  those IMEIs and chat messages were sent to AT&T.  AT&T

22  found 17 IMEIs were found to be fraud, non-pay, or

23  transit theft.  Primarily, transit theft.  No data for

24  three IMEIs, and the remaining had no results.  Likely

25  another carrier.  Screenshots of the phone are --

43

screenshots from photos of the phone or messages are here.  What you can see in these messages -- it's hard to read -- but you can see messages concerning blacklisted phones that are purchased by Israel and then sold to CD 1.

Here is a little bit bigger one.  You can read, "What you mean a locked one?"  The person -- Abriham A. says, "Blacklisted."  He says, "It's okay.  I still can buy them."  And these would be potentially devices that could be sold to CD 1 and then sold to SCS or RJ Telecom.  On May 29th of 2021, CD 5 purchased approximately 396 DeWalt units from Israel.  These devices were new in the box and stolen.  Israel had rented a U-Haul, went down to Waco, and picked these products up.  He had come back up into the Dallas area and met CD 5 at a Sam's Club at Midway and 635.  CD 5 then took this U-Haul trailer full of DeWalt products to SCS warehouse where Mohsin Zia and another employer helped him unload the trailer.  CD 5 coordinated this sale with Saad Aziz and the delivery with Mohsin.

In order to pay Mr. Israel, he received -- CD 5 received $30,000 from SCS.  The remaining amount was received later.  CD 5 believed the product cost around 180 to 1 -- 180 to 185 -- that's a typo -- and sold to Saad Aziz for $195.  CD 5 believed the retail

44

1   price was around 260.  Home Depot loss prevention

2   advised that at the time the retail price was around

3   319.

4           Here you see a screenshot from CD 5's phone

5   with Mr. Israel.  You can see on the left that's a

6   U-Haul truck with a pallet and loaded with boxes of

7   DeWalt product.  And then on the right, those are chat

8   messages from CD 5 and Saad Aziz, and those are pictures

9   of the DeWalt boxes sent to Mr. Aziz.  A consent search

10  of Mr. Israel's residence found boxes of Google Nest

11  devices and other -- other goods indicative of being

12  stolen through cargo transit theft.  Approximately

13  $160,000 was seized from the residence.

14          Another indicted co-defendant sold devices to

15  CD 5.  Those devices were then sold to SCS Supply Chain.

16  These devices came through transit theft on August 13th

17  of 2021.  CD 5 purchased approximately 89 laptops from

18  this indicted co-defendant for approximately 570 each.

19  The retail was $949.  CD 1 paid this indicted

20  co-defendant approximately 50,000 in cash.  One reason

21  the price dropped is because these laptops weren't

22  selling on Amazon or eBay.  From what CD 5 said,

23  Mr. Saad Aziz liked it when there were multiple sellers

24  on Amazon and eBay because those devices could kind of

25  fit in with the white noise there of all the sellers.

1          Since they were only being sold on Target and

2     stolen from Target, it -- it decreased the price because

3     it was harder to move these products.  The transaction

4     was completed here.  You see the negotiations where the

5     price goes all of the way down to 570 between CD 1, an

6     indicted co-defendant.  Here's photos of the MSI laptops

7     in CD 5's garage that were sent to Saad Aziz.

8     Eventually an employee for SCS came in a white Dodge Ram

9     van, picked those laptops up, and took them back up to

10    SCS.  And here's a text with Mohsin Zia confirming that

11    it was 89 laptops.

12          During the search warrant of SCS Supply

13    Chain, similar units have been located at the warehouse,

14    and we're continuing the investigation to try to confirm

15    those laptops.  Avaz Karimov is another device

16    trafficker that sold devices to Dawn Wireless and in

17    turn those devices were sold to SCS Supply Chain.

18    There -- the device trafficker that sold devices to

19    Karimov was Clifton Jerome Smith.

20          Here the warehouse theft we talked about

21    earlier is what -- is what Mr. Smith engaged in.  He

22    stole approximately $325,000 of new Samsung S20s by

23    essentially shipping those out to an address associated

24    with him due to a system glitch.  This happened from

25    March 2021 to January 11th of '21.  Twenty-five packages

1  were determined to be master cartons or cartons that

2  contained ten devices.  Samsung is still yet to assign a

3  dollar loss to the remaining 75 packages.

4          This is a slide that just -- that documents a

5  purchase between Jerome Smith of a master carton and

6  Pyramid Moving.  And then Pyramid Moving to Dawn Trading

7  a check in the amount of $20,350 with the subject line

8  of "22 Note 20s."  Samsung conducted an internal

9  investigation and tried to track where these phones were

10  being purchased from.  They were successful in 18 of

11  these devices.  They found that nine consumers purchased

12  via Amazon from Celltastic and Cellulartech.  These are

13  Canadian companies that purchased the devices from SCS

14  Supply Chain.  They've never touched the devices.  The

15  devices were sent directly to an Amazon fulfillment

16  warehouse in Oklahoma.  Two S20s were purchased from

17  Gizmobile.  One being the store on Alpha Road and one

18  from Dawn Wireless.

19          Abdullah Anwar from Dawn Wireless had told a

20  Coppell detective that they had purchased the Samsung

21  devices from UZ Global.  An attorney for SCS advised

22  that SCS had purchased the devices from Dawn Wireless.

23  And a Cellulartech rep told a Samsung investigator he

24  purchased the devices from SCS Supply Chain, and the

25  devices were shipped directly to an Amazon warehouse in

1   Oklahoma.

2          As an example of guns being at transactions,

3   on February 6th, 2021, at 6:50 a.m., Karimov who is a

4   supplier to -- device trafficker, supplier for Dawn

5   Wireless.  And for -- and used -- and had Clinton Smith

6   as a device trafficker.  In that -- some of those

7   devices went to SCS Supply Chain.  On this transaction

8   on February 6th of 2021, there was a transaction that

9   Clifton Smith arranged with Karimov and two black males

10  in a white Chevy Camaro.  Karimov was shoved in the back

11  seat and handguns were pointed at him.  And the black

12  males demanded cash.  Karimov ran from the location, but

13  his tires were slashed.  Richardson PD detective

14  conducted a telephone interview with Smith who

15  essentially said he had been dealing with Karimov over

16  the last two or three years.  He stopped after Karimov's

17  brother pulled a gun on him.  He also said that this is

18  what happens when people are doing illegal stuff.

19          On August 24th, 2021, a search was executed

20  at SCS Supply Chain in Farmers Branch.  They found

21  office space.  They found rooms for processing devices.

22  They found a big warehouse area storing electronics and

23  other goods.  Due to the significant number of items in

24  this search warrant, the search warrant is ongoing.

25  Preliminary checks with numerous companies to include

1   AT&T, Bissell, Home Depot, Samsung, and YETI have found

2   stolen property, including cargo theft items.  Cargo

3   theft being where a trailer or tractor or both are

4   stolen.

5   Q.    Can you give the Court an estimate of the size of

6   this particular warehouse?

7   A.    So these photos might give a better indication of

8   that.  Here you can see racks of cell phones.  Here you

9   can see the size of the warehouse with multiple shelves

10  or different levels of shelving and pallets full of

11  goods wrapped in black plastic.  As part of the search

12  warrant, all of these items are being inventoried.  And

13  then the -- the investigators are attempting to identify

14  if these products are stolen or not and -- in part with

15  private industry.  So private industry through the

16  unique identifiers on some of these products then links

17  them to other incidents.  I'll go through a few of

18  these.

19          Wal-Mart has a unique product through Anker

20  Eury vacuums.  There were pallets full of Eury vacuums

21  that were about 390,000 in value.  This product is

22  unique to Wal-Mart, and it is sold online.  It never

23  arrived at a Wal-Mart fulfillment center and would only

24  go to Wal-Mart.  The Wal-Mart investigators have

25  essentially said this is -- with this being a unique

1  product to Wal-Mart and them not having received it,

2  this product should not be at SCS Supply Chain.  So

3  preliminarily it is believed to be stolen.  There you

4  can see those are the pallets of the Anker Eury vacuums.

5          Bissell vacuums.  A transaction with Maaz

6  Aziz, Mohsin Zia, and CD 3 -- that should be CD 4.  On

7  Monday, August 23rd, one day prior to the search

8  warrant, CD 4 -- Maaz Aziz asked CD 4 and Mohsin Zia to

9  come with him.  The three individuals went to a Best Buy

10  parking lot where two U-Hauls were located.  They met

11  with a black male who drove a Cadillac.  Maaz Aziz

12  provided $20,000 to the black male that was put into his

13  hat, and the black male said that the keys were in the

14  U-Hauls.  CD 4 and Maaz Aziz drove the U-Hauls back to

15  SCS warehouse where the U-Hauls were unloaded.

16          CD 4 was able to determine that -- able to

17  see that -- that the load was Bissell vacuums.  After

18  those U-Hauls were unloaded, Maaz Aziz and CD 4 drove

19  those U-Hauls back to a nearby business where they

20  parked on the separate -- basically in separate parts of

21  the parking lot.  A text message in CD 4's phone on

22  August 23rd of '21 at 8:50 -- 5:52 p.m. from Maaz said,

23  "Park in a different parking lot than me."  CD 4

24  confirmed the photo -- a photo of the vacuums from the

25  search warrant as the vacuums that were in the trucks.

1   Here's the shipment of vacuums.

2          The Bissell product was stolen from a

3   facility in Mesquite, Texas, in early August of 2021.

4   The Bissell representative confirmed that over a

5   thousand cartons of the recovered Bissell product were

6   stolen.  And DPS SA Landon Corbett who investigates

7   cargo theft advised that Vincent Tasby stole a truck

8   from a parking lot location, drove that truck back after

9   cutting a hole in the fence, and stole four trailers

10  that contained the Bissell cartons within the hour.  And

11  that Vincent Tasby is tied to Morris Washington, and he

12  is referred to by others -- other individuals in cargo

13  theft as "the king of cargo theft."  Tasby is currently

14  in custody for other related activity.  SA Corbett,

15  through his experience as a cargo theft investigator,

16  said that Bissell is a continuing product of theft.

17         On or about July 23rd of 2021, a tractor and

18  trailer were stolen in Dallas containing approximately

19  279 Samsung TVs.  On or about July 30th, CD 4 advised

20  that Maaz Aziz had him -- CD 4 drop them off at the same

21  Best Buy parking lot to a U-Haul.  Maaz Aziz drove the

22  U-Haul back to SCS Supply.  CD 4, along with Saad Aziz

23  and Mohsin Zia, unloaded the Samsung TVs.  They were all

24  brand new hospitality TVs.  From the search warrant,

25  approximately 15 pallets of these TVs containing

1  approximately 200 TVs were recovered with the value

2  being 100 -- around $160,000.  And these were

3  hospitality TVs for commercial use, not generally

4  residential use.  The shipment was destined for Phoenix.

5         SA Corbett from DPS advised that in 2016 DPS

6  cargo theft began investigating a crew that would engage

7  in the tractor-trailer cargo theft.  This crew involved

8  Reginald Henry, Vincent Tasby, Morris Washington, Damian

9  Calhous a/k/a White Shoe, and Coree Hall among others.

10  The agent believed that since 2016 this group has

11  conducted anywhere from 60 to 120 cargo thefts,

12  including TVs, vacuums, computers, YETI products,

13  electronics, and other products.  On September 24th of

14  2021, DPS arrested Morris Washington for three counts of

15  theft.  And in his post-arrest statement, Washington

16  identified Saad and Maaz as the individuals who

17  purchased most of his property and gave the most money

18  for it.

19         These are screenshots from a review of Morris

20  Washington's cell phone seized at the time of the

21  arrest.  On the right-hand side, you can see a

22  screenshot of Samsung hospitality TVs.  In January of

23  '19, a shipment of 65 navy ramblers were stolen in the

24  Dallas area.  They were stolen from a rail yard and

25  destined for -- and had just been imported from China.

1  In 2020, YETI conducted three purchases of DFW Amazon

2  sellers; Maz Mobile Direct, SCS Supply Chain, and Gizmo

3  Galaxy.  All three test purchases found the product was

4  part of the stolen shipment.

5           In May 2021, a shipment of YETI coolers was

6  stolen in the Dallas area.  The shipment was scheduled

7  to be delivered to Academy Sports located in Tennessee.

8  As part of the search warrant, one cooler was scanned,

9  and it returned to this shipment.  That cooler was part

10  of a pallet that contained approximately 22 coolers.

11           Puma tennis shoes were found in the search

12  warrant as well.  These were stolen from a warehouse in

13  Forney, Texas, in February of 2020.  Approximately 1,282

14  cartons were stolen at a value of approximately 91,000.

15  The search warrant has recovered approximately 336

16  cases, 14 pallets of those shoes.  What you see on the

17  right are labels that were peeled off of the boxes and

18  were in a locked shred box that were found at the time

19  of the search.  There was one box still on the floor

20  that had a label on it.  It hadn't been peeled off.  And

21  that's how we were able to tie these Puma shoes.

22           In Tennessee, the Ingram Micro warehouse, an

23  internal investigation in September of 2020 started

24  after laptops were found being stolen from the

25  warehouse.  These were eventually -- some of these

1  laptops were eventually found at the search warrant for

2  SCS Supply Chain.  It is believed that these were stolen

3  from Tennessee and transported to Texas.  Again, with

4  Ingram Micro, Google Nest -- had a Carol Stream

5  warehouse for Ingram Micro.  These were obtained in the

6  search warrant.  They were new in the box.  They were

7  shipped to Target, a location in Midlothian, Texas.

8  There were two shipments at the end of July and early

9  part of August for approximately 60 units for a total of

10  $9,000.  Serial numbers for these products have been

11  tied to the stolen shipment.

12          Here's the pictures.  On the left, you can

13  see the label.  On the top left, you can see, "Google,

14  Carol Stream," the Ingram Micro warehouse, and you see

15  the shipped to Target.

16          And relating to devices at the SCS Supply, in

17  a preliminary review, AT&T in partnership -- not in

18  partnership -- excuse me -- AT&T came into the warehouse

19  and -- as part of the search warrant went through,

20  tracked the IMEIs on these devices.  It found that of

21  2,121 devices, over 1,500 devices were stolen --

22  confirmed stolen.  This being transit theft, blacklisted

23  devices, or devices that had network activity that could

24  be tied to fraud, nonpayment, transit theft, or buyer's

25  remorse.  There's still 600 devices that were -- where

54

1   no status has been identified at this point.

2           In regards to the 922 devices, 89 percent of

3   those were stolen with Pittney Bowes.  AT&T has

4   identified Pittney Bowes as a logistical company where

5   they've incurred losses with devices before.  What you

6   see here are Pittney Bowes labels that have been peeled

7   off and were found in the locked shred box.

8           Also identified through the search warrant of

9   SCS Supply Chain was a counterfeiting operation.  Apple

10  came in due to their manufacturing -- due to their

11  expertise in Apple products, and they identified over

12  8,000 counterfeit products, including glass backs,

13  charging cables, earpods, and power adapters.  Those

14  pictures there were identified by Apple as counterfeit.

15  Q.   And were those being produced there at that

16  warehouse?

17  A.   I don't know if those were specifically being

18  produced.  Those in the photos.  But Apple personnel

19  also found a number of machines that were located in the

20  warehouse.  Their review of these machines were found --

21  that these machines could be used to repair or replace

22  or possibly manufacture Apple components and products.

23  Their review of this machinery found that it was from

24  China and most of the language on the machinery was

25  Chinese.  They reached out to their counterparts in

1  China and found that these machines were consistent with

2  the factories in China that -- in China that manufacture

3  counterfeit parts of Apple product.

4        The pictures, which we'll get to in a second,

5  have the following functions:  Removing the back glass

6  of iPhones, removing the front frames from iPhones,

7  engraving, imprinting on common items, iPhone repair,

8  separating LCD screens, lamination, cooling, industrial

9  production, such as PC -- PCB boards, speakers,

10  circuitry, electronic components, controlled lighting,

11  conditions, sealing mobile phone screens, cutting LCD

12  screens.  Based on SCS not being an authorized

13  manufacturer of Apple products, Apple has preliminarily

14  concluded that the machines are being used to

15  manufacture counterfeit parts and devices.  Here's the

16  photographs of the machines that Apple took of -- that

17  they're referring to in those slides.

18        In December of 2019, U.S. Customs interdicted

19  a package that contained approximately 51 phones.  These

20  devices bore a counterfeit mark.  SCS submitted a

21  petition for relief and was allowed to receive that

22  product back.  However, this, again, shows that SCS was

23  aware of counterfeiting back in 2019, and there's still

24  continued evidence they've engaged in counterfeiting.

25  As part of the review of CD 5's phone, it was found that

1 there were COVID-19-forged documents.  CD 5 advised that

2 he was tested, along with his wife, for international

3 travel.  However, CD 5 did not receive his results back

4 from his test.  CD 5 sent his wife's results to Saad

5 Aziz seeking a forged result for himself so he could

6 travel.

7          CD 5 -- and he did receive that from Saad

8 Aziz.  And this was back in the late December of 2020

9 time frame.  CD 5 also flew on the same flight as Maaz

10 Aziz and observed Maaz Aziz having the same test result

11 form as himself and that it was a negative -- a negative

12 test.  Maaz went through the boarding process first and

13 told CD 5 it was fine and just a piece of paper.  Flight

14 records for Maaz Aziz showed he traveled to Dubai on

15 December 12th.  This is the forged copy.  A copy of it

16 was found on review of CD 5's cell phone.  This is the

17 forged copy of CD 5's and not Maaz Aziz.  We do not have

18 a copy of that.

19 Q.    So what he is alleging is he was using that same

20 document in order to board the plane?

21 A.    CD 5 is alleging that Maaz Aziz used the same

22 document, but with his name on that.  That based off the

23 forged document that CD 5 got and the fact that he had

24 sent Saad Aziz a copy of his wife's negative test, that

25 Maaz Aziz then had the same forged copy with his name on

57

1    it.

2                In regards to the economic danger of Saad and

3    Maaz Aziz, their income on TWC is listed from SCS

4    Supply.  No other forms of income.  Yet, the warehouse

5    is shut down right now.  All of that income that we can

6    tell to this point is coming from stolen goods,

7    stolen -- like vacuums, TVs, devices.  We haven't found

8    anything to date in this warehouse that seems to be

9    legitimate.  So all illegitimate has come from the SCS

10   Supply Chain.

11               There's also the facility of identity --

12   excuse me -- the facilitation of identity and transit

13   theft.  SCS through the course of this investigation has

14   identified or established a network for obtaining these

15   stolen devices whether it is through identity theft or

16   whether it's through a warehouse and are able to ship

17   these devices to businesses, contacts overseas to Dubai

18   or other foreign countries.  They also have a company in

19   Canada run by family that is set up to move these types

20   of devices that can be purchased on the street based off

21   cooperating defendants' statements.  Both Saad and Maaz

22   Aziz have experience purchasing these devices on the

23   street.

24   Q.   Now, you indicated that it was approximately 10,000

25   victims of identity theft?

58

A.    Correct, to date.  There's also identity theft
where there are individuals that use identity theft not
only to obtain these devices, but there are
manufacturers in this conspiracy who will obtain stolen
identities, create a Texas driver's license, create a
credit card, create a social security card for a brand
new identity, obtain a background report.  Those are
being used to obtain the devices.  Those could also be
used to make new identities.

Q.    And would those be the individuals that would be
well-known to the individuals that are involved in this
type of activity?

A.    If you're in this business, you know that -- it's
very likely for you to know how these devices are being
obtained.  One way being identity theft and that in
order to do that identities are needed.

        In regards to flight risk, there is a SCS
Supply Chain that's located in Canada.  It appears to be
run by a family member.  It's a cousin to Saad and Maaz
Aziz.  This would allow them to have resources, family
in a close foreign country that could help set up both
Maaz and Saad Aziz, help them travel.  It could also
help them in regards to obtaining resources down here in
the United States with economic danger.  If Saad and
Maaz Aziz know how to purchase from the streets, they

59

1  could continue to obtain devices.  The Canadian company

2  could be an outlet -- could be a means to get those

3  devices overseas for the generation of revenue and thus

4  continuing the economic danger to the community.

5       And, again, there is identity manufacturers

6  in this conspiracy.  Identity theft is prevalent in this

7  conspiracy.  This is what an identity set looks like.

8  Those are -- that's a driver's license you see with a

9  matching social security card with a matching debit or

10 credit card where the names all match, and that type of

11 identity set could be used to evade law enforcement.  It

12 could be used to obtain a new residence to -- basically

13 to maneuver around society and evade law enforcement.

14      While both Maaz and Saad are United States

15 citizens, they have Pakistani descent.  The Extradition

16 Treaty with Pakistan is very limited.  From my

17 knowledge, there's been approximately two extraditions

18 in the last 15 years.  The last extradition took

19 approximately six years to complete.  While they have

20 U.S. citizenship, their Pakistan -- if they were to flee

21 to Pakistan, their Pakistan heritage could prevent

22 deportation as a USC from Pakistan to the United States.

23 And with resources, life can be good in Pakistan.  If

24 you have the resources, you could have a life in

25 Pakistan.  And it's a way -- it's way to live.

1            CD 4 advised that Saad Aziz had spoken of

2  owning property in Pakistan and making good money off of

3  them to CD 4.  And in this conspiracy, a subject who is

4  not indicted, after the Secret Service froze funds,

5  after they attempted to make contact, this individual

6  fled to Pakistan.  We have not made significant seizures

7  related to SCS Supply or Saad Aziz or Maaz Aziz.

8  Q.    And, to your knowledge, have there been other

9  individuals that have been charged with similar type of

10  offenses -- offenses like the ones that these defendants

11  are charged with that have fled?

12  A.    Like as in more white-collar-type defenses?

13  Q.    Yes.

14  A.    Yes.

15            Related to seizures, related to assets that

16  they might have, the government has not seized property,

17  has not seized significant assets.  Again, with 65 bank

18  accounts and with numerous credit card accounts, we're

19  still trying to develop a financial picture to be able

20  to trace funds, identify where these funds are at,

21  identify other accounts that might still be open,

22  identify further investment accounts, or resources that

23  could allow them or could help them assist in fleeing.

24            As far as travel, both have international

25  travel to various countries.  For Maaz Aziz, he's

1  traveled to Canada, Columbia, El Salvador, Qatar, U.A.E.

2  Recent travel to Mexico.  His last trip to Dubai was

3  December 2020 and Canada December of '19.  While Saad

4  Aziz has traveled to Canada, Mexico, and the U.A.E.  The

5  last trip was Mexico in 2020 -- December of 2020.  The

6  last trip to Dubai was February of 2020, and the last

7  trip to Canada was December of 2019.

8          Relating to harboring, an FBI top ten

9  fugitive Yaser Abdel Said in January of 2008 -- Said

10 killed both of his daughters and disappeared shortly

11 thereafter.  He was charged within the year and become a

12 top ten fugitive.  Yassein Said is the brother to Yaser

13 Said and the uncle to Ameirah.  Ameirah being the wife

14 of Maaz Aziz.  In 2014, Ameirah and her sister Dalal

15 purchased a property in Justin, Texas.  In 2017, Yaser

16 Said escaped an Irving apartment as part of a FBI

17 fugitive investigation.

18          Shortly thereafter, investigators believed --

19 later found out and were to believe that Yaser Said

20 began living at the Justin residence owned by Ameirah

21 and her sister.  In August of 2020, Yaser Said was taken

22 into custody at the residence owned by Ameirah and her

23 sister.

24          MR. MCCARTHY:  Judge, I'm sorry.  For the

25 record, I wanted to point out some -- he keeps saying

62

1  "Said."  This is not my client Saad Aziz he's referring

2  to as killing his daughters.

3  BY THE WITNESS:

4  A.    I'm sorry.  That's correct.  Yaser Said.  I'll say

5  Yaser Said.  I'm sorry.

6          So just to recap, on January 1st of 2008,

7  Yaser Said killed both daughters.  Not the defendant at

8  the table.  And --

9  BY MR. GONZALEZ:

10 Q.    And that was a highly publicized killing here in

11 the local area, correct?

12 A.    It was highly publicized.  It was a long-term

13 fugitive investigation.  The investigation lasted over a

14 decade.

15 Q.    It was well known that FBI was searching for --

16 A.    It was.  It was well known.  And when he was

17 taken -- when Yaser Said was taken into custody in

18 2020 --

19 Q.    Okay.

20          DEFENSE COUNSEL:  Judge, I'm going to object

21 to relevance to this.

22          MR. GONZALEZ:  Your Honor, as indicated, it's

23 harboring a fugitive.  You have Maaz Aziz's wife

24 harboring a fugitive -- owning a property where a

25 fugitive is hiding --

63

 1              DEFENSE COUNSEL:  Objection, your Honor.
 2  It's irrelevant and defamatory --
 3              MR. GONZALEZ:  With regards to --
 4              THE COURT:  I'm going to ask for us to go
 5  ahead and move on from this issue, Mr. Gonzalez.
 6              MR. GONZALEZ:  Well, if the wife of one of
 7  the defendants is harboring a fugitive or allowing a
 8  fugitive --
 9              DEFENSE COUNSEL:  The objection --
10              MR. GONZALEZ:  Or allowing a fugitive --
11              THE COURT:  Gentlemen, I've already asked
12  Mr. Gonzalez can we move on from this particular point.
13              MR. GONZALEZ:  Okay.
14  BY MR. GONZALEZ:
15  Q.   What's depicted there, Agent?
16  A.   This is the house where Yaser Said was arrested --
17              THE COURT:  I'm familiar with this case.  We
18  can move on, Mr. Gonzalez, from that point.
19              MR. GONZALEZ:  Okay.
20              THE COURT:  Thank you.
21  BY MR. GONZALEZ:
22  Q.   Now, Agent, based on your presentation of the
23  evidence here today, obviously you've formed an opinion
24  as to whether you believe these individuals would be at
25  risk of flight or a threat to the community.

64

1  A.    I do believe they could be a risk of flight and a
2  threat to the community, yes.
3  Q.    And based on your -- your summary here at the end,
4  you believe them to be a risk of flight not only because
5  of their economic resources as well as their association
6  with foreign entities?
7  A.    A foreign -- yes.  Foreign company in Canada and
8  then ties in the Middle East and Dubai.
9  Q.    All right.  And you're aware that they have other
10  economic resources, correct?
11  A.    Those -- that's what we don't know.  I mean --
12  Q.    Okay.
13  A.    -- it's hard for us at this point, based off the
14  financial picture we have, to know what other resources
15  are out there.  We do know that Saad Aziz, I believe,
16  owns two other properties.  I'm not exactly sure if it's
17  in his name or an entity that are up in Frisco.  They
18  are both valued at about $500,000 that we're
19  investigating.
20  Q.    Okay.
21  A.    But outside of that, we're still trying to develop
22  exactly what all the resources are.
23  Q.    And then you had -- in one of your slides, you had
24  a cooperating defendant indicating that they had -- one
25  of them had indicated that he owned properties in a

1  foreign country?

2  A.    Yes.  A cooperator stated that he was told by Saad

3  Aziz that Saad had Pakistani properties or properties in

4  Pakistan and they were doing well.

5  Q.    And obviously their foreign travel was indicated in

6  one of the slides as well, correct?

7  A.    Yes.  There is foreign travel.

8  Q.    All right.  And then you also indicated that there

9  was use of a firearm on some occasions, correct?

10  A.    A cooperating defendant advised that a firearm was

11  taken as part of security by Maaz Aziz and Awais

12  Chodhury when they were dealing with the FedEx driver.

13  Q.    Did you find any firearms at the warehouse?

14  A.    We did find, I believe, one firearm in the safe in

15  the warehouse.

16  Q.    Okay.

17  A.    As far as I know.

18  Q.    Were you able to find any of the passports in any

19  of the search warrants for the defendants specifically?

20  A.    We -- I can't speak to the residences, but at SCS,

21  no.

22  Q.    Okay.  So, to your knowledge as you sit here now,

23  have all passports been turned over?

24  A.    I believe, just based off of conversations, that

25  Maaz has his passports.  And I think right before the

66

1  hearing, the defense counsel said that Saad Aziz had his

2  passports here.

3  Q.    Okay.  Now, you talked about the 10,000 victims of

4  identity theft.  And you -- if we can narrow down the

5  economic loss or the economic benefit that the

6  defendants have obtained during their time period of

7  working in this business, what would that number be?

8  A.    Well, it's hard to say at this point.  So the bank

9  statements that we have -- the four banks, the seven

10  accounts that were presented earlier -- I think the

11  foreign income was around $37 million.  Without getting

12  into the business yet at this point and getting into the

13  records and being able to, you know, identify the source

14  of those devices and what other potential income that

15  might come from, it's hard to say.  But with

16  RJ Telecom -- at a minimum, over $4 million was paid

17  from RJ Telecom to SCS Supply.  We have other device

18  traffickers.

19  Q.    Okay.

20  A.    So it's going to be, you know, well into the

21  millions.

22  Q.    And, again, in regards to travel for Saad Aziz, he

23  has other travel other than traveling to Mexico,

24  correct?

25  A.    Yes.  I -- let me go back here so I get it right.

67

1  So I believe his travel was to Canada, Mexico, and the

2  U.A.E.

3  Q.   Okay.  So it's not just for vacation in August

4  of 2020?

5  A.   No.  Not according to Customs or -- Customs.

6          MR. GONZALEZ:  That's all I have.  I'll pass

7  the witness.

8          THE COURT:  If I can go ahead and ask the

9  U.S. Marshal Service representative to please approach

10  along with counsel for the government and defense

11  counsel.

12          (A short recess was taken.)

13          THE COURT:  All right.  Everyone, at this

14  time, we're returning to Cause No. 4:20-cr-382, the

15  *United States v. Aziz*.  At this time, we still have on

16  the -- on the stand Agent Chris Doering.  Mr. Gonzalez

17  was questioning him at the time that we took a recess.

18          Mr. Doering, do you continue to understand

19  that you remain under oath?

20          THE WITNESS:  I do.

21          THE COURT:  All right.  Mr. Gonzalez, you may

22  proceed at this time.

23              DIRECT EXAMINATION (Continued)

24  BY MR. GONZALEZ:

25  Q.   Agent Doering, right before we broke, you said

1  something that caught my attention.  You said that there

2  were some other properties in Frisco?

3  A.    Yes.  I talked about two properties in Frisco, and

4  I believe at the time I had said that those properties

5  were registered to Saad Aziz.  Those properties are

6  actually registered to both Saad and Maaz Aziz.  It's

7  two properties in Frisco.

8  Q.    And do you know the approximate value or whether

9  they're up for sale?  What's the status of those

10  properties?

11  A.    The properties were both up for sale at

12  approximately $1.1 million.  One appears to be in

13  contingent status.  The other one has since been taken

14  off the market.  It's unknown if it was sold or just

15  taken off the market.

16  Q.    So it's $1 million for each property?

17  A.    Yes.

18  Q.    Or for both?

19  A.    No.  Each property.

20  Q.    Okay.  There are two separate properties --

21  A.    Correct.

22  Q.    -- at a million dollars a piece?

23  A.    Correct.

24  Q.    And they're in both defendants' names?

25  A.    Yes.  And both properties have liens on them.  The

69

1  approximate amount of -- just going from memory -- they

2  both have liens on them.  Close to a half -- $500,000.

3  Q.    Okay.  And the one that has been taken off the

4  market, you don't know whether it's been sold or just

5  taken off the market or what?

6  A.    No, sir.

7  Q.    Do you know when the properties were obtained?

8  A.    Based off of the information that I have, it looks

9  like their liens or the title transfer was on -- in

10  December of 2020.

11  Q.    And that would have been during the time period of

12  this alleged conspiracy?

13  A.    Yes.

14        MR. GONZALEZ:  That's all I have.  I'll pass

15  the witness.

16        THE COURT:  Thank you.

17        All right.  Counsel, we're going to go for

18  cross-examination in the order in which your clients are

19  listed on the indictment.

20        So at this time, Mr. Wohlford.

21        MR. WOHLFORD:  It's going to be Mr. Castle,

22  your Honor.

23        THE COURT:  All right.  Mr. Castle, then if

24  you'll proceed.

25

70

1          (A short recess was taken.)

2          THE COURT:  All right.  Everyone, we are

3   going to go back on the record following a conference at

4   the bench.  Currently pending before the Court are two

5   related filings; defendant Saad Aziz's motion for bail

6   pending trial and then as well --

7          And I apologize, Gentlemen.  I know that I'm

8   getting your names incorrectly pronounced.  I am

9   sincerely apologetic.

10          And Maaz Aziz's response to the government's

11   motion for detention.

12          Raised in each of those motions is a query as

13   to whether or not it's proper and appropriate for the

14   Court to have a detention hearing and arguments related

15   thereto.  Following a conference during the break, it's

16   the Court's understanding that counsel for the parties

17   desire to withdraw the formal motion, as well as their

18   response, and are going to stipulate that in light of

19   the government's clarification that they are moving for

20   detention under 3142(f)(2)(A,) that it is proper for the

21   Court to have a detention hearing today.

22          Let me just go ahead and confirm on behalf of

23   the parties who have filed both the response as well as

24   the affirmative motion itself.

25          Mr. Castle.

1          MR. CASTLE:  Yes, your Honor.  We filed a

2  response to the government's oral motion objecting to

3  the Court's ruling to have the hearing.  We withdraw

4  that response as well as our objection.

5          THE COURT:  All right.  And then let me go

6  ahead and ask Mr. McCarthy as well.

7          MR. MCCARTHY:  Yes, your Honor.

8          THE COURT:  I hate to ask, but the acoustics

9  are so poor.  So can you huddle through all of the

10  chairs and go to the microphone?

11          MR. MCCARTHY:  Yes, your Honor.  The same for

12  us.

13          THE COURT:  All right.  And I'm assuming on

14  behalf of the government there is no opposition to the

15  request for the withdraw of the motion for bail pending

16  trial, which is Docket 1224.  And I don't have the

17  docket cite for the response, but that response as well.

18          MR. GONZALEZ:  No objection.

19          THE COURT:  And to confirm and to clarify

20  again, the government's sole basis for seeking detention

21  in this cause is 18 U.S.C. § 3142(f)(2)(A); is that

22  correct?

23          MR. GONZALEZ:  Yes.

24          THE COURT:  All right.  So with that then,

25  we'll go ahead and proceed.

1           And, Mr. Castle, I understand that you will

2   be doing cross-examination.

3           MR. CASTLE:  Yes, your Honor.

4           May I proceed?

5           THE COURT:  You may.

6                    CROSS-EXAMINATION

7   BY MR. CASTLE:

8   Q.   Good afternoon, Agent Doering.

9   A.   Good afternoon.

10  Q.   Agent Doering, do you recall at the end of your

11  testimony you made a statement that you believed that

12  the two defendants here could be a risk of flight?

13  A.   Could be, yes.

14  Q.   And -- well, you said, "could be."  You didn't say

15  are, correct?

16  A.   I did not.

17  Q.   You did say they could be a serious risk of flight,

18  correct?

19  A.   I believe my statement was they could be a

20  flight --

21  Q.   So --

22  A.   Flight risk.

23  Q.   As you sit there today, do you believe they are a

24  serious flight risk?

25  A.   I believe there are factors of flight risks here.

73

1          MR. CASTLE:  Objection.  I'll re-ask my

2  question.

3  BY MR. CASTLE:

4  Q.    Do you believe there is a strong risk of flight?

5  That's the standard we are here on for this motion.

6  A.    Yes.

7  Q.    What do you base the strong portion on?

8  A.    The strong I would base on the fact that they have

9  a company in Canada run by family.  I would base the

10  strong on overseas ties, overseas travel.  I would base

11  the fact that we don't have a complete set or a complete

12  picture of their finances.  We don't know how many

13  resources are out there.  And I would also base that on

14  in this conspiracy there is identity theft and with that

15  comes the ability to manufacture identities, association

16  with those individuals to obtain those identities, if

17  necessary.

18  Q.    Let's take those one at a time.

19          You said they have a company in Canada.  Is

20  it your testimony or position that Maaz Aziz owns part

21  of SCS Canada?

22  A.    The information I have is that they have a company

23  up in Canada.  I haven't seen records for it.  It is a

24  Canadian company.  That will take time.  It's a

25  continuing investigation.  But based off of cooperating

74

1  defendant testimony, based off of record -- of FedEx

2  labels, based off of FedEx records, it appears that the

3  two companies are related.  Maaz Aziz is the president

4  of SCS, related to SCS.  Gizmobile is his business.

5  Yet, the wages for Gizmobile are paid by SCS.  And so,

6  therefore, I would -- I would -- that would be why I

7  would say or why I would testify to him having an

8  interest in SCS Canada.

9  Q.    Is it your position Maaz Aziz owns part of SCS

10  Canada?

11  A.    I can't make that assertion at this time that -- if

12  you want records based on that, I don't have that at

13  this time.

14  Q.    Okay.  Do you have any evidence that Maaz Aziz owns

15  any portion of SCS Canada?

16  A.    Outside of the evidence that we have so far?

17  Q.    I haven't seen any yet, Agent.

18        My question is:  Do you have any evidence

19  that Maaz Aziz owns any portion of SCS Canada?  You're

20  saying they have a company.  I'm asking what evidence

21  you have because there's none.

22  A.    Again, I have the co-defendant testimony, and we

23  have the relationship between the FedEx records, FedEx

24  labels, familial tie, and co-defendant statements.

25  That's what I have at this time.

1  Q.     So you would agree that you have no evidence that

2  he has a company in Canada?

3  A.     I don't have business records evidence.

4  Q.     He has a relationship, but he does not own a

5  company in Canada?

6  A.     He would have access to this company if he doesn't

7  own it outright or on paper.

8  Q.     Theoretically, wouldn't you agree that anyone could

9  be a risk of flight?

10  A.     Anyone could be a risk of flight.

11  Q.     That was -- your testimony earlier was he could be

12  a risk of flight?

13  A.     He could be a risk of flight.

14  Q.     Do you recall Mr. Gonzalez asking you are you aware

15  of white collar defendants fleeing?

16  A.     Yes.

17  Q.     And do you recall your answer?

18  A.     Yes.

19  Q.     Are you aware of white collar criminal defendants

20  appearing?

21  A.     White collar defendants appear.  Violent crime

22  defendants appear.  It happened -- it happens in both

23  cases.  There are several factors that can play into

24  whether a white collar criminal appears or flees.  Same

25  with a violent crime criminal.

76

1  Q.    And within -- I'm sorry --

2  A.    Same with defendant -- yeah.  Not criminal.

3  Q.    My apologies to you and to the court reporter, of

4  course.  She'll start yelling in a second.  Rightfully

5  so.

6          You've been a FBI agent for 15 years?

7  A.    Yeah, give or take.

8  Q.    Roughly?

9  A.    Yeah.

10  Q.    And in that time, have you seen -- how many cases

11  would you say you've worked on where you have had

12  criminal defendants who were indicted?

13  A.    I mean, numerous.  In the criminal enterprise for

14  robberies, I would say at least five to ten cases there.

15  Drug cases --

16  Q.    And how many total defendants in those cases?

17  Multiple defendants?

18  A.    Multiple -- yeah.  These are multiple enterprise

19  investigations.

20  Q.    And you would agree that the majority of the

21  defendants in those cases appeared and didn't flee,

22  correct?

23  A.    The majority of those in my investigations were

24  held.

25  Q.    Okay.

1  A.    Presumption cases.

2  Q.    Presumption cases on the drug side.

3         And this isn't a presumption case, correct?

4  A.    No, it's not.

5  Q.    And there's no allegations that would support a

6  presumption case, correct?

7  A.    No.

8  Q.    And when you say "presumption case," just for a

9  clear record, what do you mean?

10  A.    Presumption case, which is based off the type of --

11  the type of violation would dictate if it's a

12  presumption case, meaning that the presumption of bond

13  is on the defense.  So, essentially, it starts out that

14  they're going to be detained, and then the defense has

15  to overcome that burden.

16  Q.    And --

17  A.    I'm sorry.  I'm not a lawyer.

18  Q.    It's a good explanation.

19         And what -- this case, not being a

20  presumption case, what is the presumption -- your

21  understanding of the presumption in this case?

22  A.    I believe that the government has to show if it's

23  not a presumption case.  That's not me being a lawyer,

24  but just going the other way.  That if it's not a

25  presumption case, then we would have to show evidence

1  that there's a flight risk.

2  Q.    Okay.  And let's look a little bit more at the

3  factors you've just listed for why you think there is a

4  strong risk of flight.

5          You've agreed that anyone could be a risk of

6  flight.  You've agreed there is no proof that he owns a

7  Canadian company.

8          The travel -- you put up a slide earlier.  Do

9  you recall the countries he's reportedly traveling to?

10 A.    For Maaz?

11 Q.    Yes, sir.

12 A.    For Maaz, I want to say it was Columbia,

13 El Salvador, U.A.E., Mexico.  I think Qatar might have

14 been one of those.  I think Qatar lastly or -- Qatar,

15 yes.

16 Q.    Okay.  And Canada.  Do you know the reason for any

17 of those visits?  Were they business or pleasure?  Was

18 it a vacation?

19 A.    I think the Mexico ones were to Cancun, so I would

20 assume pleasure there.  The other ones I believe were

21 for business.

22 Q.    Our neighbors to the north may not like to hear

23 that Canada is not a vacation destination.  I'm just

24 going to throw that out there.

25 A.    Well, I would tie that to the fact of the SCS

79

1  company.

2  Q.    And where is the SCS Canada company located?  Do

3  you know?

4  A.    I cannot pronounce that.  I mean, it's on the FedEx

5  label, but -- no.  I don't have, like, an exact

6  geographical location of where that's at.

7  Q.    Do you know what province it was in?

8  A.    No.

9  Q.    If I told you that he and his family went to Canada

10  to Toronto for vacation --

11  A.    Now, that's Toronto -- that's -- I think that does

12  ring a bell, yes.

13  Q.    So he went to Toronto for vacation.  Would that

14  change your ideas about the concerns about travel?

15  A.    It would just depend on where the province is at.

16  Q.    The province would be Ontario.

17  A.    Okay.

18  Q.    I'm asking if you have any evidence to refute that

19  him and his family went there for vacation?

20  A.    No.

21  Q.    Okay.  I'm saying if he went there for vacation,

22  would that still cause you concern about him being a

23  flight risk?

24  A.    Well, it's not just the travel for whether it's

25  pleasure or not.  It's also -- when you're talking about

1  travel, it shows the ability to travel.  It shows the

2  know-how to travel.  Whether he goes there to Canada for

3  pleasure or for business, the fact that there's still a

4  business interest there with family that could assist,

5  if needed, that's what I base that on.

6  Q.    Okay.  You also mentioned Pakistan, correct?

7  A.    Uh-huh.  Yes, sir.

8  Q.    Travel concerns about Pakistan as -- in connection

9  with flight risk, correct?

10  A.    If there was flight and with his Pakistani descent

11  and he was able to arrive to Pakistan, set up a

12  residence in Pakistan, extradition would be very

13  difficult.

14  Q.    Do you know how long or how many times since

15  Mr. Maaz Aziz has been a U.S. citizen he's been to

16  Pakistan?

17  A.    I do not.

18  Q.    Would it surprise you to learn it's been one time?

19  A.    If that's what you're telling me.  I wouldn't know.

20  Q.    Okay.  And -- one time in 15 years.  And you're

21  concerned he's going to flee to Pakistan?

22  A.    He hasn't been facing federal charges before.

23  Q.    We'll get to that.

24        And the one time he went, he went for his

25  sister's wedding.

81

1   A.    Okay.

2   Q.    Are you aware of that?

3   A.    No.

4   Q.    Stayed for only a few days.  Could not get back

5   fast enough.  Were you aware of that?

6   A.    Not aware of that.

7   Q.    And then the sister he went to see get married,

8   were you aware that she now lives in Texas?

9   A.    I'm not, no.  Not aware of that.

10  Q.    So the simple fact he's of Pakistani descent can

11  be -- the government's position makes him a flight risk

12  he would run back to Pakistan?

13  A.    It's a country that he could return to with his

14  Pakistani descent, if need be, if he was trying to avoid

15  or flee prosecution.

16  Q.    Are you sure he would be welcomed back in Pakistan?

17  It's speculative.

18  A.    Based off my conversations, with the Pakistani

19  heritage, he could apply to stay.  He is a U.S. citizen.

20  That could cause deportation, but the Courts are a

21  little wishy-washy on that.  So it's not a -- it's not a

22  for sure if the Courts would deport him as a USC.

23  Q.    Do you have any idea whether Maaz Aziz has any

24  interest in ever visiting, much less fleeing to

25  Pakistan?

82

1  A.    No, I do not.

2  Q.    Do you have any opinion on whether an American

3  prison is nicer than a rural house in Pakistan?

4  A.    I do not.

5  Q.    Do you know whether he does?

6  A.    I do not.

7  Q.    You have no evidence he made any effort to flee the

8  country in any way, shape, or form, correct?

9  A.    No.

10  Q.    No conversations?  No witnesses?  No nothing?

11  A.    No.

12  Q.    Correct?

13  A.    No.

14  Q.    You have no knowledge or no evidence of any foreign

15  bank account, correct?

16  A.    We're still continuing our financial investigation.

17  With 65 bank accounts we're trying to get through, which

18  is a large number of bank accounts, we're still trying

19  to identify if those foreign bank accounts do or do not

20  exist.  We're still in that process.

21  Q.    Well, you're saying 65 bank accounts.  Sixty-five

22  accounts --

23  A.    Not just for Maaz.  I apologize.

24  Q.    That's been confusing me all day.

25  A.    Let me clear that up.  That's for SCS-related

1  entities and Saad and Maaz all combined altogether.

2  Q.    And for SCS-related entities, is Maaz a signatory

3  on any of those accounts?

4  A.    I don't know if he's a signatory.

5  Q.    Wouldn't that be easy information for the FBI to

6  get?

7  A.    It could be, yeah.  I mean --

8  Q.    And in the year since this case has been indicted,

9  you have not looked?

10  A.    It's not been a year since this case has been

11  indicted.  This case was indicted in December of 2020 as

12  a robbery case.  SCS came on to our radar or as part of

13  the investigation around April of 2021.

14  Q.    I'll rephrase.

15        In the six months, you didn't look to see who

16  was on the bank accounts?

17  A.    It's a large investigation.  Our financial

18  accountant --

19  Q.    I understand.  It's my client's freedom.  I'm not

20  criticizing your investigation.  I'm just trying to

21  figure out what's been done and hasn't been done.

22              MR. GONZALEZ:  Objection, your Honor.

23              THE COURT:  I'm going to allow the question.

24  BY MR. CASTLE:

25  Q.    So you don't know if he's the signatory on any

84

accounts?

A.    I don't know if he's a signatory on a SCS account, no.

Q.    So you have no evidence he could access any money from SCS or SCS Canada directly, correct?

A.    Not that he could access it, no.

Q.    Okay.

A.    But that doesn't mean other people couldn't access it.

Q.    Well, you have no evidence he's asked someone to access that money, correct?

A.    Not at this time.

Q.    So you would agree that the serious risk of flight or the could be a flight risk answer you gave earlier simply is speculative and a worst case scenario.  Would you agree with?

A.    I think when you take into account the weight of the evidence as this investigation moves down the line -- we're also at the early stages.  We're just now getting into the SCS warehouse.  There's a lot of records to go through that could increase the loss amount.  That could increase other factors within the investigation.  And once that weight becomes -- if it becomes a bigger weight -- if that becomes a large -- the defendant now faces more serious time due to that,

1  that could change how things move.  That could change

2  the defendant's outlook on avoiding prosecution,

3  fleeing, or remaining.

4  Q.    And, again, you would agree that the use of the

5  verb "could" indicates speculation?

6  A.    It's -- the investigation is still ongoing.  It's

7  still continuing.  It's not like this is a three-year

8  white collar investigation that's ended and the crime

9  has stopped and now we've had three years to investigate

10 it.  This activity was ongoing.  It was in the

11 enterprise form.  It was stopped the day before the

12 search warrant at SCS.  There was alleged criminal

13 activity taking place with stolen vacuums.  So this was

14 ongoing criminal activity, and the investigation has yet

15 to catch up with the activity.

16 Q.    Again, you would agree it's speculative as to what

17 may happen if the investigation gets worse or on the

18 flip side what happens if the investigation gets better?

19 A.    At this point, yes.

20 Q.    Okay.  Thank you.

21        And you've mentioned that there was business

22 going up -- up until the day before the search warrant,

23 correct?

24 A.    Yes.

25 Q.    Since that time, has SCS been operating?

86

1  A.    No.   The warehouse has not been operating.   I don't

2  know if there's other types of operations with the

3  company outside of the warehouse, but the warehouse has

4  not been operating.

5  Q.    And that's where you also saw office space.   If I

6  remember during your PowerPoint correctly, it's not just

7  a warehouse, but offices?

8  A.    Offices, yes.   Processing areas.

9  Q.    If we're going with speculation, Agent -- and so

10  you're aware -- so that the timeline -- make sure I've

11  got it in my head here.

12        On August 24th, you ran search warrants?

13  A.    Correct.

14  Q.    The government ran search warrants.   Not you.   I'm

15  using the generic here.

16  A.    I got you.

17  Q.    Search warrants on SCS, correct?

18  A.    Correct.

19  Q.    Saad Aziz's home?

20  A.    Correct.

21  Q.    Maaz Aziz's home?

22  A.    Correct.

23  Q.    And anything else related to --

24  A.    Gizmobile.

25  Q.    Gizmobile.   One location of Gizmobile, correct?

87

1   A.   Yes.

2   Q.   And during the execution of those warrants, were --

3   was Mr. Aziz hostile?

4   A.   I was not at either location, but based off what

5   I've been told, neither Maaz nor Saad were

6   confrontational in any manner.

7   Q.   Okay.  Were you aware that one of the agents on

8   site said, hey, you have been extremely nice and

9   helpful?

10  A.   I'm not aware of that, but based off of what I've

11  heard, that wouldn't surprise me.

12  Q.   And if he had been hostile or non-cooperative, that

13  would have reached your level --

14  A.   Yes.

15  Q.   -- I would think as lead agent, correct?

16  A.   Correct.

17  Q.   Do you recall asking during the search of the

18  house -- you know, you were asked whether there was, you

19  know, any sight of a passport or anything else by

20  Mr. Gonzalez.

21       During the search warrant, did you find

22  passports in the house?  I think you said you didn't

23  know --

24  A.   Yeah.  I just don't know.  I wasn't there, and I

25  can't recall if passports were found there or not.

88

1  Q.    Okay.  And if I told you that the passports were

2  next to certain watches you seized -- literally right

3  next to them -- would that surprise you?

4  A.    I wouldn't know.

5  Q.    Okay.  And were you aware that at the time the

6  search warrant was executed, there were two firearms in

7  the house?

8  A.    I can't recall.

9  Q.    Okay.  I'll represent and acknowledge there was a

10  rifle and a shotgun, which has subsequently been

11  removed --

12  A.    Right.

13  Q.    -- along with ammunition.

14         And are you aware that at the time the agents

15  and the parties executing the warrant and were there,

16  they disassembled both firearms?

17  A.    The agents did?

18  Q.    They did, yes, sir.

19  A.    Disassembled or just made safe?

20  Q.    Disassembled.  Took apart.

21  A.    Was that to box it up?  I mean, I don't know.

22  Q.    That was my question to you.

23         They weren't stored in boxes.  They were in a

24  locked cabinet.

25         Why didn't the agents seize the gun if there

1   were concerns about any type of safety or anything else

2   along those lines?

3   A.    Why didn't they?

4   Q.    Yes, sir.

5   A.    They didn't seize the guns?

6   Q.    No, sir.

7   A.    Because at that time, Mr. Aziz was a United States

8   citizen.  He was legally entitled to hold those.

9   Q.    Okay.  So on August 24th, they have search warrants

10  run.  We can agree on that.

11  A.    Uh-huh.

12  Q.    And in the week following, they didn't flee, right?

13  A.    No.

14  Q.    You have no evidence they made any plans to flee?

15  A.    No.

16  Q.    Any contingency plans, right?

17  A.    We have no evidence.

18  Q.    And did you participate in a meeting with the Aziz

19  brothers, Mr. Gonzalez, their civil attorney Mr. --

20  A.    The civil attorney.

21  Q.    The civil attorney.  I'm going to mess the name up.

22  I apologize for being disrespectful.

23            Did you participate in that meeting?

24  A.    I was in that meeting.

25  Q.    And during that meeting, weren't they told there is

1   an indictment coming down for you guys?

2   A.    They were.

3   Q.    Okay.  And did they flee after that?

4   A.    They could have.

5   Q.    Did they?

6   A.    No.

7   Q.    Wouldn't that be a better time to flee before

8   you're indicted?

9   A.    Again, at that time, they didn't have a full view

10  of what the investigation was -- the evidence that was

11  there, which has since changed.

12  Q.    Wouldn't you agree that if you're told you're going

13  to get indicted, it's better to flee before you get

14  indicted?

15  A.    It could be.  It depends on if they're trying to

16  see what we have or what the total amount of evidence

17  is, what they're facing, what the outlook is.  All those

18  factors could play into it.

19  Q.    My point is they didn't flee, right?

20  A.    They didn't flee.

21  Q.    And then on or about September 19th, there was an

22  indictment, correct?

23  A.    Correct.

24  Q.    Do they flee then?

25  A.    No.

1  Q.    Are you aware that on September 10th, my office

2  sent a letter to Mr. Gonzalez saying we plan to

3  peacefully surrender and we'd be happy to send you the

4  passports in advance or bring them to you and

5  self-surrender?

6  A.    Yes.

7  Q.    And are you aware that September 10th is over two

8  and a half weeks ago, right?

9  A.    Yes.

10  Q.    And self-surrender was not -- it was pushed down

11  the line.

12          Are you aware that, again, on September

13  the 14th, we sent an e-mail saying, hey, just to give

14  you comfort here, we have taken possession of the

15  passports.  We're not going to give them back.  We're

16  going to supply them to you.  Were you aware of that

17  e-mail?

18  A.    Yes.

19  Q.    And at that time, had they fled?

20  A.    No.

21  Q.    And then did you participate in a call with

22  Mr. Wohlford and myself from my office and Mr. Gonzalez

23  discussing the terms of the self-surrender?

24  A.    Yes.

25  Q.    Were you aware that prior to that call there were

92

1  multiple communications about self-surrender?

2  A.    It seems like there was some e-mail chatter from

3  both.

4  Q.    Okay.

5  A.    Yes.

6  Q.    And were you aware of additional phone calls

7  between Mr. Gonzalez and myself trying to coordinate

8  that self-surrender?

9  A.    Yes, to a degree.

10  Q.    And during that call, we came up with the Thursday

11  deadline of September 24th?

12  A.    Correct.

13  Q.    And then there was the offer of, hey, if your guy

14  will come in and proffer and cooperate, we won't seek to

15  detain?

16  A.    Not just if he just came in and proffered, but if

17  he came in -- honestly, if he came in and truthfully

18  accepted responsibility and basically beginning

19  cooperation with the government to a degree in that we

20  start to get comfort that there is no flight risk.  We

21  get a chance to interview the defendant.  We get more

22  information about foreign contacts, foreign companies,

23  travel.  All -- just to get a better mitigate -- it

24  would help mitigate, give us more comfort that there is

25  no flight.

93

1  Q.    And that would be a pretty lengthy proffer session,

2  wouldn't it?  I mean, probably hours?

3  A.    Could be.

4  Q.    And may not get all that in one proffer session,

5  correct?

6  A.    Depending on how long it goes and how long the

7  parties are willing to stay there, but we have been able

8  to get there before.

9  Q.    So if they cooperated and -- proffered and

10 cooperated and gave up all their constitutional rights

11 to defend themselves and their protections, you wouldn't

12 seek detention, but if they didn't cooperate, you would

13 seek detention?

14 A.    Well, since it's a proffer, none of that would be

15 allowed to be used against them.

16 Q.    Well, you agree then the use of -- whatever is --

17 provided could be used?  I mean, "tomato" and "tomato."

18 A.    Yes.  Not only -- that in place, if they come in

19 and begin the cooperation process, it gives us more

20 comfort.  It helps mitigate any flight risk.

21 Q.    Okay.  So you've never had -- you've never had a

22 person or become aware of someone cooperating and then

23 fleeing?

24 A.    I have had that, yes.

25 Q.    Okay.

1   A.     It has happened.

2   Q.     So they could still be a flight risk?

3   A.     It could still be a flight risk.  Like you said,

4   it's speculative to a degree.

5   Q.     Okay.  And we did self-surrender, correct?

6   A.     You did.

7   Q.     On September 24th?

8   A.     Yes.

9   Q.     Which is a month to the day after the search

10  warrant?

11  A.     Yes.

12  Q.     Multiple opportunities to flee?

13  A.     Yes.

14  Q.     We -- you would agree that the self-surrender

15  kept getting pushed back, pushed back?  Would you agree

16  with that?  It took a little while to get the

17  self-surrender --

18  A.     It took a little while to get the self-surrender in

19  place, yes.

20  Q.     And during that time, you'd agree that the

21  government didn't have passports, correct?

22  A.     We did not.  I think there was some -- during that

23  time frame, though, there was some representations made

24  that the attorneys had their passports.

25  Q.     Correct.  But the government didn't have them?

95

1  A.    We didn't have them.  I think there was one

2  representation made that we had them through the SCS

3  Supply Chain warehouse, but I think now those -- those

4  have been found elsewhere.  But at the time, it sounded

5  like the passports were -- that the passports were in

6  the custody of the attorneys.

7  Q.    Okay.  So let's go back to SCS Canada for a minute.

8  A.    Uh-huh.

9  Q.    We've already discussed he has a relationship with

10  the company.  You can't prove he owns it.  Public

11  records in Canada, whatnot.  And you believe that -- is

12  it your position that SCS -- sorry.

13        Is it your position that SCS Canada is

14  engaged in illegal conduct at this point?

15  A.    To a -- yes.

16  Q.    And to this point, have you reported them to

17  Canadian authorities?

18  A.    No.

19  Q.    Have you indicted anyone there?

20  A.    No.

21  Q.    Have you sought extradition?

22  A.    We haven't indicted anyone yet.

23  Q.    Have you sought any type of discovery or documents

24  or worked with Canadian authorities into SCS Canada?

25  A.    Not at this time.

96

1  Q.    So you have no idea of anything about the

2  operations of the company other than it has a name and

3  some relationship?

4  A.    It has a name.  And then in financial statements

5  for Interstellar General Trading Partners that were

6  obtained out of an iCloud account, we do see that SCS

7  Canada is listed in those financial statements.  And --

8  Q.    I'm sorry.  Pardon me.  Go ahead.

9  A.    Thus, corroborating, to a degree, from the

10  cooperating defendants' statements that product was

11  being sent from SCS Canada over to Dubai, and these

12  would have been your new MacBooks, laptops, non-phone

13  devices that are new that are going to be obtained by

14  some sort of device trafficking and sent overseas for

15  the most part.

16  Q.    And -- and is it your position that Interstellar

17  has zero legitimate business?

18  A.    It's hard for me to say that at this point.  There

19  can always be some legitimate with MacBooks through some

20  sort of seasonal discount.  Maybe some sort of --

21  whatever type of discount, trade-in that could be put

22  into the mix, but overall most of the devices that are

23  going overseas are going to have been obtained through

24  some sort of illegal means.

25  Q.    Okay.  So anything involving cell phones going

1  overseas is illegal?

2  A.    Not just cell phones, but new -- newly obtained

3  devices.   Generally, new in the box, locked or unlocked

4  in bulk.   And so what we've found in these

5  investigations is these brand new devices that are being

6  obtained in bulk by SCS, RJ Telecom, they're going

7  overseas because there's a market over there for those

8  devices.   If they can sell them here -- because

9  oftentimes through transit theft, there is a long delay

10  or sometimes never blacklisting of the device.   That

11  device can be sold locally.   But if they have new

12  devices, RJ Telecom and SCS, based off of records,

13  cooperating defendant statements, those devices normally

14  get sent overseas because there's a network that can

15  support them.

16         They'll make their way to a country that

17  doesn't participate in the blacklist where there's a

18  less chance of a blacklisted device popping up on the

19  blacklist not working here in the United States like it

20  would -- like it would here in the United States.

21  Q.    Are you aware of whether SCS or SCS Canada has ever

22  participated in a carrier auction?

23  A.    I do believe they've participated in carrier

24  auctions, yes.

25  Q.    For the purposes of a clean record, what do you

98

1  understand a carrier auction to be?

2  A.    To a limited degree, that would be a Sprint, a

3  T-Mobile auctioning generally used devices.  Opening up

4  the auction and allowing some people to come in and bid

5  on used devices.

6  Q.    Okay.  And those used devices can then be resold,

7  correct?

8  A.    Correct.  Because, typically, they're anticipated

9  to be clean since they're coming from a carrier auction.

10 There are times, though, where blacklisted devices will

11 still make their way though those auctions.

12 Q.    What happens to those blacklisted devices that made

13 their way through a carrier auction?

14 A.    At a carrier auction, from my understanding --

15 especially in a more -- like, more recently, those can

16 actually be returned to the carrier auction for some

17 sort of discount -- not discount, but exchange.

18 Q.    Exchange or credit?

19 A.    Right.

20 Q.    Are you aware of terms before the recent Exchange

21 Credit Program that were in place during the relevant

22 time period charged in your indictment?

23 A.    Were these terms -- they're more recent.  Yes.

24 They would still fit the time frame, yes.

25 Q.    Are you aware of warnings in terms of conditions

1    and conditions to the auctions relating to percentages

2    of blacklisted phones?

3    A.    No.

4    Q.    Have you ever read all of the terms and conditions

5    of each carrier auction?

6    A.    I've never seen the terms and conditions for

7    carrier auctions.

8    Q.    Would it affect your opinion if they note that a

9    certain percentage of phones purchased could be

10   blacklisted?

11   A.    Related to the used phones or the new phones that

12   we're talking about?  Because primarily this conspiracy

13   is focusing on new phones and new devices.  Because we

14   understand the used devices, there is a much larger

15   grayer gray market, if you will, because it's harder to

16   ascertain where those devices are coming from and if

17   they're blacklisted or not.

18   Q.    Correct.  I understand primarily.  My question is a

19   little different.

20         Are you willing to exclude any used phones

21   from your investigation in the scope of the indictment?

22   A.    In the scope?

23   Q.    Are you willing to exclude those from the

24   indictment?  Any used phones?

25   A.    Any used phones or used phones because there is

1  transit theft that makes its way back into those carrier

2  auctions, right?  And so if those phones are still

3  purchased --

4  Q.    Correct.

5  A.    -- and still sent overseas or disposed of through

6  other means or manners, then they would be included.  If

7  they can tell that they're used clean devices -- we've

8  already seen that in some other cases -- then that

9  wouldn't be included in the scope of the conspiracy.

10  Now, part of that also depends on the commingling of

11  funds.  If they're using funds from the sale of new

12  devices that are being sent overseas and the proceeds

13  come back dirty and then those proceeds are being used

14  to purchase clean devices, that could change the outlook

15  on that.

16  Q.    So used phones may be part of your indictment?

17  They may not be?

18  A.    It just depends if they're purchased with dirty

19  proceeds is the long way of saying that.

20  Q.    So source of the funds?

21  A.    Source of the funds.

22  Q.    So it's not part of the stolen materials count.  In

23  other words, the money laundering count?

24  A.    Yes.

25  Q.    So used phones are limited to money --

1  A.    No.  I apologize.  Did I just say that?

2  Q.    You did.

3  A.    No.  Let me catch myself.  No.  I'm sorry.  So the

4  money laundering count obviously is a part of the

5  perpetuation of the scheme.  Interstate transit of

6  stolen property -- if those -- if those proceeds come

7  back from the sale of interstate -- from stolen property

8  from overseas and those funds are used to purchase used,

9  new clean inventory, then those could be included in the

10  wire count, I would believe.

11  Q.    Okay.  So --

12  A.    Because now you're getting clean money -- let me

13  get my statement right.  Give me one second.  Let me

14  make sure -- you're asking me a question that I have to

15  run through real quick.

16          Definitely -- I would think Count 7.  I can't

17  speak to the other counts right now.

18  Q.    Fair enough.

19          Are you aware of any direct connection

20  between Maaz Aziz and Interstellar?

21  A.    No direct connection, no.  Like as far as there

22  being text messages, e-mails, and things like that?

23  Q.    Sure.

24  A.    No.

25  Q.    Okay.  And so you're talking about stuff from SCS

102

1  Canada to Interstellar, but we have no evidence of

2  Maaz's involvement of SCS Canada.  No ownership, no

3  knowledge or evidence on setting up bank accounts,

4  access to funds, or anything.  And -- I just want to

5  clarify.

6          You don't think that Maaz has contacts

7  sufficient to call someone at Interstellar directly,

8  correct?

9  A.    I don't know at this time.

10  Q.    You have no evidence?

11  A.    I have no evidence.

12  Q.    Okay.

13  A.    Correct.

14  Q.    Do you know how long Mr. -- I'm just going to say

15  Maaz.

16          How long Mr. Maaz has lived in North Texas?

17  A.    For some time, I think.

18  Q.    Give me -- can you quantify your version of "some

19  time"?

20  A.    Yeah.  I mean, is it over ten years?

21  Q.    Ballpark ten.

22  A.    Yeah.

23  Q.    Are you aware that he graduated high school -- went

24  to high school, graduated here in Irving, Texas?

25  A.    I think a little bit of college.

103

1   Q.    A little bit of college here in Texas?

2   A.    Yeah.

3   Q.    Are you aware that he met his -- married his high

4   school sweetheart?

5   A.    I didn't know it was his high school sweetheart,

6   no.

7   Q.    They've been together for almost the whole time

8   that he's been here.  Are you aware of that?

9   A.    No.

10   Q.    Do you know how many children Maaz has?

11   A.    I think he has four children.

12   Q.    And do you know their ages?

13   A.    I do not.

14   Q.    The oldest one is five.  He has four children five

15   and under.

16          Did you know he lives with his mother-in-law?

17   A.    I did.

18   Q.    Did you know that the sister he saw get married in

19   Pakistan now lives in the U.S.?

20   A.    You told me that earlier.

21   Q.    Did you know that his brother lives in the same

22   neighborhood as him?

23   A.    Yes.

24   Q.    Did you know that his mother lives with his

25   brother?

104

1   A.   I did not.

2   Q.   Are you aware that for the remaining family he has

3   in Pakistan, he virtually has no relationship or

4   communication?

5   A.   No.

6   Q.   Would it surprise you if he would -- you'll hear

7   that he considers his life in Texas and not Pakistan.

8   A.   Okay.

9   Q.   Have you reviewed the pretrial services report?

10  A.   I have.

11  Q.   There was discussion of a potential flight risk

12  based on the lack of a job.

13          If he had gainful employment with a

14  22-year-old company that had nothing to do with cell

15  phones that covered his monthly bills, would that change

16  any of your analysis of a flight risk?

17  A.   Depends if the job could cover the monthly

18  expenses.  Did you say that?

19  Q.   It covers the monthly expenses.

20  A.   You're still looking at the weight of the evidence.

21  So even if the job -- even if the job covers those

22  expenses, at the point where the investigation reaches

23  that there's significant time on the table, that could

24  change things.

25  Q.   Correct.  But right now as opposed to qualifying

1  in the "Chicken Little sky is falling worst case

2  scenario" --

3  A.    Uh-huh.

4  Q.    -- today, when this judge has to decide this case,

5  does the presence and existence of a job that covers his

6  monthly expenses -- expenses --

7            MR. CASTLE:  Pardon me, your Honor.

8  BY MR. CASTLE:

9  Q.    -- covers the expenses, coupled with the fact that

10  his family is here, his life is here.  He's built a

11  life.  We can look at the information attached to our

12  response from -- you know, specific involvement with his

13  mom.  You'll hear evidence about his importance to his

14  family, and the fact that he had a month to run and

15  never did.

16            But one thing they dinged him on is he

17  doesn't have verifiable employment.  I'm asking you if

18  there was verifiable employment today -- not six weeks

19  from now, not six months from now, or not six years from

20  now when we're on the eighty-third superseding

21  indictment.  Today does that change your assessment?

22  A.    For today?

23  Q.    Yes.

24  A.    That could be a mitigating factor.

25  Q.    Could be or would be?

1  A.    It could be.  Again, we're talking -- if we're

2  talking about speculative what's going to happen.

3  That's one more thing that could allow him to stay here,

4  but, again, we're talking about what happens when the

5  weight of the evidence becomes too much and there's a

6  sentence out there.  Because a job today is not much

7  different than the last month where he stayed.  Now the

8  fact that he has verifiable employment, that also

9  doesn't mean that he's not going to use his network to

10 supplement that job income, especially if it becomes

11 insufficient after making a very decent living with the

12 SCS Supply Chain proceeds over the last few years.  Now

13 you could move back into needing to supplement that

14 income with a network of device traffickers to get back

15 into device trafficking.

16 Q.    Okay.  So if we're going to play the guessing game,

17 let's -- what happens if I file a motion to suppress the

18 entirety of the evidence from your search warrant and

19 CD 4 and 5 and the Azizs get thrown out, doesn't that

20 mitigate further that that job makes a big difference?

21 I mean, we could play this game all day is my point.

22 A.    Sure.  Yes.

23 Q.    You have no proof he has foreign property, right?

24 No evidence of him owning any foreign property?

25 A.    No.

1   Q.    You have no evidence of him having a foreign bank

2   account?

3   A.    Not at this time.

4   Q.    You have no evidence he's made any plans to try to

5   flee the country?

6   A.    Not at this time.

7   Q.    He's never made an effort, correct?

8   A.    Not that we know of.

9   Q.    He had the chance after August 24th pretty much for

10  a month to flee, correct?

11  A.    He had the chance.

12  Q.    And he didn't, did he?

13  A.    No, he did not.

14  Q.    Instead, he showed up, self-surrendered, and came

15  here for his hearing today?

16  A.    Correct.

17  Q.    Let's go more into your investigation here.

18          This case was -- strength of evidence and the

19  (g) factors --

20          MR. CASTLE:  Your honor, I'll be brief on

21  these.  I know it's been a long day.

22  BY MR. CASTLE:

23  Q.    You first indicted this case in 2020?

24  A.    Correct.

25  Q.    How many people were initially indicted?

1  A.     I think five in the first one.

2  Q.     Okay.  How many people have been indicted now

3  through the fourth?

4  A.     One-hundred-twelve.

5  Q.     And Maaz was not indicted until the fourth

6  superseding --

7  A.     Fourth.

8  Q.     Okay.  And you first became aware of Maaz or SCS

9  Supply Chain when?

10 A.     In March -- late March, early April time frame.

11 Q.     If I told you your slide said April 21st --

12 A.     I think that was the date of the first controlled

13 sale.

14 Q.     First controlled sale?

15 A.     Yes.

16 Q.     Okay.

17 A.     But I think we had actually become aware of him

18 prior to that -- I know we became aware of him prior to

19 that.

20 Q.     Okay.  And then the first controlled sale -- as

21 we're walking through things, was that recorded?

22 A.     Yes.  Audio, video.

23 Q.     Audio, video.

24        Okay.  Is Maaz Aziz on that video?

25 A.     No.

1  Q.    Is he -- is he audibly recorded on that video?

2  A.    No.

3  Q.    Show up in the background as an extra?

4  A.    No.

5  Q.    Okay.  So there's a federal case for about a year.

6        There's no seizure warrant, correct?

7  A.    Seizure?

8  Q.    Seizure warrant at the warehouse?  Is that a

9  seizure warrant?

10 A.    A search warrant.

11 Q.    Okay.  So after you first learned about him, you

12 let SCS continue operating for about six months?  Would

13 that be -- give or take, six or seven months?

14 A.    April to August.  I wouldn't say that we let them

15 operate.  That was the time frame that we were beginning

16 to collect the first part of our evidence, yes.

17 Q.    So is it March or April?  March or April?  March,

18 April?

19 A.    Yeah.  It's late March, early April because part of

20 that -- first identified through the review of bank

21 statements as a major supplier for RJ Telecom, Smart

22 Cellular Solutions.  And then you move into identifying

23 other parts of them leading up to the controlled sale on

24 April 21st.

25 Q.    Okay.

1    A.    So it is kind of that general time frame.  But

2    really where they first -- where they first became --

3    when we became very aware of them in the investigation

4    is when a controlled sale with one of their suppliers

5    Dawn Wireless -- surveillance followed them to SCS

6    Supply.  Before that it was just on paper and trying to

7    obtain more information about them as a company.

8    Q.    Okay.  And why did you run the search warrants at

9    each of the four locations we've discussed earlier?

10   A.    Why?

11   Q.    Uh-huh.

12   A.    At SCS -- at SCS we ran the search warrant after

13   seeing four controlled sales going there to determine if

14   that's where -- if there were other stolen property in

15   that warehouse after we saw device trafficking through

16   surveillance go there and three controlled sales with

17   Gizmobile, which is an entity related to SCS Supply.

18   The Gizmobile after doing -- the other thing we were

19   looking for there in the SCS Supply warehouse was

20   records.

21        So when we conducted our search warrant at

22   RJ Telecom's Global One Wireless cell phone repair

23   store, which would be similar to Gizmobile, we obtained

24   a computer there.  We were able to obtain records --

25   Excel spreadsheets that documented the purchase and sale

1    of these transactions.  And so in doing that, we thought

2    that a search warrant at SCS Supply Chain could result

3    in additional records helping to identify more device

4    traffickers, individuals selling devices to them, where

5    they're selling the devices to at that point.

6                For Gizmobile, it was the same thing.  The

7    transactions were happening there.  We are looking to

8    obtain computers there.  Any other new stolen devices

9    that could be there that we could trace back to being

10   stolen.  That was the purpose for Gizmobile.  And then

11   at the residences, to obtain cell phones so we could

12   obtain messages, chats, e-mails to show correspondence

13   between device -- other device traffickers, other

14   suppliers, wholesalers.  Also looking for any other

15   types of stolen property that could be at the house.

16   Computers or anything else that might have records in

17   it, stolen property, or -- or cell phones.  Those type

18   of things.  Additional evidence to substantiate the

19   evidence that we had at that point.

20   Q.    Okay.  What was the probable cause that existed at

21   the time of the search warrant for his home?

22   A.    For the home?

23   Q.    Yes.

24   A.    We had conducted the controlled sales at Gizmobile,

25   a controlled sale with Ali Anwar for Dawn Wireless.

112

1  Those all led back to SCS warehouse.  We have a FBI

2  white collar investigation that involves -- I'm sorry.

3  Let me hold -- let me retract that.

4          We had the Samsung investigation with Avaz

5  Karimov who was purchasing devices from Clifton Smith

6  who worked at the warehouse.  Those devices were popping

7  up through the Canadian companies that had purchased

8  those from SCS warehouse through Gizmobile.

9  Essentially, various investigations to show the

10 involvement or other -- other evidence in this

11 investigation of Saad and Maaz Aziz.  We also had

12 surveillance at those two residences.  And on one

13 morning, the TFO conducting surveillance saw them leave

14 with boxes out of their residence and drive from their

15 residence to SCS Supply Chain.  I can't remember which

16 individual that was.

17 Q.    Okay.  A TFO?

18 A.    TFO, task force officer.  I'm sorry.

19 Q.    Just for a clean record.

20 A.    Sure.

21 Q.    Okay.  On the controlled sales at Gizmo, was Maaz

22 on the video or audio?

23 A.    No.

24 Q.    Of the controlled sales at Dawn, was Maaz on the

25 video or audio?

1  A.    No.

2  Q.    The Samsung investigation with Avaz Karimov --

3  A.    You're right.  Avaz Karimov.

4  Q.    Was there any evidence at that time or today of any

5  direct communications between Maaz and Avaz?

6  A.    Avaz Karimov, no.

7  Q.    And then the surveillance -- you saw somebody

8  carrying boxes.  One of the brothers carrying boxes.

9  You don't know which one?

10 A.    Yeah.  I can't recall which one.

11 Q.    Boxes?

12 A.    Yes.  I don't know exactly what the boxes were at

13 this time.

14 Q.    Is there any evidence of a crime at his home?

15 A.    No.  The other part of that is oftentimes these

16 guys that we've seen in this investigation is they use

17 their cell phones to communicate with other individuals.

18 Those cell phones are usually kept on person.  So those

19 cell phones are going to contain evidence that -- or we

20 would believe there to be of correspondence of e-mails,

21 of purchase orders, of Excel spreadsheets that are

22 passed back and forth.  So those -- that type of

23 evidence is often found on cell phones.

24 Q.    And, again, just for the record, cooperative, to

25 the best of your knowledge, during the execution of the

1  search warrant?

2  A.    Yes.

3  Q.    And his four children were there?

4  A.    I would imagine so, but I can't --

5  Q.    And his wife was there?

6  A.    Yes.

7  Q.    And not hostile at all?

8  A.    No.

9  Q.    Not resistant?

10 A.    No.

11 Q.    You would agree, wouldn't you, Agent, that the mere

12 presence of stolen items is not a felony, right?  You

13 can't accidentally commit a felony, right?

14 A.    Say that again.

15 Q.    You can't accidentally commit a felony, right?

16 A.    In what way?  What are you --

17 Q.    I'm saying mere possession of stolen goods is not

18 in and of itself a felony, correct?

19 A.    You're saying the knowledge component?

20 Q.    Correct.

21 A.    Okay.

22 Q.    You would agree then that you can't accidentally

23 commit a felony?  I'll represent that the Supreme Court

24 agrees with me.

25 A.    That makes sense, yes.

115

1  Q.    You have to knowingly and intentionally do it,
2  correct?
3  A.    Correct.
4  Q.    As we sit here, do you agree that each one of these
5  crimes has an actus reus -- I get to go back to law
6  school.
7            MR. CASTLE:  I've discussed law school for
8  the second time today, Judge.
9  BY MR. CASTLE:
10 Q.    An actus reus and a mens rea.
11           What is the proof that Maaz Aziz knew
12 anything was stolen?
13 A.    When you're talking about the Bissell vacuum
14 transaction --
15 Q.    I'm talking about any proof.  Let's talk about the
16 DeWalt one.  That's one you were really proud of.  We'll
17 go to the DeWalt drill transaction.
18 A.    I don't know that he was involved.  I think that
19 was Saad.
20 Q.    That's Saad.  Okay.  We'll go with the Bissell
21 vacuum.
22 A.    Correct.
23 Q.    Okay.
24 A.    So you're arriving to a Best Buy parking lot.
25 There's two U-Hauls there.  You hand over $20,000 in

1  cash.

2  Q.    Okay.

3  A.    And you drive away in two U-Hauls.  You get to the

4  loading dock.  You unload brand new in the box vacuum

5  cleaners.

6  Q.    Okay.

7  A.    At that point, you drive the U-Hauls away, but you

8  don't drive them back to the same spot.  The individual

9  that sold them to you didn't come with you to your

10  warehouse.  He doesn't -- he is not there to drive the

11  U-Hauls away.  You leave him there, and you go drive

12  these U-Hauls separately.  And then you drive them back,

13  and you park them in different places.

14        You also have a cooperating defendant who

15  says these were clearly stolen based off the price

16  volume, based off of the volume, the pricing.  They're

17  new in the box.  They know that the cooperating

18  defendant's not in the business of selling large

19  quantities of any types of goods.  And to be able to

20  come across these types of products, he doesn't have

21  that capability especially at such a reduced pricing.

22  Q.    So it's speculation?  Supposition?

23  A.    I wouldn't say that.  I would call that different

24  forms of evidence to form a picture.

25  Q.    Let's break that down a little bit.

1          Is it illegal to use a U-Haul truck and

2    conduct a legitimate business?

3    A.    Not when you break it down individually.

4    Q.    No.  We're going to take it piece by piece.  We're

5    going to come back to this.  It's fascinating that's

6    it's knowledge of a crime.

7          Is it illegal to use cash?  Are $100 bills

8    still legal tender in the United States?

9    A.    They are.

10   Q.    Is it an acceptable form of payment outside of

11   COVID?

12   A.    It is.  It's also indicative of criminal activity.

13   Q.    So when I paid dinner -- cash for dinner last

14   night, that was criminal activity?

15   A.    It depends if it was $20,000.

16   Q.    That would be a heck of a dinner.

17          My point is when you say he's not --

18   A.    Not just the use of it in and of itself, no.  It's

19   multiple factors taken together.

20   Q.    Okay.  Are you aware of auction sites that exist,

21   Agent?

22   A.    Like, for consumer goods?  Different auction sites?

23   Q.    No.  No.  Just like this.  DeWalt drills, Advanced

24   Auto Parts, B-Stock Auctions.  Have you ever heard of

25   them?

118

1   A.    I have heard of B-Stock Auctions.

2   Q.    Do you know what they do?

3   A.    No.

4   Q.    Okay.  Because this is going to fascinate you.

5         B-Stock Auctions takes all of the overstock,

6   the surplus, the stuff they didn't sell from

7   manufacturers and sells it cheap.  I'll give you a prime

8   example.  One of my clients --

9         MR. GONZALEZ:  Defense counsel is testifying.

10  Is there a question coming?

11        MR. CASTLE:  There's a question coming,

12  absolutely.  I had to preface it with a question for

13  my --

14        Sorry, Judge.

15        THE COURT:  Is there a question?

16  BY MR. CASTLE:

17  Q.    Question:  Are you aware of how B-Stock operates?

18  A.    No.

19  Q.    Are you aware that B-Stock agrees to sell bulk for

20  manufacturers?

21  A.    No.

22  Q.    Would you have any reason to disagree that they

23  routinely sell in bulk at a markedly steep discount?

24        MR. GONZALEZ:  I'm going to object.  It's

25  already been asked and answered.  He said he doesn't

1  know anything about B-Stock Auctions.

2              MR. CASTLE:  That actually mischaracterizes

3  his prior testimony.  He said he was aware of B-Stock.

4  I'm asking what knowledge he knows.

5  BY THE WITNESS:

6  A.    Yes --

7              THE COURT:  Gentlemen, the Court does

8  certainly understand the line of questioning that you're

9  trying to pursue.  I get the point that you're making.

10             Let's go ahead and move on.

11             MR. CASTLE:  Okay.

12  BY MR. CASTLE:

13  Q.    When you ran the search warrant of the business,

14  were you ever present?

15  A.    No.  Not during the search warrant.  At some point

16  during the day, I arrived just to see, but I wasn't

17  involved in the actual searching.

18  Q.    Okay.  Did you hear of anything at -- I'll condense

19  it -- at SCS and Gizmobile of, you know, non-cooperative

20  behavior?

21  A.    No.

22  Q.    Are you -- did you receive any reports of hostility

23  towards the agents executing the warrants?

24  A.    No.

25  Q.    Did they essentially say, hey, here's the keys to

1 the warehouse --

2 A.    Yes.

3 Q.    -- make yourself at home?

4 A.    Correct.

5 Q.    And they've stopped operating since then?

6 A.    Correct.  Because we're still conducting the search

7 warrant.

8 Q.    And going back to the end, prior to the issuance of

9 the indictment, you told them that you were going to

10 indict them?

11 A.    Correct.

12 Q.    And they still didn't flee?

13 A.    Correct.

14 Q.    Let's go to the COVID chart or the COVID slide you

15 mentioned earlier.  I'm going to bounce around a little

16 bit here and try to get through this quickly.

17          You're saying that what is -- actually, I'll

18 ask you because I've been a little bit baffled.

19          What was the purpose of raising the allegedly

20 falsified COVID test result in connection with this

21 detention hearing today?

22 A.    Just the fact that they have the ability to forge

23 documents or are willing to forge documents and that

24 this is a condition -- the COVID-19 test to fly is a

25 condition, and that condition is not being -- according

1  to our cooperating defendant, it's not being adhered to.

2  It's not being followed.

3  Q.    Do you know the source of that condition?  What I

4  mean by that is:  Is it a guideline or regulation or a

5  statute?

6  A.    Well, the airline was asking for a COVID test.  So

7  I would assume they would want a test result that's

8  actually been --

9  Q.    And we saw a bit and piece of that.  You would

10  agree that forging -- strike that.

11          You would agree that changing a name on one

12  piece of paper by PDF is significantly rudimentary

13  compared to forging a United States passport?

14  A.    It's not nearly as extensive, no.

15  Q.    And you're saying that by changing the name on a

16  negative test result, a skill my eighth grader learned,

17  is indicative of an ability to forge documents?

18  A.    I'm saying it's the willingness to engage in

19  forgery.  It's the willingness to take -- to take a test

20  result, falsify that, and you use it.  It's the

21  willingness to do that.

22  Q.    Willingness without ability is indicative of

23  nothing, though, correct?

24  A.    That's correct.

25  Q.    Okay.  You have no evidence they have the ability

1  to forge a passport or any travel --

2  A.    No.   It's just the fact that there's other

3  individuals in this investigation that are skilled at

4  trading identity sets.

5  Q.    And you presented and offered no evidence other

6  than vague speculation of any direct tie between

7  Maaz Aziz and any of those individuals?

8  A.    Correct.

9  Q.    Correct?

10 A.    Just by the line of work, correct.

11 Q.    Well, I've heard those are the traffickers -- the

12 people that work for the traffickers, low --

13 A.    We also had suppliers and wholesalers that know

14 these individuals and deal with these individuals as

15 well.

16 Q.    You would agree you presented no evidence that Maaz

17 knows any of them, correct?

18 A.    I do not know at this time.

19 Q.    You've presented no evidence of any communication

20 between Maaz and any of those people who are identity

21 theft or counterfeit identities?

22 A.    Correct.

23 Q.    And just to clarify, in the indictment, you would

24 agree there is no count for counterfeiting phones,

25 correct?

123

1  A.    No.

2  Q.    Would you also agree you didn't find any

3  counterfeiting document-making machines?  Laminators?

4  You know, for passports?

5  A.    For documents, no.  Correct.

6  Q.    So while somebody somewhere in this several hundred

7  person scheme that he's never talked to and has no

8  direct relationship -- the fact that they're here on an

9  allegation and we're over here, you're saying that leads

10 to him being a flight risk?  Is that your position?

11 A.    I'm saying it opens the door to a possibility where

12 other people who don't have that association -- they

13 weren't involved in that type of crime -- might not have

14 that ability to reach out and find someone that has the

15 ability to create a passport or create an identity set.

16 Q.    And you would agree there is no evidence he has the

17 ability to do that?

18 A.    To create the passport or to reach out and find?

19 Q.    To reach out to find --

20 A.    I mean --

21 Q.    -- directly with eight phone calls or nine?

22 A.    We have cooperating defendants who say he purchased

23 on the streets.  He was dealing with the streets as far

24 as device traffickers.  Those types of individuals do

25 come into contact with people that can manufacture

124

1  identities.

2  Q.    My point --

3  A.    So it's possible, yes.

4  Q.    Possible, again, but no evidence it's ever

5  happened?

6  A.    No evidence.

7  Q.    No evidence he sought it since the search warrant?

8  A.    No evidence.

9  Q.    There is no evidence that he's been involved in any

10  robbery, correct?

11  A.    No.

12  Q.    And then you already mentioned that a cooperating

13  defendant mentioned Awais Chodhury?

14  A.    Awais Chodhury, yes.

15  Q.    Awais Chodhury said he took a gun.  Mr. Gonzalez

16  characterized it as used a gun in making a sale.

17          You would agree that there's a difference in

18  using a gun in a sale and simply possessing a firearm?

19  A.    If the gun was taken there as a means of security

20  to make sure that everything happened good with the

21  dealer if something went bad, I would say that the gun

22  was taken as part of the deal.  It maybe wasn't used

23  like pointing or some sort of robbery, but it was there

24  as a tool to ensure security.

25  Q.    And do you know if a gun was ever pulled or

125

1  otherwise brandished?

2  A.    I do not.

3  Q.    You have no reports of that, correct?

4  A.    Correct.

5  Q.    And the efforts to tie -- we talked about this

6  briefly, but just since you used that to tie this to gun

7  violence, you testified earlier there is no evidence of

8  any direct communication between Mr. Karimov and Maaz,

9  correct?

10  A.    No.

11  Q.    And, in fact, didn't the Richardson Police

12  Department open an investigation into his criminal

13  complaints?

14  A.    Correct.

15  Q.    So -- okay.  So they believed it was not credible

16  either?

17  A.    From both sides.

18  Q.    Correct.

19        MR. CASTLE:  I'm almost done, your Honor.

20  BY MR. CASTLE:

21  Q.    You've offered no evidence that Mr. Aziz -- Maaz

22  has been involved in making -- anything dangerous to the

23  community, correct?  Physical danger to the community?

24  A.    Like, physical danger?

25  Q.    Correct.

126

1  A.    Correct.

2  Q.    And he's not threatened physical danger to the

3  community?

4  A.    Correct.

5  Q.    No evidence of any violence, correct?

6  A.    Correct.

7  Q.    Okay.  And your economic damages were based on your

8  belief to be continuing to operate this business you

9  contend is a criminal enterprise, correct?

10 A.    Correct.

11 Q.    Is there any evidence he's been involved in this

12 since the indictment?

13 A.    No.

14 Q.    Since the search warrant?

15 A.    No.

16 Q.    So the threat you're concerned about, again, is

17 prospective?  If things go back and the charges get

18 worse and the evidence gets worse -- today you have no

19 evidence he's done anything, correct?

20 A.    Today we have no evidence.

21 Q.    Okay.  And if his job has nothing to do with cell

22 phones that would cause you no concern either, correct?

23 Or devices?

24 A.    I would think -- we would encourage a job that has

25 nothing to do with cell phones or cell phone devices.

127

1   Q.   Yes.  And then like we've talked about earlier,

2   what percentage of their business would you say were

3   phones and device -- electronic devices or consumer

4   electronics?

5   A.   Just based off of the bank statements that we

6   have -- the limited bank statements -- when you see --

7   just a rough estimate, without going back to the slide,

8   $37 million.  I would say that would -- that would be

9   your devices just as a baseline because you're not going

10  to ship Bissell vacuums overseas to Dubai.

11  Q.   And you also mentioned that you're aware they have

12  done business through carrier auctions, correct?

13  A.   Yes.

14  Q.   And carrier auctions are a legitimate business,

15  correct?

16  A.   Carrier auctions can be, yes.

17  Q.   And buying stuff from Amazon or from other carrier

18  auctions or places like a B-Stock is a legitimate way of

19  doing business, correct?

20  A.   Correct.

21  Q.   You're not saying everything they touched was

22  illegal?

23  A.   I don't know the extent of what they touched

24  otherwise at this point in the investigation.  But if

25  they were touching stuff from a B-Stock auction, we've

1   yet to see that at the warehouse.  Everything that we've

2   come into contact with has come back to some sort of

3   offense, but that investigation is continuing as well.

4   It's not like we're finding something there that came

5   back to a B-Stock with the serial number or anything

6   like that.

7   Q.    Okay.  So anything that was legitimate, that would

8   be outside of the scope.  And if he's no longer working,

9   which he hasn't in a month, would that reduce your

10  concerns about economic harm or the threat of economic

11  harm?

12  A.    If he ceases -- I mean, clearly if he stops

13  engaging in any type of device trafficking and he begins

14  working at another job if released, that helps mitigate

15  those concerns, but that's also assuming that that --

16  that he doesn't reengage into device trafficking if need

17  be later on.  That the network would still be there.

18  The ability would still be there.

19  Q.    And right at the very end of your testimony with

20  Mr. Gonzalez earlier, you mentioned that you assumed --

21  your slide -- but Maaz and Saad have the ability to

22  reach out and sell directly internationally?

23  A.    Correct.

24  Q.    But you don't know that, do you?

25  A.    Well, I mean, they are interacting with Dubai

129

1  entities now.  Things -- companies like Action

2  Logistics, SCS Supply Canada.  That can all be done

3  through FedEx.  You don't need a warehouse to ship those

4  devices overseas.  Other wholesalers do not have a

5  warehouse.  So that could be done without a warehouse

6  collecting these devices on the street or from

7  individuals obtaining them through fraud, theft, or

8  robbery and then shipping overseas.  Those contacts

9  could still be in place.

10  Q.    So you're assuming they are?  You don't know

11  they're in place still, correct?  You don't know they're

12  in place, so you're assuming they're in place?

13  A.    Correct.

14  Q.    And you have no evidence that they've done any of

15  that, though, correct?

16  A.    No evidence.

17  Q.    Again, speculation, postulation based on worst case

18  scenario, correct?

19  A.    Correct.

20          MR. CASTLE:  Nothing further, your Honor.

21          THE COURT:  Thank you.

22          Mr. McCarthy.

23          MR. MCCARTHY:  Proceed, your Honor?

24          THE COURT:  Pardon me?

25          MR. MCCARTHY:  Proceed?  Can I proceed?

130

```
 1              THE COURT:  Yes.
 2                    CROSS-EXAMINATION
 3  BY MR. MCCARTHY:
 4  Q.    Is it Doering?
 5  A.    Doering.
 6  Q.    Doering.  Okay.
 7              Agent Doering, just a few questions.  I'll
 8  try to be as efficient as possible.
 9              Honing in to kind of the first, say, 20 to
10  30 minutes of your testimony, I want to focus in and
11  narrow it to Saad Aziz.  That's it.  Not 90 other
12  people.  Just him.
13  A.    Correct.
14  Q.    So when I'm asking you questions, that's who I'm
15  asking about.
16              You said you had experience with Title III.
17  But you have no T-III -- no Title III evidence
18  whatsoever against Saad Aziz?
19  A.    No, sir.
20  Q.    As far as the -- it looks like you had numerous
21  undercover buys, video, audio, and all that kind of
22  thing, right?
23  A.    Correct.
24  Q.    It's been about a two- -- two- to three-year
25  investigation?
```

131

1  A.    No, sir.  This began in December of 2020.

2  Q.    I thought that was the first indictment.

3  A.    December of 2020.

4  Q.    But you started investigating before that?

5  A.    No, sir.  We started in December of 2020.

6  Q.    Oh, okay.  About a year?

7  A.    It was a robbery crew.  And we were able to

8  interdict and arrest the robbery crew in very short

9  order.

10 Q.    Okay.  But you've had several undercover

11 audio/video buys since then?

12 A.    Correct.  Those began in April of 2021.

13 Q.    And my question is in all of the undercover buys --

14 undercover tapes, had Saad Aziz ever been present on

15 video even once?

16 A.    No, sir.

17 Q.    Has he ever been present on audio even once?

18 A.    He's present -- not on the undercover buys, but

19 there are some cell phone -- in cell phone chat

20 messages -- messages going back and forth with his voice

21 on those, but I wouldn't -- if you're asking just about

22 undercover buys, no.

23 Q.    Yes.  Audio, video --

24 A.    Got you --

25 Q.    Criminal activity caught on film on audio or video?

132

1    Usually, it's both together.

2    A.    Not concerning the controlled buys.

3    Q.    Correct.

4    A.    The --

5    Q.    Just to be clear, when you showed that big chart

6    that says RG [sic] Telecom at the top and has all these

7    people going down --

8    A.    Correct.

9    Q.    -- they're not RG Telecom.  They're SCS Supply,

10   correct?

11   A.    Correct.

12   Q.    So all that evidence -- that's RG Telecom -- I just

13   want to be clear.  That's not their company, correct?

14   A.    No.  Their company is SCS Supply Chain.

15   Q.    And there was about 100 people -- 103, 102 people

16   indicted before them; is that right?

17   A.    Correct.  102.

18   Q.    Okay.  So they didn't make the top 100?  It's fair

19   to say that?

20   A.    I wouldn't say that.  That's just the order that we

21   were able to obtain evidence throughout the

22   investigation.

23   Q.    Okay.  And talking about the evidence, there's no

24   evidence that Saad Aziz committed robbery?

25   A.    No evidence.

133

1   Q.    There's no evidence that Saad Aziz committed

2   identity theft?

3   A.    Himself?

4   Q.    Yes.

5   A.    No.

6   Q.    Remember, I'm asking about Saad Aziz.  Not other

7   people.

8   A.    Correct.

9   Q.    And Mr. Castle already asked you this.  They

10  brought the 10,000 people or the 10,000 identities -- do

11  you remember all that?

12  A.    Correct.

13  Q.    Did Saad Aziz steal, based on your evidence, one of

14  the 10,000 identities?

15  A.    He didn't steal, but he helped facilitate that.

16  Q.    Sir, is he directly connected to the identity theft

17  of a person himself?

18  A.    Not that I have knowledge of.

19  Q.    Okay.  Is that a no?

20  A.    No.

21  Q.    He didn't go steal somebody's identity, did he?

22  A.    No, not that I --

23  Q.    He didn't walk into a store and basically get a

24  bunch of cell phones saying he's Joe --

25  A.    No.  I don't have any evidence of Maaz doing

134

1 that -- or -- I mean -- sorry -- Saad Aziz doing that.

2 Q.    There's no evidence that Saad Aziz brandished a gun

3 at any point in this investigation?

4 A.    No.

5 Q.    No evidence that he went somewhere with somebody

6 that had a gun to do something, correct?

7 A.    The only evidence I have of that is a cooperating

8 defendant's statement.  Cooperating Defendant 4 who

9 advised at 1:00 in the morning he got a call to come to

10 the SCS warehouse to help unload a shipment that

11 Dawn Wireless had brought over.  They were called

12 gaylords -- like, big canisters, essentially.  And

13 Cooperating Defendant 4 said he believed he was there

14 because he often carries guns.  He would have a gun on

15 him to help provide security during the transaction

16 since it was late at night.

17 Q.    He believed that he would?

18 A.    He gets the call.  Not everything is spoken.  Why

19 else would he be getting a call to arrive at SCS at

20 1:00 in the morning for a shipment where there could be

21 a large amount of money involved?

22 Q.    Okay.  Just for argument -- let's take assumptions

23 out of it.

24        Do you have any evidence of him with a gun?

25 A.    Not him with a gun, no.

135

1  Q.   No.  Let's talk about the -- you said the -- you're

2  worried about the flight risk because the charges could

3  get greater; is that right?

4  A.   Correct.

5  Q.   Okay.  Are you aware that you charged him, at least

6  by my count, with three 20-year counts and a 5-year

7  count?

8  A.   Correct.  Twenty years.

9  Q.   And you've alleged $100 million in the indictment?

10  A.   Correct.

11  Q.   And that indictment has been out there for about

12  ten months, right?

13  A.   No.  The indictment for the $100 million has been

14  out there since August 24th.

15  Q.   Okay.  With the $100 million loss and -- if you

16  stacked them, a 65-year exposure, I mean, it can't get

17  much worse, can it?

18  A.   Correct.

19  Q.   And he didn't leave, did he?

20  A.   No.

21  Q.   He didn't buy any tickets to Dubai or Pakistan or

22  anywhere else, did he?

23  A.   No, he did not.

24  Q.   Are you aware he hasn't been to Pakistan?  He was

25  in Pakistan two years ago for a wedding and that's it.

136

1  A.    That's all I'm aware of now.

2  Q.    He hasn't been to Canada for two years?

3  A.    Correct.

4  Q.    With respect to Canada, Jawaad Farooq, you didn't

5  indict him, did you?

6  A.    No.

7  Q.    You indicted 114 people, and you didn't indict

8  Jawaad Farooq?

9  A.    We're still investigating.

10 Q.    Okay.  But safe to say -- and you haven't called

11 Canada to say, hey, you got a big illegal operation

12 going on up there, do something?

13 A.    Not at this point.

14 Q.    Did any Canadian authorities whatsoever submit

15 information saying, hey, you got to look into this, do

16 something, look at all this stuff, look at the

17 PowerPoint presentation?

18 A.    Not at this point.

19 Q.    All right.  So is it possible that Jawaad Farooq

20 could be operating a legal business in Canada?

21 A.    I mean, it's possible.

22 Q.    In fact, as we sit here right now, you don't have

23 any direct evidence of illegality in the Canadian

24 facility?

25 A.    The only evidence I have is what I've already

137

1  stated.

2  Q.    You said you think.  I get that.  I'm saying hard

3  evidence of illegality in the Canadian facility, you

4  don't have any as you sit here today understanding that

5  you're still investigating?

6  A.    Correct.

7  Q.    You have the $390,000 from Wal-Mart.  Do you

8  remember that part?  Anker?

9  A.    Anker.

10  Q.    So Anker -- you haven't contacted Anker to ask them

11  if the sale was made to SCS Supply, correct?

12  A.    We've been attempting to.  We've had difficulty.

13  We finally -- we were finally able to make contact.

14  Q.    So you can't say as you sit here to this judge

15  whether that was a legitimate purchase or not?

16  A.    The only thing I can say is what Wal-Mart

17  investigations told us, which is that product is unique

18  to them through their online sales.  SCS isn't

19  authorized to have that product, and that product never

20  touched Wal-Mart.

21  Q.    But until Anker answers the question, you don't

22  know, correct?

23  A.    Anker would confirm it, yes.

24  Q.    And as far as this $1.1 million in property, you

25  could go put a lis pendens on that today, could you not?

1  A.    We're still working on it.  Part of the problem is

2  the tracing.  There's so many bank accounts.  There's

3  still bank accounts out there.  We're working on the

4  tracing.  Our forensic accountants are still in the

5  process of working towards that.

6  Q.    But you agree that a lis pendens -- I mean, they're

7  not tough to put on a property by the United States

8  Government?  They do it all of the time?

9  A.    My understanding is it requires a seizure warrant,

10  which is what we're still working through with the

11  tracing.

12  Q.    And as far as the seizure warrant, you became aware

13  of SCS in April approximately 2021?

14  A.    Correct.

15  Q.    April, May, June, July, August 24th.  No

16  injunction?  No seizure warrant?  No actions taken to

17  shut down the business?

18  A.    Not at that time.  The investigation is moving --

19  we start out with a small amount of evidence and that

20  continues to increase.

21  Q.    Okay.

22  A.    We reach out for bank subpoenas.  Those don't come

23  back overnight.  Those take time to come back.  You get

24  bank subpoenas.  You realize you have to get other bank

25  subpoenas.  I mean, it's a process.

1  Q.    Okay.  But I guess the point being is this massive

2  danger to the community that you have -- you did not

3  take those measures with the injunction or some type of

4  seizure warrant at least for those month periods; is

5  that right?

6  A.    No.  We were still -- that would have prevented --

7  go ahead.

8  Q.    And I'm not attacking.  I'm saying the follow-up is

9  that company is now being operated by the FBI, correct?

10  A.    I wouldn't say operated.

11  Q.    Owned?  Possessed?

12  A.    We're possessing the warehouse at this time.

13  Q.    No one else can come in?

14  A.    Correct.

15  Q.    Except for you?

16  A.    Yes.

17  Q.    And you have no evidence that Mr. -- I'm sorry.

18  Saad.  I'll just say Mr. Saad.

19           Mr. Saad is operating SCS here, Canada, or

20  anywhere else, correct?

21  A.    Just cooperating defendant statements.

22  Q.    But no evidence that he's operating it now?

23  A.    No.  I'm sorry.  No.

24  Q.    Correct.  And then as far as the -- I know you

25  talked about this a little bit.  I don't know if I can

140

1  ask this elegantly.

2          When Mr. Castle kept asking you there is no

3  evidence of this with respect to Mr. Maaz, would any of

4  your -- without me having to ask every single question

5  that he did, would any of your answers change with

6  respect to Mr. Saad?

7  A.    Just Saad where he told the cooperating defendant

8  that he had properties in Pakistan and they were doing

9  good.  So that would change in respect to him because

10 Maaz didn't have that.

11 Q.    I mean, do you have any indication -- I mean, a

12 cooperating defendant text, e-mail, anything whatsoever

13 suggesting that he's going to go back to some property

14 in Pakistan?

15 A.    No, sir, not at this time.

16 Q.    You've already talked to Customs.  Any indication

17 that he's trying to buy tickets?  Bought tickets?

18 Anything like that trying to flee?  Trying to go?

19 A.    Not at this point.

20 Q.    I also noticed the search warrants at the three

21 locations -- I apologize.  This is not a criticism, but

22 it just struck me as odd so that's why I'm asking.

23          They're state search warrants.  You have a

24 federal case.  Why weren't you using a federal search

25 warrant to investigate your case?  Why do you use a

1   state search warrant?

2   A.   At the time, we made the decision to go with state

3   process.

4   Q.   Do you know why?

5   A.   Why?

6   Q.   Why?  You're the lead agent.  That's unusual.  Why

7   did you do that?

8   A.   I've worked with Mr. Gonzalez for a long time.  We

9   routinely use state process.  He has no problem

10  defending state process.  We have task force officers

11  that assisted with this, state officers, and so we went

12  forward with using state paper on these locations.

13  Q.   Okay.  I mean, was there any other basis?  I mean,

14  is there an evidentiary basis?  Is it easier to get a

15  state search warrant than a federal and that's why it

16  was done?

17  A.   We wrote the warrant to the exact same probable

18  cause standard and the exact same manner that we wrote

19  the federal warrants.

20  Q.   Okay.  And was there -- I think he asked this.  But

21  there wasn't any evidence of a crime in Mr. Saad's

22  house, correct?

23  A.   Not that a crime was occurring, no.

24  Q.   Just like you said no for Mr. Maaz?

25  A.   Correct.  The only thing that might be, depending

142

1  on what was in those boxes that were delivered to SCS,

2  which we've routinely -- we've seen on other occasions

3  stolen property or property represented to be stolen

4  going to SCS.

5  Q.    Okay.  But you would agree with me that you can't

6  see inside the box, right?

7  A.    No.  No.

8  Q.    So anything could be inside the box?

9  A.    Correct.

10  Q.    It could be his kids' toys for all you know?

11  A.    It could.  It could also be other property.  So --

12  Q.    It could be crack?  I mean, you just don't know,

13  right?

14  A.    Right.

15  Q.    Okay.  But the boxes were the basis for getting

16  into the house that you know of?

17  A.    That was one part of the basis.

18  Q.    What were the other parts?

19  A.    Just the overall evidence that had been accumulated

20  to that point showing their involvement or their

21  company's involvement with device trafficking.

22  Q.    No.  No.  I mean into his home specifically.

23  A.    The boxes helped provide the probable cause.  And

24  then looking for instrumentalities; cell phones,

25  computers, laptops.  These things are often on people's

143

1    persons.  In fact, cell phones are such an intricate

2    part of the person, it requires a search warrant at this

3    point.  So we know through this investigation that cell

4    phones are common -- routinely being used for

5    correspondence with device traffickers, with

6    wholesalers.  If -- so to obtain those cell phones could

7    provide evidence -- evidence in nature.

8    Q.    Okay.  Last question on this point.  You're not --

9    you're not saying that if I have a cell phone and you

10   think I'm a criminal walking into my house, you can now

11   search my home, right?

12   A.    No.  There's other evidence -- yes.  I mean,

13   there's other evidence that goes into that search

14   warrant, but that's one thing that can be searched for.

15   Q.    The inventory -- there's about 2 million items

16   inside this 40,000 square foot warehouse?

17   A.    Correct.

18   Q.    How many have you been through?  How many has the

19   FBI been through?  What percentage approximately?

20   A.    I don't know what that percentage is.  So they've

21   been working on a daily basis for the most part, and

22   they are inventorying that as we go.  But you're right.

23   I mean, there's a large amount of property that's taking

24   time to get in there.

25   Q.    I mean -- and, again, I'm not -- like, ballpark

144

1  20 percent, or are we talking you've gone through, like,

2  90 percent?

3  A.    Not 90 percent.  I would say somewhere in -- just

4  ballpark 40 -- 40 percent maybe.

5  Q.    So 60 percent has yet to be gone through?

6  A.    We're still working on it, yes.

7  Q.    Okay.  And would you agree with me that -- now, I

8  am asking you to speculate.

9            There could be in all of this a large

10  percentage of items that don't come back with any

11  problems whatsoever, correct?

12  A.    Those items that we haven't got to yet?  I mean,

13  that could be.  I mean, that's not what we've seen so

14  far, but that could be.

15  Q.    You would agree with me eBay, Amazon -- I mean,

16  they've all got stolen products in their warehouse

17  unbeknownst to them, correct?

18  A.    Correct.

19  Q.    And as far as -- I mean, when you get down -- I'll

20  get to the question.

21            Where is the proof that Mr. -- I'll say

22  Saad -- knowingly sold stolen goods?

23  A.    It would be the same thing.  It would be chat

24  messages with cooperating defendants negotiating for

25  prices that are much less than the retail price, the

145

1    quantity of product all at one time.  So you have a

2    large quantity of product.  You have a very reduced

3    price from retail.  The fact that the cooperating

4    defendant doesn't have access to this anywhere else.

5    The fact that the cooperating defendant is saying these

6    were stolen.  They were new.  They were in the box.  The

7    fact that some of these shipping labels don't have a --

8    I'm shipping this to Dawn Wireless.  I'm shipping this

9    to a company.  It has a Google to a different address,

10   which isn't related to any of the parties involved.

11          So you have these shipping labels that also

12   indicate if the product was stolen or not.  Shipping

13   labels peeled off of boxes that you normally don't do

14   and put into a shred bin.  That's not normal to take --

15   peel those off.  That takes a lot of time.  They would

16   peel off just the very top label.  Those labels do not

17   indicate they were shipped to a certain property from a

18   B-Stock auction or anything like that.

19   Q.   Is it fair to say -- I understand you're saying one

20   thing after another after another, but it's indirect

21   evidence.

22          Do you have direct evidence on Mr. Saad on

23   the stolen items?

24   A.   I would say -- related to stolen goods like that or

25   to cell phones and --

146

1  Q.    "Send me the ten stolen cell phones."  You don't

2  have anything like that?

3  A.    No.  Typically, they don't -- typically, that type

4  of communication doesn't take place.  Typically, it's,

5  hey, this is good for local or, hey, this is good for

6  overseas.  And that would indicate, hey, it's good for

7  local, and it means it's either stolen through transit

8  theft.  And oftentimes it's -- those devices don't

9  become blacklisted because they never hit a network, or

10  it's a used stock.  So, hey, that's good for local.  You

11  can sell that here.

12           If they say, "Is it good for local?"  "No,"

13  that means it needs to go overseas, meaning it was

14  obtained through financing or some other means and it's

15  going to get blacklisted and that seller knows it

16  because the seller doesn't want it to go to Saad, Saad

17  sell it locally, and then that device becomes

18  blacklisted because now you have a problem either with

19  the police or with that end user.

20  Q.    But, again, you're having to make some assumptions

21  there.  I understand what you're saying.

22           There has to be some assumptions on your part

23  with respect to this stuff?

24  A.    Well -- I mean, when you talk about that, you talk

25  about other cooperating defendants.  You talk -- hey,

1  everybody knows the game, but nobody wants to talk about

2  it.  They might use the word "gray," but they

3  communicate that this device needs to be moved outside

4  of local based off if it needs to go overseas or if it

5  needs to stay local.  If it's locked or unlocked.  This

6  is carrier AT&T locked.  There is no way you're going to

7  come into contact with a carrier locked phone at a

8  reduced retail price in the normal -- in the normal

9  course of business.

10              If you're going into AT&T, you're going to

11  get that AT&T locked phone on financing and pay that off

12  over two years.  If you have a brand new phone in the

13  box -- that's what we're talking about here.  Brand new

14  sealed in the box or maybe it's open, but all of the

15  handsets are there and it hasn't been activated yet.

16  That phone is AT&T locked.  That's the only way --

17  financing is the only way to take that phone.  So, hey,

18  we need to unlock those phones, or if you have some

19  e-mails talking about a device being unlocked or locked,

20  those are other ways that we can infer knowledge where

21  it's not being said outright.

22  Q.    Infer?

23  A.    Correct.  Constructive knowledge.

24  Q.    Anything else as far as links other than the things

25  you've named for Mr. Saad?

148

1  A.    That's it from the presentation.

2  Q.    It was a long answer, but --

3  A.    Well, it's -- it's not -- it's a complicated --

4  Q.    Right.

5  A.    Yeah.

6  Q.    And let's talk a little bit about flight, okay?

7        You did use the word "he could be a flight."

8  Mr. Castle asked you -- I mean, anybody on release could

9  be a flight, correct?

10 A.    Correct.

11 Q.    But let's break that down.  You run the search

12 warrant August 24th, 2021, right?

13 A.    Correct.

14 Q.    They don't resist you.  They cooperate.  Your own

15 agents say these guys are cooperative, right?

16 A.    I don't know if that's what they said, but I've

17 heard they were cooperative, yes.

18 Q.    Okay.  When you ran the search warrant at their

19 home, correct?

20 A.    Correct.

21 Q.    You run the search warrant at the office, they

22 literally give the codes -- the safe codes and the keys

23 so the agents can get in, right?

24 A.    Correct.  And in part so we don't have to destroy

25 property.  I mean, that was the -- that was part of the

149

1  rationale analysis, but, yes, they still did.

2  Q.    Then -- I mean, again, after that they made no

3  efforts to flee?  No efforts to buy tickets anywhere out

4  of the country, correct?

5  A.    Not to my knowledge.

6  Q.    And then literally a week later they have a

7  voluntary meeting with you, Mr. Gonzalez with them about

8  the case and their lawyer?

9  A.    Correct.

10 Q.    You tell them you're going to indict them, and you

11 even say it's going to be on all of the counts.  The

12 924(c) -- the whole gamut, right?

13 A.    I don't know.  I don't recall the 924(c.)

14 Q.    You said all of the counts.  Do you remember that?

15 A.    At the meeting?

16 Q.    Yes.

17 A.    That I said that?

18 Q.    Yes.

19 A.    I don't -- if I did, then I misspoke, but I don't

20 recall that.

21 Q.    My point being is you told them you were going to

22 basically hit them --

23 A.    I told them they were going to be indicted,

24 correct?

25 Q.    So they have notice --

150

1  A.    They're on notice.

2  Q.    It's getting dropped on them.  And they don't --

3  again, they don't flee?  They don't do anything like

4  that; is that right?

5  A.    Correct.

6  Q.    No tickets bought.  And, sure enough, about a

7  week -- September 9th -- a week, week and a half later,

8  y'all indict them.

9         Now, you were nice enough to call the lawyers

10 and say, hey, basically we're going to unseal this thing

11 tomorrow, right?

12 A.    Correct.

13 Q.    Even that night when they're told, "you're

14 indicted, this is done," they didn't go anywhere?

15 Didn't run?  Didn't flee?  Didn't try to buy plane

16 tickets?

17 A.    Correct.

18 Q.    Now, in front of you, you've got a notebook.  It's

19 a black notebook.  It's in front of you.  It's also in

20 front of the judge.  If you could flip to Exhibit A.

21 A.    Okay.  I'm there.

22 Q.    What is Exhibit A?

23 A.    Are you talking about under Tab 1?

24 Q.    Yes.

25         THE COURT:  Before we proceed, has the

1  government also been provided a copy of these materials?

2          MR. MCCARTHY:  Yes.  Everything has been sent

3  to him with the motions, your Honor.  Actually, we have

4  another one here if he wants it.

5  BY MR. MCCARTHY:

6  Q.    I'm sorry.  I'm sorry.  Tab 3A, Exhibit A.

7  A.    I'm there.

8  Q.    Okay.  And isn't it true that's the letter -- the

9  surrender letter?  It's even underlined.  It says he has

10  the intention to peacefully surrender, and we were

11  offering to bring you the passports and bring you him

12  wherever you want him; is that right?

13  A.    I see it, yes.

14  Q.    Okay.  Would you say he made efforts to turn

15  himself in or efforts to flee?

16  A.    He made efforts to turn himself in.

17  Q.    Now, flip to E --

18          MR. MCCARTHY:  I'm sorry.  Judge, I'm going

19  to offer that for the record at this time.

20          THE COURT:  If you want to go ahead and offer

21  each of the exhibits that were to the motion you've

22  withdrawn, so they'll all be part of the record for

23  today's hearing.

24          MR. MCCARTHY:  Yes, your Honor.

25          THE COURT:  Okay.

152

1    MR. MCCARTHY:  A, B, C, D, and E.

2    THE COURT:  Is there any objection to that?

3    MR. GONZALEZ:  No, your Honor.

4    THE COURT:  All right.  So then what we'll do

5  is we'll take each of the exhibits that were to the

6  motion and we will deem them as admitted for purposes of

7  today's hearing and we'll include them in our exhibit

8  set.

9    MR. MCCARTHY:  Yes, your Honor.

10 BY MR. MCCARTHY:

11 Q.   Now, flipping to E.  Agent, if you could take a

12 look at that.  What is that?

13 A.   It looks like an e-mail copy from Mr. Saad Aziz to

14 Judge Johnson.

15 Q.   And Judge Nowak, right?

16 A.   Yes.

17 Q.   It's cc'ing the U.S. Attorney's Office, the U.S.

18 Probation Office/Pretrial Services, right?

19 A.   Yes.

20 Q.   And would you say this guy is desperately trying to

21 turn himself in?

22 A.   At this point.

23 Q.   Not fleeing?  Trying to turn himself in?

24 A.   Correct.

25 Q.   Now, are you aware that on the exact same day, he

153

1  went up to Euless Police Department and met with Officer

2  Norwood and tried to turn himself in to the police?

3  A.    I am now.

4  Q.    Okay.  Would that be an indication of flight to

5  you?

6  A.    Not at this point, no.

7  Q.    Let's go to Exhibit B.  Let's talk about family

8  ties.  Exhibit B.  Do you see those pictures?

9  A.    Yes, sir.

10  Q.    I know you weren't at the search warrant.  But

11  you're aware -- I mean, he has two little kids --

12  essentially, a newborn -- a ten-month-old, a

13  three-year-old, and his wife here.  Are you aware of

14  that?

15  A.    I see that here.

16  Q.    Would you agree with me that he definitely has the

17  familial ties in the United States?

18  A.    Through his immediate family, yes.

19  Q.    In fact, his mom is sick and lives inside his home

20  that he takes care of.  Are you aware of that?

21  A.    I am now.

22  Q.    His brother lives next door?

23  A.    I did know that.

24  Q.    His extended family, sister, cousins live here?

25  A.    Correct.

154

1  Q.    He has been here for over ten years?

2  A.    Correct.

3  Q.    It's not easy to go through the U.S. citizenship

4  process, is it?

5  A.    No.

6  Q.    It's tough.

7             And he's been a U.S. citizen for several

8  years now, has he not?

9  A.    He has been.

10  Q.    In fact, Exhibit C, do you see that?  What's that?

11  A.    It looks like a bank account.

12  Q.    It's a mortgage.  His house --

13  A.    I'm sorry.  Yes.

14  Q.    That's his home, right?  Same address for your

15  random warrant?

16  A.    Correct.

17  Q.    So would you agree with me that he has property

18  here and his home is here and his family is here?

19  A.    Yes.

20  Q.    And if I took you to Exhibit D -- and this goes to

21  ties to the community.  Do you see those?  And we have

22  about six different letters from different people in the

23  community and his mom, people that have worked for him,

24  family members, and all of that attesting to who he is,

25  the type of person he is.  Do you see that?

```
 1   A.    I do.

 2   Q.    Okay.  Would you agree with me that it would appear

 3   at least that he does have fairly deep community ties

 4   here and -- specifically in Texas?

 5   A.    From the e-mails, it seems like he knows people

 6   here, yes.

 7   Q.    And we've offered to give you -- we even have them

 8   over here.  We've offered to give you his whole pack

 9   of -- his standing passport, his real passport.  That's

10   the U.S., rather.  And what's that thing called?  The ID

11   card.  We've offered to give all those to you, correct?

12   A.    Yes.

13   Q.    So you agree with me he's had an opportunity to

14   flee and he hasn't done it?

15   A.    Yes.

16   Q.    He's made serious attempts to turn himself in to

17   everybody?

18   A.    Yes.

19   Q.    This Court included?

20   A.    Yes.

21   Q.    He has family and community ties that are deep

22   here?

23   A.    Correct.

24   Q.    His home is here?

25   A.    Correct.
```

1  Q.    His sick mother is here?

2  A.    Yes.

3  Q.    His little kids are here?

4  A.    Yes.

5  Q.    And just for the record, I'm talking about the

6  danger aspect.  Mr. Aziz is not one of these armed

7  robbers, right?

8  A.    He is not.

9  Q.    He's not charged with a 924(c) or any crime of

10  violence?

11  A.    He is not.

12  Q.    He doesn't have a criminal record?

13  A.    No, sir.

14  Q.    You said -- I mean, you were actually familiar with

15  the term.  It's not a presumption case; is that right?

16  A.    Yes.

17  Q.    Are you familiar that he has a job offer?

18  A.    I am as of today.

19  Q.    From Jekyll and Hyde.  There's even a confirmation

20  letter of that; is that right?

21          MR. MCCARTHY:  Judge, I apologize.  I only

22  have one copy.  If I could mark it and offer it as --

23          THE COURT:  Please do.  You'll give it to

24  Ms. Lee.  She has to mark it for you.

25

BY MR. MCCARTHY:

Q.   They're offering 14 bucks an hour and 40 hours a week; is that right?  I'm asking you about something you haven't seen, aren't I?  Sorry about that.

A.   They're both working at the same company?  Same offer as the other?  No?

Q.   It's different.  There are two different companies.

A.   Okay.  I've read it.

Q.   Sir, I sent you and Mr. Gonzalez an e-mail on September 24th -- that is Friday at 5:26 p.m. --

     Let me ask you this first:  Have you testified before a grand jury?

A.   I have.

Q.   Have you testified previously in court?

A.   Yes.

Q.   So you have previous statements that you have made under oath?

A.   Yes.

Q.   Do you have 302s that you've drafted?

A.   Yes.

Q.   Okay.  I asked under Federal Rule 26.2(g)(4) and 46(j) for those to be produced today.  Do you have them?

A.   I do not.

     MR. MCCARTHY:  Judge, at this -- Judge, at this time, we would ask for the previous statements by

1   this witness.

2           MR. GONZALEZ:  Your Honor, that was requested

3   of me at 5:30 or 5:26 on Friday afternoon.  There --

4   there's 4 terabytes of information.  If defense counsel

5   wants to review that information, he's welcome to come

6   to our office and review it there.  If he wants that to

7   be produced, it can be produced, but it's not going to

8   be produced today.  When you asked for it -- and it

9   wasn't even asked for formally.  It was asked for

10  informally in an e-mail.

11          The witness has testified at grand jury.  He

12  didn't testify about these particular defendants at

13  grand jury.  He testified on previous indictments.  Not

14  the particular indictment that these individuals are

15  included in, but same -- same thing there.  That

16  testimony hasn't been ordered yet.  There is no record

17  of that.  It can be ordered.  If he wants to continue

18  this hearing until those records can be provided, I'd be

19  happy to do that.

20          MR. MCCARTHY:  Judge, we just want to go on

21  record as asking for those.  If they want to produce

22  them to us later, that's certainly fine.  I just -- I

23  had asked them for it, so I didn't know if they had them

24  here today.

25          THE COURT:  Well, let's go ahead and nail

1   that down a little bit further, okay?  If you're asking

2   for them, how would you like to receive them?  Do you

3   want to give Mr. Gonzalez a flash drive?  Do you want to

4   go to his office?  How on an going forward basis do you

5   want to handle this issue, so I don't have a later

6   hearing as it relates to discovery issues?

7           MR. GONZALEZ:  It's 4 terabytes, your Honor.

8   It's not a flash drive.  It's 4 terabytes of --

9           THE COURT:  A drive.  I apologize.  You know

10  what I'm talking about.

11          MR. MCCARTHY:  If he's -- if he's making the

12  representation that there's an unload happening

13  currently -- if he's representing his previous

14  statements are in there, then we'd be satisfied if he's

15  making that representation.

16          MR. GONZALEZ:  All 302s written by this agent

17  would be contained within that discovery.

18          MR. MCCARTHY:  It's all statements.

19          THE WITNESS:  There will be other phases as

20  well, though, right?  Like, it's continuing.  There will

21  be more 302s added to the case file as we go.

22          MR. MCCARTHY:  Okay.  That's sufficient, your

23  Honor.

24          THE COURT:  All right.

25          MR. MCCARTHY:  I'll pass the witness.

160

 1          THE COURT:  Anything further of this witness,

 2   Mr. Gonzalez?

 3          MR. GONZALEZ:  Just some follow-up questions.

 4                  REDIRECT EXAMINATION

 5   BY MR. GONZALEZ:

 6   Q.   Agent, you testified that you reviewed the pretrial

 7   sentence report?

 8   A.   Yes.

 9   Q.   Anywhere in here do they talk about the properties

10   in Frisco?

11   A.   Not that I could see.

12   Q.   Did they talk about -- that they had two properties

13   worth a million dollars in Frisco?

14   A.   No.  I didn't see that.

15   Q.   And that they were attempting to sell those

16   properties?

17   A.   No.

18   Q.   Would that give you some pause or concern that

19   they're hiding property?

20   A.   From the pretrial?

21   Q.   Yes.

22   A.   Yes.

23   Q.   And pretrial is part of the courts?

24   A.   Correct.

25   Q.   And they have to be honest and candid when they're

1  providing information to the Court, correct?

2  A.    Correct.

3  Q.    So the Court could make an honest determination of

4  whether they pose any risk of flight.  And if somebody

5  is concealing assets, would you consider that a risk of

6  flight?

7  A.    Yes.

8  Q.    Is there anywhere in here that they mention S --

9  SCS in Canada?

10  A.    No.

11  Q.    Is it important to you -- you've talked about SCS

12  in Canada and information from other co-conspirators

13  indicating that they're involved in that particular

14  company in Canada?

15  A.    Correct.

16  Q.    And information from co-conspirators or

17  co-defendants, that is evidence, correct?

18  A.    Correct.

19  Q.    That is evidence that can be used in a jury trial?

20  A.    Yes.

21  Q.    That's evidence that a jury trial can choose to

22  accept or not accept?

23  A.    Correct.

24  Q.    And when you interview some of these individuals

25  that are co-defendants, do you try to corroborate their

162

1  information as best as possible?

2  A.    We do.

3  Q.    And what steps did you take to try to corroborate

4  that information?

5  A.    We take that information and we find other

6  co-defendants that provide the same or similar

7  information that would corroborate it.  We look at

8  records that corroborate -- cooperating defendants' cell

9  phone chat messages, photos, and other type of

10 independent evidence that show that that defendant is

11 being honest.

12 Q.    So did you have multiple individuals talking about

13 SCS in Canada and the defendants' involvement with SCS

14 in Canada?

15 A.    Correct.

16 Q.    And did you find corroborating information when you

17 found those shipping documents or shipping records?

18 A.    Correct.

19 Q.    Is that corroboration?

20 A.    That's corroboration.

21 Q.    Now -- and then the fact that they indicated that

22 it was being run by a relative of the defendants,

23 multiple individuals told you that, correct?

24 A.    Yes.

25 Q.    And then you find that SCS, in fact, is being run

163

1  by a relative of the defendant?

2  A.    Yes.

3  Q.    That's corroboration?

4  A.    It is.

5  Q.    So is that part of what you take into consideration

6  when you look at the totality of making your

7  determination of whether someone is going to be a flight

8  risk?

9  A.    Correct.

10  Q.    All right.  So when defense counsel is asking you

11  about a white collar -- white collar defendant and a

12  non-white collar defendant and you trying to make a

13  determination of serious risk of flight, do you look at

14  the totality of your investigation to make that

15  determination?

16  A.    The totality.

17  Q.    Okay.  So do you look at the fact that these

18  individuals were involved with huge amounts of money?

19  Millions and millions dollars of money?

20  A.    Correct.

21  Q.    Do you look at that?

22  A.    Yes.

23  Q.    Do you look at the fact that -- at the warehouse

24  that you've now examined that -- you said you've

25  examined 40 percent of what was found in there.

164

1          Of that 40 percent, what have you been --

2    what have you found that was obtained legally?

3    A.    We haven't -- we've yet to find any property that's

4    been obtained legally.

5    Q.    So when defense counsel asked you of that

6    60 percent that's remaining, you know, is it possible

7    that some of that is legal, it's possible, but based on

8    the 40 percent that you've already examined, not very

9    probable, correct?

10   A.    Correct.

11   Q.    Now, you also looked at the fact that multiple

12   corroborating defendants are telling you the same

13   information about these individuals.  That they were

14   directly involved, that they were directly communicating

15   with them, and that they were directly receiving

16   payments from them.  Is that corroborated by multiple

17   individuals?

18   A.    Correct.

19   Q.    Is that corroborated by the bank statements?  The

20   money transfers?

21   A.    Yes.

22   Q.    So is that what you take into consideration in the

23   totality of what you make -- to make your determination

24   of risk of flight or serious risk of flight?

25   A.    Yes.

165

1  Q.    Now, in regards to when these individuals were

2  turned in -- now, defense counsel keeps saying that it

3  was a month and they didn't turn themselves in for -- or

4  they were willing to turn themselves in for a month.

5         When did we get the warrants for these

6  defendants?

7  A.    September 16th.

8  Q.    So it was a week prior to that?

9  A.    Yes.

10 Q.    So it was the very following week.  We received the

11 warrants on Thursday night and had them in hand Friday

12 morning?

13 A.    Correct.

14 Q.    And then we asked them to turn themselves in trying

15 to work with the Court's docket the following Thursday?

16 A.    Correct.  We had another individual

17 self-surrendering on Monday and Tuesday.  The FBI had an

18 overall operation on Wednesday, and then Thursday was

19 the self-surrender day.

20 Q.    So it was trying to basically make it as -- so it

21 was beneficial for everyone?

22 A.    Correct.

23 Q.    Now, in regards to, well, they haven't run during

24 this time period, they didn't run during this other time

25 period, but had they seen this evidence before?

166

1  A.    No.

2  Q.    Had they seen the fact that you now have multiple

3  cooperators?

4  A.    No.

5  Q.    Had they seen that some of these cooperators are

6  individuals that actually are very close to them or may

7  even work for them?

8  A.    Correct.  They hadn't seen that at that point.

9  Q.    So in your mind and taking into consideration

10 whether somebody is a serious risk of flight, does it

11 make a difference now that they've seen the evidence?

12 A.    I think so.

13 Q.    Does it make a difference now that they're actually

14 charged?

15 A.    Yes.

16 Q.    When we met with them and told them that they were

17 going to be charged, did we tell them exactly when they

18 would be charged?

19 A.    No.

20 Q.    And you -- that it could or maybe it wouldn't

21 happen?

22 A.    Maybe it wouldn't happen, correct.

23 Q.    Now, defense counsel asked you about -- they didn't

24 do identity theft.  They didn't do the armed robberies.

25 They didn't do the fraud.  And you said they didn't.

1     But isn't this -- aren't these conspiracy

2    charges?

3    A.    They are.

4    Q.    And can't you hold individuals in a conspiracy

5    accountable for the activities of some of the other

6    co-conspirators?

7    A.    Yes.

8    Q.    And when you talk about or when they talk about

9    them not having direct impact on other individuals, is

10    there an economic damage here from their activities?

11    A.    Yes.

12    Q.    And what do you mean and what do you -- what do you

13    call economic damage?

14    A.    I would call economic damage as people's identities

15    being stolen, having to get their identities back, have

16    to re-establish their identities, cancel credit cards.

17    Anything else that goes along the lines of having your

18    identity stolen.  It also goes to these companies,

19    whether it's shipping companies, the carriers, who have

20    actually lost product.  They've lost devices, goods.

21    Anything that relates to product that they no longer

22    have in their possession, it's now a financial loss.

23    Q.    And there's plenty of that here in this case,

24    correct?

25    A.    Correct.

1  Q.    There are victims in this case of identity theft?

2  A.    Yes.

3  Q.    And there are victims of armed robberies in this

4  case?

5  A.    Yes.

6  Q.    The defendants may not have been involved in that

7  aspect of it, but there is that aspect in this

8  investigation in this conspiracy?

9  A.    I would say they were involved in the facilitation

10  of it.

11  Q.    And when it comes back to that COVID document, it's

12  the willingness of them to forge a document to get what

13  they want that you're bringing to the Court, right?

14  A.    Correct.  The fact that they're not going to adhere

15  to the same conditions as everybody else when they're

16  looking for bond conditions.

17  Q.    And potentially the counterfeiting of devices at

18  their warehouse -- the -- as you testified, the iPhones?

19  A.    Correct.

20  Q.    They don't shy away from counterfeiting those

21  particular items either?

22  A.    No.

23         MR. GONZALEZ:  That's it.  I'll pass the

24  witness.

25         THE COURT:  The Court has a few questions

1   unless any of you have any follow-up.

2            MR. CASTLE:  Your Honor, I have three

3   questions.

4            THE COURT:  Never make a promise regarding

5   the number of questions.  I've never seen a lawyer

6   actually stick to that representation.

7            MR. CASTLE:  My plan, your Honor.

8                    RECROSS-EXAMINATION

9   BY MR. CASTLE:

10  Q.   During the meeting when you told them they were

11  going to be indicted, you told them there were

12  cooperators, people close to them, and the noose was

13  coming for their neck, right?

14  A.   I don't think I used those words.

15  Q.   Pardon me.  You told them --

16  A.   I told them the charges were coming.

17  Q.   The charges were coming.

18            You told them you had cooperators, didn't

19  you?  You told them you had cooperating defendants?

20  A.   I can't specifically recall what I said at the

21  time.

22  Q.   If I represented to you, you told them you had

23  cooperators who were close to them who could point the

24  finger at them, would you have any reason to disagree

25  with that?

170

1   A.    I wouldn't have any disagreement.

2   Q.    So the idea that they're hearing this for the first

3   time is wrong.  They've already heard this, correct?

4   A.    If that's the representation, yes.

5   Q.    With SCS Canada, again, you're talking about on the

6   financial statement not representing SCS Canada

7   ownership.

8         You have no evidence of who owns that, do

9   you?

10  A.    Not actually who owns it at this point, no.

11  Q.    Are you required to put together every business

12  relationship you have on your pretrial interview report?

13  Do you have to list every business relationship I have

14  on the pre --

15  A.    Do you have to?

16  Q.    Yes.

17  A.    I would think you would want to list a business

18  relationship that's outside of the country to alert the

19  Court.

20  Q.    So if I am a salesman and I have 1,050 clients, I

21  need to list all 1,050 clients I do business with?

22  A.    I wouldn't say that that's the same thing here.

23  Q.    All business relationships, you said you would

24  think you'd want to.  I'm asking --

25  A.    He listed other businesses he was a part of, but he

171

1  didn't mention the SCS Canada business, which was an

2  international business.

3  Q.    Correct.  But at the same time, SCS Canada, if he

4  doesn't own it -- I mean, another business he has equity

5  in or directly employed by?  Direct relationship with,

6  perhaps?

7  A.    Possibly.

8  Q.    As for the lots you mentioned in Frisco, were you

9  present for the conversation with pretrial services?

10 A.    No.

11 Q.    Do you know if it was disclosed to them?

12 A.    No.

13 Q.    Do you know what the status of those lots are?

14 A.    I do not.

15 Q.    Do you know whether or not that was disclosed to

16 the pretrial services?

17 A.    I do not.

18             MR. CASTLE:  Nothing further, your Honor.

19             THE COURT:  Mr. McCarthy.

20                      RECROSS-EXAMINATION

21 BY MR. MCCARTHY:

22 Q.    Agent Doering, this is more for clarity for the

23 record.  I understand your testimony on this.  I just

24 want to make clear.

25             There's no fake COVID thing for Mr. Saad

172

1   Aziz?  That doesn't exist?

2   A.    No.  Not for Saad, no.

3   Q.    And then as far as the cooperating defendants -- I

4   mean, these are people who have been indicted?

5   A.    Yes.

6   Q.    I wasn't going to bring this up, but since he

7   asked -- Mr. Gonzalez asked.

8           These are also people who essentially y'all

9   moved for detention, kept them in jail, and the only way

10  they could get out was if they sat down and talked to

11  you and told you what you say is cooperation or telling

12  the truth?

13  A.    These particular cooperators, yes.

14  Q.    Okay.  And sitting in jail and wanting to please,

15  let's say, the FBI or the U.S. Attorney's Office with

16  the promise of getting out of jail -- I mean, you would

17  agree with me there's a slight degree of coercion when

18  it comes to these people's testimony?

19  A.    That's why we take their information and we

20  corroborate it.  There's also been other cooperators in

21  this case that have debriefed and have not been let out.

22  It's not like it's an automatic thing where you sit down

23  and talk and all of a sudden you're released.

24  Q.    But they were incarcerated and then a lot of them

25  got out after cooperating, correct?

173

1  A.     Some did, yes.

2                MR. MCCARTHY:  Pass the witness.

3                THE COURT:  Anything further, Mr. Gonzalez?

4                MR. GONZALEZ:  No, your Honor.

5                THE COURT:  Agent Doering, the Court has a

6  number of questions for you.

7                First off, I do want to confirm.  Is it your

8  testimony to this Court today that you believe each of

9  these individuals are a serious risk of flight?

10               THE WITNESS:  Yes.

11               THE COURT:  Okay.  So the items that I've

12 heard you mention today that support or buttress that

13 testimony are international travel to Canada, Columbia,

14 El Salvador, Qatar, United Arab Emirates, and Mexico.

15               Are you aware of any other international

16 travel?

17               THE WITNESS:  No.  Just what was listed.

18               THE COURT:  Are you aware of any recent

19 international travel?

20               THE WITNESS:  Just what was listed.

21               THE COURT:  Okay.  Do you know or are you

22 aware of the circumstances that these gentlemen traveled

23 to these locations?

24               THE WITNESS:  Just in the pretrial report as

25 to whether it was pleasure or business.

174

1              THE COURT:  Are you aware of any plans by any

2    of these gentlemen to travel again internationally?

3              THE WITNESS:  No.

4              THE COURT:  Counsel has made much ado here

5    today --

6              THE WITNESS:  Yes.

7              THE COURT:  -- about the fact that these

8    gentlemen have attempted and tried on numerous occasions

9    to surrender themselves.

10             Were you involved in the discussions about

11   their attempts to surrender themselves?

12             THE WITNESS:  Leading up to the

13   self-surrender, yes.

14             THE COURT:  Okay.  In your opinion from your

15   past experience and your investigation, do individuals

16   that are this interested in surrendering, are they

17   likely to flee?

18             THE WITNESS:  Well, again, that's before

19   they've seen all of the evidence, too.  So if they do

20   have significant ties here and they haven't seen the

21   evidence, then they might want to get in to potentially

22   help their -- or help their chances for some sort of

23   bond while they determine what the weight of the

24   evidence is.

25             THE COURT:  Okay.  And so the question that I

1  asked, though, as to whether or not in your experience

2  do individuals who attempt or try to surrender, are they

3  generally a risk of flight?  What's been your past

4  experience in the totality of your career?

5  　　　　　THE WITNESS:  Most of my experience is --

6  well, this is kind of the first one where I've had

7  someone make this much effort that I can recall right

8  now.  But when people are looking to turn themselves in,

9  oftentimes they stay in custody with us, but even when

10  they don't, they haven't fled, no.

11  　　　　　THE COURT:  Okay.  Do you know if these

12  gentlemen have dual citizenship?  So some countries when

13  you take on United States citizenship you lose the

14  citizenship that you had in your prior country.

15  　　　　　Do you know if they maintain dual

16  citizenship?

17  　　　　　THE WITNESS:  I don't know if they maintain

18  dual citizenship.

19  　　　　　THE COURT:  So another thing we talked about

20  today are what you would consider to be mitigating

21  circumstances.  I just want to confirm.

22  　　　　　You agree that surrender of passports would

23  be a mitigation?

24  　　　　　THE WITNESS:  That's mitigating.

25  　　　　　THE COURT:  Okay.  You believe that

176

 1   employment would be a mitigating factor so long as their

 2   employment did not involve in any way cellular devices;

 3   is that correct?

 4                THE WITNESS:  It could be, yes.

 5                THE COURT:  You have spoken regarding --

 6   we've heard the term "millions of dollars."

 7                Do you have any reason to believe that these

 8   two individuals have significant assets outside of the

 9   country that they could use to flee?

10                THE WITNESS:  We're still conducting that

11   financial investigation, but nothing right now.

12                THE COURT:  Okay.  And then as it relates to

13   SCS Canada, is it your belief that these gentlemen have

14   an ownership interest in that entity?

15                THE WITNESS:  Based off the cooperating

16   defendant's statement where they said their cousin was

17   up there running the business for them and that the

18   cousin came down here to learn how to run the business.

19                THE COURT:  Okay.  And so my question is just

20   a little different.

21                Certainly, I understand your representation

22   that they have a family member who is running the

23   entity.  But is it your belief that they have an

24   ownership interest in it such -- because, obviously, the

25   implication is why was it not disclosed in the pretrial

1   services report.

2            THE WITNESS:  Correct.

3            THE COURT:  So, you know, you don't disclose

4   entities necessarily that your family is running.

5            So I'm asking you:  Do you believe that these

6   folks have an ownership interest in that entity?

7            THE WITNESS:  Yes.  Based off the financial

8   statements from Interstellar and that it says "SCS

9   Canada" and the cooperating defendants' statements.

10           THE COURT:  And the other question that I

11   have for you, sir, is:  We've talked a lot about the

12   danger of these individuals to the community.  And if

13   I'm understanding your testimony, certainly you believe

14   that these gentlemen had significantly impacted or

15   caused economic harm; is that correct?

16           THE WITNESS:  Correct.  Yes.

17           THE COURT:  All right.  So what I'm to look

18   at in addition to the weight of the evidence is the

19   likelihood that they're a continuing danger.

20           And so I need to know your testimony here

21   today as to whether or not you believe these gentlemen

22   to be a continuing economic danger.

23           THE WITNESS:  If they get back into the

24   business.

25           THE COURT:  Okay.  And what is your

1 understanding from your investigation as to your belief?

2 Do you think that they're going to get back into the

3 business or not?

4          THE WITNESS:  It's just hard to say at this

5 point, ma'am.  I don't have any basis right now -- right

6 now that would let me know that they're going to

7 continue this business other than other cooperating

8 defendants have received offers for devices and

9 essentially -- like, the network is still there.  We

10 haven't indicted everybody in the network.  So the

11 opportunity is there if it presents itself.  It can --

12 they could move forward in this line of business, but

13 that's what I have.

14          THE COURT:  And so you're not disputing here

15 today that they do have family ties here in this

16 district?

17          THE WITNESS:  No.

18          THE COURT:  Or that they have resided in this

19 district for a significant period of time?

20          THE WITNESS:  Yes.

21          THE COURT:  You're also not disputing that

22 they have no past criminal history?

23          THE WITNESS:  Not disputing.

24          THE COURT:  And you're not alleging that

25 either of these gentlemen have drug or alcohol abuse; is

179

1 that correct?

2          THE WITNESS:  Correct.

3          THE COURT:  All right.  Anything further,

4 Mr. Gonzalez?

5          MR. GONZALEZ:  Can I ask questions?

6          THE COURT:  Yes.  I'm inviting both sides to

7 ask any additional questions.

8                FURTHER REDIRECT EXAMINATION

9 BY MR. GONZALEZ:

10 Q.   The contacts that you've talked about in Canada,

11 they're doing business -- they're sending items to

12 foreign countries as well?

13 A.   Correct.

14 Q.   So they have business contacts with other

15 individuals in these other foreign countries?  It's not

16 only Canada?

17 A.   No -- yes.  It's Dubai as well.

18 Q.   So they have other interests over there?  They have

19 other contacts?  They have people that they know in a

20 foreign country?

21 A.   Correct.

22 Q.   And in regards to one of the statements made by one

23 of the defendants, who is a cooperating defendant, is

24 that he owns property in Pakistan?

25 A.   Yes.

180

1  Q.    And the information provided by that cooperating

2  defendant is information that you've corroborated,

3  correct?

4  A.    We've corroborated some of his information.  Not

5  necessarily that information.

6  Q.    True.  But the information that he's provided to

7  you, you found to be credible and reliable?

8  A.    Correct.

9  Q.    Based on your corroboration of his information?

10 A.    Yes.

11 Q.    And this is one of the statements that he made

12 telling you that that's what Saad Aziz told him?

13 A.    Correct.

14 Q.    Now, in regards to the defendants now having

15 knowledge of people cooperating against them, when you

16 told them in interviewing them or talking to them

17 before, you said there were cooperators that had

18 provided information, correct?  A very generalized

19 statement?

20 A.    Yes.  If that's what I said.  I can't recall.

21 Q.    Okay.  But here you're being very specific.  You're

22 saying --

23 A.    Yes.

24 Q.    -- CD 1, CD 2, and CD 4, and you're talking about

25 very specific events where those individuals were

1  involved with them.  So it won't take a lot of effort by

2  them to find out who those individuals are that are now

3  cooperating with you?

4  A.    Correct.  They could.

5  Q.    So that is information that they didn't have before

6  this hearing today?

7  A.    Correct.

8  Q.    And -- so based on that -- now they know more about

9  who's cooperating against them, who could possibly come

10 in and testify against them, and now expose them to a

11 considerable amount of time, correct?

12 A.    Correct.

13 Q.    That's information that they didn't have?

14 A.    Yes.

15 Q.    That's information that they now have and may be an

16 impetus to flee?

17 A.    Correct.  It could be another factor.

18 Q.    And the fact that somebody -- someone gets

19 naturalized or becomes a U.S. citizen, that in and of

20 itself doesn't stop someone from becoming a fugitive?

21 A.    No.

22 Q.    The fact that someone turns in their passport, that

23 in and of itself doesn't stop somebody from becoming a

24 fugitive?

25 A.    No.

182

1  Q.    There has been other instances where individuals

2  have fled?

3  A.    Correct.

4  Q.    Are you familiar with an individual by the name of

5  Frederico Machada (phonetic)?

6  A.    No.

7  Q.    Who cooperated with the government, turned in his

8  passport, and then after cooperating and leading to the

9  indictment and arrest of other people, decided to flee

10 and go to Argentina --

11             THE COURT:  Mr. McCarthy, I already know

12 where you're headed with this.

13             Mr. Gonzalez, do you have a different

14 question that you would like to ask?

15 BY MR. GONZALEZ:

16 Q.    Do you know about that case?

17             THE COURT:  No.  Let's move on from that.  I

18 get the point that you're trying to make.  There is

19 always a risk of flight if somebody's out on conditions,

20 and the Court is certainly apprised as -- that that risk

21 is inherent in anyone who is under indictment and is

22 released.

23 BY MR. GONZALEZ:

24 Q.    And the fact that he has a family here in the

25 United States, that's not necessarily a factor to

183

1  becoming a fugitive either.  They're not looking at a

2  long sentence.  These defendants --

3  A.    You could flee without your family or bring your

4  family with, yes.

5  Q.    And substantial ties to the community at length --

6  it says here, "Time in community of residence:  Three

7  years."

8              Is that a substantial amount of time in the

9  community?

10  A.    What?

11  Q.    Under the pretrial services report.

12  A.    Is that just in the neighborhood, or is that in the

13  Dallas area?

14  Q.    It says, "Time in community of residence:  Three

15  years."

16  A.    Three years.

17  Q.    On the pretrial services report, Mr. Maaz Aziz --

18  is that a substantial amount of time in the community?

19  A.    It's not ten years.

20  Q.    And then when it talks about, well, a lot of ties

21  that got -- his family is here.  His brother is here.

22              But is there anybody outside of the family

23  that he has significant ties to?

24  A.    I don't know.

25  Q.    Attends church.  That doesn't necessarily mean he

184

1   has significant ties there either?

2   A.   Correct.

3   Q.   And this new employer that both defendants are

4   offering up as a prospective employer, do you know what

5   it was that they told them, or do you know if they

6   notified them -- I know the letter says that they

7   notified them of their legal troubles.

8           Do you know if they notified them

9   specifically about what they were involved with

10  involving stolen products?

11  A.   No.

12  Q.   So you don't know whether he would still offer him

13  that job if he knew the specifics of this?

14  A.   Yeah.  I don't know.

15          THE COURT:  Anything further, Mr. Gonzalez?

16          MR. GONZALEZ:  That's it, your Honor.

17          THE COURT:  All right.  So I'm going to allow

18  you two questions.

19              FURTHER RECROSS-EXAMINATION

20  BY MR. CASTLE:

21  Q.   Having long-standing ties to community doesn't mean

22  living in the same house every single day for that

23  entire period, does it?

24  A.   It's one factor.  Are you talking about community

25  of the neighborhood or community of the overall

185

1   community?

2   Q.   From Irving to Euless in the Dallas-Fort Worth

3   area?

4   A.   It just depends where else they're at -- where else

5   they're spending their time in the community.

6   Q.   Fifteen years within 15 miles and his whole family

7   lives in the neighborhood around him.  Are you aware of

8   that?

9   A.   Now I am today.

10  Q.   He doesn't have to live in the same house to be a

11  part of the community, correct?

12  A.   You don't have to, no.

13  Q.   Another question where Mr. Gonzalez was saying he's

14  hearing this for the first time at this hearing, that's

15  false, isn't it?

16  A.   Why would you say that?

17  Q.   Because you told him -- you told us during

18  conversations between me and Mr. Gonzalez, you and

19  Mr. Wohlford, you had people close to him that were

20  ready to cooperate with you who were going to show they

21  were engaged in criminal conduct --

22          MR. GONZALEZ:  Your Honor, this is -- defense

23  counsel is going to interject himself into being a

24  witness in this case.  That's not what we said.  What

25  was said is that there was cooperating -- it may have

186

1  been said to him, but that doesn't mean that it was said

2  to the defendants.  He wasn't there for that -- that

3  interview.  And so he can't say that those things were

4  said when he wasn't there --

5              THE COURT:  Gentlemen --

6              MR. GONZALEZ:  If he wants to be a witness --

7              THE COURT:  Gentlemen, let's ask the witness

8  the question.

9              I gave you two.  I think we've already moved

10 past two.

11             MR. CASTLE:  My last question, your Honor.

12             THE COURT:  Okay.

13 BY MR. CASTLE:

14 Q.   Do you recall -- just for foundation, two

15 questions.

16             Do you recall a call between Mr. Gonzalez

17 where he brought you in --

18 A.   Yes.

19 Q.   -- me and you?

20 A.   Yes.

21 Q.   During that call, Mr. Gonzalez expressed to us and

22 you concurred that you had people who were close to the

23 Azizs who were cooperating?

24 A.   Again, generalized statements there versus these

25 specific statements and more in-depth statements today.

187

```
 1              MR. CASTLE:  Nothing further.

 2              THE COURT:  Thank you.

 3              Mr. McCarthy, anything further?

 4              MR. MCCARTHY:  No.

 5              THE COURT:  All right.  Agent Doering, you

 6  may step down.

 7              All right.  Counsel, I'm going to ask for all

 8  counsel to convene in my conference room.

 9              (A short recess was taken.)

10              THE COURT:  The Court is back on the record.

11  We're here in Cause No. 4:20-cr-382.

12              Let me go ahead and just confirm.  Does the

13  government have any further witnesses to present or

14  evidence to proffer to the Court at this time?

15              MR. GONZALEZ:  No, your Honor.

16              THE COURT:  And so then I will turn at this

17  time, Mr. Castle and Mr. Wohlford, do you have any

18  witnesses to present to the Court?

19              MR. WOHLFORD:  Yes, your Honor, I do.

20              The first witness would be Haitham Issa.

21              THE COURT:  Mr. Issa, if you could come

22  forward to be sworn, please.

23              (The witness was duly sworn.)

24              THE COURT:  Sir, if I might ask once you're

25  seated if you could please tell me your full name.
```

188

1          THE WITNESS:  Haitham Issa.

2          THE COURT:  And can you spell that as well,

3    please?

4          THE WITNESS:  H-a-i-t-h-a-m, first name, and

5    last name I-s-s-a.

6          THE COURT:  Thank you.

7          You may proceed.

8          MR. CASTLE:  Thank you, your Honor.

9                    HAITHAM ISSA,

10   called as a witness herein, having been first duly

11   sworn, was examined and testified as follows:

12                  DIRECT EXAMINATION

13   BY MR. CASTLE:

14   Q.   Mr. Issa, what do you do for a living?

15   A.   I work for a family business.  We've owned it for

16   the past 20 or so years.  The name of that business is

17   Big D Automobile.  It's located in Dallas.

18   Q.   Okay.  And what sort of services does that business

19   provide?

20   A.   It's a mechanic shop.  We do full service.

21   Anything engine, transmission, brakes, light work, heavy

22   work.  All of that.  We recently started doing custom

23   work for vehicles such as lift kits, lowering kits, some

24   rims and tires, and such.

25   Q.   Okay.  And nothing to do with cell phones or

189

1  consumer electronics; is that right?

2  A.    No.

3  Q.    Okay.  And you said this is a family business?

4  A.    Yes.  Family owned for -- since, I believe, 1999 or

5  so.  So a little over 20 years.

6  Q.    Okay.  And how long have you known Maaz Aziz?

7  A.    I met him my sophomore year in high school.  So

8  about -- I mean, as long as he's been here.  So about 10

9  or more years or maybe 11 years to be exact.  I've known

10 him since then.  Since he moved from New York.

11 Q.    Okay.  And so you all met around 2010; is that

12 fair?

13 A.    Yeah.  I guess that would be the beginning of my

14 sophomore year.  Yeah, 2010.  End of 2010, yeah.

15 Q.    And do you consider Maaz a good friend?

16 A.    Yes.

17 Q.    Okay.  And were you born in Texas?

18 A.    I was born and raised in Irving.

19 Q.    Okay.  Been here all your life?

20 A.    Yes, sir.

21 Q.    Okay.  You're a U.S. citizen, right?

22 A.    Yes.

23 Q.    Okay.  Has -- to your knowledge, has Maaz lived in

24 North Texas since you and he met in high school?

25 A.    Yes.

1  Q.    And do you know Maaz's immediate family?

2  A.    I know -- I've met -- I mean, almost everybody

3  possible from his family probably.

4  Q.    Okay.  You know his wife Ameirah?

5  A.    Yes.

6  Q.    And their four little children?

7  A.    Yes, sir.

8  Q.    Okay.  Does Maaz's family primarily reside in North

9  Texas?

10  A.    For -- yes.  Almost all of them, yes, sir.

11  Q.    Okay.  Does Maaz have family in Pakistan?

12  A.    I went with them on the trip where they went for

13  his sister's wedding.  And, to my knowledge, I mean, all

14  that I met who was his direct family was maybe one or

15  two uncles at most.  But it seemed like -- I mean, they

16  haven't -- they haven't -- from my knowledge -- what I

17  saw there, they hadn't seen or even spoken to Maaz since

18  he left, which I believe -- I don't know.  I can't

19  remember what age he was when he left.  I think maybe

20  around four or five years old.

21  Q.    Okay.

22  A.    And they were surprised to see him.

23  Q.    So you went with Maaz to his sister's wedding in

24  Pakistan, right?

25  A.    Yes, sir.

191

1  Q.    Okay.  And how long did you all stay in Pakistan on

2  that trip?

3  A.    The flight there seemed longer than the time we

4  were there.  I think maybe three or four days, five days

5  at the most.

6  Q.    Okay.

7  A.    I don't think any longer than four days, though.

8  Q.    And did Maaz want to stay in Pakistan when you were

9  there?

10 A.    Not at all.  Not at all.

11 Q.    Has Maaz ever indicated to you that he would like

12 to move back to Pakistan?

13 A.    No.

14 Q.    Does Maaz enjoy living in America?

15 A.    Very much so, yes.  There's a lot of things you

16 can't do there that you can -- you know, obviously a lot

17 more opportunity here than there is there.

18 Q.    Do you think Maaz would ever live anywhere other

19 than America?

20 A.    No.

21 Q.    Do you think that Maaz would ever leave his family?

22 A.    No.

23 Q.    To your knowledge, has Maaz ever been convicted of

24 a crime?

25 A.    No.

192

```
 1  Q.    Does Maaz use drugs?

 2  A.    No, sir.

 3  Q.    Does Maaz use alcohol -- drink alcohol?

 4  A.    No.

 5  Q.    Is Maaz a violent person?

 6  A.    No.

 7  Q.    Have you ever seen Maaz act violently towards

 8  anyone?

 9  A.    No.

10  Q.    If the Court were to release Maaz before his trial,

11  I understand you are prepared to hire him to work at

12  Big D Auto; is that correct?

13  A.    Yes, sir.

14  Q.    And you would hire him immediately?

15  A.    Of course.  Yes.

16  Q.    Would you hire him even after hearing the

17  presentation by the prosecutor today?

18  A.    Yes.  That's not a problem.

19  Q.    Without question?

20  A.    Without question.

21  Q.    And you will have him do marketing and business

22  development; is that right?

23  A.    Yes.

24  Q.    And you anticipate being able to pay him between

25  $5,000 and $8,000 a month for that work?
```

193

1   A.   Yes, sir.

2   Q.   Do you know Maaz to be a hard worker?

3   A.   Of course.  Yes.

4   Q.   Is he a good provider for his family?

5   A.   Uh-huh.

6   Q.   Now, with respect to whether or not you would be

7   willing to serve as a third-party custodian for Maaz,

8   would you be willing to move in with Maaz, if necessary?

9   A.   Yes.  Move in with him or he could move in with me.

10  Yeah.  That's not a problem.

11  Q.   And you would watch him?

12  A.   Yes, sir.

13  Q.   Both at home and at work?

14  A.   Yes, sir.

15  Q.   And you would report Maaz if he violated any

16  conditions on his release that this Court might place on

17  him?

18  A.   Of course.

19       MR. WOHLFORD:  Okay.  Nothing further.

20       THE COURT:  Mr. Gonzalez.

21                  CROSS-EXAMINATION

22  BY MR. GONZALEZ:

23  Q.   Sir, you've said you've known him for some time?

24  A.   Correct.

25  Q.   Does he have any family members in Pakistan --

194

1  Pakistan?  You kind of danced around that question.

2           Does he or does he not have family members in

3  Pakistan?

4  A.    Of course, he does.

5  Q.    Okay.  How many family members do you know that he

6  has?

7  A.    In Pakistan, I honestly couldn't be sure.  Maybe

8  two.  I would say -- you know, maybe two or three

9  immediate family members.

10 Q.    Maybe two or three.

11          Do they own homes there?

12 A.    I don't know if they own them or not.  They

13 certainly live in homes there.

14 Q.    And they certainly wouldn't turn him away if he

15 decided to go there, right?  That's family, right?

16 A.    I have no idea.  I don't know their -- I don't know

17 their relationship.

18 Q.    Okay.  You don't know whether they would turn him

19 away if he went there?

20 A.    I don't know.  You know, them knowing he's running

21 away, how that would change a person.  You know, for

22 instance, if I knew somebody was running away from the

23 law, I wouldn't harbor them in my home.

24 Q.    Have you ever purchased any items from Maaz?

25 A.    No, sir.

195

1   Q.    No items at all?

2   A.    No, sir.

3   Q.    Have you ever been over to his business?

4   A.    Yes.  I've been to his office.

5   Q.    And what items have you seen there at the business?

6   Have you ever asked where he's purchasing all those

7   items?

8   A.    No, sir.  I've been to his office.  I haven't been

9   to the back of their warehouse.

10  Q.    Well, you don't necessarily have to be -- go to the

11  back of the warehouse.  There's an open area there right

12  in front of the warehouse, isn't there?

13  A.    I was at his old -- I have never seen his new

14  office that they moved into recently.  I -- I've seen

15  the old warehouse that they were in.

16  Q.    So you've never been to the new warehouse?

17  A.    No, sir.

18  Q.    Where all of the items that were depicted on the

19  screen were located that were all stolen items?

20  A.    No.  That new warehouse, I have not been to, sir.

21  Q.    So you had no idea that he was involved in

22  purchasing stolen items?

23  A.    No, sir.

24  Q.    Never talked to you about that?

25  A.    No, sir.

196

1  Q.    Concealed that from you?

2  A.    No, sir.

3  Q.    He never told you?

4  A.    No.

5  Q.    Okay.  You say you would have him live in your

6  house.

7            Who lives -- who lives with you?

8  A.    Currently, I live -- my mother and my siblings live

9  there.

10  Q.    How old is your mother?

11  A.    My mother is about 52 -- 52 years old.

12  Q.    And siblings?

13  A.    I'm the oldest at 26.  The next one would be 23,

14  and then I have another sister that is 20.  I have a

15  brother that just turned 19.  Sorry.  He's 21 and then

16  19.

17  Q.    Okay.  And they all live at this residence,

18  correct?

19  A.    Yes, sir.

20  Q.    Okay.  Do they know about Maaz's involvement in

21  this activity?

22  A.    They all know I'm here.  They know why I'm here

23  today, sir.

24  Q.    But do they know he was involved with purchasing

25  and selling large quantities of stolen materials?

197

```
 1  A.    I don't know that he was involved in that.

 2  Q.    The question is:  Do they know?

 3  A.    No, they don't.

 4  Q.    Have you talked to them about bringing somebody

 5  into your house that has these kind of charges against

 6  them?

 7  A.    No.  I have not talked to them about that.

 8  Q.    Okay.  And is this your house?  Your mom's house?

 9  Whose house is this?

10  A.    This is my house.

11  Q.    And you said you don't know him to use any drugs?

12  A.    No, sir.

13  Q.    Not even on one single occasion?

14  A.    No, sir.

15  Q.    Did he ever talk to you about using drugs on one

16  single occasion?

17  A.    No, sir.

18  Q.    Would it surprise you that he said that he used

19  marijuana on one occasion about a month ago?

20  A.    No, sir.

21  Q.    Never talked to you about that?

22  A.    No, sir.

23  Q.    So it's safe to say there are things about him that

24  you just don't know, right?

25  A.    I think that's -- that could be true, yes, sir.
```

1  Q.    Any firearms?  Does he own any firearms?

2  A.    Yeah.  We purchased one together actually.

3  Q.    What kind of firearm did you purchase together?

4  A.    It was a Remington 870 we purchased together.  To

5  my knowledge, he has not shot it once.  I, on the other

6  hand, have taken it --

7  Q.    And where did you take that firearm?

8  A.    I don't know exactly where.  I mean, I wouldn't

9  tell somebody where I kept my firearms at home.

10  Q.    No.  The question was not that.  Not what you would

11  do.  I'm asking you --

12  A.    I don't know.

13  Q.    -- do you know where he keeps his firearm?

14  A.    I'm not sure.

15  Q.    How long ago did you purchase this firearm?

16  A.    I can't give an exact time frame.  It was maybe

17  three years ago.  Maybe possibly more.

18  Q.    Has he ever sold you a cell phone?

19  A.    Sold me a cell phone?  No.

20  Q.    Never sold you a cell phone even though he's in the

21  cell phone business?  Never sold you a cell phone?

22  A.    I mean, I don't -- you know, we're good friends.

23  He's given me gifts before.  I haven't -- I don't think

24  I've ever purchased --

25  Q.    What kind of gifts has he given you?

199

1  A.    You know, there -- I can't recall off the top of my

2  head.

3  Q.    Cell phones?  Computer?  Laptop?  Electronics?

4  A.    Maybe some Airpods from him.  Something like that,

5  you know.

6  Q.    Airpods.  What else?  Computers?  Cell phones?

7  A.    Computer --

8  Q.    Consumer electronics?  Grills?  Anything for the

9  shop?

10  A.    No, nothing for the shop.  I'm sure there were

11  other things.  I mean, I can't think of them off the top

12  of my head.

13  Q.    How long ago?

14  A.    Probably -- nothing recent.  Maybe two years ago

15  probably was the last thing I got from him.

16  Q.    Okay.  You are aware that they had this new

17  warehouse, but you've never been over there?

18  A.    Yes.  I contacted him about going over.  I just

19  never had the chance to make it over there, you know.

20  We both get off of work at the same time, and I'm miles

21  away from him.  So by the time I get off of work,

22  there --

23  Q.    So how often do you see him on a weekly basis?

24  A.    It fluctuates.  We're both busy with work.

25  Sometimes we can go months without seeing each other.

1  Sometimes I'll see him multiple times in the same month.

2  Q.    And what type of work would you have him doing at

3  your business?

4  A.    Marketing.

5  Q.    Marketing?

6  A.    Yes, sir.

7  Q.    Would he have access to other people's identities?

8  A.    No.

9  Q.    Driver's license?

10  A.    No.

11  Q.    Phone numbers?

12  A.    No.

13  Q.    Nothing?

14  A.    I mean, phone numbers of customers or who?

15  Q.    Yes.

16  A.    Customer phone numbers?  He wouldn't need those,

17  no.

18  Q.    Do you have those types of items in your business

19  office?

20  A.    Yes.  We have them on work orders for the customers

21  that come in and --

22  Q.    Credit card accounts?

23  A.    No.

24  Q.    Nobody pays with credit card at your business?

25  A.    We don't keep credit card information.  It goes

201

 1  through the machine.  We don't keep any information.

 2            MR. GONZALEZ:  That's all I have, your Honor.

 3            THE COURT:  Any further questions for your

 4  witness?

 5            MR. WOHLFORD:  Nothing further, your Honor.

 6            THE COURT:  Thank you, sir.  You may step

 7  down.

 8            Do you have any further witnesses to present

 9  or evidence to proffer to the Court at this time?

10            MR. WOHLFORD:  I'm sorry, your Honor.  Just

11  one minute.

12            No further witnesses, your Honor.

13            THE COURT:  Thank you.  Do you have any

14  further witnesses to call on behalf of Saad Aziz?

15            MR. MEYER:  Yes, your Honor.  We'd call

16  Dua Aziz.

17            THE COURT:  She may come forward,

18  please.

19            (The witness was duly sworn.)

20            THE COURT:  Ma'am, if you would like, you can

21  leave your mask on or you may take it off.  But if

22  you'll please state your name into that microphone and

23  spell it for me as well.

24            THE WITNESS:  Dua Aziz, D-u-a, A-z-i-z.

25            THE COURT:  Thank you.

202

1          You may proceed.

2               MR. MEYER:  Thank you, your Honor.

3                         DUA AZIZ,

4   called as a witness herein, having been first duly

5   sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7   BY MR. MEYER:

8   Q.    And, Ms. Aziz, I take it you're married to

9   Maaz Aziz?

10  A.    Yes.

11  Q.    How long have y'all been married?

12  A.    Five years.

13  Q.    Do y'all have any children?

14  A.    Yes.  Two.

15  Q.    Okay.  How old are they?

16  A.    One is three years old and one is ten months old.

17  Q.    Okay.  All girls?  All boys?  Boy and girl?

18  A.    No.  One is girl; one is boy.

19  Q.    All right.  And is Saad involved with the kids?

20  A.    Yes.  All of the time.

21  Q.    Okay.  What does he do?

22  A.    He does all of the stuff father's should do like

23  change them, give them bath, take them out, feed them.

24  All that kind of stuff.

25  Q.    Okay.  How have you been able to manage the last

203

1  few days without Saad there?

2  A.    It's horrible.  I can't manage.  Like --

3  Q.    Okay.  Does anybody else live in your house with

4  you besides your children and Saad?

5  A.    Yes.  His mom.

6  Q.    Okay.

7  A.    My mother-in-law.

8  Q.    Okay.  And how old is she?

9  A.    Sixty-five, I guess.

10  Q.    Okay.  And does she have any health issues?

11  A.    Yes.

12  Q.    Okay.  Tell us about that.

13  A.    She has anxiety, depression.  She has high blood

14  pressure.

15  Q.    Okay.  And who takes care of her?

16  A.    Him.

17  Q.    All right.  And in the last month since all of --

18  since Saad has become aware of this, has he made any

19  mention of leaving the country?

20  A.    No.

21  Q.    Would he leave the country without you and your

22  children?

23  A.    No.

24  Q.    Okay.  Do you and your children have passports?

25  A.    Yes.

204

1  Q.    All right.  And are you prepared to surrender those

2  if the Court requests?

3  A.    Yes.  Definitely.

4  Q.    To be clear, you're prepared to surrender your

5  passport and your children's passports?

6  A.    Sorry?

7  Q.    You're prepared to surrender your passport --

8  A.    Yes.

9  Q.    -- and your children's passports?

10 A.    Yes.

11 Q.    Okay.  And the last questions I've got, Dua, are --

12 I think you've heard some discussion in the court about

13 serving as a third-party custodian.

14 A.    Uh-huh.

15 Q.    Is that something that you're willing to do?

16 A.    Yes.

17 Q.    Okay.  And to be clear, that means if you thought

18 Saad was trying to leave the country, you would be

19 responsible for calling the police.

20 A.    Yes.

21 Q.    Is that something you're willing to do?

22 A.    Yes.

23 Q.    And if you thought he was doing something illegal,

24 you would be responsible for calling the police?

25 A.    Yes.

205

1  Q.    Okay.  And you're okay doing that?

2  A.    Yes.

3  Q.    Can I ask you why you're okay -- why you're

4  comfortable calling the police on your husband?

5  A.    Yes.  Because I love him.  I want -- I don't want,

6  like -- I don't want him to do such kind of stuff.

7  Like -- because I love him.  That's all I have to say.

8            MR. MEYER:  Okay.  We pass the witness, your

9  Honor.

10           THE COURT:  Mr. Gonzalez.

11                  CROSS-EXAMINATION

12 BY MR. GONZALEZ:

13 Q.    Ma'am, you say you love him, but were you aware

14 that he was in possession of stolen items?

15 A.    No.

16 Q.    Have you ever gone to the warehouse?

17 A.    Yes.

18 Q.    Have you ever seen the items that are at the

19 warehouse?

20 A.    Yes.

21 Q.    Did you ever question him about those items at the

22 warehouse?

23 A.    No.

24 Q.    Did you ever ask where those items were being

25 purchased from?

206

```
 1  A.    No.
 2  Q.    So the fact that he had all these stolen items at
 3  the warehouse he was keeping from you, correct?
 4  A.    Yes.
 5  Q.    Okay.  Has he ever -- who is Jawaad Farooq?
 6  A.    What is it?
 7  Q.    Jawaad Farooq.
 8  A.    Jawaad Farooq?
 9  Q.    Yes.
10  A.    His cousin.
11  Q.    Okay.  And where is he?  Where is he?
12  A.    He's in Canada.
13  Q.    And does he run SCS in Canada?
14  A.    I don't know.
15  Q.    Or involved with SCS in Canada?
16  A.    I don't know.
17  Q.    You don't know.
18         Did you ever talk to your husband about him
19  running the company in Canada?
20  A.    No.  We don't -- we didn't talk about it.
21  Q.    Didn't talk about it.
22         But you're aware that there is a company in
23  Canada, correct?  You're aware that there's a SCS in
24  Canada?
25  A.    Yeah.  I just got to know.
```

207

```
 1  Q.    When?  Today?

 2  A.    Yes.

 3  Q.    Your husband has never talked to you about that?

 4  A.    No.

 5  Q.    Never talked to you about his cousin running that

 6  in Canada?

 7  A.    No.

 8  Q.    Okay.  And you have traveled to Canada, correct?

 9  A.    Yes.

10  Q.    Have you ever gone to visit the cousin in Canada?

11  A.    Yes.

12  Q.    Okay.  And when you were there in Canada, did you

13  ever talk to him about what he did for a living?

14  A.    No, we didn't.

15  Q.    Did he ever travel here to Texas?

16  A.    Yes.

17  Q.    Did you ever talk to him here asking him what he

18  did for a living?

19  A.    No.

20  Q.    Okay.  Is it safe to say that you're not aware of

21  your husband's activities, correct?  What he's doing at

22  the warehouse?

23  A.    I mean, I do.  I mean --

24  Q.    Do you work at the warehouse?  Do you work in the

25  business?
```

208

1  A.    No.  But I know what kind of business he does.

2  Q.    Okay.

3  A.    It's an electronic business.

4  Q.    So he sells consumer goods, right?

5  A.    Yes.

6  Q.    Electronics.  Do you know who is selling him those

7  electronics and consumer goods?

8  A.    No.

9  Q.    You never talked to him about that?

10  A.    No.

11  Q.    Has he ever had to go do transactions in the middle

12  of the night?

13  A.    No.

14  Q.    Never late at night?  Midnight?  You've never seen

15  him leave the house to go do a business transaction at

16  midnight?

17  A.    I don't know.

18  Q.    Do you not live in the same house with him where

19  you would know if he left at midnight to go do a

20  business transaction?

21  A.    I mean, not off -- I can't remember.

22  Q.    Okay.  Does he own any firearms?

23  A.    Yes.

24  Q.    Has he ever taken any firearms to any business

25  transactions that you know of?

209

1  A.    I don't know.

2  Q.    Does he have any firearms -- how many firearms does

3  he have?

4  A.    I guess, one.

5  Q.    Okay.  When did he get that?

6  A.    I don't know.

7  Q.    Where does he keep it?

8  A.    In the safe.

9  Q.    Okay.  Now, do you know any of the individuals that

10 he does business transactions with?

11 A.    No.

12 Q.    He's never talked to you about them?  Never come

13 over to your house?

14 A.    Sorry?

15 Q.    Has he ever had them come over to his house?  Any

16 of these individuals that he does business transactions

17 with?

18 A.    I mean, no.

19 Q.    Never?

20 A.    Not that I recall.

21 Q.    No?

22 A.    Not that I recall.

23 Q.    How many bank accounts do you have?

24 A.    I do?

25 Q.    You and your husband or -- you and your husband

210

1  together.  Let's start with you and your husband.

2  A.    I have one account.

3  Q.    How about your husband's accounts?  How many --

4  A.    I don't know about that.

5  Q.    You don't know how many bank accounts he has?

6  A.    No.

7  Q.    How many properties does he own?

8  A.    Where?  In Texas?

9  Q.    Sure.  In Texas.  Let's start in Texas.

10  A.    I don't know.

11  Q.    You don't know about the properties in Frisco,

12  Texas?

13  A.    I mean, yeah.  One property.

14  Q.    One property?

15  A.    Yes.

16  Q.    And how much is it worth?  When did he buy it?

17  A.    I don't know about the worth.

18  Q.    When did he buy it?

19  A.    I'm not sure.  I'm not sure about the time period.

20  Q.    Okay.  Does he still own it?  Has it been sold?  Is

21  it up for sale?

22  A.    I don't know about that.

23  Q.    What about properties in foreign countries?  Do you

24  know about that?

25  A.    No.

211

1  Q.    Does he own any properties in Pakistan?

2  A.    I don't know.

3  Q.    Does he have family members in Pakistan?

4  A.    Yes.

5  Q.    Who lives in Pakistan?

6  A.    His cousins.

7  Q.    How many cousins does he have that live in

8  Pakistan?

9  A.    I mean, a few.

10  Q.    Give me -- give me an estimate.  More than ten?

11  A.    Maybe ten.

12  Q.    Okay.  And those are the same cousins for Maaz

13  Aziz, correct?

14  A.    Yes.

15  Q.    Okay.

16  A.    But they're extended family.

17  Q.    Anybody else?  Any other family members other than

18  cousins?  Uncles?  Aunts?  Grandparents?

19  A.    Yes.

20  Q.    Okay.  How many of them?

21  A.    I don't know.  I mean, he -- he has one grandma

22  that's --

23  Q.    So he has extended family?  He has quite a bit of

24  family still in Pakistan, correct?

25  A.    Yes.

212

1  Q.    Okay.  And if he decided to go there, he would be

2  well received.  They wouldn't turn him out.  They

3  wouldn't push him out, right?  They would bring them

4  into their house.  They would feed him.  They would make

5  sure he's safe, right?

6  A.    No.

7  Q.    No?

8  A.    I don't think so.

9  Q.    His family members wouldn't give him a place to

10 stay?

11 A.    I don't know.  I don't think so.

12 Q.    Why do his family members hate him so much?

13 A.    Sorry?

14 Q.    Why do his family members hate him that they won't

15 allow him to stay in their house?

16 A.    I mean, I don't know.

17 Q.    You don't know?

18 A.    No.

19        MR. GONZALEZ:  That's all I have, your Honor.

20        THE COURT:  Do you have any further questions

21 for this witness?

22        MR. MEYER:  No.

23        THE COURT:  Thank you, ma'am.  You may step

24 down.

25        Do you have any further witnesses to present

213

1   or evidence to proffer to the Court?

2          MR. MEYER:  No, your Honor.

3          THE COURT:  In light of the fact that this is

4   not a presumption case, I'll hear argument from the

5   government first.

6          MR. GONZALEZ:  Your Honor, we would argue,

7   first of all, that the witnesses that have been provided

8   as third-party custodians are insufficient for this

9   Court to rely on.  That -- for example, the witness who

10  had just testified, Saad Aziz's wife, was oblivious to a

11  lot of what her husband was doing or his business

12  activities, his business accounts, his belongings.  She

13  was honest about the fact that he has an extensive

14  family in Pakistan.  We would argue that would pose a

15  risk of flight.

16         As the agent testified, he now has an idea of

17  the strength of the government's case.  He now knows

18  who's cooperating against him to put it together.  We

19  would argue that based on that there is some incentive

20  for him to flee this country.  The fact that he is now

21  facing multiple charges that carry with it a term of up

22  to 20 years is an incentive for -- for the defendant to

23  flight.  The fact that -- the fact that he has not been

24  candid and honest with the Court and not having provided

25  the Court all of the information that it needs to make a

214

1  proper assessment whether the defendant should be

2  released on bond.  The fact that they hid there was

3  several properties in Frisco, Texas, that were up for

4  sale at the present time and not report that to the

5  Court I think is indicative of their ability or -- their

6  ability to conceal things from this Court.

7          The fact that they're willing to forge

8  documents in order to get what they want is indicative

9  of their mindset to do whatever needs to be done to get

10  their way.  Lastly, your Honor, he would argue that the

11  quantity of evidence that was provided by the agent

12  indicates that they were involved with this large --

13  very large conspiracy involving the selling of stolen

14  products.  Not only domestically, but internationally.

15  They have substantial ties to foreign countries.  The

16  fact that they're tied to another business in a foreign

17  country is also of concern to the government.

18          We believe that all of that is indicative of

19  someone who has the resources as well as the ability to

20  flee this country and be -- and is a substantial flight

21  risk.  In regards to the other witness who testified for

22  Maaz Aziz as a third-party custodian, again, we would

23  argue that that particular third-party custodian is not

24  suitable to be an appropriate third-party custodian.  In

25  questioning his knowledge about what he knew about his

1    friend that he's known for 11 years, it was very

2    limited.  He didn't know a lot about his business

3    activities, hadn't been to the warehouse, and hadn't

4    questioned him about what he did for -- at the

5    warehouse.

6              So we would argue that his information --

7    what he knows about the defendant is so lacking in

8    knowledge that he would not be a suitable third-party

9    custodian.  And the fact that there is other individuals

10   living at the house that he hasn't discussed about this

11   individual that's accused of these criminal offenses

12   coming to live at that house is also problematic and

13   that that would be an issue that the Court hasn't heard

14   to be resolved yet because those individuals haven't

15   been notified that he's volunteering his house to an

16   individual that's accused of these types of crimes.

17             We would argue, your Honor, that the strength

18   of the government's case is -- the strength of the

19   government's case relies heavily on co-conspirators',

20   co-cooperators' testimony, and the testimony is that

21   these individuals were involved in millions and millions

22   of dollars and involved in selling products

23   internationally.  So their contacts are substantial

24   internationally.

25             So based on all of that, your Honor, based on

216

1  the totality of the information that the Court has

2  heard, we believe that they pose a significant risk of

3  flight.  Some of the other considerations that the Court

4  needs to look at is their ties to the community.  I

5  think the Court has heard that their ties to the

6  community are that of his family.  Sure.  He's tied to

7  his family, but I don't think the Court has heard that

8  he's tied to much more than that.

9           The nature and circumstances of the offense

10 charged.  Well, the Court knows what the offenses are

11 that were charged.  The fact that some of the

12 offenses -- maybe they may not have directly been

13 involved in the armed robberies, but some of the items

14 that were obtained through armed robberies were

15 eventually getting to them.  Some of the items that were

16 obtained through fraud and identity theft, as the agent

17 testified -- tens of thousands of individuals whose

18 identities were --

19           THE COURT:  Mr. Gonzalez, I'm going to

20 interject.  Obviously, the Court's determination here

21 today must be tied to these individuals and their

22 involvement and their activity.  So, certainly, I

23 understand the scope of the argument, but help me

24 understand as it relates to the nature and circumstances

25 of the offense whether or not as to these individuals

1  there is violence.

2            MR. GONZALEZ:  Well, these individuals are

3  involved in the conspiracy, your Honor.  And there are

4  acts of violence involved with individuals that are

5  within this conspiracy who were using acts of violence

6  to obtain some of the items that they were then

7  delivering to the defendants who then would obtain those

8  items and sell them and distribute them forward.  So

9  this is a conspiracy.  Some of the acts of the

10 co-conspirators can be attributable to these defendants

11 as well.

12            The fact that, as the testimony has been,

13 that some of them -- on some of the occasions guns were

14 brought by the defendants to some of these transactions

15 in order to make sure that the transactions ran safely

16 and securely.  So I think the Court can take note of

17 that as well.  The weight of the evidence against the

18 person is another thing that the Court looks at.  The

19 weight of the evidence, as testified by the witness

20 Agent Doering, is substantial in the sense that we've

21 got multiple individuals identifying these two

22 defendants as being the recipient of stolen products by

23 different manners and that they then sell the stolen

24 products internationally and receive large sums of

25 money.  As indicative of what was found in the

1   warehouse, 40 percent, as Agent Doering has testified,

2   has turned out to be primarily stolen products with

3   60 percent still to go worth hundreds of thousands of

4   dollars.

5           The history and characteristics of the

6   person, including the person's character, physical,

7   mental condition, family ties, employment.  Well, family

8   ties, I've already talked about.  His family ties are to

9   his direct family.  It's not more than that.  There's

10  equal family ties to individuals in Pakistan.

11  Employment.  This was their employment.  This was what

12  they were supporting their family with.  The selling of

13  stolen items.

14          Financial resources.  Substantial financial

15  resources has been testified by the agent.  Not only

16  financial resources that we know about now and that has

17  been reported to the pretrial services report, but also

18  financial resources that the agent is still under -- is

19  still investigating.  Sixty-five bank accounts is a

20  substantial amount of financial resources that we just

21  don't know how much money is still out there for them to

22  be able to use -- to be able to use to either flee the

23  country or go -- get back involved in this criminal

24  activity.

25          Length of residence in the community.  I'll

1  leave that -- I'll leave that to the Court.  Ten years.

2  If the Court thinks that ten years of residence is

3  substantial, then so be it.  The nature and seriousness

4  and danger to any person or the community that would be

5  posed by the person.  He would argue that there is a

6  substantial danger.  They've been involved in this type

7  of activity where there are victims where individuals

8  were using firearms in order to perpetrate the crime.

9  We believe that is a serious danger to the community.

10  We don't believe that that has been rebutted by any

11  other witnesses provided by the defendant.

12          So we would argue, based on all those

13  criteria and the things the Court needs to look at, that

14  both defendants should be detained.

15          THE COURT:  Thank you.

16          Mr. Wohlford.

17          MR. WOHLFORD:  Thank you, your Honor.  I know

18  we've mentioned it a lot today, but this is not a

19  presumption and detention case.  And because it's not a

20  presumption and detention case, the Bail Reform Act

21  creates a presumption of pretrial release.  Now, after

22  hearing a bunch of testimony about, you know, what

23  Agent Doering thinks other defendants might have done

24  and the scope of this conspiracy, we didn't hear a whole

25  heck of a lot about Maaz Aziz.

1        What we heard was a lot of speculation and --

2   and then finally after we hear Agent Doering's

3   presentation, we hear that the only basis the

4   government's seeking to detain on is that he's a risk of

5   serious flight.  And so to detain him on that basis, the

6   Court must not only find the risk of serious flight, the

7   Court has to also find that no condition or set of

8   conditions would ameliorate any concern of serious

9   flight.  And we would respectfully submit that the

10  government hasn't met its burden.  And even if the Court

11  does believe that Mr. Maaz Aziz is a risk of serious

12  flight, we would respectfully submit that as pretrial

13  services found in the pretrial services report, various

14  conditions can reasonably assure his appearance at these

15  proceedings.

16        So I would like to first address the flight

17  issue, your Honor.  On the issue of flight, the evidence

18  does not create any sort of -- they did not present any

19  evidence that creates a -- a serious question as to

20  whether he's a risk of serious flight.  Notably, even in

21  presumption cases, the Fifth Circuit has held that

22  long-standing ties to the community is sufficient to

23  rebut the presumption.  And Mr. Aziz does have

24  long-standing ties to the community.  Notwithstanding,

25  Mr. Gonzalez misrepresenting that he's only lived here

221

1    for three years.  He's lived here for at least ten.  He

2    went to high school here.  He's a proud naturalized

3    American citizen.  He's married to his high school

4    sweetheart Ameirah who is a natural born American

5    citizen.

6              Him and Ameirah have four young, beautiful

7    children that mean everything to Mr. Aziz.  Mr. Aziz and

8    Ameirah own a beautiful home where they're raising their

9    children and also taking care of Ameirah's mother.

10   Mr. Aziz's brother, his brother's family, his aging

11   mother all live in North Texas near Mr. Aziz and

12   Ameirah.  His sister also lives in Texas, and his cousin

13   also lives in Texas nearby.  Mr. Aziz may have been born

14   in Pakistan, but the United States and particularly

15   North Texas is his home.  He would never abandon his

16   family no matter what sort of charges he's facing.

17             Now, although Mr. Aziz has traveled

18   internationally, he immediately surrendered his passport

19   to his attorneys when he hired us.  And we have been

20   prepared and have offered repeatedly to surrender them

21   to Mr. Gonzalez and are prepared today to surrender them

22   to the Clerk of the Court.  Now, we've heard about this

23   COVID document.  Again, what we've got here is the

24   evidence that a confidential defendant whose been

25   detained facing serious time said that he -- that

222

1   Mr. Aziz was somehow involved in getting him a COVID

2   document.  There is not a bunch of details about it.

3   It's not at all clear that this confidential defendant

4   and this informant had any actual knowledge that Maaz

5   used the forge document.

6           They didn't present a forged document that

7   Maaz used today.  But even if he had done that, which it

8   would have been a stupid thing to do, that doesn't mean

9   that he has any ability to forge a document that could

10  get him out of the country once his passports are

11  sitting here with the Clerk of the Court.  And so even

12  if you take that evidence as -- as established that

13  Mr. Maaz Aziz was involved in creating a fake COVID

14  test, that doesn't at all mean that he's a risk of

15  flight because his passport is going to be here and he's

16  not going to be able to get out of the country without

17  it.

18          As for -- as for this SCS Canada business,

19  there's no evidence -- none whatsoever -- first, that

20  SCS Canada is illegal.  Agent Doering specifically

21  testified it's possible that that's a fully legal

22  business.  There's also no evidence that Mr. Aziz owns

23  this business.  Over and over Agent Doering was asked

24  that.  And, yes, he deflected and said, well, there is a

25  connection.  There is no evidence that he actually owns

223

1 the business or has any ownership stake in the business.

2          Moreover, there's no evidence that Mr. Aziz

3 could or would escape to Canada.  Again, without a

4 passport, with his whole family here.  All of the

5 evidence is that this is his home.  He's tied to this

6 place.  He's not leaving this place.  He's here to face

7 his charges.  Now, there was lots of discussion about 65

8 bank accounts.  There's no specific testimony about who

9 those bank accounts belong to.  No idea whether Maaz

10 Aziz has access to those accounts.  It's all pure

11 speculation.  What the government is trying to do here

12 is argue, well, we don't know what their assets are

13 fully yet because we're still doing our investigation.

14 So the absence of evidence should itself be evidence

15 that they're a flight risk.  Well, it's the government's

16 burden.  Again, this isn't a presumption case.  They

17 can't rely on an absence of evidence in order to

18 create -- in order to meet their burden of presenting

19 evidence that he's a flight risk.

20          Finally, there's some discussion about people

21 who commit identity theft being involved in this

22 conspiracy.  But, again, there is nothing, as your Honor

23 even pointed out during Mr. Gonzalez's argument --

24 there's no evidence directly tying Maaz Aziz to anyone

25 who did that.  There is no evidence that Maaz Aziz has

224

1   any fake identities, any fake IDs, or anything like

2   that.  Again, I believe that Agent Doering repeated, in

3   fact, he has no evidence of that.  There is no direct

4   tie.

5            So just because there's some tangential

6   relation, you know, six degrees of separation between

7   Maaz Aziz and somebody who once created a -- you know,

8   might have -- might have committed identity theft,

9   that -- that is not evidence that Maaz Aziz is a flight

10  risk.  And we'd respectfully submit that the Court

11  shouldn't take that as evidence that he's a flight risk.

12  One thing, your Honor, that's been mentioned over and

13  over about, well, there weren't disclosure of properties

14  in Plano.  In fact, your Honor, because Mr. Aziz is

15  facing a money laundering charge, I brought the list of

16  assets.  I spoke to pretrial services.  I did

17  specifically mention a -- he owns a property in

18  Runaway Bay, Texas, and he's also listed as a co-owner

19  of real property in Frisco, Texas, which was in the

20  process of being transferred prior to the indictment.

21            Now, why that didn't make it into the

22  pretrial services report I don't know, but it was not

23  because of any attempt to conceal any evidence from this

24  Court.  Finally, your Honor, and perhaps most telling,

25  Mr. Aziz's business and home were raided by federal

225

1   authorities on October -- on August 24th, 2021.  That's

2   more than a month ago.  And on September 9th, Mr. Aziz

3   was indicted.  He learned of the indictment.  If

4   Mr. Aziz intended to flee, he would have done so then.

5   But he didn't.  In fact, he did the exact opposite.

6              He hired counsel.  He willingly surrendered

7   his passports to his counsel, and he willingly offered

8   to surrender himself and his passports to the

9   authorities.  Also, if the government was so concerned

10  about Mr. Aziz fleeing, why did they take so long to do

11  a self-surrender?  We offered to self-surrender a long

12  time ago.  We offered to self-surrender, I believe, the

13  first time on September 9th.

14             He self-surrendered on September 23rd.  I

15  understand they say, well, it's a matter of scheduling

16  this and that.  Well, why do you -- if there's a serious

17  flight risk, you're going to let scheduling get in the

18  way of letting someone self-surrender.  I don't think

19  so.  I don't think the government believes he's a

20  serious flight risk.  Otherwise, they would have made

21  sure and brought him in long before they did.

22             Look, I don't think there's any better

23  evidence of Mr. Aziz's intention.  And what will happen

24  is he's going to stay put.  He's going to defend against

25  these charges.  He's going to work for Mr. Issa and

226

1  continue to take care of his family the same way that he

2  has.  And I think it's significant, your Honor, that

3  pretrial services has recommended that he be released

4  with certain conditions.  And we would absolutely agree

5  that he should be released and that those standard

6  conditions should apply.

7            And, in fact, if there's any further risk

8  that the Court has about Mr. Aziz being a flight risk,

9  he would voluntarily submit to monitoring.  We would

10  agree to pay for the monitoring device.  Whatever needs

11  to be done -- whatever conditions can be met, I think

12  those conditions can reasonably assure Mr. Aziz's

13  appearance at the proceedings in this case.

14            Also, if there's any concern about any

15  connection between Mr. Aziz and SCS Canada, we would

16  respectfully submit that your Honor could make as a

17  condition of his release that there be no contact with

18  SCS Canada or the cousin who apparently runs that

19  business.

20            Finally, your Honor, I do want to touch

21  briefly on this safety issue, safety to the community.

22  There was a lot of stuff talked about today on that even

23  though that isn't the primary basis on which the

24  government seeks to detain.  There's really not any

25  evidence at all that -- that Mr. Aziz has engaged in

227

1  violence ever.  That he has been anything other than a

2  loving husband, a loving father, a good friend, a loving

3  member of his family.  He's never exhibited violence

4  towards anyone.  Now, although Mr. Aziz does lawfully

5  own firearms, the FBI did not seize those when they

6  searched his home.  Furthermore, those firearms have

7  also been provided to counsel, and we will secure those

8  firearms.  And Mr. Aziz understands he will not be

9  getting those firearms back prior to trial.

10           And to the extent that the government

11  suggests that Mr. Aziz poses a further risk of economic

12  harm to the community, that argument's also without

13  merit, your Honor.  The government has seized the

14  business that's the subject of the indictment.  And

15  Mr. Aziz, as Mr. Issa testified, has secured a good

16  playing job with a long-standing family business.  But

17  simply there is no threat of any kind of harm to the

18  community, economic, violence, or otherwise.

19           Finally, your Honor, I do want to address the

20  point -- and I think it goes hand in hand with this

21  notion that the custodian isn't suitable.  Mr. Gonzalez

22  says the -- Mr. Aziz's custodian isn't suitable because

23  he didn't know everything that Mr. Aziz did.  Well,

24  those are allegations, your Honor.  Those are

25  allegations of what Mr. Aziz did.  This is not proven.

228

1  This -- you know, that would take away his right to

2  trial to suggest that, well, Mr. Issa wouldn't be a

3  suitable custodian because he doesn't know what the

4  government's alleging against him.  These are simply

5  allegations.

6         In short, your Honor, we would respectfully

7  submit that the government has not met its burden of

8  showing that Mr. Maaz Aziz is a serious flight risk, but

9  even if your Honor is concerned that he is a serious

10 flight risk, we would respectfully submit that all of

11 the conditions laid out in the pretrial services report

12 that recommended his release with conditions, including

13 conditions related to SCS Canada, conditions related to

14 a monitoring device should be sufficient to reasonably

15 assure this Court that he will appear for proceedings.

16 Long-standing ties to this community.  Long-standing

17 familial, economic, and social ties to this community.

18 This man would never leave his family, and he's not

19 going to if you release him, your Honor.

20         Thank you.

21         THE COURT:  Before you're seated, sir, can

22 you tell me -- you referenced during your argument here

23 today that you provided the list of properties to

24 pretrial, and so to the extent that it's incomplete,

25 that that's on you.

229

```
 1          Can you help me understand why you waited
 2   until now to bring that up?
 3          MR. WOHLFORD:  I honestly did not realize,
 4   your Honor, that those were omitted from that.  I have
 5   the sheet here that I had that I was using to provide
 6   the information to pretrial.  The last two bullet points
 7   are Mr. Aziz owns undeveloped real property in
 8   Runaway Bay, Texas, and Mr. Aziz may be listed as a
 9   co-owner of real property in Frisco, Texas, which was in
10   the process of being transferred prior to his
11   indictment.  Your Honor, until it came up late in the
12   day that that -- that that wasn't disclosed and the
13   suggestion that it wasn't disclosed, that totally
14   escaped my mind.  That is on me.  That's absolutely my
15   fault.  I fall on the sword on that.
16          But I'm representing as an officer of the
17   Court that I -- this is the sheet that I used to provide
18   the list of assets and liabilities to pretrial.
19          THE COURT:  Mr. McCarthy, your remarks.
20          MR. MCCARTHY:  Briefly, your Honor, I agree
21   with probation.  There is certainly conditions that he
22   could be released on.  I also agree with the FBI that he
23   is -- in his 15 years never seen somebody make this
24   effort to turn himself in, and he is correct.
25          The standard here is not -- as the Court is
```

230

1  well aware, is not could and it is not might.  Could he

2  be a flight risk?  He might go out and deal in the

3  future in stolen property.  I mean, that seems to be the

4  underlying argument here.  As the Court is aware, the

5  Bail Reform Act clearly favors non-detention in the

6  Fifth Circuit.  The conditions must be the least

7  restrictive.

8          So here we are -- he has zero conditions.  He

9  has no conditions at all the past month.  And what did

10 he do?  We sent a surrender letter saying we'll give you

11 the passport.  He wrote a letter to you.  He wrote a

12 letter to Judge Johnson and anybody else pretty much

13 that's involved in this thing.  An e-mail went to

14 Mr. Gonzalez basically reiterating the offer saying

15 we'll bring him in.  He went down to the Euless Police

16 Department meeting with Officer Norwood to try to turn

17 himself in.  Then he self-surrenders.  And this is after

18 he's been indicted.  He's got four major counts.  I

19 don't think the idea that the government showed a

20 PowerPoint that was about 90 percent of other people is

21 going to scare them in running for the hills.  I just

22 don't think that's realistic in the context of

23 everything we've seen.  So that's what we have on flight

24 risk.

25          And then on top of it, then we add the deep

1  family ties.  He's got two little kids here.  His wife

2  just said if the Court wants, they'll easily give over

3  their passports for the children and his wife here.  His

4  home is here.  His mortgage is here.  He has -- he has

5  new employment now here if he ever gets out.  His past

6  conduct -- he has no criminal history whatsoever.  So

7  looking at are there conditions or accommodation

8  conditions that will reasonably ensure the defendant's

9  appearance -- is he a flight risk?  I think the evidence

10  is -- he was -- even though it's not on us, is

11  overwhelmingly yes.

12           And then they attack the custodian because

13  she doesn't know enough.  I mean, it's kind of like a

14  "Catch 22."  It's like, well, you didn't know about the

15  stolen goods.  Well, if she did, she would be a terrible

16  custodian.  She should be indicted.  So, you know, we

17  lose either way on that, according to Mr. Gonzalez.

18           So I would just ask the Court to consider the

19  reality of this.  We all know this case is probably

20  going to take a year or two to try.  I mean, do we

21  really think there is no conditions and he has to sit in

22  jail for the next year or two given this scenario?  And

23  I'm hoping and I believe the evidence supports the fact

24  that the answer is no.

25           THE COURT:  Thank you.

232

1          All right.  Counsel, anything further that we

2  need to discuss before we proceed?

3          Mr. Gonzalez?

4          MR. GONZALEZ:  No your Honor.

5          THE COURT:  All right.  Mr. Wohlford?

6  Mr. Castle?

7          MR. WOHLFORD:  No, your Honor.

8          THE COURT:  And Mr. McCarthy?

9          MR. MCCARTHY:  No.

10          THE COURT:  All right.  Gentlemen, at this

11  juncture, the Court is leaning towards releasing your

12  clients.  There is an issue that I desire to research

13  this evening before making that final determination.  I

14  don't see a significant number of (f)(2) only cases.

15  And so I need to look at the burden on the initial

16  threshold determination before I make a final

17  determination.

18          But I'm telling everyone here that I am

19  leaning towards release.  And as a result, I believe

20  that the government has already advised that if the

21  Court does determine to release, that they will be

22  requesting a stay.

23          Mr. Gonzalez, is that correct?

24          MR. GONZALEZ:  That's correct, your Honor.

25          THE COURT:  Okay.  It is the practice in this

233

1    district that the magistrate judges grant the stays when

2    they are requested.  And so I will notify everybody

3    before noon tomorrow of my final determination whether

4    I'm recommending release or detention.

5              Notwithstanding whatever my recommendation

6    is, if I recommend release, that will be automatically

7    stayed, and it will be presented to the District Court

8    for consideration.

9              Government, how long would y'all -- if you

10   have an ultimate need to file a motion to stay, would

11   you be able to file that by Thursday?

12             MR. GONZALEZ:  By Friday, your Honor.

13             THE COURT:  Okay.

14             MR. GONZALES:  Could I have until Friday?

15             THE COURT:  Okay.  So the motion will be on

16   file by Friday for the District Court's consideration.

17   That will trigger y'all's response deadline to the

18   motion to stay and requesting for the District Court to

19   make an alternative determination.  I will go ahead and

20   order that the transcript from today's proceedings be

21   prepared so that that can be filed on the docket and

22   will be available to the District Court for his

23   consideration on that motion.

24             Mr. Gonzalez, anything further?

25             MR. GONZALEZ:  No, your Honor.

234

1        Thank you.

2        THE COURT:  All right.  Mr. Wohlford,

3   Mr. Castle, anything further?  Any questions about the

4   information I've given you at this juncture?

5        MR. CASTLE:  No, your Honor.

6        MR. WOHLFORD:  No, your Honor.

7        THE COURT:  Okay.  And Mr. McCarthy?

8        MR. MCCARTHY:  Judge, just briefly just for

9   the record, if there is an initial determination by you

10  that he be released, can he be released --

11       THE COURT:  Not pending -- not pending the

12  District Court's determination.

13       MR. MCCARTHY:  I just wanted to ask for my

14  client.

15       THE COURT:  Yes.  No.  The Court's practice

16  is that when there is a stay requested by the

17  government, there's maintenance of the status quo until

18  such time as the District Court makes a determination.

19  And so whether I order your client detained or released

20  tomorrow before noon, he will remain in custody until

21  such time as Judge Jordan has an opportunity to review

22  any determination that I've made.

23       All right.  I should ask the flip side, too.

24  Gentlemen, if the Court desires or determines to detain,

25  are you also going to be requesting reconsideration at

235

1    the District Court level?

2                MR. CASTLE:  Yes.

3                MR. MCCARTHY:  Yes, your Honor.

4                THE COURT:  I'm shocked.

5                Okay.  So whatever the situation -- whether

6    it's the government or whether it's you gentlemen, any

7    motion requesting reconsideration or the stay has got to

8    be on file by Friday.  But either case, I'll go ahead

9    and get that transcript ordered so that it will be

10   available to the District Court and y'all can pursue

11   your motion practice before him, all right?

12               Okay.  Thank you everyone so much for hanging

13   with us for as long as you did today.

14               With this, the Court will be adjourned.

15               (Court adjourned at 6:19 p.m.)

16                     *      *      *

17

18           COURT REPORTER'S CERTIFICATION

19               I hereby certify that on this date,

20   October 1, 2021, the foregoing is a correct transcript

21   from the electronic record of proceedings.

22

23

24   _____
                 APRIL D. HARGETT, RPR, RVR
25