```
1                     IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
2                              SHERMAN DIVISION

3    UNITED STATES OF AMERICA,          §
                                        §
4                    Plaintiff,         §   Case No.
                                        §   4:20-cr-00382-SDJ-KPJ-
5         vs.                           §   103, 104
                                        §
6    MAAZ AZIZ and SAAD AZIZ, et al,    §   VOLUME 1
                                        §   Pages 1 - 170
7                    Defendants.        §

8                     TRANSCRIPT OF DETENTION HEARING
                   BEFORE THE HONORABLE SEAN D. JORDAN
9                       UNITED STATES DISTRICT JUDGE

10                  Friday, October 15, 2021; 1:40 p.m.
                              Plano, Texas
11

12   APPEARANCES OF COUNSEL:
     (Continued on page 2.)
13
     FOR THE UNITED STATES:
14
      Ernest Gonzalez
15    Colleen Elizabeth Bloss
      U.S. ATTORNEY'S OFFICE - Plano
16    101 East Park Boulevard, Suite 500
      Plano, Texas 75074
17
     FOR THE DEFENDANT MAAZ AZIZ:
18
      Lucas C. Wohlford
19    Robert M. Castle, III
      DUANE MORRIS, LLP - Dallas
20    100 Crescent Court, Suite 1200
      Dallas, Texas 75201
21

22       ************************************************

23                    GAYLE WEAR, RPR, CRR
                  Federal Official Court Reporter
24                      7940 Preston Road
                       Plano, Texas 75024
25                        214.872.4867
```

```
 1    APPEARANCES OF COUNSEL:
      (Continued from page 1.)
 2
      FOR THE DEFENDANT SAAD AZIZ:
 3
      Brandon Nelson McCarthy
 4    Ryan Jonathan Meyer
      KATTEN MUCHIN ROSENMAN LLP - Dallas
 5    2121 N. Pearl Street, # 1100
      Dallas, Texas 75201
 6

 7                           *    *    *

 8
                          I N D E X
 9    GOVERNMENT WITNESSES                         PAGE

10    CHRISTOPHER B. DOERING

11        Direct examination by Mr. Gonzalez         5
          Cross-examination by Mr. Castle           98
12        Cross-examination by Mr. McCarthy        151

13

14                       E X H I B I T S

15    GOVERNMENT'S                              ADMITTED

16        6                                         56

17        1                                         63

18        7                                         95

19    DEFENDANTS'

20        All exhibits submitted with response briefs   96

21

22                           *    *    *

23

24

25
```

```
 1   October 15, 2021                              1:40 p.m.

 2                          ---o0o---

 3                   P R O C E E D I N G S

 4                          ---o0o---

 5        THE COURT:  Good afternoon.  You can be seated.

 6        All right.  We're here on cause number 4:20-cr-382,

 7   the United States of America versus Boulden, et al, but we're

 8   here particularly on defendants 103 and 104, Maaz Aziz and

 9   Saad Aziz.

10        And let's have counsel make their appearances for

11   the record.  We'll start with the government.

12        MR. GONZALEZ:  Your Honor, Ernest Gonzalez for the

13   government.  The government's ready to proceed.

14        THE COURT:  Thank you.

15        MR. CASTLE:  Your Honor, Bob Castle and Luke

16   Wohlford for defendant Maaz Aziz.  We're ready to proceed.

17        THE COURT:  Thank you.

18        MR. MCCARTHY:  Judge -- Your Honor, Brandon

19   McCarthy and Ryan Meyer for Saad Aziz, Your Honor.  We are

20   ready.

21        THE COURT:  All right.  Thank you, counsel.

22        So I will just let everyone know for today that,

23   typically, when you're addressing the Court and when

24   you're -- or when you're making argument, we'll have you do

25   that from the podium simply because we get the best sound and
```

```
 1    it's best for our transcript.

 2             And we're here today on the United States'

 3    emergency motion for stay of magistrate court's order of

 4    release.  This is your motion, Mr. Gonzalez, and I assume --

 5    can you let me know how many witnesses you plan to present?

 6             MR. GONZALEZ:  Two witnesses, Your Honor.

 7             THE COURT:  All right.  Why don't we go ahead and

 8    proceed with the government's first witness.

 9             MR. GONZALEZ:  The government calls Special Agent

10    Chris Doering.

11             THE COURT:  Let's have Agent Doering sworn.

12                         (Witness sworn.)

13             THE COURT:  Okay.  Just make sure the microphone's

14    on.  And were you looking for something?

15             THE WITNESS:  Looking for the PowerPoint.

16             MS. BLOSS:  Your Honor, may I hand him the

17    PowerPoint clicker?

18             THE COURT:  Oh, yes, go ahead.

19             (Provided to the witness.)

20             THE COURT:  Mr. Gonzalez, you can proceed when

21    you're ready.

22             MR. GONZALEZ:  Thank you, Your Honor.

23                     CHRISTOPHER B. DOERING,

24       first having been duly sworn by the courtroom deputy,

25                 testifies under oath as follows:
```

```
1                      DIRECT EXAMINATION

2    BY MR. GONZALEZ:

3    Q.    Sir, would you please state your full name for the

4    Court and the record.

5    A.    Christopher B. Doering.

6    Q.    Spell your last name for us, please.

7    A.    D-O-E-R-I-N-G.

8    Q.    How are you employed?

9    A.    I'm a special agent with the FBI of the Dallas division

10   on the Dallas Violent Crimes Task Force.

11   Q.    How long have you been so employed?

12   A.    Sixteen years.

13   Q.    Have you received any specialized training in regards

14   to your duties with the FBI?

15   A.    Yes.

16   Q.    Can you tell us what those -- that training is?

17   A.    Basic training in Quantico, periodic training,

18   at robbery conferences, other types of conferences.  Training

19   towards Title IIIs.  Informal training when it comes to Pen

20   Registry review, that type of stuff.

21   Q.    And did you attend an academy in order to have the

22   position that you now have?

23   A.    I did.

24   Q.    Tell us about that.

25   A.    The academy was four and a half months when I went
```

6

1    through.  It was a series of physical training, firearms

2    training, tactical training, and then investigative training.

3    Q.    Can you -- and have you had follow-up training after

4    the academy?

5    A.    Throughout, back at Quantico, at times I went back for

6    public corruption training, other types of fraud training;

7    and just training through conferences, and informal training

8    through senior agents.

9    Q.    And have you testified before?

10   A.    Yes.

11   Q.    On few or many occasions?

12   A.    Over ten.

13   Q.    Okay.  All right.  Now, are you familiar with -- based

14   on your duties with the FBI, are you familiar with two

15   individuals:  One by the name of "Saad Aziz," and another by

16   the name of "Maaz Aziz"?

17   A.    Yes.

18   Q.    And do you see those individuals in the courtroom

19   today?

20   A.    I do.

21   Q.    Would you point to where they're seated and indicate an

22   article of clothing that they're wearing?

23   A.    Maaz Aziz has the shorter hair; he's wearing a gray and

24   darker gray striped jumpsuit.  Saad Aziz is sitting on the

25   right side of the table with longer hair, wearing the same

1    article of clothing.

2              MR. GONZALEZ:  Your Honor, may the record reflect

3    that the witness has identified the defendants?

4              THE COURT:  Yes.  The record will reflect the agent

5    has identified defendants Maaz Aziz and Saad Aziz.

6    BY MR. GONZALEZ:

7    Q.    Now, sir, are you familiar with the facts that led to

8    the indictment and subsequent arrest of these two

9    individuals?

10   A.    I am.

11   Q.    And can you summarize that investigation for the Court?

12   A.    Yes.

13   Q.    And have you prepared a PowerPoint in order to assist

14   you in that summary of your investigation?

15   A.    I have.

16   Q.    Would you like to present that presentation -- that

17   PowerPoint to the Court now so that it can assist you in your

18   summary?

19   A.    Yes.

20   Q.    Okay.  You can -- tell us how you initiated this

21   investigation and what is the substance of this

22   investigation?

23   A.    Yes.  The initiation or the investigation began in

24   December of 2020 when an armed robbery crew was committing

25   armed robberies throughout the Dallas metroplex.  A series of

1  arrests on December 9th and December 22nd led to the arrest
2  of 15 individuals who had been indicted under this cause
3  number.
4         The armed robberies were of cell phone stores where
5  they were targeting the rear safe of the store where the
6  higher-end iPhones or Samsung phones were at.
7  Q.    Were there individuals inside the stores at the time
8  that these robberies were occurring?  And what would happen
9  to the individuals that were there?
10  A.    Yes.  At the time of the robberies, the robbery crew --
11  two to three individuals -- would enter the stores.  It would
12  be a take-over robbery at gunpoint, and they would force at
13  gunpoint the -- at least one employee, sometimes more, to the
14  back of the store to try to open the safe.
15  Q.    What if there were customers in the store at the time?
16  A.    They would still enter the store and conduct the
17  robbery.
18  Q.    Okay.  And -- okay.  Thank you.
19  A.    On December 9th, the arrest of four individuals
20  conducted -- who conducted a robbery in Fort Worth, Texas,
21  led to the identification of Global One Wireless, a retail
22  store owned by Arsalan and Abdul Bhangda, who also are a part
23  of RJ Telecom, that led to the identification of Arsalan and
24  Abdul Bhangda and RJ Telecom.
25  Q.    And the primary purpose of the robberies, what were

1    they primarily trying to obtain from the cell phone stores?

2    A.    They were attempting to obtain high-end cell phones and

3    resell to individuals like Arsalan and Abdul for U.S.

4    currency.

5    Q.    So Arsalan and Abdul Bhangda, would they be considered,

6    in common parlance, as a fence --

7    A.    Yes.

8    Q.    -- someone that you take stolen things to, and then

9    they buy them and sell them further along?

10   A.    Correct.

11   Q.    Okay.

12   A.    So the arrest of those individuals after they left the

13   Global One Wireless, that initiated an investigation into RJ

14   Telecom that led to the discovery of a device-tracking

15   conspiracy where RJ Telecom would obtain new Apple and

16   Samsung stolen devices for export to the UAE and Hong Kong.

17          RJ Telecom would rely on device traffickers -- who

18   obtained those devices through robbery, fraud, theft -- to

19   supply these devices to them or other wholesalers, who would

20   also buy from device traffickers.  They would ship these

21   phones via interstate carriers from the Dallas area to the

22   UAE, or Dubai, and would get return proceeds via wire.

23   Q.    Well, let me stop you there so that we can get an idea

24   of the wording that you're using here.

25          You said *wholesalers*.  Can you kind of break it

1    down as to who -- what role certain people have?

2    A.    So the device traffickers or device trafficking

3    organizations would be at the street level.  Those would be

4    individuals conducting identity theft to obtain finance

5    phones; individuals who conduct transit theft, which is

6    taking phones from warehouses or FedEx, UPS drivers, or those

7    shipments; and then robbery crews, who would go into the

8    store by force and obtain those phones.

9    Q.    Okay.  And then who would be the wholesalers that you

10   just mentioned?

11   A.    RJ Telecom would be a wholesaler.  SCS Supply Company,

12   which is the company for Saad and Maaz, would be a

13   wholesaler.  And those wholesalers can buy it from device

14   traffickers; they can also buy it from each other and sell to

15   each other.  Some wholesalers then export to the UAE or

16   Dubai, and some wholesalers simply sell to other wholesalers.

17              Through the investigation, we identified an

18   authorized distribution channel for new devices.  These Apple

19   and Samsung new devices are typically sold through carrier

20   and big-box resellers; carriers being T-Mobile, AT&T, and

21   Verizon; while your big-box resellers are Walmart, Target,

22   Best Buy; along with Apple retail stores.  This is where new

23   Apple product can be purchased from; your phones, your iPads,

24   your MacBooks, Apple watches, AirPods, your new devices.

25   This is the authorized distribution channel.

1          In order to purchase these devices at or near, this

2     is -- I'm sorry, excuse me -- this authorized channel is

3     where individuals have to go to purchase these devices.

4     There is no secondary wholesaler market that offers a bulk

5     discount pricing for these types of devices.  And when you go

6     to an Apple retail store, you have to pay retail cost.  And

7     when you go to an AT&T or Verizon store, you can finance the

8     phone, but that comes with a two-year commitment to pay off

9     that phone along with the using the service for two years,

10    which is how AT&T and Verizon make their money.

11    Q.    So Apple and Samsung, these are their retailers, these

12    are the people that are authorized to sell the product, the

13    brand new product, for them?

14    A.    Correct.  This is how Apple is pushing out their

15    product.

16    Q.    So there is no other source of distribution for, and

17    just using, Apple and Samsung?

18    A.    Correct.

19    Q.    So if you want to buy a brand new Apple or Samsung

20    product, you go to these specific retailers:  AT&T, T-Mobile,

21    Verizon, Walmart, Target.  That's where you have to go.

22    A.    Correct.  Outside of the authorized distribution

23    channel, you have what's the grey market supply.  The grey

24    market supply is often derived from the device trafficking

25    that comes from robbery, fraud, and theft.  This is where a

1    lot of this grey market comes from, where wholesalers will

2    purchase that to then export overseas.

3              Within the international grey market, there is the

4    Global Standards Mobilization Association, the GSMA.  They

5    hold what's called a block list, or manage a block list.  And

6    that's where a group of companies within -- approximately 43

7    countries, 120 companies, will share stolen IMEIs with each

8    other in an effort to prevent the stolen or blacklisted IMEIs

9    from being used on each other's networks.  This block list

10   only works in participating countries; it doesn't work for

11   non-participating countries such as Pakistan, China,

12   Uzbekistan and the UAE.

13   Q.   Let me -- if we can go back a couple of slides, please.

14             So when you're talking about the grey market,

15   you're talking about individuals that are outside of that

16   distribution chain that you just talked about; correct?

17   A.   Correct.

18   Q.   Outside of Walmart, Target, AT&T, Verizon, so that's

19   the grey market; they're individuals that are operating

20   outside of that distribution chain.

21   A.   Correct.  For new devices we're talking about.

22   Q.   All right.  If we can go to the next slide.

23             So here, you're talking about the GSMA; right?

24   A.   Correct.

25   Q.   And they're the ones that list the phones that have

1    been blacklisted?

2    A.    Correct.

3    Q.    Those are phones that have been taken by either theft,

4    fraud, or robbery?

5    A.    Stolen, or they're broken.  Some -- for some reason,

6    the carrier decides to list that on there to prevent usage on

7    another network.

8    Q.    So when someone comes into a business and offers a

9    brand new phone, can that business owner go into the GSMA and

10   determine whether that phone is listed on that database?

11   A.    Correct.

12   Q.    And that's so that they know that that phone is

13   problematic.

14   A.    Yes.

15   Q.    All right.  And then you also talked about IMEI

16   numbers.  Do you remember talking about that?

17   A.    So IMEI numbers are unique identifiers for cell phones.

18   The equivalent is a VIN of a car.

19   Q.    And each phone has an IMEI number.

20   A.    Correct.

21   Q.    That's specific to that particular device.

22   A.    Correct.  MacBooks would have a serial number; same

23   thing.

24   Q.    Okay.

25   A.    iPads.

1    Q.    And in regards to subscribers to this particular GSMA,

2    not every country in the world subscribes to it; correct?

3    A.    No.  Only 43 countries or approximately, give or take.

4    Q.    So there are countries where you can send these devices

5    that no -- that don't subscribe to this particular database.

6    A.    Correct.  If you have blacklisted devices here in

7    America, export them to Dubai, they make their way to

8    Pakistan, those phones will work on a Pakistan network

9    despite being blacklisted.

10          After the arrest of the four robbers following the

11   Fort Worth robbery on December 9th, a search warrant was

12   conducted at Global One Wireless.  Through that search

13   warrant, an HP computer was seized and forensically examined.

14   Through that, numerous documents were obtained that

15   essentially tracked or logged IMEIs.

16          Several of the spreadsheets were named "daily

17   buyings," some degree to that, and they would list the IMEI,

18   the product description, carrier condition, amount, and

19   customer, which would be depicted below.  The FBI took these

20   spreadsheets, they compiled them for approximately 2000 --

21   for the years 2019 and '20 to develop a picture or what RJ

22   Telecom was buying and selling.

23          This is an example of what the RJ Telecom daily

24   buyings could look like.  Here, you see the date, the IMEI

25   number; the carrier, it's unlocked, so that means that the

1    carrier -- that phone can be used on any network.  If it was

2    locked, T-Mobile, that phone could only be used on T-Mobile's

3    network, or AT&T's.  It also lists the condition.  Sealed,

4    which is typically -- refers to a brand new in-the-box phone.

5    The price.  And, here, the name "Saad," that would be Saad

6    Aziz.

7    Q.   If you can go back again just so I can follow up with a

8    question there.

9         So is there more value in an unlocked as opposed to

10   a locked phone, or a sealed as opposed to an unsealed

11   condition?

12   A.   Yes.  As far as the unlocked, if the phone is unlocked,

13   then it can be sent over at a higher price.  Generally, the

14   unlocked phones would go do Dubai.  If it's locked, at some

15   point that device has to become unlocked in order to be used

16   on a network outside of, for instance, AT&T.  That process

17   costs money to unlock that phone.

18        There are no legitimate ways to unlock a phone.  In

19   order to do that, you use a service, which typically is

20   someone has developed a source inside of, for example,

21   T-Mobile.  That source is an employee or a contractor,

22   somehow has access to the locked list and is able to unlock

23   that device, and may charge a fee for that.  So that fee then

24   is added to the cost of obtaining that locked phone.

25        Locked phones are typically your financed phones.

1    When you go into AT&T and finance a phone, they are going to

2    lock that phone to their service in an attempt to ensure you

3    use that phone throughout the two years, so they can recoup

4    the cost of the phone that you -- that individual received

5    for essentially free, or for taxes, or a small down payment,

6    depending on the credit.  So identity theft in a large part

7    was used to purchase these locked financed phones.

8    Q.    Okay.

9    A.    Here, you have an organizational chart where you can

10   see that RJ Telecom had numerous entities.  For the sake of

11   today, anytime we refer to a transaction between Arsalan or

12   Abdul, or those entities, we'll refer to RJ Telecom.

13          On the left side of the chart, you can see SCS

14   Supply Chain, you'll see Saad Aziz; underneath that -- he is

15   the principal for the supply chain -- Maaz Aziz, who is the

16   principal for Gizmobile; and Feras Obeidat, who is the

17   manager of Gizmobile; and Mohsin Zia, who is a manager at SCS

18   Supply Chain.

19   Q.    Okay.  So here, to the left of the screen, is what

20   you're referring to.  So they would be a wholesaler; correct?

21   A.    Correct.

22   Q.    And they would, in essence, also sell phones or deliver

23   phones to RJ Telecom?

24   A.    They would.

25   Q.    Okay.  Do you know if they were also sending phones

1    directly to foreign countries?

2    A.    They did.

3    Q.    What countries do you know?

4    A.    Dubai.  Other countries like Colombia, Mexico.  Those

5    three that I can think of for now.

6    Q.    Canada?  Canada.

7    A.    Um, I don't -- yes, to Canada as well.  And phones from

8    Canada came down to the Dallas area.

9    Q.    Now, and you also talked about going back to this

10   entity of SCS Supply Chain.  There were other businesses and

11   entities that were related to this particular business;

12   correct?

13   A.    Correct.

14   Q.    What have you found in your investigation?

15   A.    What it appears like, from review of financial

16   statements from the search warrant at SCS Supply Chain, that

17   SCS operates it kind of like RJ Telecom, a parent company,

18   where it has other subsidiary companies underneath it, but

19   they tend to act as one company with the goal of obtaining

20   property and selling that property.

21   Q.    And were they obtaining property from the street-level

22   buyers, like you indicated before, the street-level buyers

23   being the individuals that are conducting the identity theft,

24   that are conducting the armed robberies, and so forth?

25   A.    They were conducting street-level transactions,

1    especially early on.  As it moved closer into 2021, they

2    became more wholesalers and would purchase those types of

3    devices from other wholesalers.

4    Q.    Okay.

5    A.    Through Gizmobile, they were purchasing street stock.

6    Feras Obeidat, the manager at Gizmobile, was purchasing

7    street stock through Gizmobile, which was a storefront

8    business, much like Global One Wireless was for RJ Telecom, a

9    store open to the public; anyone could come in, anyone could

10   sell phones, buy inventory.

11   Q.    So give the Court an example of how the process would

12   work.  You've got what you call a street-level individual

13   going in, either getting the phones by the methods that you

14   said, either robbery, theft, identity theft, so on and so

15   forth, and they take those particular devices.  Is it

16   multiple device at one time?

17   A.    It can be one device.  It can be upwards of 20, 30,

18   40 devices at a time.  It just depends on how the device

19   trafficker works.

20   Q.    So then that device trafficker then takes those units,

21   the number varies, and then he goes to a wholesaler.

22   A.    Correct.

23   Q.    And that would be someone like SCS.

24   A.    Yes.

25   Q.    And then SCS would either decide to sell it to another

```
 1    wholesaler, RJ Telecom.

 2    A.    Correct.

 3    Q.    Or send it directly to Dubai or to a foreign entity.

 4    A.    Correct.

 5    Q.    Okay.  And then was RJ Telecom sending the phones that

 6    they were receiving from SCS abroad as well?

 7    A.    Yes.

 8    Q.    Okay.  All right.

 9    A.    As part of the investigation, we found RJ Telecom

10    records that depicted these shipments that were going

11    overseas.  There were numerous spreadsheets that documented

12    transactions with SCS, and these involved shipments to China,

13    Hong Kong, and Dubai.  This also includes SCS Canada, which

14    appears to be a subsidiary of SCS Supply Chain.

15              Also, we saw on these spreadsheets charges for

16    unlocking carrier-locked cell phones.  What this means is

17    there were payments made to these services, to these

18    individuals, that had sources inside of companies in order to

19    unlock these locked phones to then send overseas.

20    Q.    And have you been able to determine who is involved --

21    of the defendants here in the courtroom, who is involved with

22    SCS Canada?

23    A.    Yes.

24    Q.    Okay.  And can you tell us about that?

25    A.    SCS Canada is a business that was incorporated in
```

1    Ontario, Canada, in June of 2019.  Saad Aziz is the listed

2    director on the Articles of Incorporation, along with Jawaad

3    Farooq, who is a cousin of the Aziz's.

4    Q.    And have you been able to determine that there have

5    been transactions back and forth between the Canadian SCS and

6    the SCS here in the United States?

7    A.    And with RJ Telecom.

8    Q.    And tell us about that.  Explain that to us, please.

9    A.    That SCS Canada would also send supply directly to RJ

10   Telecom or through RJ Telecom.  They would also send product

11   down to SCS Dallas, and vice versa; SCS Dallas up to SCS

12   Canada.

13   Q.    Was there any money going from the United States SCS to

14   the Canadian SCS?

15   A.    From the financial statements, it appeared there was.

16   I can't recall right now, from the actual bank transactions,

17   if that occurred.

18   Q.    Okay.

19   A.    SCS Supply Chain, the primary office where the

20   warehouse and office space was at was 14292 Gillis Road in

21   Farmers Branch.  There were loading docks for

22   tractor-trailers, a warehouse space, processing areas.

23         Saad Aziz is the principal for SCS Supply Chain,

24   although both Maaz and Saad are involved in the operations

25   and both received wages from SCS Supply Chain.

1          Gizmobile, their retail store, that was nearby on

2    Alpha Road in Dallas, Texas, was a cell phone and repair

3    business.  There were three controlled sales conducted at

4    this business by the FBI from May of '21 to August of '21.

5          Maaz Aziz is the principal for Gizmobile, and Feras

6    Obeidat was the manager.

7    Q.    Can you go back, please.  And you say controlled sales

8    can you explain that to the Court, please.

9    A.    A controlled sale is where the FBI has a source or an

10   undercover.  This case, it was a source.  We would control

11   the entire transaction.  We would wire up -- we wired up the

12   source with an audio/video -- audio/video devices.

13         We provided the source with new devices; in this

14   case, MacBooks and cell phones, combination thereof.  We

15   would follow the source to the store.  We would conduct

16   surveillance while he was there.  When he left, we would

17   follow the source and collect any U.S. currency that he

18   obtained in exchange for the devices.

19   Q.    And would the source make it known to the individuals

20   there at Gizmobile that the product was obtained

21   fraudulently?

22   A.    He would -- the source represented that the devices

23   were stolen from a warehouse where he worked.

24         Maaz Aziz, who has no criminal history in his TWC

25   shows SCS Supply Chain payments since the first quarter of

1     January that ranged 30- to 35,000 per quarter.

2              Saad Aziz is the principal for SCS -- also no

3     criminal history -- and the same, since the first quarter of

4     January 2019, 30- to 35,000 per quarter.

5              And then Feras Obeidat, who is the manager at

6     Gizmobile, his supply -- his wages also came from supply

7     chain -- SCS Supply Chain.

8              As we've discussed, SCS Supply Chain and RJ Telecom

9     supplied each other with devices.  They also supply chain --

10    SCS Supply Chain and SCS Supply Chain Canada also sold

11    devices to RJ Telecom's affiliated company, Interstellar in

12    Dubai.  SCS Supply Chain also purchased devices from Dawn

13    Wireless and from Jill -- excuse me, Jibran Khalil, other

14    individuals in the conspiracy.

15             Cooperator -- cooperating defendant 1 and

16    cooperating defendant 2 have both advised that Maaz Aziz and

17    Saad Aziz began purchasing new devices from the street in

18    2016 and '17.  They started small, three to four devices at a

19    time, and worked their way up to 2- or 300 a week --

20             (Court reporter clarification.)

21             THE WITNESS:  Yes, working together, they advised

22    that Maaz Aziz would get devices from FedEx drivers and that

23    they both sold devices to RJ Telecom.  As they began dealing

24    in bigger quantities, they specialized in Samsung devices,

25    while RJ Telecom specialized in Apple devices.

1          CD 2 stated that RJ Telecom sold the Samsungs to

2     Saad and Maaz, and Saad and Maaz sold Apple products.  And at

3     times they would tally, so there wasn't a payment for every

4     transaction.  They would tally, and then at some point they

5     would make a payment.  Generally, RJ Telecom would make the

6     payment as the Apple product was more expensive than the

7     Samsung.

8          As time went on, CD 2 stated that Saad gained an

9     expertise in dealing with wholesalers, while Maaz gained an

10    expertise in cargo and transit theft.

11    Q.    And I guess I need to -- for you to explain transit and

12    cargo theft.  How would that -- how does that occur?

13    A.    Transit theft is when, for example, FedEx or UPS is

14    driving from one location to another, and FedEx drivers steal

15    the devices from the boxes; or it's stolen once it's

16    delivered; or at a warehouse, employees from the warehouse

17    will steal devices.

18    Q.    Okay.

19    A.    CD 3 advised that Awais Chodhury worked for Maaz and

20    Saad in the 2017 time frame.  He worked as security with Maaz

21    to pick up devices from FedEx -- from a FedEx guy.  They

22    would go to the FedEx guy's house.  Maaz would provide Awais

23    Chodhury with a gun to provide security during the

24    transaction.  Awais would stay outside during the

25    transaction; he was former Pakistani army.  This was one

```
1    example of a street-level buy.
2            CD 3 sold electronics and consumer goods to SCS.
3    And while working for SCS, Awais Chodhury would pick up these
4    stolen devices and consumer electronics such as drills,
5    vacuums, generators and other things from CD 3.
6            THE COURT:  Can I stop you for a moment, agent?  I
7    think before Mr. Gonzalez asked you to define transit theft
8    and cargo theft.  I think you defined transit theft --
9            THE WITNESS:  I'm sorry.  Cargo --
10           THE COURT:  -- and can you define cargo theft?
11           THE WITNESS:  I'm sorry.  Cargo theft would be a
12   tractor-trailer where -- for example, at night, individuals
13   could break into a storage warehouse or a business that's
14   designed to hold product or hold tractor-trailers,
15   shipping -- a shipping warehouse, and then drive off with a
16   tractor-trailer filled with goods, or steal it from the
17   street side.  And so they will get that trailer or steal
18   goods out of the trailer, and then take that trailer and
19   dispose of the goods.
20           THE COURT:  All right.  Thank you.  You can
21   proceed.
22           THE WITNESS:  CD 3 sold phones, computers, or
23   whatever was coming in stolen, to SCS leading up to the 2018
24   time frame.
25           And the RJ Telecom buyings from approximately
```

1    January 2019 to May 2019, there was approximately 2,327

2    devices for Saad Aziz, totaling roughly 1.6 million.

3            AT&T confirmed that some of these devices were

4    transit theft, fraud, equipment gaming, that they were under

5    review or non-pay.  Non-pay is a typical category for a

6    financed phone where a payment was never made on it, and it

7    is a very high indicator of finance -- financed phone fraud.

8            The retail loss amount was only $305,000 at this

9    time.  That's only because 305 devices at this point have

10   loss amounts.  We're still waiting or Verizon and T-Mobile's

11   request, and AT&T is still reviewing devices.

12           From RJ Telecom records with email -- through

13   emails with Maaz Aziz and through RJ Telecom daily buyings,

14   there was approximately 720 IMEIs associated with Maaz Aziz

15   through the time frame of 2016 to '18.  Again, preliminary

16   carrier checks with AT&T found 86 devices were stolen through

17   transit theft; another 29 were found stolen through fraud,

18   transit, or likely fraud.

19           Sprint found 160 devices that were found to be

20   stolen -- I mean, I'm sorry, 160 devices were found to be

21   Sprint.  Of this, 110 were found to be stolen through fraud,

22   theft, or likely to be stolen.  And T-Mobile found 12 devices

23   were fraud through -- stolen through fraud or theft.  And

24   Verizon found 3 devices.

25           Again Interstellar, the affiliated RJ Telecom

1   business, purchased laptops, primarily iPads, from SCS Supply

2   and SCS Supply Canada.  These were shipped directly to Dubai

3   where Interstellar is located.

4           Here, on the right, you see a shipping label.  On

5   the top left, you see Jawaad Farooq, SCS Supply Chain with a

6   Canadian address.  There, you see Saad Aziz, the "To," which

7   is the 14292 Gillis Road location, and this is just an

8   example of a shipment from SCS Canada to SCS Dallas.

9           Cooperating defendant 2 had provided statements

10  that SCS had a Canadian location that also shipped MacBooks

11  to Interstellar.  And that all phones collected in Canada

12  were sent to Dubai through Action Logistics, an importer used

13  by SCS Supply Chain.

14          CD 2 stated Jawaad came to SCS supply in Dallas for

15  six months to learn how to operate the business.

16          And CD 4 stated Jawaad was a cousin to Saad -- I'm

17  sorry -- and Maaz, and ran the SCS Supply location in Canada.

18          What you have here are the pictures of SCS Supply

19  on the left, and the Gizmobile store on the right.  A review

20  of seven bank accounts from April 2016 to February of '21,

21  which is not exhaustive, found payments from RJ Telecom of

22  over $4 million, Dubai-based income of $21 million;

23  China-based income of $3.2 million; and other foreign-based

24  income of $11 million; to note, Canada of 167,000; and

25  Pakistan, 46,000; other vendors or wholesalers like we

1    discussed, Dawn Trading, who is in this indictment, of

2    500,000; Jibran Khalil, for Am-Pak, at 23,000; M7 Group is in

3    this indictment at 27,000.

4          And there you see Blowfish Unlocks for $86,000,

5    which is an unlocking service that CD 2 advised was an

6    unlocking source; essentially, a company or person that had

7    someone at a telephone company to illegally unlock phones.

8    Q.    And this is the method that you were referring to

9    earlier where if it's a block or blocked phone, you can pay

10   an extra amount to unlock it illegally.

11   A.    Correct.

12         The Gizmobile store location, according to CD 4,

13   initially wasn't buying street stock or new devices coming in

14   from the street; they were selling stock that came from SCS;

15   they were financing stock that came from SCS.

16         Early on, CD 4 stated that Maaz Aziz told CD 4 to

17   give his number to anyone trying to sell street stock.  In

18   early 2021, due to COVID, sales were down, and Saad Aziz

19   pressured CD 4 to purchase street stock, which he eventually

20   did; one of those individuals being Ryeshawn Green, a/k/a

21   Peso, who's in this conspiracy.  Once he obtained street

22   stock, Feras -- or CD 4, the manager at Gizmobile, would take

23   these devices to SCS Supply.

24   Q.    Let me stop you there.  So you've identified Ryeshawn

25   Green as one of the street suppliers; right?

1    A.    Correct.

2    Q.    How was he getting his devices?

3    A.    He would use stolen identities.

4    Q.    And so explain that.  How does that stolen identity

5    process work?  For someone like -- so you have Ryeshawn Green

6    using stolen identities, getting those devices, and then

7    taking them to sell to SCS; correct?

8    A.    Correct.

9    Q.    So how does that initial process of stolen identity

10   work, based on your investigation?

11   A.    The stolen identities can be obtained through the

12   internet, they can be obtained through different sites, for a

13   fee.  Once those stolen identities are obtained, then they

14   can either be used -- if you have an employee on the

15   inside -- to activate lines based off of that identity, or

16   you can create -- if you have someone create an actual

17   identity set where a driver's license is created, a Social

18   Security card, a debit card, that matches; so it would be an

19   identity set.

20          And that individual or one of his workers would go

21   into a store, use that identity set to an unsuspecting or

22   suspecting employee to obtain credit to activate a new

23   account, and then obtain however many lines or devices they

24   could on that account.

25   Q.    So based on your investigation, Ryeshawn Green had that

1   knowledge of being able to obtain a stolen identity.

2   A.    Yes.

3   Q.    And do you have individuals in this investigation that

4   were selling identity sets, as you described, that would be a

5   Social Security number, a driver's license number, a credit

6   card?  Did you have individuals selling that set or that

7   group of identifying documents?

8   A.    Yes, we did.  Two -- yes, Richard Sims and Gregory

9   Trent would manufacture these identities.  They would also

10  provide a background report oftentimes that would help the

11  worker who was in the store know what question -- kind of

12  security questions.  If the Verizon, for example, employee

13  would ask a security question to challenge this worker to

14  ensure that that was his identity, they would use the

15  background report to answer that.

16  Q.    That being the two-step identity process where you have

17  to answer a specific question?

18  A.    In person, they could ask you those questions, um-hum.

19  Q.    Okay.  So you have Ryeshawn Green committing identity

20  theft, obtaining these phones.  Was he obtaining multiple

21  phones at a time?

22  A.    Yes.

23  Q.    And then he's taking these multiple phones that he has

24  obtained through stealing someone's identity and then he's

25  taking it to SCS?

A.    Correct.

Q.    And then the process works like you just indicated before, SCS would either send it to Dubai directly or send it to another wholesaler, who would then send it and distribute it here in the United States or send it to a foreign country.

A.    Correct.

Q.    Is that correct?

A.    Yes.

Q.    Okay.

A.    CD 4 also would get the cash from SCS Supply to pay these device traffickers.  So when device traffickers come in to sell the street stock, they are essentially doing what's called the term "cashing out."  They want to come in, sell the devices, and get cash; in part to pay anyone that helped to get that stock, which would be an individual within the store for them, to pay for the identities, to pay for the identities sets.  If there is a comprised employee, they need the cash to go pay those individuals that were part of the transaction.

Q.    What do you mean by a "compromised employee"?

A.    The investigation also had AT&T employees, or Verizon employees, T-Mobile employees that were involved in the fraud.  Essentially, they knew the individuals that were coming in who were purchasing these phones illegally and they would assist.

1          Like I said, anything purchased at Gizmobile by CD

2    4 was for SCS Supply Chain.  The last conversation CD 4 had

3    with Saad Aziz was to continue street-stock purchasing.  And

4    around this time, he was purchasing 30- to $40,000 a week of

5    street stock.

6          CD 4 also received cash from different unknown

7    individuals in Gizmobile.  He would get a text message saying

8    this individual is going to show up.  And certain unknown

9    individuals would show up and drop off cash that he would

10   count and then take to SCS Supply.  He recalled one occasion

11   where an individual dropped off $200,000, and then he would

12   take that to SCS, the accounts department.

13         Here, you have Ryeshawn Green who sold

14   approximately 60 new phones to CD 4; these were considered

15   street stock.  Peso also sold to RJ Telecom, Melik Salameh,

16   who is in the conspiracy.

17         The first controlled sale that was done in the case

18   was on April 4th -- I mean, April 21st, 2021.  Like we

19   discussed, the FBI conducted this controlled sale with a CHS

20   who sold one MacBook for $1700, and five 13-inch MacBooks for

21   $900, totaling 6200.  They were all new, sealed.  And he

22   represented that they were stolen, to Ali Anwar, who is who

23   he sold them to.

24         Ali Anwar then left the transaction.  Surveillance

25   continued and they followed Ali Anwar back to his store and

1   then they followed him to SCS Supply.

2          THE COURT:  Before you continue, just so I am clear

3   on that, when you say CHS --

4          THE WITNESS:  I'm sorry, sir.  That's confidential

5   human source, which is the term that we label our

6   confidential informants.

7          THE COURT:  And, likewise, you referred to CDs 1

8   through 4; I assume that means cooperating defendant.

9          THE WITNESS:  Yes, sir.

10          THE COURT:  All right.  And if you can continue.

11          THE DEFENDANT:  Here are the photos of Ali Anwar

12   dropping off what appeared to be the five boxes, that would

13   be the MacBooks, to SCS Supply Chain.

14          A review of his Pen Register data found that he

15   made a call to Maaz Aziz's cell phone at 11:38 a.m., which is

16   approximately the time he departed his store, and at 12:00

17   p.m., which is approximately ten minutes prior to him

18   arriving at SCS Supply.

19          A white collar investigation conducted by the FBI

20   also found that from October 17 to April 18, that

21   approximately $1.2 million in Fitbit devices were stolen from

22   a Kohl's distribution center here in the Dallas area.  These

23   Fitbits were purchased by Arsalan Bhangda from a Dave, and

24   then sold to Smart Cellular at the time, now SCS Supply, Saad

25   Aziz.

1        The FBI interviewed Saad Aziz who said he had also

2   made two to four Fitbit purchases from Arsalan Bhangda in the

3   November 17 to 18 -- April 18 time frame.  And then in July

4   18, Saad Aziz directly purchased approximately 42,000 in

5   Fitbit product from Dave.  CD 2 advised that these Fitbits

6   were stolen.

7        A controlled sale on May 14th, 2021, with Feras

8   Obeidat at the Gizmobile location on Alpha Road, took place.

9   The CHS sold ten new sealed Apple iPhone SE 128 gigabytes for

10  $300 each.  During this sale, the CHS represented the devices

11  were stolen from the warehouse.  All ten were new and in the

12  box.

13       Shortly after the sale, surveillance followed

14  Obeidat from Gizmobile to the SCS Supply Chain in Farmers

15  Branch.  All ten Apple iPhones -- excuse me of the ten

16  devices sold, two were found to be activated in the UAE, two

17  were found to be activated in India, and one was found to be

18  activated in Georgia -- in Jordan.

19       Here are surveillance photos loading the product

20  from Gizmobile and then entering SCS with the product, and

21  then without the product.

22       Another controlled sale on May 24th, 2021, with

23  Feras Obeidat.  This time, one MacBook was sold for $1,100,

24  which was approximately $523 less than a retail store

25  purchase.

1          On August 5th, 2021, another controlled sale with

2     an FBI CHS.  This time, Obeidat was not at the sale, but

3     coordinated with the CHS.  The sale was done with an employee

4     at Gizmobile.  After the sale, surveillance followed the

5     employee to the SCS Supply Chain.

6          This is a surveillance photo, video.

7          Dawn Wireless and Dawn Trading.  Ali Anwar is the

8     top photo for Dawn Wireless.  Abdullah Anwar is the bottom

9     photo for Dawn Trading.  Both of these individuals sold

10    significant quantities of stolen goods to SCS Supply Chain.

11         Different ways that they obtained these devices

12    were through robbery, theft.  This is the individuals

13    Thompson and Wright, who were stealing phones from T-Mobile.

14    George Israel, who is part of this conspiracy, would purchase

15    devices and other goods from an individual in Waco, Texas,

16    and sell them to Ali Anwar.

17         An indicted co-defendant, who has yet to be

18    arrested, also purchased stolen phones, obtaining stolen

19    phones and electronics, and sold them to Dawn Wireless.

20         CD 5 stated that indicted co-defendant 1 had also

21    dealt with Maaz Aziz.  They also purchased phones from Avaz

22    Karimov and then sold those to SCS Supply.

23    Q.    So would you consider Dawn Wireless a wholesaler as

24    well?

25    A.    They're a wholesaler.

Q.    So they're a wholesaler that is selling to SCS?

A.    And RJ Telecom.  In the RJ Telecom buyings, there was approximately 1,341 devices for Ali Anwar, totaling $856,000; and there are approximately 3,521 devices for Abdullah Anwar, totaling over $1.8 million.

      AT&T has preliminarily confirmed device loss is over $1 million relating to fraud or transit theft, equipment gaming, first time non-pay.

Q.    Explain to us what first time non-pay is.

A.    When you see that with AT&T or Verizon, you know the various codes, but essentially that code, that deals with financed phones.  When you finance a phone, AT&T and Verizon expect there to be a payment at the end of that month.  When there's no payment, that's highly indicative of financed phone fraud.

      When the customer calls in or a -- the customer's identity who was stolen calls in, they'll confirm that as fraud because the customer will say *I didn't purchase this phone*.  AT&T will confirm that.  For whatever reason, when a customer never calls in or it doesn't get vetted out that it's fraud, that transaction can stay in non-pay, but AT&T has said a large part of their fraud resides in that category.

Q.    So just walking through that scenario.  So let's say that someone steals someone's identity; right?

1   A.   Yes, sir.

2   Q.   So they take that identity over to a store.

3   A.   Yes, sir.

4   Q.   They -- a cell phone store, and let's just say AT&T for

5   this hypothetical.  So they go in there.  They have this

6   stolen ID.  They then purchase a phone on a service plan,

7   two-year service plan; correct?

8   A.   Yes.

9   Q.   Then do they have to put any money down for that

10  particular phone?

11  A.   It depends on their credit.

12  Q.   Okay.  And what are the quantities of money that they

13  have to put down?

14  A.   If they have good credit, they just pay taxes.  If

15  their credit is somewhat, you know, not the best, they can

16  pay a hundred, $200 as well, to walk out with that phone.

17  Q.   Okay.  So then they walk out with that phone.  And then

18  30 days later when there isn't a follow-up payment for that

19  service on that phone, that's when it gets into that status

20  of non-pay; correct?

21  A.   Correct.

22  Q.   And when the person goes in there with that false ID,

23  can they buy multiple phones at one time?

24  A.   It depends on their credit.

25  Q.   And what have you seen in your investigation?

1    A.    Typically, it's two phones with maybe an Apple watch,

2    if the credit's really good.  And they can come back on that

3    account.  Sometimes they can get up to seven, approximately

4    seven, devices on that account.

5    Q.    Have you seen occasions where someone allows their

6    identity to be used for that purpose?

7    A.    That's called a credit muling or equipment gaming.  And

8    that's where someone goes into a store, uses their credit

9    knowing they're not going to fulfill the contract.  They then

10   get the phone, take it to a device trafficker.  The device

11   trafficker pays them the fee for the use of their credit, and

12   then they'll go sell that phone to a wholesaler.

13   Q.    So that would be someone that's not necessarily caring

14   about their credit.

15   A.    Correct.

16   Q.    Or could that person report that phone stolen?

17   A.    They could.

18   Q.    All right.

19   A.    From an analysis of the SCS bank accounts, it shows

20   that Dawn Trading was paid approximately $500,000.  This is

21   not a complete accounting, as we still do not have all the

22   bank accounts for SCS Supply.

23   Q.    How many bank accounts have you identified for SCS

24   Supply?

25   A.    I believe it's 65.

1  Q.    And have you subpoenaed the records for all 65 bank

2  accounts?

3  A.    I believe so.

4  Q.    And have you gotten all 65 bank account --

5  A.    No, we have not.

6  Q.    -- records back?

7  A.    No, I have not.

8  Q.    Okay.  So you're still examining those records.

9  A.    Yes.

10  Q.    Okay.  Well, let me ask you this.  Who are the

11  signatories -- who signs on those -- on those particular bank

12  accounts?

13  A.    Just it depends.  I mean, there is a multitude of

14  accounts.  Some of the accounts, Maaz Aziz is the signatory;

15  some, Saad Aziz.  I believe Mikaela Keene, our financial

16  accountant, will testify to that later.

17  Q.    Okay.

18  A.    Both Dawn Wireless and Dawn Trading sold numerous

19  devices to SCS Supply.  Ali Anwar also sold numerous goods

20  such as DeWalt tools and laptops.  For an example, on a

21  DeWalt transaction on May 29th, 2021, CD 5 purchased

22  approximately 396 DeWalt units from George Israel.  CD 5

23  stated they were new and in the box and they were stolen.

24        Israel rented a U-Haul to get the product from

25  Waco, met CD 5 at a Sam's Club on Midway and 635.  CD 5 then

1    took the U-Haul to SCS Supply Chain where they unloaded the

2    product.

3          CD 5 coordinated this sale with Saad Aziz and

4    Mohsin Zia.  Zia paid CD 5 cash in the amount of

5    approximately $30,000 to pay Israel.  The price, CD 5

6    believes he bought the product for, was 180 to $185, and then

7    sold to Saad Aziz for 195.  He believed the retail price was

8    around $260.  Home Depot Loss Prevention advised that at that

9    time, the retail price for this product was around $319.

10   Q.    So SCS Supply was not only limiting itself to stolen

11   cell phones.

12   A.    No.  Also consumer goods.

13   Q.    So was there a variety of consumer goods that they were

14   purchasing?

15   A.    Vacuums, TVs, laptops.

16   Q.    And you talked about Mr. Israel in a prior section of

17   your PowerPoint.  You indicated that Mr. Israel was traveling

18   to Waco?

19   A.    Yes.

20   Q.    And what was he doing in Waco?

21   A.    That's where he would pick up the product.

22   Q.    So he would go pick up the product, the stolen product,

23   in Waco and then bring it up to SCS Supply?

24   A.    Correct.  Well, he would bring it up to CD 5, who would

25   then sell it to SCS Supply.

1    Q.    Okay.

2    A.    Another transaction involving CD 5 was for 89 MSI

3    laptops who he purchased from indicted co-defendant 1 for

4    approximately $570.  The retail at the time was $949.  And

5    the indicted cooperating defendant was paid $50,000 in cash

6    from CD 5.

7            CD 5 was told that the price had to drop because

8    these laptops were only being sold on Target, and not Amazon

9    and eBay.  So it was harder to sell these since there weren't

10   as many laptops that were out there in different sites to be

11   sold.  These laptops were brand new and in the box.  CD 5

12   sent photographs of the laptops in his garage to Saad Aziz

13   and Saad's -- for Saad's buyer.

14           An SCS employee came to CD 5's house to pick up

15   those 89 laptops.  And on August 17th, 2021, there was a

16   confirmation text from Mohsin Zia that it was -- if it was 89

17   or 90, and it was confirmed 89.  Here's the photographs of

18   the laptops in CD 5's garage sent to Saad Aziz.

19           Two similar boxes were found in the warehouse at

20   the time of the search warrant.

21           There were Samsung warehouse thefts that were

22   taking place at a Samsung warehouse here in the Dallas

23   metroplex from March of 2020 to January of 2021.  Clifton

24   Smith would steal Samsung S20s by sending these phones or

25   master cartons via FedEx from the warehouse to an outside

address due to a system glitch.  There was approximately

$325,000 in losses.

Samsung was able to determine 97 packages were --

FedEx packages were sent.  Of this, 25 packages were

determined to be master cartons or cartons that contained 10

Samsung S20s that retailed at a value of $1300.  Samsung has

yet to assign a dollar loss to 71 of the FedEx packages.

Abdul Anwar purchased these Samsung devices from UZ

Global.  An attorney for SCS advised they had purchased the

devices from Dawn Wireless, which is Ali Anwar, Abdullah

Anwar's brother.  And then a Cellulartech rep told a Samsung

investigator that they purchased the devices from SCS Supply

and these devices were shipped directly to an Amazon

fulfillment warehouse in Oklahoma.  So, essentially, the

devices were purchased by a Canadian company, but shipped to

a fulfillment center in Oklahoma for sale.

From there, Samsung used warranty registration

information in an attempt to identify who purchased these

phones, to see where the end users purchased the phones.

They were able to get information from 18 of these stolen

devices.  Nine consumers purchased via Amazon from Celltastic

and Cellulartech; these are the companies that purchased the

devices from Samsung and were sent to the Amazon fulfillment

center.

Two S20s were purchased from Gizmobile, one being

1    the location of Alpha Road where the controlled purchases

2    were done; and one S20 was purchased from Dawn Trading at one

3    of their stores.

4           On August 24th, 2021, as part of the larger

5    takedown by the FBI and other agencies in this investigation,

6    a search warrant was executed at SCS Supply Chain at the

7    Farmers Branch location.  The search found that there was

8    office space, processing areas, and a large warehouse that

9    was storing electronic and other goods.  This search is still

10   ongoing due to the significant numbers in the warehouse.

11          Preliminary checks with AT&T, Bissell, Home Depot,

12   Black and Decker, Samsung, Yeti, and other retailers have

13   found stolen property, including cargo theft items.

14          Here are some photos from the search.  You can see

15   shelves of phones.

16          Here's some shelving where pallets of goods were

17   stored.

18   Q.   Can we go back, please.

19          So we see three levels of pallets; correct?

20   A.   Correct.

21   Q.   And this is the SCS warehouse?

22   A.   Correct.

23   Q.   And this is the one that you're conducting or had been

24   conducting an inventory?

25   A.   We're still conducting the inventory.

1    Q.    Okay.  And have you, based on your inventory of the

2    products at that location, have you been able to determine

3    the quantity of stolen products that were found there?

4    A.    So far, the processing has found 1,074 pallets,

5    approximately.  Of those, 751 pallets have been claimed and

6    are considered stolen or fraud.  There is a remaining 323

7    pallets that we're still trying to lock down, through various

8    companies, what their status is.

9         Some of the status has been determined for these

10   323 pallets, but those companies have yet to pick those

11   products up.  Of that, there's DeWalt pallets that contain

12   955 units that are included in the 323 pallet number, and

13   those have been confirmed stolen.

14        There's also stolen dog food that's included in

15   this number.  This food was scheduled to be returned to

16   Amazon, but they never received it.  So the DeWalt and Amazon

17   recently confirmed stolen, and that's another 32 pallets.

18        Bissell vacuums were found in the search warrant

19   that were found to be stolen.

20        On August 23rd, 2021, Maaz Aziz asked CD 4 and

21   Mohsin Zia to come with him to a Best Buy that's nearby the

22   SCS Supply Chain.  There, there was two U-Hauls close to the

23   entrance.  A black male in a Cadillac walked up to the car

24   where the three individuals were at.  Maaz Aziz placed

25   $20,000 in his hat, and the black male said that the keys

1    were in the trucks.

2           CD 4 and Maaz Aziz each drove one of the U-Haul

3    trucks back to the SCS warehouse where the U-Hauls were

4    unloaded, emptied, and then Maaz Aziz and CD 4 took the

5    U-Hauls to a nearby truck.

6           In review of CD 4's phone, CD 4 -- it was found --

7    a text message from Maaz Aziz was found "Park in a different

8    parking lot than me."  And how CD 4 described it was they

9    were in a big parking lot, each parking on a different side

10   of the building.  Mohsin then picked them up.

11          CD 4 was shown a photograph of the vacuums that

12   were located at the search, and confirmed that those were the

13   vacuums in the trucks.  Bissell has confirmed those vacuums

14   were stolen.

15          Another DeWalt -- two DeWalt transactions by CD 5

16   again.  This -- these are DeWalt transactions on top of the

17   May 29th transaction.  For the product DCD791P1, on August

18   5th, CD 5 sold two pallet fulls of 720 units, for

19   approximately 120 units to SCS.  An SCS employee went to

20   George Israel's house to pick those up.  On August 16th,

21   another 235 units were sold by CD 5 to SCS.

22          Approximately 956 of these units were seized at the

23   warehouse and have been confirmed stolen in transit on a

24   shipment from California destined for Tractor Supply in Waco.

25          Going back to the Bissell product that was

1  recovered on August 23rd, that was found to be stolen on

2  August 2nd, 2021, when four containers were stolen from the

3  Bissell facility in Mesquite, Texas.  A representative of

4  Bissell confirmed that over 1,000 cartons of the Bissell --

5  of the recovered Bissell product were stolen.

6       DPS Special Agent Landon Corbett, who investigates

7  cargo theft, advised that Vincent Tasby was the individual

8  responsible for stealing a truck from a parking lot location

9  down the road, cutting a hole in the fence and then stealing

10  four trailers containing the cartons within the hour.  Tasby

11  is tied to Morris Washington and identified as the "king of

12  cargo theft."

13       Samsung TVs were also found in the warehouse.  And

14  these Samsung TVs were found to be stolen on July 23rd, 2021,

15  when a tractor and a trailer were stolen in Dallas.  The

16  theft contains -- the theft was of approximately 279 Samsung

17  TVs.  And on July 30th, CD 4 stated that he dropped off Maaz

18  Aziz at the Best -- same Best Buy location.  They returned to

19  the warehouse where they unloaded hospitality TVs.  And from

20  the search warrant, these TVs were found to be hospitality

21  TVs.

22       In 2016, DPS began investigating a crew that was

23  dealing with cargo and tractor-trailer theft that was

24  consisted of Reginald Henry, Vincent Tasby, Morris

25  Washington, Damian Calhoun, Coree, Hall, and others.

1            DPS believes that since 2016, this group has

2    conducted anywhere from 60 to 120 cargo thefts that consists

3    of TVs, vacuums, computers, other consumer goods.  And on

4    September 24th, '21, they -- DPS arrested Morris Washington

5    for three counts of cargo theft.

6            In his post-arrest interview, he identified Saad

7    and Maaz Aziz as the individuals who purchased most of this

8    property and gave him money for it.

9            These are screenshots of text messages in his

10   phone.  On July 25th, approximately thereof, that have a

11   screenshot of hospitality TVs, which was what was recovered

12   in the warehouse.

13           January of 2019, there was a shipment of 65,000

14   navy 14-ounce Ramblers that were stolen in the Dallas area.

15           In 2020, Yeti conducted three test purchases, and

16   found sellers Maz Mobile Direct, SCS Supply Chain, and Gizmo

17   Galley -- Galaxy, all purchased this product.

18           In May '21, a shipment of Yeti coolers were stolen,

19   and the search warrant found one cooler that had been scanned

20   at SCS which returned a GPS -- essentially a GPS code to Yeti

21   letting them know.  There was a pallet of 22 coolers in this

22   that were recovered at the warehouse.

23           Puma tennis shoes.  Approximately 1,282 cartons

24   were found in the warehouse.  It was approximately over 7,700

25   units.  These were valued at 91,000.  These were stolen from

1    a warehouse in Forney, Texas, in February of 2020.

2           In a locked shred box you could see these labels on

3    the right-hand side where they were peeled off of the boxes.

4    In cargo theft and consumer goods, those labels are a key way

5    to help trace back to where that cargo theft was stolen from.

6    These labels had been taken off and were in a shred box.

7           And the phone extract of Damian Calhoun, who was

8    one of DPS' targets, found that there were conversations

9    between the two of Pumas.

10          Ingram Micro, one of their facilities in Tennessee,

11   found that there was thefts that were ongoing.  Some of the

12   Lenovo laptops located in the warehouse were stolen from this

13   Tennessee Ingram Micro warehouse.

14          Ingram Micro also has a Carol Stream, Illinois,

15   warehouse.  There were Google Nests that were found in the

16   search warrant that were found stolen in transit,

17   approximately 60 units, for a total of $9,000.

18          Here, you can see the boxes.  And on the left-hand

19   side you can see the shipping label of -- from Google at the

20   Ingram Micro facility to Target Corporation here in

21   Midlothian, Texas.

22          AT&T came, conducted an inventory of devices.

23   Their preliminary review has found 922 devices were from

24   transit theft.  Approximately 89 percent of these devices

25   were stolen and shipped from Pitney-Bowes.  There were 64

1    blacklisted devices, and 606 devices with network activity

2    that are indicative of fraud, non-payment, buyer's remorse.

3    AT&T is still trying to determine the status of the remaining

4    600 devices.  For a total of 2,100 devices.

5            Pitney-Bowes is a known facility by AT&T where

6    there is a significant amount of theft.

7            Also found in the warehouse were AT&T FirstNet SIM

8    cards.  FirstNet is -- it's a SIM card that allows first

9    responders and other individuals with the need to have

10   priority net access -- with that SIM card, in the event of

11   emergency or any other type of catastrophe, you will be given

12   priority access.  These are not sold anywhere by AT&T, which

13   means they had to have been stolen by theft or transit.

14           Here are some of the labels from the Pitney-Bowes

15   AT&T theft that were in the shred box.

16           Also found at SCS were Apple -- counterfeit Apple

17   products.  Apple came out -- Apple personnel that are trained

18   in counterfeiting and investigate counterfeiting

19   operations identified approximately 8,144 counterfeit

20   products, to include glass backs, charging cables, earpods,

21   power adapters.  Here is close-up photos.  These were

22   identified as counterfeit products by the Apple personnel.

23           Also identified in the warehouse were a number of

24   machines that Apple colleagues in China have determined were

25   the same type of machines in China to engrave counterfeit

1    Apple logos and artwork and replace the iPhone glass back

2    covers with counterfeit ones.

3              Here is photos of the machines that are used in the

4    counterfeiting operations.

5              In December 2019, U.S. Customs inspected a shipment

6    of 39 iPhones and 12 Samsung S10s; these devices bore a

7    counterfeit mark.  SCS petitioned for relief, and it was

8    granted.  But this letter shows that SCS was involved with

9    counterfeit products back in 2019, and still has machines for

10   that type of operation.

11             THE COURT:  Mr. Gonzalez, let me know when you're

12   at a stopping point.

13             MR. GONZALEZ:  We can stop here, Your Honor.  I

14   think we're going to go into the travel, so it's a good

15   place.

16             THE COURT:  Yeah.  Let's just take about ten

17   minutes and come back about five minutes to three.  We'll

18   stand in recess until then.

19             THE COURT SECURITY OFFICER:  All rise.

20             (Recess taken.)

21             THE COURT:  All right.  We'll go back on the

22   record.  You can go and sit down, Agent Doering.

23             All right.  Mr. Gonzalez, you can proceed.  I will

24   let you know that I'm planning for us to finish here like

25   5:00 or 5:30, so let's keep it moving.

```
 1              MR. GONZALEZ:  We will, Your Honor.

 2    BY MR. GONZALEZ:

 3    Q.    Agent Doering, as part of the investigation, did you

 4    examine or investigate the travel of both the defendants?

 5    A.    I did.

 6    Q.    Can you summarize that?  I believe that's your next

 7    slide.

 8    A.    It is.  If you could hit the first Excel tab there.  Go

 9    back.  The Excel icon, please, on the slide before.

10              Okay.  In general, the travel records from Customs

11    was obtained for both Saad and Maaz Aziz, and it showed

12    travel to various countries from 2009 up to 2020; those

13    countries being Dubai, France, Ontario, and Mexico for Saad

14    Aziz.  And for Maaz Aziz, he's traveled, since 2007, to

15    Toronto, Qatar, Mexico, Bogota, Toronto, Canada, and Dubai.

16    Q.    There's been more extensive travel than that; is that

17    correct?  I mean, there's -- I've got Government's Exhibit 6

18    shows the travel for both Saad and Maaz Aziz, and it shows

19    travel to Mexico, Dubai, Mexico, Antigua Bay, Dubai, Mexico,

20    Toronto, Bogota...

21    A.    Correct.  That was just listing in general the

22    companies they had been to, not each trip.

23              MR. CASTLE:  Your Honor, I'm going to object to the

24    use of this exhibit --

25              THE COURTROOM DEPUTY:  Can you use your microphone?
```

1          MR. CASTLE:  Your Honor, we would object to the use

2    of this exhibit during the hearing.  While I fully agree that

3    they are able, under the Fifth Circuit precedent, to

4    introduce new evidence, this was provided to us today just

5    before the hearing, and in contravention of Rule 47(c) of the

6    local rules which requires -- it requires that any -- it

7    specifically states, when allegations of fact not appearing

8    in the record are relied upon in support of a motion, all

9    affidavits and other pertinent documents shall be served and

10   filed with the motion.  This information was not filed with

11   the motion, Your Honor.

12          And then on top of that, the failure to provide

13   this with a motion is exacerbated in the sense that since

14   providing a 4-terabyte hard drive about 18 days ago, we still

15   haven't received a single bite of discovery.  This is about

16   as pure a form of ambush as we can see, and as for the rule

17   appears to be trying to avoid specifically, just to comport

18   basic tenets of due process and notice.

19          So we would object to this exhibit as not having

20   been provided and being outside the record.

21          THE COURT:  All right.  And just so we know what

22   exhibit we're referring to, Mr. Gonzalez, I have certain

23   numbered -- is this Government Exhibit 6?

24          MR. GONZALEZ:  It is, Your Honor.

25          THE COURT:  Okay.  So and what's your response with

1   regard to -- it's Mr. Castle; correct?

2          MR. CASTLE:  Yes, Your Honor.

3          THE COURT:  -- Mr. Castle's objection on Government

4   Exhibit 6?

5          MR. GONZALEZ:  Our response is, in their response

6   to our motion -- our motion, emergency motion, they indicated

7   that we had exaggerated the amount of travel that the

8   defendants had been involved with.  Well, this is to respond

9   to that particular accusation in their response to our motion

10  that we exaggerated the amount of travel.  So we just want to

11  introduce the exact amount of travel that they've been

12  involved with since 19 -- well, since 1991.

13         THE COURT:  Let me --

14         MR. GONZALEZ:  -- so that the Court gets an

15  accurate understanding of the amount of travel that they've

16  been involved with.

17         THE COURT:  So -- oh, you can go ahead, Mr. Castle.

18         MR. CASTLE:  Your Honor, two things.  Number one,

19  we never accused -- in our motion, we addressed Mr. Aziz's

20  travel on page 6 of our opposition.  There is no mention of

21  any type of exaggeration.  This was being used to support his

22  flight risk for him under 3142(f)(2)(A).  It was not attached

23  to his motion.  We had no notice of this document.  And under

24  the local rule, this should not be admitted, it should be

25  disregarded.

1          THE COURT:  Well, I'm going to consider this

2    document, consider their travel history.  However, two

3    things.  One is if you-all want to make submissions after the

4    hearing having to do with this document and/or if you-all

5    wind up at the end of today saying, you know, we may want to

6    submit more and may want to get in front of the Court again,

7    I will consider that because I think you didn't have

8    substantial notice of this -- of these records.

9          Now, admittedly, they're your own clients', you

10   know, flight records and so presumably they can provide you

11   information.  But you didn't have this material from the

12   government before, so I'll consider it.  But you can make

13   your own submissions after the hearing today.  And if there's

14   a request to get in front of the Court again on these -- on

15   this issue or other issues, then I'll take that under

16   consideration.

17          MR. CASTLE:  Thank you, Your Honor.

18          MR. MEYER:  And, Your Honor, just for Saad Aziz --

19          THE COURTROOM DEPUTY:  Can you make sure your

20   microphone is on?

21          MR. MEYER:  Your Honor -- any better?

22          THE COURTROOM DEPUTY:  Is it turning green?  Don't

23   push and hold.  Just push it.

24          MR. MEYER:  There we go.

25          Just for the record, Saad Aziz joins in that

1    objection as well, Your Honor.

2            THE COURT:  Right.  And so that I'm clear for

3    counsel, in this regard, my concern, obviously my overarching

4    concern with regard to the application of this rule, is that

5    your clients have sufficient process and the ability to

6    respond to this and the time to respond to this.  And that's

7    why I'm saying I'll take it under consideration, but I'm

8    going to give you time to respond.  And if you feel that you

9    need more time from the Court, that I will also consider.  So

10   that if there is more you want the Court to hear on this

11   issue, that we'll be able to do that.

12           MR. CASTLE:  Thank you, Your Honor.

13           THE COURT:  Yes.

14           So go ahead, Mr. Gonzalez.

15   BY MR. GONZALEZ:

16   Q.    So, Agent Doering, so this is the complete record of

17   their travel; correct?

18   A.    Correct.

19   Q.    And your prior testimony before the magistrate judge,

20   you limited it only to a certain amount of travel, but this

21   is the complete record of their travel; correct?

22   A.    Correct.

23   Q.    So it shows -- and it shows dating from December of

24   2020, traveled to Mexico; and then it shows travel to Dubai

25   on February 29th, 2020; travel to Ontario, Canada, on

1    December 3rd, 2019.  And it just shows a complete picture of

2    the amount of travel internationally for both of these

3    defendants; correct?

4    A.    Correct.

5    Q.    And this specific travel record belongs to Mr. Saad

6    Aziz; correct?

7    A.    Correct.

8    Q.    In regards to Maaz Aziz, similarly, it shows extensive

9    travel, and starting, to Mexico, Dubai, Mexico, Dubai,

10   Montego Bay, Dubai, Mexico, Toronto, Bogota, El Salvador.  So

11   it shows travel; correct?

12   A.    Correct.

13   Q.    And this is what you found in your investigation to be

14   their complete travel; correct?

15   A.    Correct.

16            THE COURT:  Mr. Gonzalez, so, and I don't know, are

17   you asking for this to be admitted as an exhibit for this

18   hearing?

19            MR. GONZALEZ:  Yes, Your Honor.  At this time, the

20   government would offer Government's Exhibit 6 into evidence.

21            THE COURT:  And, defendants, I have your

22   objections.  I have both defendants have objected to this

23   exhibit.  I've overruled the defendants' objections, but I'm

24   going to give the defendants time to respond to this.  And as

25   I mentioned earlier, if the defendants, again, want to make a

1    request for further presentation before the Court on these

2    issues, that I will take that under consideration.  With

3    that, it's admitted.

4                    (Government's Exhibit 6 was admitted.)

5    BY MR. GONZALEZ:

6    Q.    Agent, can we go back a couple of slides, please, to

7    the beginning of this?  Okay.  Let's start there.

8              So here, in this particular slide, you're

9    indicating the amount of travel that we just went -- but it

10   only gives a depiction of a few trips but not the total

11   trips; correct?

12   A.    Correct.

13   Q.    All right.  You can go from there.

14   A.    The next slide, it looks at payments from Colombia to

15   SCS.  And what you see here are that there were payments from

16   June 7th, 2019, to February 12th of 2020, where there were

17   incoming wire transfers in the amount of $988,000 to their

18   BB&T account.

19             THE COURT:  I have a quick question.  I mean, this

20   may just be a typo, but I want to make sure that we're

21   talking about the country of -- because I see Bogota, this

22   should be -- this is Colombia, C-O-L-O-M-B-I-A; correct?

23             MR. GONZALEZ:  It's incorrectly on the slide.  It

24   should be C-O-L-O-M-B-I-A.

25             THE COURT:  And just to return quickly to some of

 1    your earlier slides, referring to Yeti, I assume that's the

 2    company Yeti with one T.  Y-E-T-I.

 3              MR. GONZALEZ:  That is correct.

 4              THE COURT:  Not two Ts.  All right.

 5              MR. GONZALEZ:  Yes, sir.

 6              THE COURT:  I wanted to make sure of that.

 7              You can proceed, Mr. Gonzalez.

 8    BY MR. GONZALEZ:

 9    Q.    All right.  So here, you're explaining that there are

10    money transfers as well as travel to Bogota, Colombia;

11    correct?

12    A.    Correct.  What you see is outbound travel to Bogota on

13    April 25th, 2019, returning on the 29th.  And three months

14    later, you see payments beginning from Colombia to the BB&T

15    account for SCS Supply.

16    Q.    Okay.

17    A.    Here, you see on the right-hand side the 2000 -- a

18    screenshot of the 2019 GITEX conference, which ran from

19    October 6th, 2019, to October 10, 2019, in Dubai.  How this

20    has been explained to me is this is an expo where

21    individuals, companies, in this industry come to Dubai to

22    make connections, to meet people.  You can set up a booth

23    there.  On the left-hand side you see travel for both Saad

24    and Maaz that was outbound to Dubai on October 1st, returning

25    on October 14th.

1          Cooperating defendant 2 advised that this trip was

2     for Maaz and Saad Aziz, with three or four employees, to

3     travel to Dubai.  They set up a booth there, and this was to

4     get more direct line of business with Dubai or other

5     countries rather than having to go through RJ Telecom.

6          On the right-hand side you can see a photo that was

7     sent from Saad Aziz to CD 2, which shows a JW Marriott tag,

8     and this was sent on October 11th of 2019.  It appears to be

9     some sort of hotel tag related to the trip in Dubai.

10         On June 3rd, 2019, is when SCS Supply Chain in

11    Canada was incorporated as an Ontario corporation, with the

12    director, Jawaad Farooq, the cousin of Saad Aziz, who is the

13    other listed director.  Both Saad and Maaz Aziz had travel

14    that began on June 2nd, 2019, one day before this company was

15    incorporated, and then returned to the U.S. on June 12th.

16         What you see there on the right is a map of the

17    Toronto airport, and you see the first listed address on the

18    Articles of Incorporation, which is about 17 miles away from

19    the airport in Toronto.  Again, Saad Aziz had travel on

20    November 28th that spanned to a return of December 2nd.

21         Here, you can see the registered address -- the new

22    registered address for SCS Supply Chain as of February 2020.

23    And again, it's right -- it's near the Toronto airport.

24         Regarding SCS Supply Chain, the Canada branch, CD 2

25    advised that there was a big -- there is a big market for

1    financed phones and transit theft in Canada, and that credit

2    muling or financed phones is popular.

3          Jawaad, the cousin, dealt in MacBooks, iPads, and

4    watches, that were sent directly to Dubai or Hong Kong, and

5    approximately 90 percent were new.  SCS Canada sold to

6    Interstellar and Grand Famous Phones as well.

7          At first, the stock was differentiated between SCS

8    Canada and SCS U.S. for Interstellar, but after a while, it

9    became commingled and it was hard to keep track of, according

10   to CD 2.

11         CD 2 also advised that SCS Canada would send

12   Samsung phones to the U.S. that were obtained in Canada, and

13   that SCS would send Samsung phones from the U.S. up to

14   Canada; that these blacklisted phones could work on the other

15   countries' networks.  And that Maaz also told CD 2 that they

16   could sell Samsungs at a good price in Canada and Europe.

17         CD 2 had in his WhatsApp *Jawaad SCS Canada* with the

18   number 647-920-9786, which is the same number for Jawaad in

19   the SCS Canada corporate documents.

20         This document was seized from --

21   Q.   Let me just interrupt you for a second.

22         Now, a lot of your information is coming from

23   cooperating sources, cooperating defendants, as you indicate,

24   CDs -- CD 2, CD 1, and so on and so forth.  And specifically,

25   this information you're talking about here is CD 2.  But

1   you're also relying on documentation; correct?

2   A.    Correct, that's used to corroborate their statements.

3   Q.    And this is documentation that was found where?

4   A.    It's found in various places.  Business documents, in

5   WhatsApp conversations, from seized phones of the

6   cooperators, or in conversations between Saad Aziz and the

7   cooperators.

8         So anywhere we can get a business document,

9   messages from a phone, emails, all go towards the

10  corroboration of these statements.

11  Q.    And were some of the documents that you're referring to

12  and using here for this particular part of your presentation,

13  were some of those documents found at the SCS warehouse

14  subsequent to the search warrant?

15  A.    They were.

16  Q.    Okay.  And if we can go ahead and continue.

17        And is this a document that was found at the SCS

18  warehouse as well?

19  A.    It was.

20  Q.    Okay.

21        MR. CASTLE:  Your Honor.

22        THE COURT:  Yes.  Stand by.  Go ahead.

23        MR. CASTLE:  I'm sorry.  I just want to lodge an

24  objection, same objection as earlier.  Again, this was not

25  provided with the motion, in accordance with Rule 47(c), and

1    I had no notice of this document.  And although the last one

2    may have been their travel, this is a warehouse -- from a

3    warehouse and a seizure that was run on the warehouse, but we

4    have no access to it and have not had access for several

5    months.  So I would object on the same basis of violation of

6    Rule 47(c).

7              THE COURT:  Are you going to join in that

8    objection?

9              MR. MEYER:  Yes, Your Honor.  And reiterate that we

10   provided a 4-terabyte hard drive to the government via

11   courier --

12             THE COURTROOM DEPUTY:  Is your microphone on?

13             MR. MEYER:  We provided a 4-terabyte hard drive the

14   day the government requested, which was almost a month ago.

15   I have still received no discovery.  The most recent update I

16   had was the end of last week saying we'd get it this week,

17   and it's Friday.

18             MR. GONZALEZ:  And, Your Honor, just so that the

19   Court knows, this particular -- these particular documents

20   were found after our briefing deadline for the -- our motion.

21   And, secondly, these are their documents.  These are

22   documents that were found in their warehouse, so they have

23   knowledge of them.  And it's their documents that were found

24   during the search of the warehouse.  So it can't possibly be

25   a surprise to them.  It's their documents.

1          THE COURT:  And do we have an exhibit number for

2     this -- for the PowerPoint, Mr. Gonzalez?

3          MR. GONZALEZ:  Yes, Your Honor.  It's Government

4     Exhibit 1 in the notebook that's been provided to the defense

5     counsel as well as the Court.

6          THE COURT:  Because I know we're not fully through

7     it yet, but I assume you're going to be asking for Exhibit 1

8     to be admitted.

9          MR. GONZALEZ:  Yes, sir.  Yes, sir.

10         THE COURT:  Go ahead, counsel.

11         MR. MEYER:  Your Honor, just to be clear, this

12    notebook that was provided by counsel -- the government right

13    before the hearing, starts at Exhibit 18, so we haven't had

14    any of these exhibits so far.

15         MR. GONZALEZ:  It's Government Exhibit 1, but it's

16    in tab 18, just so that there's clarity.

17         THE WITNESS:  That's the government, the lack of

18    resources of the government right there.  So all the tabs

19    prior to were used, so I found a set where I could start the

20    tab at 18.

21         THE COURT:  Let me have defense counsel just

22    confirm that what is in your notebook as Exhibit 18 is what

23    Mr. Gonzalez has referred to as Government's 1.  Do you want

24    to take a moment to look?

25         MR. MEYER:  I'm sorry, Your Honor.  I thought he

1    meant the entire PowerPoint.

2           THE COURT:  Well, no.  I understand.  So let me

3    just say I'm going to overrule the objection and admit

4    Exhibit 1.  But again, to be clear for these exhibits, as

5    with the prior objection that you raised on the travel

6    document, Exhibit 6, I'm going to give you the opportunity

7    after this hearing to respond.  And also, if there is a

8    request to reconvene so that you can present on these issues,

9    I will give you the opportunity to do that.

10          You know, this decision on detention is obviously

11   very important for both sides, it's very important to your

12   clients, it's their liberty.  And for the government, the

13   government has its interests as well with regard to the

14   community and/or a flight risk.

15          So, to my mind, the most important thing is that I

16   have the material before the Court to make an appropriate

17   decision, but also that your clients have an opportunity to

18   respond and put on, if necessary, their own evidence.

19          So I'm going to consider this exhibit and overrule

20   the objection, but I'm also going to give you the opportunity

21   to respond on this and any other issues that come up this

22   afternoon.

23                 (Government's Exhibit 1 was admitted.)

24          MR. MEYER:  Thank you, Your Honor.

25          MR. CASTLE:  May I ask one quick question?  I know

1    we're trying to get through this expediently.  We have

2    another witness and several witnesses on our side.  If we

3    could just have a standing objection, you know, under 47(c)?

4    It's clear how you're going to rule.  That way, we can just

5    preserve the record without popping up on every new document

6    that seems it's about to come up.

7             THE COURT:  Yes, you can have a running objection.

8    And also I want you to know that don't feel like you're going

9    to frustrate me if you do pop up, because I understand you

10   need to make, you know, your record and preserve your

11   objections.  But if you want, when you need to stand up,

12   again, you can say, Your Honor, I'm just reasserting the

13   objection I've asserted before under 47(c), that we weren't

14   previously provided this document.  But I will also say that

15   you have a running objection to any documents that you have

16   not already received from the government prior to this

17   hearing.

18             MR. CASTLE:  Thank you, Your Honor.

19             MR. MEYER:  Thank you, Your Honor.

20             MR. GONZALEZ:  May I proceed?

21             THE COURT:  Mr. Gonzalez, you can proceed.

22             MR. GONZALEZ:  Thank you.

23   BY MR. GONZALEZ:

24   Q.   And, agent, what's depicted there on the screen?

25   A.   That's the Certificate of Incorporation for -- from

1    Ontario documents, Canadian documents.

2    Q.    And this was a document that was found at SCS Supply

3    here in the United States; correct?

4    A.    No, sir.  That was provided by a Canadian authorities.

5    Q.    Okay.  And but it does show the date of June 3rd of

6    2019?

7    A.    Yes, sir.

8    Q.    And you showed in the travel records --

9             MR. MEYER:  Quick objection, Your Honor.

10            THE COURT:  Yes.

11            MR. MEYER:  Just want to clarify.

12            THE COURT:  Go ahead.

13            MR. MEYER:  There we go.  Are all of the documents

14    in Exhibit 1 found with the search warrant, or are some of

15    the documents found elsewhere?

16            MR. GONZALEZ:  Agent, can you answer that question?

17            THE COURT:  Mr. Gonzalez, can you answer that or --

18            MR. GONZALEZ:  I'm going to have the agent answer

19    that question.

20            THE WITNESS:  So that document that was just shown

21    was from Canadian authorities.  I believe the rest will have

22    been through the search warrant, with the exception of -- if

23    you go to tab, not exhibit, 21, when you get to the map

24    towards the back of that, halfway through that exhibit, those

25    pages are from the internet.

1          THE COURT:  All right.  Go ahead, counsel.  I think

2     this is going to be a matter for cross-examination.

3          MR. MEYER:  Yes, Your Honor.  I apologize.  I was

4     just trying to clarify the record of what might be ours and

5     what was located elsewhere, just because the exhibits are all

6     combined in the binder.

7          THE COURT:  No, that's fine.  It's a good question.

8     I do think it's something that we'll want to cover in

9     cross-examination.  And it raises the question --

10          MR. MEYER:  Thank you, Your Honor.

11          THE COURT:  -- that the PowerPoint exhibits are

12     paginated; is that right, Mr. Gonzalez?  I think they're

13     paginated, are they not?

14          MR. GONZALEZ:  I don't believe they are, Your

15     Honor.

16          THE COURT:  All right.  Well, we'll still be able

17     to reference particular pages by the heading of a page.

18          MR. GONZALEZ:  Yes, sir.

19          MR. MEYER:  Thank you, Your Honor.

20          THE COURT:  So I think that when you do

21     cross-examination, you'll need to refer to the heading of a

22     particular page to determine what they're talking about.

23          MR. MEYER:  Thank you, Your Honor.

24          THE COURT:  All right.  You can go ahead,

25     Mr. Gonzalez.

1   BY MR. GONZALEZ:

2   Q.   All right.  So we showed this document, showed a date

3   of June 3rd, 2019; correct?

4   A.   Correct.

5   Q.   And that's a Certificate of Incorporation out of

6   Ontario for SCS Supply Chain; correct?

7   A.   Correct.

8   Q.   And then you also showed documentation of flight

9   travel, and it shows a flight on the day before --

10  A.   Correct.

11  Q.   -- to Ontario, Canada; correct?

12  A.   Correct.

13          THE COURT:  Can I ask the agent very quickly, that

14  document that shows basically all of those flights, is that a

15  document that you -- that was obtained from Customs?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  All right.  Thank you.

18  BY MR. GONZALEZ:

19  Q.   All right.  So if we can go back to scrolling through

20  the -- so that's that document.  Then the following document,

21  what is that?

22  A.   These are just continuation of the document.

23  Q.   If we go to the next page.  And there, if we can...

24  A.   That's where you see the second director of the

25  company, Saad Aziz, who lists his home residence of 1010

1    Canyon Oak Drive.

2    Q.    So that shows that the director for that SCS Canada is

3    the defendant Saad Aziz with the local address; correct?

4    A.    Correct.

5    Q.    All right.  If we can continue to scroll through these

6    documents.

7              And here, it just shows the division of shares for

8    the individuals and their -- and the voting rights of each of

9    the individuals that are directors; correct?

10   A.    Correct.

11   Q.    Okay.  And here, again, it shows the individuals

12   involved with the corporation and it shows the name of

13   "Jawaad Farooq"; and you testified previously that is the

14   cousin of both of the defendants here today; correct?

15   A.    Yes.

16   Q.    And it shows that he's involved with SCS Canada?

17   A.    Correct.

18   Q.    And that corroborated the information that you had

19   received from your cooperating defendant; correct?

20   A.    Cooperating defendants, yes.

21   Q.    Multiple cooperating defendants indicated that Jawaad

22   Farooq was involved in SCS Canada and was involved with the

23   defendants.

24   A.    Yes.

25   Q.    Okay.  Let's look at that.

1  A.    Again, this is just showing the contact information.

2  The telephone number that is listed there is the same

3  telephone number that CD 2 had in his WhatsApp under "Jawaad

4  SCS Canada."

5  Q.    And here, are these some of the documents that were

6  found during the search at SCS?

7  A.    No.  I think this is all going to be part of the packet

8  received from the Canadian authorities.

9  Q.    Okay.  But again, it shows SCS Chain incorporated in

10  Canada; correct?

11  A.    Correct.

12  Q.    And in the incorporation profile again, it shows the

13  particular names at the bottom?

14  A.    Yes.

15  Q.    And it indicates that Saad Aziz is a director.

16  A.    Correct.  And I think that's what it will continue to

17  show.

18          (Documents scrolling on the screen.)

19  BY MR. GONZALEZ:

20  Q.    All right.  Now, these documents are from 2019, 2020;

21  is that correct?

22  A.    Correct.

23          (Documents scrolling on the screen.)

24  BY MR. GONZALEZ:

25  Q.    Are these documents here, were these --

1    A.    These documents were from the search warrant.

2    Q.    Okay.  And what is the significance of this particular

3    document?

4    A.    This is a printout of the Microsoft licensed or

5    unlicensed users for scssupplychain.com accounts.  What

6    you'll see as you scroll down -- if you can stop there,

7    you'll see Dallas SCS Supply Chain on the left, which is the

8    name; and then on the right is the Dallas, and then they'll

9    all be the same at scssupplychain.com.

10          If you scroll down a little bit -- actually, if you

11   scroll up, you'll see canada@scssupplychain.com.  And then if

12   you scroll down a little bit more, you'll see Jawaad Farooq,

13   and he has his name at the same domain name along with Maaz

14   and Saad.

15          Essentially, this looks like all of the employees

16   for SCS Supply Chain that have access to their business

17   system.

18   Q.    And this establishes a link between SCS Canada and SCS

19   United States; correct?

20   A.    A link.  And that from these records, it appears SCS

21   Canada is a part of SCS Supply Chain.

22   Q.    Okay.

23          (Documents scrolling on the screen.)

24          THE WITNESS:  If you scroll back up.  I don't know

25   if there's a way to shrink it.  This was found in the

1    warehouse and it's a flowchart.  On the left, you'll see

2    SCS-Dallas, and then Sales, Inventory, Cash, and then another

3    box for Cash.

4         In the middle, you see SCS Canada where it shows

5    Sales, Inventory-Dubai, and then Cash Flow Diverted back to

6    the same cash box that SCS Dallas leads to.  And then on the

7    right, you'll see SCS Logistics, all under the SCS HO.  Which

8    I'm not aware that SCS has a Houston operations.  I would

9    believe that to be head office or something like that, some

10   sort of parent company.

11        Here, you'll see a profit and loss quarterly report

12   that was found in the warehouse for SCS Supply Chain.  Again,

13   like the flowchart on the left, you'll see SCS HO, SCS

14   Canada, and then SCS Retail, and SCE eCom.  And so different

15   branches of the business all consolidated under the SCS

16   Supply Chain for sales, cost of goods, and income statements,

17   essentially.

18        This was also found at the warehouse and it appears

19   to be some sort of financial statement where it lists Canada,

20   SCS Retail, eCom Total, SCS Main with an amount, and then

21   below that it has an Investor Share and an SCS Share.  So,

22   essentially, that looks to be profits and how it's split.

23        Another statement found in the warehouse, this time

24   for SCS Canada and Canada eCom, and shows the income loss

25   statement for April 2021.  And then at the bottom, it shows

1    SCS Profit and then how that's split.

2              Same thing for Gizmobile, the company owned by Maaz

3    Aziz, with the retail storefront where the controlled sales

4    were conducted.  Again, a profit and loss for the month of

5    April 2021.

6              Another profit and loss sheet for SCS Supply Chain.

7              Yet another financial statement for SCS eCom.  This

8    is a different type of financial statement from the ones

9    before.  This is from February, believed to be 2021 based off

10   the binder it came out of.  Again, it's from the warehouse.

11   You'll see different expenses.

12             If you look down, you'll see Canada Pay-Hamaad:

13   2500; SCS USA Pay, Maaz and Saad, each 5,000; and Canada

14   Pay-Jawaad:  5,500.  If you scroll down, you'll see bonus

15   lines for Jawaad of 10,000, for Hamaad of 4,000, and bonuses

16   for Saad and Maaz of 25,000.

17             This is a similar statement for March where again

18   it lists Canada Pay and SCS USA pay for the same individuals,

19   and then bonuses for the same individuals.

20             If you can shrink that.  Thank you.

21             This was found in one of the two memo books from

22   the safe that was found at the warehouse.  At the top, it's a

23   handwritten note of SCS Canada.  You see a Maaz-Saad

24   designation that says 50 CAD, or that's the best I can

25   tell -- I believe that to be Canadian dollars -- September of

1    2020.

2              Then you see another entry September 2020, and you

3    see 5,000 what looks to be CAD extra; 5,000 CAD Jawaad extra;

4    and 10,000 CAD Pakistan.

5              October 2020, Saad and Maaz pay, it looks to be a

6    thousand, 10K, CAD; and then Saad and Maaz, 5K CAD.  I would

7    allege that 10K is $10,000, and 5K is $5,000.

8              And I can't quite make out that last -- those last

9    two lines, but essentially, this seems to show that Maaz and

10   Saad both have an interest along with Jawaad in SCS Canada.

11   Q.    So other than finding foreign involvement in Canada,

12   were there other countries that you saw in your

13   investigation, or in determining your investigation, that the

14   defendants were involved in?

15   A.    Dubai.

16   Q.    Can you turn to Government's Exhibit 2 there in the

17   notebook in front of you?  It would be your tab 19.

18              And were these documents that were also found at

19   the SCS warehouse?

20   A.    Correct.

21   Q.    Okay.  Can you tell the Court what's depicted there?

22   A.    This is a tax invoice from the Dubai airport free zone.

23   This is the business area where many of the importers office

24   at, where they receive the goods at, that SCS, RJ Telecom,

25   other wholesalers, send to the Dubai importers.

1          What you see here is a tax invoice number.  It

2     lists a customer number, and then it's made out to SCS Supply

3     Chain Branch, the DAFZA, Dubai airport free zone, in Dubai

4     UAE.  It appears to be an invoice for licensing and fees for

5     the Dubai government -- Dubai government.

6          And if you shrink it, it appears that an invoice

7     was dated November 3rd and that it was paid.

8          If you scroll to the next one, it's another tax

9     invoice made out to SCS Supply Chain Branch.  This one is for

10    office rent and other fees.  Again, it shows paid and dated

11    November 3rd of 2020.

12         And if you scroll, here, these are Texas Secretary

13    of State documents where board minutes to open a branch and

14    provide power of attorney to Saad Aziz, in order to open a

15    Dubai branch for SCS Supply Chain in the airport free zone.

16         These are just Secretary of State documents for

17    Smart Cellular Solutions, SCS Supply Chain.  They were with

18    that -- those minutes, so I included them here.

19              (Documents scrolling on the screen.)

20         THE WITNESS:  If we could move on to the next

21    exhibit.

22    BY MR. GONZALEZ

23    Q.    I believe we can go now to Government's Exhibit 3,

24    which is at tab 20 of your binder in front of you.

25              Do you recognize those documents?

1    A.    I do.

2    Q.    Okay.  And were these documents also found at the

3    search of SCS here, in the United States?

4    A.    They were.

5    Q.    And what do they show and what do they indicate?

6    A.    This is a Wallis Bank wire transfer sheet that shows a

7    wire from SCS Supply Chain from Wallis Bank.  The beneficiary

8    is Saad Abdul Aziz, that lists a Pakistani address, and the

9    beneficiary bank is Silk Bank in Karachi, Pakistan.  The

10   amount is $15,000 USD.

11   Q.    Had you received any information from any of the

12   cooperating defendants that the defendants, either one of the

13   defendants, had an interest or had any kind of interest in

14   properties or business transactions in Pakistan?

15   A.    Yes.

16   Q.    Okay.  And did this document that you found at the

17   search corroborate that information?

18   A.    This document right here shows a bank transfer to a

19   bank account.  If you're saying property as in being monies

20   in a bank account, then yes.  They were speaking more towards

21   properties of --

22   Q.    And we'll get to that --

23   A.    Okay.

24   Q.    -- and we'll talk about real estate properties.

25   A.    Correct, yes.

1    Q.    But having some business in Pakistan; correct?

2    A.    Yes.

3    Q.    All right.  Because so it shows the beneficiary down

4    here as Saad Aziz, and that the money's being originated from

5    SCS Chain here, in Irving, Texas; correct?

6    A.    I think that's a dated address.  But, yes.

7    Q.    Okay.  What's depicted there?  What's that document?

8    A.    This is a Silk Bank bank application, which I believe

9    to be the same Silk Bank that was the wire transfer was sent

10   to.

11   Q.    All right.  If we can go to Government Exhibit 4, and

12   it's your tab 21.

13   A.    Yes, sir.

14   Q.    And are those also documents that were found during the

15   search?

16   A.    Yes.

17   Q.    At least some of the documents?

18   A.    Yes.

19   Q.    If you can indicate when we go through this, which

20   documents are not from the search.

21   A.    Yes, sir.

22   Q.    Okay.  This document was one that was found during the

23   search; correct?

24   A.    Correct.

25   Q.    All right.  And what does it show?

A.    At the top, it's labeled "Pakistan Properties."  It
lists a property for Saad and gives the property description
of Parkview D-34, 2 Kanal, which an internet research found
Kanal was essentially an eighth of an acre.  So that appears
to be a half-acre property in Islamabad.

The next line is Asma, and it lists -- I can't tell
what that word is, but then Flat, and then some sort of
property identifier.

The next line lists Flat 2. B268, which appears to
be a third property, and then an address that includes the
word "shop" for a fourth property in Pakistan.

What you see next are Park View Enclave (Pvt)
Limited account statements.  This is a residential property,
part of a planned community in Islamabad, Pakistan.  The plot
information where Block D, Plot 34 to Kanal, ties with the
handwritten notes in the prior page, and this shows payment
summary that began in December of 2018 and concluded in
December of 2020.  And based on this document, it appears the
property's been paid for in full.

The next two documents are the same, both
handwritten notes.

When we get to this one, the top right-hand corner,
the 1533 and the 1589, I believe that those would be the
Frisco properties discussed in the first hearing, with the
amounts to the right, 550,000, and what appears to be

1    575,000.  And then lists a number in equity right there.

2    Q.    Those are plots of land that they own in Frisco, Texas?

3    Or owned at one point in Frisco, Texas?

4    A.    Correct.

5    Q.    Okay.

6    A.    The next handwritten note just shows more years of

7    payments.  The top part of the page says "Flat" which could

8    be --

9    Q.    Hold on just a second.  Let's catch up with you.

10   A.    Oh, I'm sorry.

11         MR. GONZALEZ:  Can we scroll down, please.  There

12   we go.

13         THE WITNESS:  Sorry.  The top part of that page

14   says "Flat," which I believe to correspond with the

15   handwritten notes of the property described as Flat.

16         If you go to the bottom, it says "Shop" and it has

17   an amount of 420,000, which could very well be in -- I

18   believe it's rumadi, the Pakistani currency.

19         And then more -- another investment note with more

20   handwritten notes.

21         And as you scroll through the rest of the pages,

22   it's just payment schedules for the same Park View property.

23         And then these were copies of a copy found in the

24   search warrant as well that just show a confirmation letter

25   and then payments, all towards that property.

1    Q.    And were you able to go on the internet and find the

2    property being described in these documents?

3    A.    Yes.  When you get to the Google map in color, that's

4    where the documents stop being the search warrant documents

5    and are now documents I printed from the internet.  It just

6    show -- it shows the location of the development.  And this

7    seems to be somewhat of a syllabus or a project description

8    of what the Park View City planned development is, and goes

9    into details about the project itself and then describes what

10   it is and the types of properties available.

11         If you scroll all the way to the last page, the

12   very last page, that is a wire transfer sheet from Wallis

13   Bank that was found in the search, again from Saad Aziz, in

14   the amount of 7,000 U.S. dollars.  The payment date was

15   December 31st of 2020.  The originator was SCS Supply Chain

16   again.  The beneficiary was Saad Abdul Aziz, with the same

17   Islamabad address.  Again, the beneficiary bank was Silk

18   Bank.  This --

19         MR. GONZALEZ:  Miss Martinez, can we go down,

20   please.

21         THE WITNESS:  Oh, I'm sorry.

22   BY MR. GONZALEZ:

23   Q.    All right.  So we have SCS as --

24   A.    Yes, the originator.

25   Q.    And then the payee was Saad Aziz; correct?

A.     Yes.   The beneficiary bank is Silk Bank.

          And if you scroll down more, you'll see notes for shop purchase, which I believe to be related to the handwritten notes denoting a shop under property.

Q.     Okay.  Now, returning back to your PowerPoint, the next slide, please.

A.     These are just slides that summarize what we've already been over.

          This slide here details an email from Jawaad Farooq that was sent on September 29th of '19 to Saad, using the same domain names we saw in the Microsoft account printout.

          This email was then forwarded to the cooperating defendant 2, who forwarded it to Hanggroup Telecom, which is a company specializing in locked phones in Hong Kong.  This email contained a spreadsheet, and it was named "Locked Shipment Overseas."  It also had a purchase order from SCS to Hanggroup Telecom.

          The reason it went through cooperating defendant 2 is he was the connection to Hong Kong at this time.  The locked spreadsheet had numerous IMEIs.  These were sent to AT&T who conducted a preliminary search and found 92 of the 228 IMEIs returned to fraud or that category of first time non-pay.

          The next slide, the screenshot you see on the top right comes from RJ Telecom records.  If you look in the

1    middle of the screenshot, you'll see wire paid SCS Canada

2    against 86 pieces on December 15th of '19.  It says minus

3    from inter ledger.  And on November 25th, 2019, Saad had sent

4    the SCS Canada corporate documents to CD 2 so that CD 2 could

5    arrange the wire from Dubai to SCS Canada.

6            As explained to me, there's problems with fraud in

7    Dubai, so oftentimes Dubai banks will ask for some sort of

8    documentation to ensure the beneficiary is legitimate.

9            On December 15th of '19, there was an email in

10   the RJ Telecom records showing a payment from Xpress

11   Logistics to SCS Canada for the same amount showed in the

12   screenshot for RJ Telecom records, and that payment that was

13   in the email is on the bottom right hand depicted as a

14   screenshot.

15           This slide refers to tab 19 in exhibit -- in the

16   binder exhibit.  So the invoices for that tax invoice were in

17   November of 2020.  The board minutes were in September of

18   2020.  Maaz Aziz traveled to Dubai in December of 2020, and

19   returned in January of 2020, so not long after a Dubai DAFZA

20   branch for SCS was established and Maaz Aziz traveled to

21   Dubai.

22           THE COURT:  Should that be -- is that 2021 on that

23   second one?

24           THE WITNESS:  Oh, of January?  Yes, sir.  That

25   should be January 10th of 2021.

1           THE COURT:  All right.

2           THE WITNESS:  We've got some typos to correct.

3           The Dubai -- this is -- CD 2 also provided

4  information that there was a Dubai shop located outside of

5  the DAFZA zone.  So different from the documents that we just

6  saw.  This was a shop that, in partnership with an individual

7  named Farhan, SCS ran.  This shop was used by SCS to send

8  stock over to Dubai and sell locally where there was a higher

9  margin.  Farhan ran the shop.  And at one point, Saad asked

10 CD 2 to send stock to Farhan to help boost his market.

11          THE COURT:  The acronym "DAFZA, is that Dubai

12 Airport Free Zone?

13          THE WITNESS:  Yes, sir.

14          In CD 2's WhatsApp there were messages with Farhan

15 that gave the office address at the time that CD 2 was in

16 Dubai in June and July of 2021 that helped corroborate this

17 information he provided about a shop outside of the DAFZA

18 used to sell stock.

19          Farhan has also ran a website GSMswift, which was

20 used to unlock phones -- going back to the same locked

21 phones, unlocked phones that we've been talking about.

22          CD 5, in talking about a COVID-19 forged document,

23 provided information that in December of 2020, he needed to

24 travel and get tested for COVID.  CD 5 did not receive his

25 test result as his wife did, so CD 5 sent his test result to

1    Saad Aziz who, in turn, had someone prepare a forged test

2    result from the wife's result and return that to CD 5.

3           CD 5 advised that he flew with Maaz Aziz on the

4    same flight, and Saad and Maaz Aziz provided the same test

5    result form with Maaz's name that showed a negative test.

6    And that Maaz went through the boarding first and told CD 5

7    it was fine, it was just a piece of paper.  This COVID-19

8    forged document relates to the December 2020 flight that Maaz

9    Aziz took to Dubai.

10          This is a screenshot of the copy.

11          In talking about the flight risk for Saad and Maaz

12   Aziz, there's an SCS Supply Chain company located in Canada

13   that is a fully functioning company that's dealing with cell

14   phone stock, shipping that stock to Dubai, shipping it down

15   here to the United States.  It's run by a family member, and

16   it's set up to do the same type of activities that SCS Dallas

17   was doing.

18          This business could be used for the same type of

19   activities even without the warehouse that is currently under

20   government control.  This could provide a continuing avenue

21   for financial danger for the community, as the ties to the

22   individuals that provide these devices are likely still

23   there.

24          There's also identity manufacturers in this

25   conspiracy that are -- that contributed to the large

1    percentage of devices that were obtained through identity

2    theft to obtain the financing phones, such as the likes of

3    Gregory Trent and Richard Sims.  These identity manufacturers

4    deal with device traffickers.

5            Maaz Aziz dealt with device traffickers, he lived

6    on that world.  That could potentially provide him with

7    access to these same type of individuals that are involved in

8    identity manufacturing.

9    Q.   When you talk about identity theft and identities being

10   stolen, I believe you previously testified that over 10,000

11   devices were bought with identity theft.

12   A.   Correct.

13   Q.   Okay.  So there's thousands of victims or individuals

14   whose identities have been stolen.

15   A.   Correct.

16           What you see here is a picture of an identity set

17   that Richard Sims, one of the identity manufacturers, used to

18   provide device traffickers a new line activation fraud or

19   financing phones.  You can see a driver's license, a Social

20   Security card, and a debit card, all with matching names.

21           Both Maaz and Saad Aziz became American citizens in

22   the 2016 time frame or somewhere around there.  They --

23           THE COURT:  Can we pause for a second on that?

24           If you can go back to the last screen, I want to

25   just clarify a point on the concern you're raising about

85

1    their connections to people who have been involved in

2    identity theft; and you're bringing up driver's licenses, and

3    Social Security cards.  I just want to be clear.  Are you

4    suggesting that you think the same people could be involved

5    in, for example, forging passports or other documents that

6    would allow travel?  Is that your --

7              THE WITNESS:  I don't have any information that

8    they've ever done passports.  But in this world, you have

9    access to people that do engage in forged documents, and so

10   it's possible that that could -- that knowing -- being in

11   this business and knowing these types of people could lead

12   one there if that's an avenue you wanted to take.

13             THE COURT:  All right.  You can proceed.

14   BY MR. GONZALEZ:

15   Q.   All right.  So I guess the point of the matter here is

16   that they, through -- the business that they're involved

17   with, the business of receiving stolen phones by identity

18   theft, have the ability to contact individuals that would

19   have the ability to create documents such as passports,

20   Social Security cards, IDs; correct?

21   A.   Could have the ability, yes.

22   Q.   Because of the fact that you have somebody like

23   Ryeshawn Green, who you talked about earlier, who was using

24   identity theft, who was using fake documents such as the ones

25   that are there on the screen to purchase items; correct?

A.     Correct.

Q.     And that's someone that's selling directly to SCS.

A.     Yes.

Q.     So if he would have familiarity with individuals that are involved in fictitious documents?

A.     Yes.

        THE COURT:  And you're saying the fictitious documents you've seen are things like Social Security cards and driver's licenses.  You haven't specifically seen passports.

        THE WITNESS:  No passports --

        THE COURT:  All right.

        THE WITNESS:  -- at this point, sir.

BY MR. GONZALEZ

Q.     But even if the defendants had turned in their passports to the Court, could they go to the Pakistani consulate and get another passport?

A.     They could.

Q.     All right.  You can go to the next slide.

A.     This slide depicts the extradition treaty with Pakistan, which is extremely hard to extradite individuals from Pakistan.  The last extradition took approximately six years, and there -- from my knowledge, there has only been two extraditions in the last 15 years.  So with a Pakistani heritage or citizenship that they still might have, they

1    could get to Pakistan, and it could be difficult to be

2    deported from Pakistan.

3            As we've shown previously in the hearing, they

4    have -- there are properties owned in Pakistan, multiple

5    properties, either by Saad or family members, and potentially

6    a Silk Bank bank account.  Based off of those wire transfers,

7    that's a Pakistan bank account.

8            As far as the economic danger for Saad and Maaz,

9    continuing on with the SCS Supply Chain Canada with a DAFZA

10   branch in Dubai, with a shop run by Farhan, product -- with

11   the network that's potentially still in place, could be used

12   to ship those products directly overseas or to Canada, and

13   then be shipped overseas where there is an ability to sell

14   this product and then leave the money overseas or return the

15   money back here.  So the mechanisms are in place where not

16   necessarily a warehouse is needed to continue moving this

17   product overseas.

18           Here, we have the harboring of an FBI top-ten

19   fugitive, Yaser Abdel Said.

20           THE COURT:  Hold up, agent.  I believe we have an

21   objection.

22           MR. CASTLE:  Your Honor, I'm going to object to

23   this being irrelevant ... (inaudible)

24           THE COURT:  Oh, yeah, you need your microphone.

25           MR. CASTLE:  Your Honor, my apologies, and to the

1    court reporter.

2              We object to this being inflammatory, irrelevant,

3    pertinent to nothing.  It's just a tasteless attempt to

4    disparage and try to create havoc when none should exist.

5              This relates to a situation where Judge Nowak was

6    having the detention hearing for the defendants who were

7    charged in a harboring issue, who are both in prison,

8    completely irrelevant to this case at this time, Your Honor.

9              THE COURT:  Do you join in that objection,

10   Mr. McCarthy?

11             MR. MCCARTHY:  Yes, I would.  Just to point out,

12   for clarity, just for confusion -- it says it's Said,

13   S-A-I-D.  And then, obviously, my client's name is "Saad."

14   For the record, this has nothing to do with Saad Aziz, for

15   relevance purposes alone, not to mention the prejudicial

16   effect.  We would join the objection, Your Honor.

17             THE COURT:  Mr. Gonzalez?

18             MR. GONZALEZ:  Your Honor, we believe it's totally

19   relevant.  It's a family member of the defendant.  The

20   defendants' -- one of the defendants' wives -- wife and her

21   sister owned the property where a fugitive was being hidden

22   for two years.

23             Now, if the Court should release these two

24   defendants, they would go back to that same family structure

25   that was able to hide a DEA/FBI fugitive for two years.  So I

```
1     think it's relevant for the Court to know that family
2     members, the same family members that these defendants would
3     go and potentially be released on bond to, were involved in
4     harboring a fugitive, and not cooperative with law
5     enforcement when they were questioned about the whereabouts
6     of the individual, which was a direct family member of one of
7     the defendants' wives.
8              So I think it is relevant and it's telling as to
9     what a family -- their family members would be willing to do
10    if these defendants decided to become fugitives.
11             THE COURT:  Do you want to say something,
12    Mr. Castle?
13             MR. CASTLE:  Yes, Your Honor.  If I could, I'll be
14    brief here.  The two people accused of harboring have been
15    convicted and are serving a prison sentence.
16             The house at issue, as the record is before the
17    Court and in the record, as Mr. Gonzalez is well aware, was
18    bought for Maaz Aziz's wife and her sister and titled in
19    their name.  Had no knowledge and was never accused of any
20    wrongdoing.  And the only two people who are accused of any
21    wrongdoing are serving prison sentences.  This is -- and
22    fomenting, you know, concern where none should exist.
23             MR. MCCARTHY:  To take it a step further.  Saad
24    Aziz, this is literally holding him responsible for his
25    brother's wife's father's actions in a completely different
```

1    place that he doesn't own, that he wasn't involved in; and,

2    quite frankly, they've already admitted they have zero

3    evidence to connect my client to this.

4           THE COURT:  All right.  So your client is one step

5    removed.  Go ahead, Mr. --

6           MR. GONZALEZ:  And the other argument is the fact

7    that they argued before, and I'm sure they are going to argue

8    here, is that they have significant ties to the community.

9    Well, this is the community of individuals that they have

10   significant ties to; individuals that were involved in

11   harboring a fugitive; family members of individuals that were

12   involved in harboring fugitives.  So I think it's relevant.

13          THE COURT:  I'm going to overrule the objection.

14   And you can respond to the question, agent.

15   BY MR. GONZALEZ:

16   Q.   All right.  So tell us the significance of Yaser Abdel

17   Said and his relationship to the individuals here, the two

18   defendants.

19   A.   Yaser Said was -- killed both of his daughters, became

20   an FBI fugitive, top-ten fugitive.  He was on the run for

21   numerous years since 2008.  He is the brother to Yaser Said,

22   who is the uncle to Ameirah, the wife of Maaz Aziz.  His

23   daughter.  So Yaser Said, the uncle, is -- yes.

24          So as was discussed, Ameirah and her sister

25   purchased the Justin address in 2000 and 2015.  In 2017,

1    Yaser Said escaped from an Irving apartment as part of an FBI

2    fugitive investigation.

3            Shortly thereafter, the FBI believes that Said

4    began living in the Justin residence owned by Ameirah and her

5    sister.

6            And in August 2020, he was taken into custody at

7    this residence.  And in 2021, Yassein Said, the father of

8    Ameirah, and Islam Said, Yaser's son, were convicted of

9    conspiracy to harbor and obstruction of justice in the

10   Northern District of Texas.

11           As part of the FBI investigation, the Said family

12   was uncooperative.  Dalal, Ameirah's sister, was not

13   cooperative with law enforcement.  And there is no documented

14   contact with Ameirah, the wife to Maaz Aziz.

15   Q.    Next slide, please.  What's depicted there?

16   A.    This is a photo of the house above, early on.  And then

17   this is a photo of the house later on, where it shows a

18   living space where the garage used to be, and there's a

19   hiding hole that was located in the residence.

20   Q.    Now, in regards to the defendant's risk of flight,

21   you've indicated that they have significant ties to other

22   communities; correct?  To Canada?  To Pakistan?  To Dubai?

23   A.    Correct.

24   Q.    And the individuals that are purchasing these items in

25   Dubai, for example, they're individuals that are selling

1    stolen products; correct?

2    A.    Yes.

3    Q.    So they're part of the conspiracy to sell these

4    products.

5    A.    Correct.

6    Q.    And the quantities of money that is being transacted

7    here, can you tell the Court -- can you give the Court an

8    estimate, an amount, of money that's being involved here?

9    A.    I think from the bank statements, payments from Dubai

10   were $21 million in that five-year time frame, and $11

11   million from other foreign countries.

12   Q.    And you indicated there were over 65 -- or there were

13   65 bank accounts, many of which you haven't been able to

14   obtain all the financial records; correct?

15   A.    Correct.

16   Q.    So do you believe that there are resources, money, in

17   places where you just haven't found at this point?

18   A.    Where we haven't found, or in places like Silk Bank in

19   Pakistan that we don't have access to.

20   Q.    And the two properties that were located in Frisco,

21   Texas, which had a value of over $2 million.

22   A.    I think 1.1 million or 1.2.

23   Q.    So over a million dollars.  Do you know what happened

24   to those properties?

25   A.    I believe one of the properties has been sold.  And the

1   other one has been taken off the market, so I'm not sure of

2   its status.

3   Q.    Do you know when that one property was sold?  Was it

4   sold after the detention hearing?

5   A.    I believe it was in October 8th, if I'm correct on that

6   date.

7   Q.    So it would have been sold after the detention hearing

8   that you had in front of Judge Nowak --

9   A.    Correct.

10  Q.    -- correct?

11  A.    Yes.

12  Q.    Do you know where the money is, the proceeds are, from

13  that sale?

14  A.    I do not.

15  Q.    So based on your training and experience, and based on

16  your knowledge of the defendants, do you -- in your opinion

17  of this case, do you believe them to be a flight risk?

18  A.    Yes.

19  Q.    And what do you base that opinion on?  If you can just

20  summarize it for the Court.

21  A.    The weight of the evidence; the foreign ties in Canada,

22  Dubai, and Pakistan; the business structure that's still in

23  place through Dubai and Canada; and the assets in Pakistan;

24  along with the knowledge of flight -- how to fly, how to

25  travel.

1    Q.    And is there a continuing threat to the community, the

2    fact that there still is a SCS Canada that hasn't been seized

3    or taken over by any federal agency; correct?

4    A.    No.  It's still active, as far as we know.

5    Q.    And the businesses in Dubai, they're still in

6    operation, as far as you know.

7    A.    As far as we know.

8    Q.    So all of those businesses would allow them to continue

9    to be involved in this same type of activity that they've

10   been charged with here today?

11   A.    Correct.

12           MR. GONZALEZ:  That's all I have, Your Honor.  I'll

13   pass the witness.

14           THE COURT:  One question for you, Mr. Gonzalez.  I

15   think we have -- so far, we have Government's Exhibits 1

16   through 4 and 6, which have been described and have been

17   admitted.  I assume Exhibit 5 is your other witness.

18           But this PowerPoint, I think what you referred to

19   as Exhibit 1 earlier -- your Government Exhibit 1, it was tab

20   18, was a different set of documents.  Are you wanting the

21   PowerPoint admitted or not?

22           MR. GONZALEZ:  Your Honor, if it would assist the

23   Court, I will be happy to admit it and we'll make that

24   Government's Exhibit 7?  7.

25           THE COURT:  Right.  I think your colleagues on the

```
 1    other side may want to refer to it in their questioning.

 2          So Government's Exhibit 7, I assume we have the

 3    same objections from the defendants to the extent that it

 4    turns on any documents that have not been produced prior to

 5    today; is that correct?

 6          MR. CASTLE:  Yes, Your Honor.  And I would

 7    certainly like --

 8          THE COURT:  Go ahead.

 9          MR. CASTLE:  Yes, Your Honor.  And we would

10    certainly appreciate a chance to use a copy of the PowerPoint

11    in questioning here, so...

12          THE COURT:  Yes.  I take it you join in that

13    objection, Mr. McCarthy, on behalf of Saad Aziz?

14          MR. MCCARTHY:  Yes, Your Honor.  And while we're on

15    the subject, I was going to say we attached several exhibits

16    to our motion.  Would this be a proper time to just offer

17    those at this time?  So we --

18          THE COURT:  You can.  You know, one of the things

19    you can do -- so, first of all, let me come back.  I'm going

20    to go ahead and overrule the objections and admit Exhibit 7,

21    again with the same caveats that I gave earlier, that you'll

22    be able to respond to these and submit your own materials.

23    And I have a feeling we're going to be reconvening, so we'll

24    be able to address it at that time.

25                    (Government's Exhibit 7 was admitted.)
```

1          THE COURT:  For your exhibits, I have reviewed the

2     exhibits that you submitted.  You can do it whichever way you

3     want.  If you want, you can also resubmit them for this

4     hearing.  Or if what you want to do for this hearing is use

5     them with the Court, refer to them by the exhibit letters or

6     numbers that you used in the filings you've already made, you

7     can also do that, because I have them.  I've reviewed them.

8     But if you want to resubmit them, feel free to do so.

9          MR. MCCARTHY:  Just for purposes of time, I was

10    going to offer them now.  I don't think there is any

11    objection.

12         THE COURT:  Is there no objection?

13         MR. GONZALEZ:  No, Your Honor.

14         THE COURT:  All right.  So I note that both

15    defendants submitted exhibits with your response briefs.  So

16    all of the defendants' exhibits on behalf of both defendants

17    are admitted for the purposes of this hearing as well.

18              (All Defendants' exhibits submitted with

19                   response briefs were admitted.)

20         MR. MCCARTHY:  Yes, Your Honor.

21         THE COURT:  All right.  So what, I believe we're

22    going to have you start, Mr. McCarthy, with

23    cross-examination.  Or no?

24         MR. MCCARTHY:  No, Your Honor.  That was for --

25    Mr. Meyer had a child issue and he left.  So we'll just do

```
 1    the normal, the normal course.
 2              THE COURT:  All right.  So, Mr. Castle, I mean,
 3    we're going to need to take a break here pretty soon, so we
 4    could either let you start, or take about a five-minute break
 5    or so before you start.
 6              MR. CASTLE:  I prefer a five-minute break very
 7    quickly just --
 8              THE COURT:  All right.
 9              MR. CASTLE:  -- to streamline it.
10              THE COURT:  Why don't we do that.
11              All right.  It's about -- we'll come back at about
12    4:20.
13              MR. CASTLE:  Thank you, Your Honor.
14              THE COURT SECURITY OFFICER:  All rise.
15              (Recess taken.)
16              THE COURT:  You can be seated.
17              All right.  We're back on the record in cause
18    number 4:20-cr-382.  And I believe that Mr. Castle is going
19    to begin his cross-examination of Agent Doering.
20              And, Mr. Castle, you can proceed when you're ready.
21              MR. CASTLE:  Yes, Your Honor.  I've got copies of
22    the transcript from the hearing before Judge Nowak, one for
23    the Court and one for the witness.
24              THE COURT:  All right.
25              MR. CASTLE:  May I approach?
```

1        THE COURT:  You may.

2        (Provided to the Court.)

3                  CROSS-EXAMINATION

4   BY MR. CASTLE:

5   Q.    Good afternoon, Agent Doering.

6   A.    Good afternoon.

7   Q.    Agent Doering, I'm going to try to short circuit this.

8   I know it's a little bit late in the day, so I'm going to try

9   to speed some things up.

10        Early on in your PowerPoint there was some

11  discussions of armed robbery, theft, or identity theft.  Do

12  you recall those conversations?

13  A.    Yes.

14  Q.    I'm kind of lumping together here.

15  A.    Correct.

16  Q.    You have no direct evidence that Maaz Aziz was a

17  participant in any robbery; correct?

18  A.    Correct.

19  Q.    You have no evidence and presented no evidence he has

20  any involvement with the thefts that were occurring; correct?

21  A.    Direct involvement, correct.

22  Q.    And you have no direct evidence that he was involved in

23  identity theft?

24  A.    Correct.

25  Q.    Correct?  As a matter of fact, with over 10,000 victims

1    Mr. Gonzalez mentioned multiple times, you would agree that

2    Maaz Aziz didn't steal a single identity; correct?

3    A.    Correct.

4    Q.    And there is no direct evidence he's stolen any

5    identity.

6    A.    Correct.

7    Q.    At the end of your testimony with Mr. Gonzalez, you

8    went through a number of factors that you said constitute a

9    risk of flight.

10   A.    Yes, sir.

11   Q.    I noted -- I did note you never said it was a serious

12   risk of flight, which is the standard.

13   A.    It's a serious risk.

14   Q.    So you're going to add to it now?

15   A.    Yes, sir.

16   Q.    Okay.  And if I understood these PowerPoints correctly,

17   it was the weight of the evidence.

18   A.    Correct.

19   Q.    Okay.  The business structure.

20   A.    Correct.

21   Q.    Assets in Pakistan.

22   A.    Correct.

23   Q.    Knowing how to travel.

24   A.    Correct.

25   Q.    And then the fact that SCS Canada and Dubai give them

1    the ability to continue working; correct?

2    A.    Correct.

3    Q.    And you would agree that during your three-plus hours

4    with Mr. Gonzalez, there wasn't a single discussion of any

5    condition; correct?  Condition of release.   Pardon me.

6    A.    No.

7    Q.    Are you also aware you never even discussed risk of

8    flight until 3:52 p.m. today, more than 2 hours and 20

9    minutes into it?

10   A.    It was towards the end.

11   Q.    And you would agree that the first 2 hours and 22

12   minutes were all weight of the evidence; correct?

13   A.    Correct.

14   Q.    And are you aware that weight of the evidence is the

15   least important (g) factor?

16   A.    I don't know the ranking factor.

17   Q.    Are you aware the Fifth Circuit and this honorable

18   court has said the weight of the evidence is the least

19   important consideration?

20   A.    If that's what you're telling me.

21   Q.    So let's look at the weight -- we'll come back to the

22   weight of the evidence.

23         So you mentioned assets in Pakistan, correct --

24   A.    Correct.

25   Q.    -- as one of your factors.

1    A.    Yes.

2    Q.    And there is no evidence before the Court, and you've

3    testified to nothing before the Court, which shows Maaz Aziz

4    has any property in Pakistan; correct?

5    A.    Not that Maaz Aziz does, no.

6    Q.    He has no bank accounts that you testified to; correct?

7    A.    Not that we know of.

8    Q.    In fact, the only mention of Pakistan is he might be

9    able to go to the Pakistani embassy and get a Pakistani

10   passport; correct?

11   A.    Correct.

12   Q.    Are you aware of whether Mr. Maaz Aziz is a dual

13   citizen of Pakistan or the United States?

14   A.    If he still has Pakistani citizenship?

15   Q.    Yes, sir.

16   A.    I don't know.

17   Q.    Do you know the impact of him accepting and earning

18   American citizenship over his Pakistani citizenship?

19   A.    As far as that prevents him from getting a passport?

20   Q.    Yes, sir.

21   A.    I don't know that it would.

22   Q.    You don't know that it wouldn't either, though, do you?

23   A.    I don't know that it wouldn't either.

24   Q.    Are you an expert in Pakistani embassy policies and

25   Pakistani passports?

1    A.    No.

2    Q.    You would agree with the statement that "he might be

3    able to get a Pakistani passport" is pure speculation.  You

4    don't know if he can or can't, do you?

5    A.    I don't know the exact procedure that it takes, no.

6    Q.    You don't know if the procedure exists, do you?

7    A.    The exact procedure?  No.

8    Q.    So pure speculation that he could flee to Pakistan;

9    correct?

10   A.    It's a possibility.

11   Q.    But it's a possibility, speculation, and you don't even

12   know if he can get that.

13          Do you recall a -- it's Government Exhibit 6.  I

14   don't know if you have a copy.  Or maybe the government can

15   put one up.  It was the list of travel.

16   A.    Okay.  Yes, sir.

17          MR. CASTLE:  I have -- I'm not going to try to mess

18   with that, Judge, for at least 30 minutes.

19   BY MR. CASTLE:

20   Q.    Where did this document originate?

21   A.    Customs provided it.

22          THE COURTROOM DEPUTY:  The document camera is on.

23          MR. CASTLE:  Oh.  Thank you.  And I apologize --

24   (inaudible).

25   ***

1    BY MR. CASTLE:

2    Q.    And how did you obtain this document from Customs?

3    A.    I requested it.

4    Q.    And do you know how Customs tracks this information?

5    A.    No.  Through TECS.  I believe TECS, but I'm not a

6    hundred percent sure on that.

7    Q.    When you say --

8    A.    The TECS system, like border crossings.

9    Q.    But does it track the use of a passport, when it scans

10   in and scans out when you go through Customs?

11   A.    The passport itself?  I believe you can track by

12   passport, yes.

13   Q.    And can you identify a single trip on this sheet where

14   Maaz Aziz was able to travel internationally without a

15   passport?

16   A.    You know, I don't recall the records exactly, what that

17   entailed, if there were passport usages or not.  But to

18   travel internationally, it does require a passport.

19   Q.    And you have no evidence he's ever traveled

20   internationally without a passport.

21   A.    I don't have evidence of that, no.

22   Q.    And he has offered -- "he" being Maaz Aziz -- has

23   offered to surrender his passport multiple times to the

24   government; correct?

25   A.    Yes.

1  Q.   And starting on the search warrant on August 24th, his

2  home was raided?

3  A.   Yes, there was a search warrant there.

4  Q.   Saad Aziz's home was raided?

5  A.   Yes.

6  Q.   A Gizmobile location was raided.

7  A.   Yes.

8  Q.   And then the SCS warehouse; correct?

9  A.   Correct.

10 Q.   And he didn't run after that time; correct?

11 A.   No, sir.

12 Q.   At the same time -- and I'm going to try to convince

13 some things here -- I know that the judge had mentioned a

14 stop.  So if it's confusing, please ask me to rephrase.

15      At the same time, you made mention of 65 bank

16 accounts; correct?

17 A.   Correct.

18 Q.   How many of those bank accounts are active?

19 A.   I don't know the answer to that.  I think Mikaela

20 Keene, the FOA, financial accountant here today, might have a

21 better grip on that.

22 Q.   Okay.  Did you read the government's motion prior to

23 being involved?

24 A.   No.

25 Q.   So it mentioned Bank of America, Regent's Bank, BBVA,

1   BB&T, and Frost Bank.  Are you aware of that?

2   A.    No.

3   Q.    Are you aware of a relationship between SCS or either

4   defendant and those banks?

5   A.    I'm aware of the relationship, not that that's what

6   they listed.

7   Q.    But you have no idea which ones of those are active or

8   inactive.

9   A.    No.

10  Q.    And if we told you there are only accounts active at

11  four banks, would you have any reason to dispute that?

12  A.    No.

13  Q.    Or that the combined deposits are approximately or

14  actually less than $50,000 for all four banks in all the

15  accounts?

16  A.    We don't have those records right now, but I wouldn't

17  dispute it if you told me.

18  Q.    And the 65 banks, if I'm understanding correctly,

19  covers April 1st, 2016, to February 19th, 2021.

20  A.    Correct.

21  Q.    So 65 accounts which includes open and closed accounts.

22  A.    Yes, sir.

23  Q.    Credit cards; correct?

24  A.    Yes.

25  Q.    Active --

1    A.    The credit cards might be in addition to that.

2    Q.    Okay.  But it would be active and inactive credit

3    accounts --

4    A.    Yes.

5    Q.    -- correct?  Okay.  And you made mention here that

6    there were tens of millions of dollars running through SCS,

7    and you've said where is this phenomenal wealth; correct?

8    A.    Correct.

9    Q.    Do you remember you were asked questions on that?  You

10   were asked questions on that?

11   A.    That what type of money was running through these

12   accounts?  Yes.

13   Q.    Right.  And on your slide and the PowerPoint --

14         MR. CASTLE:  I'll reserve it to ask all questions

15   at a different time, Your Honor, because I don't have the

16   PowerPoint.

17   BY MR. CASTLE:

18   Q.    -- you made note that there was $21 million of income

19   received from Dubai, and then $11 million of income from

20   other countries; correct?

21   A.    Revenue, yes.

22   Q.    Well, you said *income* in your slide.

23   A.    Okay.

24   Q.    Is there a difference between revenue and income?

25   A.    The revenue would just be from the sales coming back.

1    Technically, net income would be minus the cost of goods

2    sold.

3    Q.    Okay.  And other expenses; right?

4    A.    Correct.

5    Q.    So because you've made concerns that there's millions

6    and millions of dollars that are out there, and the fact that

7    you don't know where they are causes the government

8    concern --

9    A.    Correct.

10   Q.    -- that there is a risk of flight?

11   A.    Yes.

12   Q.    And do you recall seeing this document earlier?  I

13   apologize.  We would normally have copies, and I would hand

14   you one.

15   A.    Yes.

16   Q.    This is the -- from Government Exhibit 1, I believe.

17   So at the very top here, this is the profit and loss --

18   A.    Yes.

19           THE COURTROOM DEPUTY:  Can you make sure you stand

20   near a microphone --

21           MR. CASTLE:  Oh, I'm sorry.

22           THE COURTROOM DEPUTY:  -- or pull the microphone

23   towards you.

24           MR. CASTLE:  Is that better?

25           THE COURTROOM DEPUTY:  Yes.

```
 1              MR. CASTLE:  Perfect.

 2    BY MR. CASTLE:

 3    Q.    So here you'll see total sales of $5 million; correct?

 4    A.    Yes.

 5    Q.    Cost of goods is $4.5 million?

 6    A.    Correct.

 7    Q.    Gross profit is only $485,000 for January 2021.  Do you

 8    see that?

 9    A.    Yes.

10    Q.    Total expenses are $397,000, which left net income of

11    $87,514?

12    A.    Can you move that sheet up a little?

13    Q.    Oh, I'm sorry.  There you go.

14    A.    Yes.

15    Q.    That's a far cry from tens of millions of dollars,

16    isn't it?

17    A.    For one quarter, that already includes the salary, the

18    payroll, all that, for $300,000.  If it's a hundred thousand

19    dollars net income per month after all expenses, that's not a

20    bad income.

21    Q.    It's a million dollars -- to get to the 60 million

22    you've referenced several times, you would agree that a

23    million dollars, you would have to work 60 years?

24    A.    Over five years, that would start to add up.  That

25    would turn into millions of dollars.
```

1    Q.    Sure.  If it's a hundred thousand a month, times

2    twelve, is 1.2 million.  Can we agree on that?

3    A.    Correct.

4    Q.    So 1.2 million per year, times 5 years, that's 6, not

5    60.  So where is the mass of wealth you're so worried about?

6    A.    It's still $6 million that we don't know where that

7    exists.

8    Q.    You're assuming that all five years, including the

9    first years when they first started out, are a million

10    dollars a year.

11    A.    Well, that's net profit after salaries that goes

12    towards living expense and all that.  That's profit.

13    Q.    Correct.  But you have no idea of the financial

14    performance prior to 2021, of the documents you presented

15    here today; correct?

16         For example -- and I'll ask a clarifying

17    question -- you don't know if they've ever lost money for a

18    year, do you?

19    A.    I do not.

20    Q.    And if they have, would that change your opinion at all

21    on the massive fortune you're concerned about here and

22    speculate about?

23    A.    Typically, when they're using this stolen stock and

24    selling that overseas, from what I've seen so far, that's

25    profitable, that increase -- that generates income, that

1    generates profit.  So the fact that they're involved in that

2    type of business would seem to indicate that they would have

3    profit in those years.

4    Q.    But you would agree that a company in year one has

5    probably performed differently and not as well as a company

6    in year five, wouldn't you?

7    A.    There's growth, so -- typically.

8    Q.    Saying there's a million a year for five years would be

9    pretty generous.

10   A.    That's generous.

11   Q.    And speculative, we can both agree.

12   A.    Without seeing the full set of records...

13   Q.    So earlier you alluded to that you were discussing SCS

14   Canada.  Do you recall that?

15   A.    Correct.

16   Q.    And you made a statement, because the verb choice

17   again -- some of your verbs always sticks out to me -- you

18   mentioned, it appears to be a subsidiary of SCS Supply.

19   A.    It might be habit.  I would call that a subsidiary of

20   SCS Supply based off the financial statements and the records

21   that I've seen.

22   Q.    So what is your understanding and how are you -- I want

23   to make sure we're not talking past each other because --

24            (Court reporter clarification.)

25   BY MR. CASTLE:

1   Q.    -- we're not talking past each other, because

2   "subsidiary" has a definitive meaning here.  What is your

3   understanding of a subsidiary?

4   A.    A subsidiary is a company that is owned in part by

5   another company.  And even though it might have its own

6   independent operations, at some point decisions are made by

7   the parent company, or profit can go back up to that parent

8   company.  So it still reports to the parent company, but has

9   some of its own independent operations.

10  Q.    Are you aware of subsidiaries where there are joint

11  ventures that don't have a parent; they have two separate

12  companies.  Have you ever seen that?

13  A.    That could be.  But in this case, with the common

14  emails, with the accounts on OneDrive that are all the same,

15  with the common financial statements, with the bonuses, with

16  the Canada-USA pay all on one statement, that seems to

17  indicate to me more that the company is a subsidiary of

18  SCS Supply.

19  Q.    You would agree that's your best guess; right?  Your

20  best guess.  You don't know.

21  A.    That's based off the records.

22  Q.    Your best guess of interpreting the records; correct?

23  A.    That's my analysis of the records.

24  Q.    And in terms of SCS Canada, you may recall in the last

25  hearing we talked about SCS Canada quite a bit.

1    A.    We did.

2    Q.    You have no evidence that Maaz Aziz is a director of

3    SCS Canada; correct?

4    A.    No.

5    Q.    You have no evidence he's an owner of SCS Canada; do

6    you?

7    A.    The only evidence I have are those handwritten notes

8    where his name and Saad's name were both under SCS Canada,

9    and it shows monetary denominations multiple times.

10   Q.    That could have been a loan; correct?

11   A.    It could have been a loan.

12   Q.    It was simply dollars.  It didn't say -- it wasn't a

13   stock certificate.  Correct?

14   A.    No, but I took that as payments coming from SCS Canada

15   to those individuals, which typically indicates some sort of

16   ownership.  Ownership isn't always on paper.  It can be

17   silent, silent ownership.

18   Q.    In what jurisdiction?

19   A.    Well, undocumented ownership.

20   Q.    Really?  What jurisdiction have you seen that?

21   A.    More of a gentleman's agreement where you get a

22   percentage of the company for any type of involvement or

23   anything like that.  I mean, I wouldn't say it's formal or

24   any type of business law, but you could have a silent owner

25   in a business.

1   Q.    And do you know if Canadian law allows for silent

2   owners of a business?

3   A.    I don't.

4   Q.    Other than that, you have no evidence Maaz Aziz owns

5   anything; correct?

6   A.    The only evidence I have is what I stated.

7   Q.    Let's go back to that, then.  You have numbers,

8   handwritten numbers, on a scratch piece of paper that you're

9   guessing as to what they mean.  Is that a fair assessment?

10  A.    That's what I have.

11  Q.    So you don't know; correct?

12  A.    I don't have anything else saying what to interpret

13  that for me, no.

14  Q.    And you have no direct evidence of that, of any

15  ownership of Maaz Aziz; correct?

16  A.    No direct.  No, sir.

17  Q.    And previously I asked you about do you have any

18  evidence of Maaz Aziz is a signatory on any of the SCS bank

19  accounts.

20  A.    Correct.

21  Q.    And is he?

22  A.    I don't think so.

23  Q.    Do you have any direct evidence that he is?  That he is

24  a signatory, do you have any direct evidence?

25  A.    No.  Mikaela Keene would have that.

1    Q.    Okay.  Are you aware of Mr. Maaz Aziz having the

2    ability to access funds from SCS Canada?

3    A.    He might not directly.

4    Q.    If I asked you the same questions on Dubai, would your

5    answers be the same for Maaz Aziz?

6    A.    They would be.

7    Q.    Ownership?  No evidence of ownership.

8    A.    Correct.

9    Q.    No evidence he's got funds in Dubai.

10    A.    Correct.

11    Q.    No evidence he's on any bank account.

12    A.    Correct.

13    Q.    No evidence he has any involvement; correct?

14    A.    Other than the trip he took to visit that convention,

15    and then the trip right after they had the -- the board of

16    minutes meetings to establish a DAFZA free zone, right.

17    Q.    So was Maaz on the minutes, or was it just the

18    happenstance --

19    A.    It was not just that.  The coincidence of the trip,

20    timing right after the minutes authorized the branch opening

21    in Dubai, and the convention in Dubai, going there to

22    establish connections.

23    Q.    Isn't it equally as likely as -- in order to establish

24    criminal acts, you know, connections, equally as likely he

25    wanted to spend New Year's Eve in Dubai?  It's supposed to be

1    a fun place.

2    A.    It was, other than cooperator -- or CD 2's statements

3    where Maaz and Saad, along with three to four employees, went

4    over there for that purpose.

5    Q.    And were you going to corroborate the CD 2's

6    statements?

7    A.    I was able to corroborate some of those statements

8    related to that.

9    Q.    And you would agree that CD 2 -- you've provided a deal

10   of some sort to -- he's biased?

11   A.    There is no deal at this point.

12   Q.    Did you detain CD 2?

13   A.    We did not.

14   Q.    Did you threaten to detain CD 2?

15   A.    There wasn't a threatening to detain him.

16   Q.    Did you offer to waive the motion to detain if he

17   cooperated?

18   A.    Once he cooperated and provided honest information

19   based off of what we could tell, what we could corroborate,

20   and we were able to mitigate releasing him for any flight

21   risk or to the best that we could, we released him, yes.

22   Q.    Did you move to detain CD 2 prior to him cooperating --

23   A.    Yes.

24   Q.    -- or her?  And did you -- did the government make an

25   offer:  If you will cooperate and proffer, we'll withdraw the

1    motion to detain?

2    A.    We reached out and said if you want to proffer, if you

3    want to debrief, and it's honest and it's honest statements,

4    then we will consider releasing.  We haven't released

5    everybody that we have proffered and they have provided

6    honest statements.

7    Q.    And you made a similar offer to Mr. Aziz; correct?

8    A.    Yes.

9    Q.    And so basically, If you cooperate, we won't seek to

10   detain, we'll withdraw the motion.  But if you exercise your

11   constitutional rights, we're going to seek to detain.

12   A.    In some cases, we did that.  And some cases, we didn't.

13   Q.    Is that what you did here, though?  If they had agreed

14   to cooperate with the government, you would have withdrawn

15   the motion we're here on today; correct?

16   A.    Potentially.

17   Q.    But that was offered; correct?

18   A.    If we would have debriefed and the debriefing was

19   honest, and there was continued cooperation, and we were able

20   to get a good feeling that there wasn't flight risk, then

21   potentially, yes.

22   Q.    That was offered before you knew what they were going

23   to say; correct?

24   A.    I think the offer was to sit down and debrief and see

25   where it went.

1    Q.    And if they were truthful, if they accept

2    responsibility, if they plead guilty, We won't seek to

3    detain.

4    A.    And we feel like there is no flight risk or we've

5    mitigated the flight risk -- correct, all of those -- flight

6    and danger to the community.

7    Q.    And are you familiar with the Bail Reform Act through

8    your lengthy service and training at Quantico?

9    A.    No.

10   Q.    Are you -- we've talked about it in the last hearing.

11   A.    Yes.  From what you've said, I --

12   Q.    Sure.

13   A.    -- yeah.

14   Q.    Are you aware of whether coercing cooperation by

15   threats of detention is improper use of a detention hearing?

16   A.    I don't have -- can you say that again one more time?

17   Q.    Do you have an understanding as to whether coerced

18   cooperation is a proper use for seeking detention?

19   A.    Is that one of the -- one of the rules that came out

20   with that?

21   Q.    I'm asking you, are you allowed to use threats of

22   detention to coerce and try to force cooperation?

23   A.    I don't -- I don't know.

24   Q.    You were never taught that was okay, though; right?

25   A.    If someone decides to cooperate and that gives us a

118

1    sense they aren't an economic danger, or we have increased

2    contact with them, or we have more control over their

3    behavior or flight, I don't necessarily think that's a

4    threat.

5    Q.    If you cooperate, we will withdraw our motion.  If you

6    don't cooperate, we will seek to detain.  That doesn't sound

7    like a threat to you?

8    A.    I think that sounds like the chance for two parties to

9    get together and see if there is a way that detention can be

10   overcome.

11   Q.    So going back to your reasons for why you think this

12   is -- they are a flight risk and now a serious flight risk,

13   we've gone to assets in Pakistan, which we've confirmed

14   Mr. Aziz -- you have no evidence of any --

15   A.    None that he has, but family has.

16   Q.    Sure.  But you have no ties to whether or not he even

17   speaks to that family, do you?

18   A.    To Saad?  Saad has property in Pakistan.

19   Q.    Okay.  Saad's sitting right here, though.  What does

20   that have to do with Mr. Maaz Aziz?

21   A.    If Mr. Maaz fled, I'm sure that his family would allow

22   him -- or his sister, Asma, would allow him to use that

23   property or the proceeds from a lot or residential lot to

24   gain residency in Pakistan.

25   Q.    Well, there's nothing wrong with them selling a piece

1    of real property in Texas, is there?

2    A.    No.

3    Q.    Is that illegal?

4    A.    No.

5    Q.    And they sold a piece of property they owned.

6    A.    Yes.

7    Q.    It was not under criminal forfeiture identified in the

8    indictment; correct?

9    A.    No.

10   Q.    Okay.  And you have no idea if any relative would take

11   him in or if he would be welcome with any relative in

12   Pakistan; correct?

13   A.    No.

14   Q.    We established you have no idea how the Pakistani

15   citizenship, and nationalities, and issuance of passports

16   work; correct?

17   A.    No.

18   Q.    And any thought that he could walk into the Pakistani

19   embassy and miraculously get a passport is just a guess.

20   A.    If he is a Pakistan citizen?

21   Q.    Is he a Pakistan citizen?  I think I asked you that,

22   too.

23   A.    No.  I don't know.

24   Q.    He's an American citizen.

25   A.    He is at least that.

1   Q.    So no property, no accounts in Pakistan.  A mere guess,

2   speculation, and belief, unsupported albeit, that he could go

3   get a Pakistani passport.  That takes care of everything in

4   Pakistan; right?  That's the entirety of your evidence for

5   why Pakistan is a problem; correct?

6   A.    And the business.

7   Q.    What business?

8   A.    I'm sorry, the businesses in Dubai -- Pakistan, you're

9   right.

10  Q.    Pakistan.

11  A.    You're right.

12  Q.    It would be both SCS Canada and Dubai as well; correct?

13  A.    Correct.

14  Q.    And no evidence of ownership, no evidence of

15  relationship, no evidence of a director?  All of those

16  things; correct?

17  A.    Well, I think there's an evidence of a relationship

18  with SCS Canada with his cousin running that business up

19  there.

20  Q.    So he has a familial relationship.  And, you know, last

21  time we spoke, you mentioned that, you know, you had no

22  evidence that SCS Canada was doing anything illegal.

23  A.    I think since then, we've obtained evidence that

24  they're at least involved in some illegal activity with that

25  email that had the locked -- with the attachment with the

1   locked IMEIs for the overseas, many of those coming back to

2   fraud, theft, other types of ways the device traffickers will

3   obtain devices.

4   Q.    And are you familiar with Canadian law as to whether,

5   you know, the scope of what their statutes require, permit,

6   and don't permit?

7   A.    No, but I would assume that they're somewhat the same

8   as the United States.

9            MR. CASTLE:  Move to strike everything after "no."

10  BY MR. CASTLE:

11  Q.    In that regard, you have no ties with Maaz Aziz with

12  any stolen property with SCS Canada; correct?

13  A.    Not with SCS Canada.

14  Q.    Okay.  You remember last time we talked, I asked you a

15  question and you kind of laughed.  You know, you can't

16  accidentally commit a felony; correct?

17  A.    No.

18  Q.    I mean, mere possession of stolen goods isn't a crime,

19  is it?

20  A.    Not mere possession.

21  Q.    And you've offered no evidence, say, on Mr. Aziz's

22  knowledge; correct?

23  A.    Today, I would say the Bissell vacuum transaction shows

24  knowledge of the stolen goods with the vacuum.  It would show

25  engaging in new-device trafficking where locked devices are

```
1    very routine.  That shows knowledge.  The fact that he's
2    purchasing devices from the street to start out with, in
3    2017, 2018 -- purchasing those devices, selling them to RJ
4    Telecom at a discounted retail price, brand new in the box,
5    and then those devices getting shipped overseas, I think that
6    produces knowledge; right?
7    Q.    So you would agree that's all circumstantial and
8    speculative?  You're kind of --
9    A.    I think it's inferred.
10   Q.    -- layer upon layer upon layer of speculation?
11             THE COURT:  Both of you, just make sure you don't
12   talk over each other.  So --
13             MR. CASTLE:  My apologies, Your Honor.
14             THE WITNESS:  -- that's for the witness and the
15   attorney.  So I think why don't you go ahead and proceed with
16   your next question.
17   BY MR. CASTLE:
18   Q.    Okay.  Do you recall walking through stolen property in
19   the warehouse earlier today?
20   A.    Yes.
21   Q.    I think you mixed, you know, Bissell vacuums, Samsung
22   TVs, a number of different cases; correct?
23   A.    Um-hum.
24   Q.    And the one thing I noticed was different here is you
25   didn't mention Anker vacuums this time.
```

A.     That's correct.

Q.     And in the last hearing, you testified that the

Anker -- you testified that you had been through 40 percent

of the warehouse, or agents -- not you, let me clarify -- had

been through 40 percent of the inventory in the warehouse?

A.     Approximately.

Q.     And at that time you testified that a hundred percent

of that 40 percent was stolen.

A.     I testified that what we had been through at that point

was stolen.  The Anker vacuums, I did qualify it that it was

a preliminary because we hadn't been able to reach Anker

Vacuums at that point to confirm it.  What we had was Walmart

law enforcement -- Walmart law enforcement relations or loss

prevention who came out; they viewed the product and it had a

Walmart item number on it.

        And Walmart has a relationship with Anker where

that product is manufactured in China and sent to Walmart for

online sales.  And when Walmart doesn't have that product in

a purchase order, that led them to the belief that that

product was stolen.

        We had tried to contact Anker multiple times

without success.  After the hearing, we finally contacted

Anker, and Anker did confirm that that was legitimate

product.  What had happened is that Walmart did not know that

Anfy (phonetic) or those Eury (sic) vacuums, the Anker was

1    selling overstock without their knowledge.  Walmart didn't

2    know they would sell overstock.  So whatever they produced

3    for Walmart, Walmart thought it was going to Walmart.

4         They produced -- overproduced for Walmart, which

5    then created an excess for Anker, so Anker decided to sell

6    that overstock.  That's what led to the confusion there that

7    we've since cleared up.

8    Q.   So you would agree you removed Anker from your

9    presentation because it wasn't stolen; right?

10   A.   Correct.  Yes.

11   Q.   So there was legitimate business being conducted;

12   correct?

13   A.   There is -- they are -- they do conduct legitimate

14   business, yes.

15   Q.   And like we discussed last time, they'll buy phones

16   from carrier auctions; correct?

17   A.   That's one way the phones can be purchased from.  They

18   also purchase phones from device traffickers or wholesalers

19   that purchase from device traffickers.

20        MR. CASTLE:  And move to strike everything after

21   "yes, that's one way."

22        THE WITNESS:  Just because they're engaged in

23   legitimate business doesn't mean they can be engaged in

24   illegitimate business.

25   BY MR. CASTLE:

1   Q.    Sure.  I'm going back to your statements of a hundred

2   percent of the inventory --

3   A.    That's for the inventory --

4   Q.    -- or the inventory --

5   A.    -- at that time.

6          (Court reporter clarification.)

7   BY MR. CASTLE:

8   Q.    So my -- that's why I'm going through the statements,

9   when you're a hundred percent of the inventory of what we're

10  going through, it's not right; correct?

11  A.    In the last presentation, based off of my knowledge at

12  the time, that's what we believed.  In this presentation, we

13  removed it because we now know that it wasn't.

14  Q.    So you --

15  A.    In this presentation, I didn't assert that it was all a

16  hundred percent.

17  Q.    So you would agree, then, that your beliefs aren't

18  always right.

19  A.    Oftentimes during an investigation, you learn new facts

20  that change what you believe.

21  Q.    You would agree that your beliefs are not always right;

22  correct?

23  A.    Beliefs can be changed throughout the investigation.

24  Q.    Agent Doering, I'm simply asking for a yes-or-no

25  answer.  Your beliefs are not always --

1    A.    They can be --

2    Q.    -- right.

3    A.    -- yes.

4    Q.    And a lot of your testimony today about serious flight

5    risk is based on those same beliefs; correct?

6    A.    It's based off beliefs, based off of records obtained

7    through the investigation, cooperating defendant statements

8    that have proven credible.

9    Q.    But a large part of it is what could happen, what might

10   happen, and what you believe may happen; correct?  Large

11   portion of your evidence and purported concerns?

12   A.    Correct.  I mean, we're not -- I can't predict the

13   future just basing it off of what we have here today.

14   Q.    Is there any other mistakes from your prior testimony

15   incorrect?

16   A.    Not that I can think of now.

17   Q.    And just to clarify, when I first started questioning

18   you, I asked you about robberies, theft, identity theft.  Do

19   you recall that?

20   A.    Um-hum.

21   Q.    You said there was no direct evidence on Maaz Aziz.

22   For all of the thefts you've mentioned here, the DeWalts or

23   whatnot, you know, Samsung, Yeti, you have no direct evidence

24   he was involved in the actual theft.

25   A.    Not the actual theft.

1    Q.     And you offer no direct evidence showing he had

2    knowledge or intent to buy stolen property; correct?

3    A.     That knowledge would be inferred through the price and

4    the quantity and the fact that it's new in-the-box product.

5    Q.     Taking you on your inferences, your assumptions, your

6    circumstantial, do you have any direct knowledge before the

7    Court today showing he had knowledge that he was -- and

8    intent to buy stolen goods?

9    A.     Direct knowledge --

10   Q.     Direct evidence.

11   A.     -- defined as --

12   Q.     Direct evidence.  Someone said, oh, I told him they

13   were stolen.

14   A.     That's not how these individuals typically work.  We do

15   have cooperating defendants saying he had to have known it

16   was stolen --

17   Q.     Did he --

18   A.     -- based off --

19   Q.     I'm sorry.

20   A.     Excuse me?

21   Q.     I'm sorry.  I thought you were done.

22   A.     No.  Cooperating defendants who would say he had to

23   have known it was stolen based off of the quantity, the

24   price, the fact that it was brand new.  But these individuals

25   in this business don't talk with, hey, this was stolen here

1    and, hey, this was stolen there.  That's not how the

2    conversations go.

3    Q.    You would agree that *he would have to have known* is a

4    far cry from *he knew*; correct?

5    A.    I would say that's inferred or constructive knowledge

6    or willful blindness.

7    Q.    Well, I'm asking a different question, much more basic.

8    You would agree that *he would have to have known* is different

9    than *he knew*.

10   A.    I think that you could construct that knowledge.

11   Q.    So earlier, you were talking about introducing new

12   evidence about Raymond Green?  Rayquan Green?

13   A.    Ryeshawn Green?

14   Q.    Ryeshawn Green, yes.  And you said he was using

15   identity theft; correct?

16   A.    Correct.

17   Q.    Do you have any evidence that Maaz Aziz has ever spoken

18   to Mr. Green?

19   A.    No.

20   Q.    Ever communicated with Mr. Green?

21   A.    No.

22   Q.    Do you have any belief or any evidence that shows he

23   even knows how to reach Mr. Green?

24   A.    No.

25   Q.    Do you know whether Mr. Green was actually creating his

1    own identity kits?

2    A.    No.

3    Q.    Do you know if he had to go through one person to get

4    it, or six people, to get an identity kit?

5    A.    No.

6    Q.    Do you know whether Mr. Green has the ability to

7    procure a passport?

8    A.    No.

9    Q.    Do you agree that falsifying a credit card is a little

10   easier than falsifying a United States passport?

11   A.    Yes.  It is easier, I would believe.

12   Q.    And I believe the Judge asked multiple times, and I was

13   glad to hear it -- I just want to confirm and make sure I

14   understood -- you're not aware of anybody in this case having

15   forged a passport or a travel document of another country --

16   A.    No.

17   Q.    -- correct?  So the fact that he may know some people

18   who can make identity kits says nothing about his ability to

19   travel internationally, does it?

20   A.    No.

21   Q.    So, again, speculation that maybe if he knows someone

22   16 phone calls away, who might be able to put him in touch

23   with somebody, who may be able to put him in touch with

24   somebody else who might be able to find a passport, that's

25   the basis of your concern; right?

1    A.    Correct.

2    Q.    The deep international ties you've referenced earlier;

3    correct?

4    A.    Correct.

5    Q.    And you have no evidence of direct communications with

6    Maaz seeking to flee, travel to, or move to any foreign

7    country; correct?

8    A.    No.

9    Q.    You have no evidence that Maaz Aziz has made any

10   efforts to buy plane tickets or sneak across the border

11   somewhere or somehow?

12   A.    No.

13   Q.    No evidence he's made any plans or attempted to do any

14   of that?

15   A.    No evidence.

16   Q.    Let's walk through a quick timeline here.  August 24th

17   you raid both homes, a Gizmobile, and SCS; correct?

18   A.    Correct.

19   Q.    They didn't flee after that; correct?

20   A.    No.

21   Q.    And the money you're concerned about them having, they

22   would have had that at the same time they had their

23   passports; correct?

24   A.    They could have, yes.

25   Q.    And they didn't use it to flee; correct?

1   A.    Not at that time.

2   Q.    Subsequent to that, there was a meeting.

3   A.    Correct.

4   Q.    With their civil attorney, both Aziz brothers.

5   A.    Correct.

6   Q.    You, Mr. Gonzalez.

7   A.    Yes.

8   Q.    And maybe others.  I wasn't there.

9   A.    There were others there.

10  Q.    And it's my understanding that it was made crystal

11  clear for them that you're going to be indicted, no matter

12  what you do.

13  A.    Yes.

14  Q.    Was that message conveyed?

15  A.    Correct.

16  Q.    And they still had their passports at that time;

17  correct?

18  A.    They did.

19  Q.    And still had the same access to the same bank

20  accounts; right?

21  A.    Correct.

22  Q.    And they didn't flee.

23  A.    Not at that time, no.

24  Q.    Okay.  Then on September 9th, we learned you

25  graciously -- Mr. Gonzalez called us on the indictment to

1    come down; correct?

2    A.    Correct.

3    Q.    And at the time of the indictment, they had the same

4    passports and bank accounts; correct?

5    A.    Yes.

6    Q.    And they didn't flee, did they?

7    A.    No.

8    Q.    And they didn't use any of that money to try to flee;

9    correct?

10   A.    Not at that time.

11   Q.    They got the passport or they -- pardon me -- they

12   got the indictment -- the following Tuesday, it would have

13   became available on Pacer; correct?

14              (Court reporter clarification.)

15              MR. CASTLE:  Sure.

16   BY MR. CASTLE:

17   Q.    The indictment was made available on Pacer the

18   following Tuesday; correct?

19   A.    Yes, if you're telling me that.

20   Q.    Yeah.  And they didn't flee after getting the

21   indictment; correct?

22   A.    No, sir.

23   Q.    And we have had multiple calls, at this point, it would

24   be Mr. Wohlford and myself, and communications with both you

25   and Mr. Gonzalez; correct?

1   A.    Correct.

2   Q.    Offering to self-surrender.

3   A.    Yes.

4   Q.    Offering to send you the passports.

5   A.    Yes.

6   Q.    Alerting you that we had collected his passports from

7   him, to provide the government with comfort.

8   A.    Correct.

9   Q.    And seeking to self-surrender multiple times; correct?

10  A.    Correct.

11  Q.    And it took more than two weeks to arrange the

12  self-surrender; correct?

13  A.    Yes.

14  Q.    And during that whole time, they never fled, did they?

15  A.    No.

16  Q.    Never used any of that money you were worried about

17  them having.

18  A.    No.

19  Q.    To flee.

20  A.    Not at that time.

21  Q.    And they self-surrendered; correct?

22  A.    Yes.

23  Q.    Without incident; correct?

24  A.    Without incident.

25  Q.    When you executed the warrants, there was no hostile,

1    no incidents --

2    A.    No.

3    Q.    -- correct?

4    A.    Not during that.

5    Q.    And I understand, just for a clean record, you weren't

6    at all the search warrants.

7    A.    Correct.

8    Q.    Or the properties searched.  But something like that

9    would have been reported to you had there been a problem;

10   correct?

11   A.    Likely.

12   Q.    And are you aware that as of following the search

13   warrant, Mr. Aziz had two firearms in the house which were

14   both taken apart, but not seized by the FBI?

15   A.    Correct, we did not seize them.

16   Q.    And they were inoperable, disassembled; correct?

17   A.    I guess so, if that's what you're telling me.

18   Q.    So...

19   A.    Yeah.

20   Q.    Earlier, you mentioned there are two people on fake ID

21   cards that Maaz and Saad Aziz allegedly have close ties to.

22   A.    Fake ID.

23   Q.    Identity kits.  John Gregory Trent and then Richard

24   Sims?

25   A.    I don't know if I said they had close ties to them;

1    that they're involved in the conspiracy.

2    Q.    Well, I will say Mr. Gonzalez's motion alleges that

3    they had close ties.  So are you aware of close ties between

4    Maaz Aziz and those two gentlemen?

5    A.    No.  I don't think they know each other.  I have no

6    knowledge of that right now.

7    Q.    So you have no knowledge they have ever met?

8    A.    No.

9    Q.    Or spoken?

10   A.    (Nodding in the negative.)

11   Q.    Or if he can get in touch with them?

12   A.    No.

13   Q.    Do you know whether Mr. Trent or Mr. Sims can make a

14   U.S. passport?

15   A.    I don't.  I don't know.  No.

16   Q.    Do you know whether they are within 15 degrees of

17   somebody who might be able to make a passport?

18   A.    I mean, it's possible they could.

19   Q.    But you don't know, do you?

20   A.    But I've never seen it, no.

21   Q.    I mean, it's possible to win the lottery tonight;

22   right?  Just unlikely.

23          And you mentioned the COVID test result that was

24   used, a violation of an airline policy; correct?

25   A.    Correct.

1    Q.    And you would agree, though, that simply changing the

2    name on a PDF is different than forging a United States

3    passport?

4    A.    Yes.  It doesn't require the same skill.

5    Q.    Would you agree that's pretty rudimentary compared to a

6    U.S. passport?

7    A.    Yes.

8    Q.    So you have no evidence to show that they have any way

9    of obtaining foreign travel documents such as a passport, do

10   you?

11   A.    Not direct evidence.

12   Q.    You have nothing more than guesses, from what I can

13   tell.

14   A.    Just a potential association --

15   Q.    The people --

16   A.    -- with the conspiracy.

17   Q.    But you would agree that the potential association with

18   no one you know who's ever made a passport.

19   A.    Correct.

20   Q.    Correct?

21   A.    Correct.

22   Q.    So you would agree that's speculative.

23   A.    It's still in the identity-theft world.

24   Q.    Let's talk about the Said case for a second.  Are you

25   familiar with that case?

```
 1    A.    Not very -- I was not involved with that case.

 2    Q.    But you were asked to testify on it today; correct?

 3    A.    Yes.

 4    Q.    So you were aware that the house was purchased and

 5    placed in Mr. Aziz's wife's name and her sister's name.

 6    A.    I'm aware that they were on the deed, yes.

 7    Q.    Because one of your slides says --

 8          MR. MCCARTHY:  I'm sorry, I just want to object for

 9    clarity.  It's not Saad --

10          THE COURTROOM DEPUTY:  Would you use a microphone,

11    please.

12          MR. MCCARTHY:  Just for clarity, I wanted to object

13    this is not Saad Aziz, my client, even though they have

14    similar names, Your Honor.

15          THE COURT:  Yeah.  I think we can say that when

16    you're referencing "Said," it's S-A-I-D --

17          MR. CASTLE:  Yes, Your Honor.

18          THE COURT:  -- is that correct?

19          MR. CASTLE:  Said versus Saad.

20          THE COURT:  All right.

21    BY MR. CASTLE:

22    Q.    But you were asked to testify about that case today;

23    correct?

24    A.    Correct.

25    Q.    And your slide said they purchased the house, Ameirah
```

1    and her sister.  Do you recall that?

2    A.    Their names, yes.  Their names are on the deed.

3    Q.    That's not what your slide said.  You said that they

4    purchased the house.  It was just titled in their name.  I

5    think that's all you can discern from that; correct?

6    A.    Correct, which would be who the purchasers would be.

7    Q.    And there are only two people who are accused of any

8    wrongdoing in that situation are both in prison now; correct?

9    A.    They are.

10   Q.    And Ameirah Aziz was never alleged to have anything to

11   do with any of that; correct?

12   A.    There is no evidence of that, no.

13   Q.    As a matter of fact, your slide finished up with there

14   was no documented evidence of any contact with Ameirah Aziz.

15   A.    Correct.

16   Q.    And are you aware of anybody else who was accused of

17   wrongdoing who is not in prison in that?

18   A.    Not of wrongdoing, just uncooperativeness throughout

19   the investigation.

20   Q.    And who was uncooperative of being --

21   A.    Dalal, her sister --

22   Q.    Okay.

23   A.    -- in speaking with the FBI agent that investigated it.

24   Q.    But that's not Mr. Aziz's wife, though; correct?

25   A.    No.  It's a close family member.

1    Q.    Okay.  It's an in-law.  I mean, if I told you about my

2    in-law, phiff ...

3              So she never talked to him.  She never had the

4    chance to be uncooperative, did she?

5    A.    Not that I know of.

6    Q.    And you don't know the specifics of what the sister,

7    Dalal -- how she was allegedly uncooperative.

8    A.    I don't know the specifics of that, no.

9    Q.    So you're just taking somebody else's word on that and

10   just repeating it as gospel truth; right?

11   A.    I'm taking it the case agent's word for that, yes.

12   Q.    Sure.  You know, I'm sure --

13             MR. GONZALEZ:  Objection, Your Honor.

14   Argumentative --

15             MR. CASTLE:  Let's try --

16             THE COURT:  All right.  Hold on.  Hold on for a

17   second.  We have --

18             MR. CASTLE:  I apologize --

19             MR. GONZALEZ:  Your Honor --

20             THE COURT:  Both of you -- both of you hold up for

21   a second.  Hold up.

22             So, Mr. Gonzalez, we'll hear your objection, and

23   then we'll get a response.

24             MR. GONZALEZ:  Your Honor, argumentative.  It's

25   been one sidebar after another.  Can he just ask the question

1    and not be argumentative with the witness and make some

2    commentary sidebar?

3             MR. CASTLE:  I made one comment, Your Honor.  I'll

4    withdraw that.  I apologize to the Court, Mr. Gonzalez, and

5    Agent Doering.

6             MR. GONZALEZ:  You've made quite a few sidebar

7    comments.

8             MR. CASTLE:  We can certainly discuss that,

9    because --

10            THE COURT:  All right.  So --

11            MR. CASTLE:  -- there have been several

12    mischaracterizations, Mr. Gonzalez.

13            THE COURT:  So, Mr. Castle, just going forward with

14    the witness, just refrain from any sidebar, from any comment

15    on the witness's answer, and let's just stick to question and

16    answer.

17            MR. CASTLE:  Yes, Your Honor.  And, again, my

18    apologies.

19            (Court reporter speaks to the judge.)

20            THE COURT:  Well, I'll tell you what.  We're going

21    to move on from here.  So the record will reflect what it

22    reflects, but let's try to stick to Q and A.

23            MR. CASTLE:  Absolutely, Your Honor.

24            (Inaudible.)

25            (Court reporter clarification.)

1          MR. CASTLE:   I was just letting the Court know I

2    was going through my notes and I'm close to being done.

3    BY MR. CASTLE:

4    Q.    All the information in Government Exhibits 3, 4, 5

5    regarding Pakistani properties and wires or whatnot have

6    nothing to do with Maaz Aziz; correct?

7    A.    Correct.

8    Q.    And the Texas Secretary of State documents, I believe

9    they're in Government Exhibit 2, were those obtained from the

10   Secretary of State or the search warrant?

11   A.    For the Texas Secretary of State?  With a search

12   warrant.

13   Q.    With a search warrant?

14   A.    You're talking about the board minutes and then the

15   following Texas of Secretary of State records?

16   Q.    Yes.

17   A.    That was a search warrant.

18   Q.    Okay.  And they don't show -- none of those records

19   show any ownership of the Dubai company that was approved by

20   Maaz Aziz; correct?

21   A.    Correct.

22          MR. CASTLE:  All right.  If I can have just one

23   minute here.

24          (Pause in the proceedings.)

25   BY MR. CASTLE:

1    Q.    And as we sit here today, on your other point, on

2    weight of the evidence, do you know if we ever received

3    discovery today?  To date?  Has any defendant received

4    discovery to date?

5    A.    Yes.  I believe some have.

6    Q.    Do you know whether either Mr. Azizs has received any

7    discovery as of today?

8    A.    Just based off what you said, no.  Or counsel.

9    Q.    So you would agree that if Maaz Aziz received no

10   discovery, he didn't receive any exculpatory material either;

11   correct?

12   A.    Correct.

13   Q.    So we don't really know what the weight of the evidence

14   showed us; correct?

15   A.    As far as yourselves?

16   Q.    Yes.

17   A.    Correct.

18   Q.    And you would agree that there is a lot of speculation

19   here about what you believe might happen; correct?

20   A.    Based on beliefs, yes.

21   Q.    And you would agree that the majority of the background

22   in your PowerPoint did not relate to Maaz Aziz; correct?

23   A.    Maaz Aziz is involved with SCS Supply Chain, with his

24   activities.

25   Q.    Sure.  My question was about the majority of that first

1    2 hours and 22 minutes --

2    A.    Correct.

3    Q.    -- of the PowerPoint.  And I'm saying the majority of

4    the slides don't mention or touch on Maaz Aziz; correct?

5    A.    They touch on SCS Supply Chain's business activities,

6    which he is a part of.

7    Q.    When you say *he is a part of*, you mean he worked for?

8    A.    He works for.  He's the president.  Based off the

9    cooperating defendants' statements, Saad Aziz took more of a

10   role with the wholesalers, with the wire transfers, somewhat

11   of the financials; where Maaz Aziz was dealing more with the

12   street-level purchases, the transit theft, cargo theft.  So

13   he was more involved with the procuring the goods; where Saad

14   was more involved with the wholesaling and selling, where you

15   might see the RJ Telecom records, things like that where his

16   name would be mentioned more.

17   Q.    And do you recall before Judge Nowak, she asked you, in

18   your opinion, do the -- either of the defendants pose

19   continuing risk of harm to the community?

20   A.    Correct.

21   Q.    And you said they could -- I'm paraphrasing here -- I

22   can get the exact quote, if you want -- they could if they

23   continue in the business.

24   A.    Economic harm.

25   Q.    Economic harm --

1   A.    Correct.

2   Q.    -- correct?  And there's no record of any violence

3   against either one; correct?

4   A.    No, sir.

5   Q.    And no criminal history; you put that on the slide?

6   A.    Correct.

7   Q.    No history of alcohol or drug use.

8   A.    Correct.

9   Q.    No mental illness.  No physical illness.

10  A.    No, not that I know of.

11  Q.    Okay.  And do you know how long Mr. Aziz has lived in

12  the Dallas-Fort Worth area?

13  A.    I think, from the last hearing, it was around ten

14  years, or something like that.

15  Q.    And do you know how long he's been in the United

16  States?

17  A.    Was it -- 2009, if I recall correctly, but I can't put

18  a certain date on that.

19  Q.    And are you aware that Mr. Aziz is married?

20  A.    Is he married?  Yes.

21  Q.    Where was his wife born?

22  A.    I don't know that.

23  Q.    During the last testimony -- the last hearing, do you

24  recall being told she was, you know, born in the United

25  States, in Bedford?

```
 1    A.    That's -- yes.

 2    Q.    Do you recall whether Mr. Aziz has children?

 3    A.    Yes, he does.

 4    Q.    And do you know where they were born?

 5    A.    I believe they were born here.

 6    Q.    "Here" being the United States; correct?

 7    A.    Here in the United States, yes.

 8    Q.    Yeah.  And do you know where Mr. Aziz's mother lives?

 9    A.    I think from the hearing, he -- she lives with him or

10    with Saad, one of the two.

11    Q.    She lives -- I'll represent that she lives with Saad --

12    A.    Okay.

13    Q.    -- and then Maaz's mother-in-law lives with him.

14    A.    That's right.  From the hearing, yes.

15    Q.    And are you aware of any other family of his that lives

16    in the north Texas area?  By "north Texas," I mean DFW.

17    A.    The sister, Asma.

18    Q.    And are you aware that he has uncles in DFW as well?

19    A.    Only if you told me last time.

20    Q.    Are you aware of any communications between Maaz Aziz

21    and any relative in Pakistan?

22    A.    No.

23    Q.    And what about the questions I was asking you earlier.

24    You had mentioned economic harm if they continue with the

25    business --
```

1   A.    Correct.

2   Q.    -- correct?  Since August 24th, are you -- do you have

3   any evidence of them still engaging in the same business?

4   A.    No.

5   Q.    You mentioned in one of your slides -- and I apologize,

6   I'm going to have to go from memory here a little bit.  One

7   of your slides, you said they have no other source of income,

8   based on TWC reports.  Do you recall --

9   A.    Correct.

10  Q.    -- saying that?

11  A.    Yes.

12  Q.    And at the same time, you -- at the last hearing, you

13  heard that Mr. Aziz has another job; correct?

14  A.    Another job offer, yes.

15  Q.    Yes.

16  A.    Yes.

17  Q.    And so that will give him a source of income and that

18  would be a mitigating factor; correct?

19  A.    That job could mitigate some.  I think it was at $15 an

20  hour, if I remember correctly.

21  Q.    No.  It was between 5- and $8,000 per month.

22  A.    5- and $8,000 per month?  Maybe that was Mr. Saad

23  Aziz's job offer, but just -- that could help mitigate.  But

24  at the same time, if it's not enough to cover the expenses or

25  if he is trying to build up any type of reserve if he were to

1    be incarcerated or convicted, then that could cause economic

2    harm through the continued activity.

3    Q.    But you have no evidence of any continued activity;

4    correct?

5    A.    Well, not at this time, no.

6    Q.    And since August 24th, you guys have held all the

7    inventory and the warehouse; correct?  "You guys" being the

8    FBI.

9    A.    Correct.  But new inventory could be purchased through

10   the streets.

11   Q.    But you have no evidence that's happened, though;

12   right?

13   A.    No.

14   Q.    And absent them reentering the business, he is going to

15   work for an automotive company.  If he stays and works for an

16   automotive company, would you agree that he poses no economic

17   harm?

18   A.    If he only works for the automotive company.

19   Q.    Correct.  So you would agree, then, no risk of economic

20   harm or harm to the community; correct?

21   A.    If he stays with that employment.

22   Q.    And while you mentioned you believed that the

23   defendants are a serious risk of flight, and you acknowledge

24   you weren't asked about any conditions, is it your opinion

25   that no conditions or combination of conditions would ensure

1   that the brothers -- or that Mr. Aziz appears for trial?

2   A.    With the weight of the evidence, if they decide to

3   flee, it doesn't matter what conditions are on there.  People

4   will knock off -- they'll take off.  ELN (phonetic).  If they

5   want to flee, they will find a way to flee.  And in this

6   case, he does have family in Canada.  He could get to Canada.

7   He could cross into Canada.  Family is there to pick him up

8   in Canada.  There are avenues for flight, even with

9   conditions.

10  Q.    So you can -- those avenues would be there with or

11  without conditions.  I mean, so you're saying you can get to

12  Canada without a passport?

13  A.    People cross over into Canada without passports.

14  Q.    Right.  Even with border closures except for Canadian

15  citizens right now?

16  A.    No, not through border.  Through unauthorized

17  crossings.

18  Q.    Wouldn't that be true for anyone?  If someone wanted to

19  flee, they're going to flee?

20  A.    Yes.

21  Q.    And do you remember last time we talked about the

22  extensive efforts, and how you had mentioned you had not seen

23  such extensive efforts to self-surrender?

24  A.    There were a lot of efforts to self-surrender, but

25  circumstances change.  That was also before he had had a

1    chance to see any of the evidence; to see the cooperating

2    defendants that are willing to provide cooperation on him;

3    for us to go through the warehouse and find the amount of

4    stolen property that we have.

5              We haven't yet got into records at SCS yet to

6    determine what other activities that are in invoices, IMEIs,

7    like we did with RJ Telecom, to build out a total loss, to

8    build out the number of IMEIs and who those were purchased

9    from, and how those IMEIs were obtained.  That has yet to

10   happen.

11   Q.   At the same time, though, like you were talking about

12   documents earlier, and you heard Mr. Gonzalez say it, we know

13   what's in the records.  If we thought it was really bad and

14   we're scared about what the case was, wouldn't you agree it

15   would make sense to flee before indictment?

16   A.   Once you're indicted, once you actually see the

17   evidence, once you actually see who is willing to cooperate

18   against you, and the weight of the evidence, that's different

19   than wondering what the government has as part of their case

20   against you.

21   Q.   Do you recall where I asked you about a meeting after

22   the search warrants but before the indictment where the civil

23   attorney was present?

24   A.   Correct.

25   Q.   Wasn't it mentioned that you had cooperators at that

1   time during that meeting?

2   A.    It was in passing, though, but not to the degree of

3   information that's been provided as through these two

4   hearings, with the very detailed information from several of

5   these cooperators that are detailing the type of conduct of

6   Maaz and Saad Aziz.  That wasn't mentioned in that -- in that

7   meeting.  It was a general, There's cooperating defendants.

8   Q.    During the meeting, Mr. Gonzalez said, You're going to

9   be indicted -- not tomorrow, in the next week or two -- no

10  matter what you do.

11  A.    Correct.

12  Q.    Now, I've met Mr. -- and spoken with Mr. Gonzalez

13  several times.  He doesn't seem like someone who bluffs by

14  any means.

15  A.    No, sir.

16  Q.    So they knew they were going to be indicted and they

17  stayed here.

18  A.    They also didn't know what they would be indicted with

19  and what that consisted of.

20  Q.    During that meeting, didn't Mr. Gonzalez tell them they

21  would be indicted on all seven counts?

22  A.    He might of -- might have, but that doesn't -- that

23  still doesn't show the full extent of the conspiracy, the

24  sentencing, potential sentencing loss, amounts, conduct, all

25  of that.

```
1    Q.    Continuous ties we've been through today; correct?

2    A.    I'm sorry?

3    Q.    Continuous ties we've been through today; correct?

4    A.    Yes.

5              MR. CASTLE:  Your Honor, nothing further.  I'll

6    pass the witness.

7              THE COURT:  Thank you, Mr. Castle.

8              Mr. McCarthy, do you have examination?

9                        CROSS-EXAMINATION

10   BY MR. MCCARTHY:

11   Q.    Agent Doering, I'm going to try to be -- I know we're

12   running out of time, so I'm going to try to be efficient.

13   A.    Yes, sir.

14   Q.    I apologize in advance for the duplication.  A lot of

15   these are questions already asked you.  So I'm just

16   confirming what you told me under oath is the same today.

17   A.    Okay.

18   Q.    And just to lay out a little bit, I'm going to start

19   with flight risk because that's what you-all moved under was

20   flight risk; is that correct?

21   A.    Correct.

22   Q.    It wasn't -- danger to the community was only if we got

23   past flight risk, as Judge Nowak told us.

24   A.    Correct.

25   Q.    So I'm going to spend most of my time there.
```

1        With respect to the 65 accounts, as Mr. Castle

2   pointed out, actually only about a dozen of those are even

3   active accounts, isn't that right, based on what you've

4   looked at?

5   A.    Yeah.  And I don't have a great grip on that.  Mikaela

6   Keene, our financial accountant, is really the one who has a

7   better understanding of that.

8   Q.    And if you added up all of those accounts together, it

9   would be somewhere around or under $50,000; is that right?

10  A.    I don't know what those balances are right now.

11  Q.    And you, as the government -- obviously, you've been

12  doing this a long time -- have the ability to seize those

13  accounts; is that right?

14  A.    If you can trace and -- you have to be able to trace

15  those accounts with illicit activities, right, and be able to

16  show that the illicit activities from the deposits, the wire

17  transfers, go into those accounts.

18  Q.    But, for example, if Mr. Saad Aziz, or either Aziz

19  brother, agreed with the government to just write those

20  accounts over right now as a condition of release, that could

21  happen today; right?

22  A.    That could happen.

23  Q.    And you wouldn't have a problem with them agreeing to

24  that, would you?

25  A.    No.

```
1    Q.    Also, you already told Mr. Castle this, but I just want
2    to be clear.  You have no evidence that they have continued
3    in this business, that is the trafficking of electronics,
4    since August 24th, the search warrant.
5    A.    No, sir.
6    Q.    And you have no evidence of that in the United States;
7    correct?
8    A.    No, sir.
9    Q.    You have no evidence of that in Canada, do you?
10   A.    No, sir.
11   Q.    You have no evidence, really, anywhere in the entire
12   world that they've continued to do any type of business, as
13   we sit here today?
14   A.    No, sir.
15   Q.    The next thing that you list in the government motion
16   is extensive international travel.
17           MR. MCCARTHY:  And if I could go back to my desk
18   real quick, Your Honor.
19           THE COURT:  Go ahead.
20   BY MR. MCCARTHY:
21   Q.    I'm showing you what I believe is Government Exhibit
22   number 6.  That's Saad Aziz's travel; is that right?
23   A.    Yes, sir.
24   Q.    Okay.  Extensive international travel is one of the
25   bases, so I want to talk -- I want to break that down.
```

1           Actually, Mr. Aziz -- Saad Aziz, has traveled to

2    Mexico for vacation in the past year; correct?

3    A.     Correct.

4    Q.     To Cancun, and then another trip to Cozumel -- to

5    Mexico -- for vacation.

6    A.     Correct.

7    Q.     According to his records, he has not been to Pakistan

8    for three years, has he?

9    A.     Which records?  These records?

10   Q.     Yes.

11   A.     We wouldn't necessarily know from these records if he's

12   going to connect through Dubai, which often happens.

13   Q.     And that came up, actually, in the last hearing, did it

14   not?

15   A.     Correct.

16   Q.     And you learned that he went there for his sister's

17   wedding three years ago.

18   A.     Yes, from what you told me.

19   Q.     And that's the last time he's been there.  His

20   immediate family, that is his daughter, his newborn that he

21   is actually now a year old, his three-year-old, his mother,

22   his uncle, his other uncle, his whole extended family, his

23   cousins, they all live here in Texas.

24   A.     From what you've told me, yes.

25   Q.     Do you have anything to dispute that or that goes

1   against that?

2   A.    No.

3   Q.    As far as his other travel, he hasn't been in Canada in

4   almost two years; is that right?

5   A.    The last time he was in Canada was when the business

6   SCS Canada was incorporated.

7   Q.    Which was almost two years ago.

8   A.    Correct.

9   Q.    Hasn't been back since.

10  A.    Not from these travel records.

11  Q.    Are there any other travel records I'm not aware of?

12  A.    Not that I know of.

13  Q.    And, in fact, the travel records, you would agree with

14  me, they are not even correct because they have an outbound

15  to Dubai, which would suggest he's still in Dubai.  There is

16  no inbound, is there?  Do you see that?

17  A.    I don't know if that's -- are you looking at the OBD?

18  Q.    Well, let me ask you this.  When you book your ticket

19  and you don't go on the plane --

20  A.    Where are you looking, sir?

21  Q.    Where I circled "Dubai outbound."

22  A.    So I think the NBD means not board.

23  Q.    Right.

24  A.    Yes.

25  Q.    He never got on the plane --

1   A.    So he never got on the plane.

2   Q.    -- didn't take the trip.

3   A.    Right.

4   Q.    So the only thing we're left with is the vacation in

5   Mexico, a couple of them in the past two years, a trip to

6   Canada almost two years ago, and then his sister's wedding

7   three years ago in Pakistan.

8   A.    And the trip to Dubai in October of 2019, when they

9   went to the conference.

10  Q.    In 2019.

11  A.    Correct.

12  Q.    Okay.  And that's the basis of extensive international

13  travel.

14  A.    And I think there was -- there's a trip to Ontario on

15  June 2nd of 2019 down there.

16  Q.    But that's no different than the one we talked about

17  almost two years ago in Canada.

18  A.    Correct.  And then France.  I can't see what's down

19  below.  It looks like other trips to Dubai down in 2018, down

20  to 2011.

21  Q.    Okay.  2011, I mean, we're talking ten years ago?

22  A.    It's continued travel over a decade.

23  Q.    Let's move on to ID theft and robbery.  You previously

24  testified Saad Aziz, not other people, is not personally

25  involved in any robbery whatsoever in this case.

1    A.    Correct.

2    Q.    He is not involved in any of the 10,000 identity theft

3    cases either, is he?

4    A.    No, not directly.

5    Q.    In fact, you even told this Court that Gregory Trent

6    and Richard Sims, who are listed in your motion, they don't

7    even know of the Aziz brothers; they've never met.

8    A.    Not that I know of.

9    Q.    There is no direct connection with these guys at all --

10   that is Richard Sims and Gregory Trent -- correct?

11   A.    Correct.

12   Q.    And you would agree with me if I've never met somebody,

13   I can't have close ties with them, can I?

14   A.    No.

15   Q.    That's just common sense; right?

16         As far as the proceeds, the proceeds from the sale

17   of the land, you have a forensic person here who traces

18   accounts?

19   A.    Yes, sir.

20   Q.    Okay.  Were you aware or was the government aware that

21   the funds from the sale of the land went to his lawyer up in

22   New York?

23   A.    No.  We don't have those records yet.

24   Q.    Did you -- did you-all ask for those, reach out to the

25   bank --

```
 1    A.    I don't know --

 2    Q.    -- the title officer?

 3    A.    I don't know if we've asked for those, but typically

 4    they don't turnaround that quickly.

 5    Q.    Okay.  Is that something we could quickly provide

 6    you-all that would give you comfort, to show that they went

 7    to his lawyer in New York?

 8    A.    Some sort of documentation to let us know where that

 9    went.

10    Q.    And you would agree with me -- we've already been

11    through this, too -- but there is no forged medical COVID

12    test for Saad Aziz, is there?

13    A.    No.  He's the one that facilitated the forgery of --

14    Q.    Facilitated, it means that it shows -- somebody's test

15    result showed up in his text messages; right?

16    A.    No.  Cooperating defendant --

17                (Court reporter clarification.)

18                THE WITNESS:  Cooperating defendant 5 sent the test

19    for his wife to Saad Aziz.  Saad Aziz then facilitated that

20    test from another individual that forged it.

21    BY MR. MCCARTHY:

22    Q.    Who?  Who?

23    A.    He mentioned a name in the text message.  I can't

24    remember the name.  And then he sends it back to cooperating

25    defendant 5.  So he facilitated it.
```

1    Q.    So the question is, is there a forged medical COVID

2    test for Saad Aziz?

3    A.    Not for Saad Aziz.

4    Q.    If it says that there's a prepared forged medical test

5    for Saad Aziz in the government's motion, is that correct?

6    A.    The forged medical test is more Maaz Aziz.  Saad Aziz

7    facilitated the forged medical test.

8    Q.    And then the -- let's talk about the fugitive, the

9    top-ten fugitive.  Just to be clear for the record, there is

10   no evidence that Saad Aziz is involved in the harboring of

11   his brother's wife's father's brother, is there?

12   A.    There's no evidence.

13   Q.    And the land in Pakistan -- so we put this in

14   context -- according to your slides, was bought in 2018;

15   right?

16   A.    I think it began being purchased in 2018 up to December

17   of 2020.

18   Q.    Two years before your investigation.

19   A.    Okay.

20   Q.    So you would agree with me it wasn't bought in response

21   to your investigation because it was two years before the

22   investigation; correct?

23   A.    No.  I'm saying that that's property that's in Pakistan

24   that's now paid for.

25   Q.    I understand, but it was purchased two years before

1    your investigation.

2    A.    Are you saying it wasn't in response to this

3    investigation?

4    Q.    What I'm asking is this.  Absent a crystal ball,

5    there's no way that Saad Aziz knew in 2018 that you were

6    going to investigate him in 2020; right?

7    A.    No.  I think it just shows that he has assets and bank

8    accounts in Pakistan.  So if he were to flee, he would have

9    something to flee to.

10   Q.    And, again, the bank account -- to put it in context --

11   according to your documents, that was opened in 2018.

12   A.    The bank account.

13   Q.    You showed some type of bank account or something that

14   was all in December of 2018, according to your own slide.

15   Two years before the investigation; correct?

16   A.    The Wallis Bank account that he was wire-transferring

17   from SCS Supply to himself in the Silk Bank account, I

18   believe those were in 2020, December -- November and December

19   of 2020.

20   Q.    If your slide said December 2018, would you disagree

21   with that?

22   A.    I would say it was a typo if that -- if we're talking

23   about the same thing.

24   Q.    Okay.  Do you have any evidence that he's moved money,

25   retrieved money, made any efforts to get money to or from

1    Pakistan, as you sit here today?

2    A.    After his indictment?

3    Q.    Before his indictment, after his indictment, yeah.

4    A.    The only evidence I have are those documents showing

5    him moving money into that account.

6    Q.    When?

7    A.    In the end of 2020.

8    Q.    Okay.  Long before this, before he got indicted --

9    A.    Yes.

10   Q.    -- before he had all this.

11   A.    Correct.

12   Q.    Any evidence that he is trying to buy a plane ticket,

13   or any of your cooperating defendants say he's talked about

14   fleeing or getting out of Dodge or taking off?

15   A.    No.

16   Q.    And this case was first indicted in December of 2020

17   with a hundred people plus; correct?

18   A.    No.  It was indicted in December of 2020 with five, I

19   believe, and then again with more individuals in March of

20   2021, and then the majority related to the device trafficking

21   conspiracy was indicted in August of 2021.

22   Q.    Okay.  And Mr. Castle referenced August 24th as being

23   the day you ran search warrants on his home?

24   A.    Yes.  So they were indicted before that in August.

25   Q.    Mr. Saad Aziz was not indicted before that.

1    A.    No.

2    Q.    Right, okay.

3    A.    Yes.

4    Q.    The timeline, August 24th search warrant --

5    A.    Right.

6    Q.    -- agent showed up to his house.

7    A.    Correct.

8    Q.    He's cooperative.

9    A.    Yes.

10   Q.    You go to his business.  He's cooperative there.

11   A.    They're cooperative there.

12   Q.    Gives you the codes.  Let's you in the safe.

13   A.    Yes.

14   Q.    Okay.  Didn't flee.

15   A.    No.

16   Q.    Even after an agent showed up at his house, showed up

17   at his business.

18   A.    Correct.

19   Q.    And you ran these through state search warrants, not

20   federal.

21   A.    That's correct.

22   Q.    And isn't it true you never approached a magistrate --

23   federal magistrate judge in order to obtain a search warrant?

24   A.    In the Northern District?

25   Q.    In any district.

1    A.    No.  We obtained federal warrants here in the Eastern

2    District.

3    Q.    But on the house and the business, you did not go to a

4    federal magistrate judge.

5    A.    Not there, no.

6    Q.    You never approached a federal magistrate judge.

7    A.    No.

8    Q.    You went directly to a state judge.

9    A.    Correct.

10   Q.    And just to be clear, there was no evidence -- and I

11   asked you this last time -- there is no evidence of any

12   crime, identity theft, robbery at Saad Aziz's house at all,

13   was there?

14   A.    Not at their house, no.

15   Q.    No.  And as far as flight, after August 24th, you

16   referenced a meeting, you agree with me, for Saad Aziz as

17   well as Maaz.  But for Saad Aziz, he did not attempt to flee.

18   A.    Correct.

19   Q.    Didn't buy any tickets.

20   A.    No.

21   Q.    Didn't tell anybody he was taking off.

22   A.    Not that we know of.

23   Q.    And on September, I believe it was, 9th -- or 8th or

24   9th, you-all told him he was going to get indicted; correct?

25   A.    Yes.

1   Q.    And he did not flee.

2   A.    Correct.

3   Q.    He sent a self-surrender letter --

4         MR. MCCARTHY:  Which for the record, Your Honor, is

5   Exhibit A.

6   BY MR. MCCARTHY:

7   Q.    -- which you now went over.

8   A.    Correct.

9   Q.    And he offered to give up his passport and turn himself

10  in anywhere y'all wanted.

11  A.    Yes.

12  Q.    And, in fact, Exhibit E, for the record, was a letter

13  he literally wrote to Judge Nowak and to Judge -- I always

14  call her Kimberly Priest -- Johnson, I believe is her last

15  name --

16  A.    Correct.

17  Q.    -- Kimberly Johnson, offering to turn himself in.

18  A.    Correct.

19  Q.    And Mr. Saad Aziz even went down to the Euless Police

20  Department, met with Officer Norwood, and tried to turn

21  himself in to jail.

22  A.    Yes.  That's what you told me.

23  Q.    That was true, was it not?

24  A.    Yeah.  I don't dispute that.

25  Q.    And as far as -- and he self-surrendered here as

1    well --

2    A.    Yes.

3    Q.    -- up in Sherman.  And I think you even told me in 15

4    years, you've never seen anybody try to turn themselves in

5    quite as much as Mr. Saad Aziz.

6    A.    I haven't, no.

7    Q.    And you would agree with me, when I showed you Exhibit

8    B for the record, those were the family ties.  Do you

9    remember that?

10   A.    Yes.

11   Q.    Little kids?

12   A.    Yes.

13   Q.    One-year-old?

14   A.    Correct.

15   Q.    His wife even got up on the stand and offered to give

16   her passport and her children's passport to you-all or to

17   pretrial --

18   A.    Correct.

19   Q.    -- or to the supervised release officer.

20   A.    Correct.

21   Q.    And you would agree with me in Exhibit C it showed that

22   his home is here.

23   A.    Yes.

24   Q.    His house, he has a mortgage.

25   A.    Yes.

1   Q.    And his ties to the community, I showed you Exhibit D,

2   which was letter, after letter, after letter about community

3   ties and community support.

4   A.    Yes.

5   Q.    And I think you also learned in Exhibit D that his sick

6   mother, Samina Yasmin, he is the primary caregiver for.

7   A.    Yes.

8   Q.    And she also wrote a letter.

9         So you would agree with me that he had multiple

10  opportunities to flee.

11  A.    Up until he turned himself in, yes.

12  Q.    He attempted to turn himself in, by my count, at least

13  five times.

14  A.    Correct.

15  Q.    He has deep family/community ties here in Texas.

16  A.    Yes.

17  Q.    His home is here.

18  A.    Yes.

19  Q.    His mom is here.

20  A.    Yes.

21  Q.    His little kids are here.

22  A.    Correct.

23  Q.    And as far as any danger, he's not -- just for the

24  record, he's not charged with a crime of violence, a 924(c),

25  anything like that.

1    A.    No, sir.

2    Q.    He does not have a criminal record at all.

3    A.    No, sir.

4    Q.    He's not one of these armed robbers or identity

5    thieves.

6    A.    No.

7    Q.    And I think you already said he has a job offer waiting

8    for him when he gets out.

9    A.    Yes.

10   Q.    Where he produced a letter -- I think a letter of that

11   to probation.

12   A.    Yes.  I remember the letter.

13   Q.    And the company is still currently in possession of the

14   warehouse, that is the SCS warehouse.

15   A.    The government?

16   Q.    Yes.

17   A.    Yes.

18   Q.    And then I'm not trying to put you guys in a bad

19   position, but for the record, I've requested, because you're

20   testifying here, your previous statements two or three times

21   now; is that right?

22   A.    Yes.

23   Q.    And did you bring those with you today?

24   A.    No.

25   Q.    Okay.  Do you plan on giving those to me at some point?

1    A.    Those are within the discovery, which it's just a -- it

2    takes time to copy that discovery.

3              MR. MCCARTHY:  I'll pass the witness, Your Honor.

4              THE COURT:  All right.  We're going to close out

5    for today rather than have -- I don't know, Mr. Gonzalez, if

6    you're going to have any sort of redirect examination of this

7    agent, but my thought is that we -- we will follow up with an

8    order.  But I think we will try to -- we have a criminal

9    trial going next week, but so we would not be able to get

10   this in before next Friday afternoon.

11             And so I think what we're going to do is set this

12   for about the same time, about 1:30 on Friday afternoon, and

13   we will finish it next Friday afternoon.

14             In the meantime, my suggestion is that the

15   defendants will be able to file -- if anyone wants to file a

16   responsive plea for whatever you want to file, with regard to

17   what's been submitted by the government today, I would like

18   to have that by next Wednesday.

19             On the government's side, I think, Mr. Gonzalez,

20   you may want to file a supplement to what you filed by

21   Wednesday as well; and, hopefully, you will deliver discovery

22   to the defendants so that they'll have it for the next

23   hearing, next Friday.  And we'll complete the government --

24             And how many witnesses did the defendants expect

25   that you want to present next Friday?

1              MR. CASTLE:  Your Honor, we anticipated one, maybe

2      two.

3              THE COURT:  All right.  Mr. McCarthy?

4              MR. MCCARTHY:  We anticipated one, Your Honor.

5              THE COURT:  Go ahead.  Was there something else you

6      were going to say?

7              MR. MCCARTHY:  I was just going to say, just for

8      the record, I did want to ask -- we would move to lift the

9      stay to let these men out while -- until the hearing, that I

10     would like to at least make that request on the record for my

11     client.

12             THE COURT:  Well, I'm not -- well, we're going to

13     meet a week from today, so I'm not going to lift the stay for

14     a week.  And, you know, but we have a criminal trial we're

15     doing next week.  I would get you in earlier if I could, but,

16     you know, this has just come up and our schedule is rather

17     tight.  But I'm going to fit you in at 1:30 next Friday, and

18     we'll complete it.  And we'll hope to have a decision shortly

19     thereafter on the case.

20             MR. MCCARTHY:  Yes, Your Honor.

21             MR. CASTLE:  Yes, Your Honor.

22             THE COURT:  Is there anything further from the

23     government?

24             MR. GONZALEZ:  No, Your Honor.  Thank you.

25             THE COURT:  Anything further from the defendants?

1          MR. CASTLE:  Not from Maaz Aziz, Your Honor, no,

2     sir.

3          MR. MCCARTHY:  Nothing further, Your Honor.

4          THE COURT:  All right.  We'll stand in recess until

5     1:30 next Friday.

6          THE COURT SECURITY OFFICER:  All rise.

7               (Adjourned at 5:35 p.m.)

8                    *   *   *   *   *

9

10              CERTIFICATE OF OFFICIAL REPORTER

11

12          I, Gayle Wear, Federal Official Court Reporter, in

13     and for the United States District Court for the Eastern

14     District of Texas, do hereby certify that pursuant to Section

15     753, Title 28 United States Code, that the foregoing is a

16     true and correct transcript of the stenographically reported

17     proceedings held in the above-entitled matter and that the

18     transcript page format is in conformance with the regulations

19     of the Judicial Conference of the United States.

20

21               Dated 21st day of October 2021.

22

23               /s/ Gayle Wear
                  GAYLE WEAR, RPR, CRR
24               FEDERAL OFFICIAL COURT REPORTER

25